# EXHIBIT A

EXECUTION VERSION

**AMENDED AND RESTATED**
**HOTEL MANAGEMENT AGREEMENT**

**FOR**

**TRUMP OCEAN CLUB® INTERNATIONAL HOTEL & TOWER**

**AMONG**

**TRUMP PANAMA HOTEL MANAGEMENT LLC,**

**NEWLAND INTERNATIONAL PROPERTIES CORP.,**

**HOTEL TOC INC.**

**And**

**OWNERS MEETING OF THE P.H. TOC**

# TABLE OF CONTENTS

Page

1.   APPROVAL OF CO-OWNERSHIP REGULATIONS; APPROVAL OF
     ASSIGNMENTS; HOSPITALITY SERVICES; RENTAL PROGRAM ....................... 21
     1.1   Approval of Co-Ownership Regulations ............................................ 21
     1.2   Approval of Assignment by Promoter/Developer to Owner ................. 21
     1.3   Approval by Owners Meeting ........................................................ 22
     1.4   Operator Hotel Services and Other Operator Services ...................... 22
     1.5   Rental Program .......................................................................... 22
     1.6   Management of P.H. TOC and Hotel Common Areas ......................... 24
     1.7   Third Party Operated Areas ......................................................... 24
     1.8   Trump Brand Standards ............................................................... 25

2.   GENERAL MANAGEMENT AND OPERATIONS .......................................... 25
     2.1   General Management Services ..................................................... 25
     2.2   Authority and Duty of Operator ................................................... 26
     2.3   Annual Plan ............................................................................... 30
     2.4   Maintenance and Repair of Hotel ................................................. 37
     2.5   Books and Records; Financial Statements ...................................... 39
     2.6   Personnel .................................................................................. 40
     2.7   Centralized Services ................................................................... 45
     2.8   Complimentary Rooms ................................................................ 46
     2.9   Limitations on Operator's Authority .............................................. 46
     2.10  Limitation on Operator's Duty ...................................................... 48
     2.11  Head Office Support ................................................................... 49
     2.12  Food and Beverage .................................................................... 49

3.   MANAGEMENT FEE AND REIMBURSABLE EXPENSES ................................ 50
     3.1   Management Fee ........................................................................ 50
     3.2   Reimbursement of Expenses ........................................................ 52
     3.3   Interest ..................................................................................... 53
     3.4   Taxes ........................................................................................ 53
     3.5   Payment of Fees and Expenses .................................................... 53

4.   HOTEL ACCOUNTS ............................................................................. 54
     4.1   Operating Account ...................................................................... 54
     4.2   Capital Reserve Funds ................................................................ 56
     4.3   Hotel Asset Management Fee Account ........................................... 57
     4.4   Working Capital Reserve Account ................................................. 57
     4.5   Requests for Additional Funds from Hotel Unit Owners and Withdrawals
           from Hotel Asset Management Fee Account ................................... 59
     4.6   Disbursement of Funds to Hotel Unit Owners and Hotel Amenities Units
           Owner ....................................................................................... 60
     4.7   Place and Means of Payment ....................................................... 61

5.   TERM AND TERMINATION .................................................................... 62

i

# TABLE OF CONTENTS
## (CONTINUED)

Page

| | | |
|---|---|---|
| 5.1 | Term of Agreement | 62 |
| 5.2 | Default | 62 |
| 5.3 | Performance Test and Performance Termination | 64 |
| 5.4 | Wrongful Termination | 66 |
| 5.5 | Survival of Obligations After Termination | 66 |
| 5.6 | Actions To Be Taken on Termination | 66 |
| 5.7 | Deferral of Termination | 71 |
| 6. | INSURANCE | 71 |
| 6.1 | Maintenance of Insurance Coverage | 71 |
| 6.2 | Parties Insured and Amounts of Coverage | 71 |
| 6.3 | Evidence of Insurance | 71 |
| 6.4 | Review of Insurance | 72 |
| 6.5 | Maintenance of Insurance Records | 72 |
| 7. | ASSIGNMENTS; MORTGAGES | 72 |
| 7.1 | Assignment by Operator | 72 |
| 7.2 | Assignment by Promoter/Developer, Owner, Hotel Amenities Units Owner or Owners Meeting | 73 |
| 7.3 | Effect of Permitted Assignments | 75 |
| 7.4 | Mortgages. | 75 |
| 8. | DESTRUCTION; TAKING | 77 |
| 8.1 | Partial Destruction | 77 |
| 8.2 | Total Destruction | 78 |
| 8.3 | Taking | 78 |
| 8.4 | Taking for Temporary Use | 79 |
| 8.5 | Reinstatement | 79 |
| 9. | DISPUTES | 80 |
| 9.1 | Arbitration | 80 |
| 9.2 | Dispute Subject to Resolution by Expert | 82 |
| 9.3 | Survival and Severance | 83 |
| 10. | NAME OF HOTEL; LICENSE AGREEMENT AND TRUMP MARK | 83 |
| 10.1 | Name of Hotel | 83 |
| 10.2 | License Agreement and Trump Mark | 83 |
| 10.3 | Proprietary Materials | 83 |
| 10.4 | Use of Trump Mark by Hotel Unit Owners and Hotel Amenities Units Owner | 85 |
| 11. | INDEMNIFICATION | 85 |
| 11.1 | Owner's, Hotel Amenities Units Owner's, Owners Meeting and Promoter/Developer's Indemnification of Operator | 85 |

7404892v25

# TABLE OF CONTENTS
## (CONTINUED)

Page

11.2 Operator's Indemnification of Owner, Owners Meeting, Hotel Amenities Units owner, Asset Manager and Promoter/Developer .......................................... 86
11.3 Survival; Claims Covered by Insurance ........................................................ 86

12. MISCELLANEOUS ................................................................................................ 86
    12.1 Consents .......................................................................................................... 86
    12.2 Use of Affiliates by Operator ........................................................................ 86
    12.3 Governing Law ............................................................................................... 87
    12.4 Jurisdiction ..................................................................................................... 87
    12.5 Waivers, Modifications, Remedies ............................................................... 88
    12.6 Interpretation/Severability ............................................................................ 88
    12.7 Notices ............................................................................................................ 88
    12.8 Successors and Assigns .................................................................................. 91
    12.9 Purchasing ...................................................................................................... 91
    12.10 Freedom of Action ......................................................................................... 92
    12.11 Entire Agreement ........................................................................................... 92
    12.12 Counterparts .................................................................................................... 92
    12.13 Relationship of the Parties; Nature of Agreement ....................................... 92
    12.14 Confidentiality ............................................................................................... 92
    12.15 No Third Party Beneficiaries ........................................................................ 93
    12.16 Time of the Essence ....................................................................................... 93
    12.17 Representations and Warranties of Parties ................................................... 93
    12.18 Survival of Miscellaneous Provisions .......................................................... 93
    12.19 Taxes  93

13. EXCLUSIVITY. ...................................................................................................... 94

EXHIBIT A --     Hotel Unit Maintenance Agreement
EXHIBIT B --     Hotel Amenities Units Maintenance Agreement
EXHIBIT C --     Hotel Unit Rental Agreement
EXHIBIT D --     Condominium Management Agreement
EXHIBIT E --     Description of Punta Pacifica and Outer Region
EXHIBIT F --     Current Centralized Services

## AMENDED AND RESTATED
## HOTEL MANAGEMENT AGREEMENT

**THIS AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT** (this "**Agreement**") is made and entered into as of April 13, 2011 (the "**Effective Date**"), by and among **NEWLAND INTERNATIONAL PROPERTIES CORP.,** a Panamanian corporation, in its capacity as promoter and developer of the P.H. TOC (as defined in Recital A) ("**Promoter/Developer**") and in its capacity as owner of the Hotel Amenities Units (as defined in Recital A) ("**Hotel Amenities Units Owner**"), **OCEAN POINT DEVELOPMENT CORP.,** a Panamanian corporation ("**Hotel Asset Manager**"), **TRUMP PANAMA HOTEL MANAGEMENT LLC,** a Delaware limited liability company, as assignee of **TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC,** a Delaware limited liability company (together with its permitted successors and assigns, "**Operator**"), **HOTEL TOC INC.,** a Panamanian corporation ("**Owner**"), and Owners Meeting of the P.H. TOC, as defined in Recital B below (the "**Owners Meeting**"). Promoter/Developer, Hotel Asset Manager, Operator, Owner and Owners Meeting are sometimes referred to collectively in this Agreement as the "**Parties**" and individually as a "**Party.**"

### RECITALS

A.     Promoter/Developer has registered with the Property Section, Panama Province, of the Public Registry, the Co-Ownership Regulations (the "**Co-Ownership Regulations**") of that certain Horizontal Property Regime known as the P.H. TOC (the "**P.H. TOC**"), established over that certain real property two hundred and thirty four thousand two hundred and forty (234240), registered in Document six hundred and seven thousand eight hundred and seventy (607870), location Code eight seven zero eight (8708) of the Property Section, Panama Province, of the Public Registry, in accordance with the Legal Provisions of Law thirty one (31) of June eighteenth (18), two thousand and ten (2010) and other pertinent legal provisions, (hereinafter the "**P.H. Law**"), improved and consisting of a 70 story building (the "**Building**") subdivided into casino units ("**Casino Units**"), commercial units ("**Commercial Units**"), hotel units ("**Hotel Units**"), a hotel administrative unit ("**Hotel Administrative Unit**"), hotel amenities units ("**Hotel Amenities Units**"), office units ("**Office Units**") and residential units ("**Residential Units**" and, collectively with the Casino Units, Commercial Units, Hotel Units, Hotel Administrative Unit, Hotel Amenities Units and Office Units, the "**Units**")), all as more particularly described in the Co-Ownership Regulations;

B.     Pursuant to the Co-Ownership Regulations, an Owners Meeting, consisting of all owners of Units in the P.H. TOC, has been established as the supreme body of the P.H. TOC;

C.     Owner has been established as an entity owned by the HOTEL TOC FOUNDATION, a private interest foundation formed under the laws of Panama (the "**Foundation**"), the beneficiaries of which are all of the owners of the Hotel Units ("**Hotel Unit Owners**"), for the purpose of collectively exercising the rights and performing the obligations of the Hotel Unit Owners in connection with the operation of the Hotel, and performing the operating, management and maintenance services required for the Hotel, subject to the supervision and direction of the Operator;

7404892v25

D.     Hotel Asset Manager has entered into a hotel asset management agreement with Owner, dated of even date herewith (the "**Hotel Asset Management Agreement**"), pursuant to which Hotel Asset Manager has agreed to provide certain services to Owner as described therein, and Owner has agreed, on behalf of the Hotel Unit Owners, to pay a hotel asset management fee (the "**Hotel Asset Management Fee**") to Hotel Asset Manager, which shall be deposited into a hotel asset management fee account (the "**Hotel Asset Management Fee Account**") subject to the terms of this Agreement;

E.     Promoter/Developer, as owner of the Hotel Amenities Units, has entered into a lease agreement, dated of even date herewith (the "**Hotel Amenities Units Lease**"), with Owner, pursuant to which Promoter/Developer has leased all of the Hotel Amenities Units to Owner, and Owner has agreed to be responsible for all costs and expenses of operation of the Hotel Amenities Units;

F.     Pursuant to the terms of the License Agreement, dated as of March 16, 2006 between Trump Marks Panama, LLC, a Delaware limited liability company, successor by assignment to Donald J. Trump, as licensor ("**Licensor**"), and Promoter/Developer's predecessor, as licensee, as amended from time to time thereafter (the "**Promoter/Developer License Agreement**"), Promoter/Developer has received a license to use the Trump Mark in connection with the sale of Units in the Building;

G.     Pursuant to the terms of the License Agreement, dated of even date herewith, among Trump Marks Panama LLC, a Delaware limited liability company ("**Licensor**"), Owners Meeting and Owner (the "**Owner License Agreement**"), Licensor has granted a license to Owner and Owners Meeting to identify the Building as the Trump Ocean Club® International Hotel & Tower, subject to the terms and conditions of the Owner License Agreement;

H.     Pursuant to the terms of the P.H. TOC Management Agreement, dated of even date herewith, (the "**Condominium Management Agreement**") between Owners Meeting and Trump Panama Condominium Management LLC, a Delaware limited liability company ("**Condominium Manager**"), Owners Meeting has engaged the Condominium Manager to manage the Common Areas of the Building and the Components  and to administer the affairs of Owners Meeting, the Board of Directors, the Committees and the Boards of Coordinators of each Component (as such terms are defined in the Co-Ownership Regulations);

I.     Pursuant to the terms of the Pre-Opening Services Agreement, dated as of even date herewith (the "**Pre-Opening Agreement**") between Promoter/Developer, Hotel Asset Manager and Operator, Operator has been engaged by Promoter/Developer to perform certain pre-opening services as more specifically set forth therein;

J.     Pursuant to the terms of the Hotel Management Agreement ("**Hotel Management Agreement**"), dated as of August 11, 2008, by and between Promoter/Developer and Operator, Operator agreed to operate the Hotel Units and Hotel Amenities Units as a first class, luxury hotel ("**Hotel**") and to provide additional services, including management of the Building and administration of the condominium association for the Building in accordance with the terms and conditions set forth in the Hotel Management Agreement, and the Promoter/Developer and Operator agreed to prepare and agree upon the additional condominium documents and

2

7404892v25

agreements necessary to establish the rights and obligations of the entities and parties that would own and operate the Hotel and the Building; and

K.   Operator and Promoter/Developer have now agreed upon the Co-Ownership Regulations and the other forms of condominium documents and agreements that will be entered into with respect to the ownership and operation of the Hotel and the Building, and they now desire to amend and restate this Agreement to be consistent with the terms of the Co-Ownership Regulations and the other condominium documents and agreements.   In addition, Promoter/Developer now desires to assign certain of its rights and obligations under the Hotel Management Agreement with respect to the operation of the Hotel to Owner, and Operator desires to assign certain of its rights and obligations under the Hotel Management Agreement with respect to the management and administration of the P.H. TOC to Condominium Manager. In addition, the Parties desire to amend and restate the Hotel Management Agreement in its entirety as set forth herein to establish the rights and obligations of each of the Parties hereunder with respect to the operation and management of the Hotel and the provision of services by Operator to other Units, in a manner consistent with the Co-Ownership Regulations.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

<u>**AGREEMENTS**</u>

<u>**DEFINITIONS**</u>

<u>**Key Definitions**</u>

The following terms shall have the meanings set forth below:

<u>Affiliate</u> -- any entity which controls, is controlled by or is under common control with Operator or Owner, as the context may require.  For such purposes, "**control**" shall refer to the direct or indirect (i) ownership of a majority of voting shares or interests in an entity or (ii) in the absence of such majority ownership, other effective control over the decision-making process of an entity.  In addition, no entity shall be deemed an Affiliate of Promoter/Developer unless both one or more of (i) Roger Khafif (having an address at c/o P.O. Box 2017, Colon Free Zone, Colon, Republic of Panama), (ii) Carlos Alberto Serna Londoño (having an address at Gerente General, Espacios Urbanos, Consultores Inmobiliarios, Carrera 13 No. 82-74, Piso 3, Oficina - Espacios Urbanos, Bogotá, Republic of Colombia, South America), and (iii) Eduardo Saravia Calderón (having an address at Avenida Calle 82 # 7-80, Bogotá, Colombia, South America) (collectively, the "**Principals**"), or an entity controlled by any of the Principals, controls the day to day operations of such entity and participates in all major decisions of such entity, and such individuals have ultimate ownership of at least 51% of the beneficial interests in such entity. Notwithstanding the foregoing, an Affiliate of Operator shall be deemed to include any entity of which Donald J. Trump (and/or an entity or entities) established by Donald J. Trump for estate planning purposes of which Donald J. Trump and/or his spouse and/or the lineal descendants of his parents (including adopted descendants) own a majority of voting shares or interests therein)

3

owns a majority of voting shares or interests or, in the absence of majority ownership, has effective control over the decision-making process.

Annual Plan – as defined in **Section 2.3.1**.

Annual Report – as defined in **Section 2.5.5**.

Approval – as defined in **Section 12.1**.

arbitrator – as defined in **Section 9.1.1**.

Assessments – amounts charged to owners of Units for expenses of the Common Areas in accordance with the terms of the Co-Ownership Regulations.

Available Participating Unit – Participating Units that are, at the time in question, available for rent.

Base Fee – shall mean the Base Fee/Hotel together with the Base Fee/Hotel Amenities Units.

Base Fee/Hotel – as defined in **Section 3.1.1(a)**.

Base Fee/Hotel Amenities Units – as defined in **Section 3.1.1(c)**.

Base Fee Percentage – as defined in **Section 3.1.1**.

Beach Club – shall mean that certain beach club constructed by Beach Club Owner on Isla Viveros, Panama.

Beach Club Opening Date – as defined in **Section 4.6.2**.

Beach Club Owner – shall mean Ocean Club Pearl Island Corp., a Panamanian corporation.

Beach Club Standards – shall mean a first class, luxury standard consistent with the nature of the Building and the standards applicable thereto under the Owner License Agreement and this Agreement and such other standards that Hotel Operator (or its Affiliates) and Beach Club Owner shall mutually agree to in writing.

Benefit Programs – as defined in **Section 2.6.8(b)**.

Bidders – as defined in **Section 2.4.2**.

Branded Operator – as defined in **Section 5.3.6**.

Breach – as defined in **Section 1.5.3**.

Capital Budget – as defined in **Section 2.3.1(b)**.

4

7404892v25

PAGES 5-79 NOT INCLUDED

Operator of the notice given by Owner, Owners Meeting and/or Hotel Amenities Units Owner or, if no such notice is given by Owner, Operator's actual knowledge of such commencement), this Agreement shall be reinstated (with only such amendments as are required due to changes in the type, scope or design of the Hotel and/or other portions of the Building).  The provisions of this **Section 8.5** shall survive Termination of this Agreement.

## 9.    DISPUTES

9.1    Arbitration.Unless otherwise specifically provided for in this Agreement, all disputes, controversies, claims or disagreements arising out of or relating to this Agreement (singularly, a **"Dispute"**, and collectively, **"Disputes"**) shall be resolved in the following manner.

9.1.1    Either Party may submit the Dispute to the International Chamber of Commerce for binding arbitration under the then existing ICC Commercial Arbitration Rules. The initiating Party shall file and serve its request for arbitration including its statement of claims, with the Secretariat of the ICC International Court of Arbitration, which shall notify both claimant and respondent of the receipt of the request. Within 20 days from receipt of the request and statement of claims from the Secretariat, the other Party shall file and serve its answering statement. Each Party shall submit all Disputes then known to that party within the same arbitration proceeding and any such claim that is not so submitted shall be barred.   The arbitration shall be conducted by a panel of three arbitrators, (collectively, the **"arbitrator"**) selected in accordance with this Agreement.  Each arbitrator shall have not fewer than 10 years of experience (at the time the request for arbitration is filed) in the luxury hotel business as construed under U.S. market standards (and no fewer than five years of experience in the luxury condominium business), shall be independent of the parties as provided by the ICC Commercial Arbitration Rules, and shall not be an Affiliate of or a Person who has any past (within the prior three years from the date the arbitration is filed), present, or currently contemplated future business or personal relationship with Owner, Promoter/Developer, any owner of 10% or more of the Hotel Units or any other category of Units, or Operator.  Each of Operator, on the one hand, and any one or more of the other Parties, on the other hand, shall propose one arbitrator by written notice incorporated into the request for arbitration and the answering statement, to the other Party, and the two arbitrators selected shall, within twenty (20) days after their appointment, select the third arbitrator.  If either Party does not select an arbitrator within twenty (20) days after the date the Dispute is submitted, then an arbitrator shall be selected for that party under the ICC Commercial Arbitration Rules.  In the event that the parties are unable to obtain the services of arbitrators which meet the qualifications set forth in this **Section 9.1.1**, the parties shall use diligent efforts to obtain the services of arbitrators whose qualifications are substantially similar to those set forth above.

9.1.2    The arbitration, including all documents filed, hearings and rulings in connection with the arbitration, shall be conducted in the English language.  The arbitrator shall conduct the arbitration at law, and shall be instructed to apply the internal laws of the State of New York (without regard to conflict of laws principles), except to the extent that the subject of the dispute arises out of or concerns the enforcement of rights where only local law is applicable such as Panama real estate or Panama real estate interests, employment, gaming and permitting from governmental entities or municipalities (such as liquor permits).

9.1.3     The decision of the arbitrator (which shall be deemed to be agreement by at least two of the three arbitrators) shall be made within 30 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of such arbitrator when reduced to writing and signed by it shall be final, conclusive and binding upon the parties hereto, and may be enforced in any court having jurisdiction.

9.1.4     The award of the arbitrator shall state the arbitrator's decision with respect to each of the individual claims presented by each Party, and shall contain a detailed statement of the reasons supporting each such decision of the arbitrator, including all necessary findings of fact and conclusions of law.

9.1.5     The arbitration hearing shall be held in Panama City, Panama and, except for those procedures specifically set forth in this **Section 9.1**, including, without limitation, the application of the internal laws of the Republic of Panama or the State of New York (without regard to conflict of laws principles), shall be conducted in accordance with the Commercial Arbitration Rules of the International Chamber of Commerce as in effect on the date thereof.  The seat of the arbitration shall be in the State of New York, County of New York, and any action by any party challenging the validity of the arbitration award shall be filed in the appropriate federal or state court located in the State of New York, County of New York.

9.1.6     The arbitrator shall be directed to establish (i) a schedule for the conduct of the arbitration which shall yield a conclusion within 120 days following the appointment of the arbitrator and (ii) economic or procedural sanctions (which may include default judgment) for any party the arbitrator determines has intentionally delayed the conduct of the proceedings.

9.1.7     The arbitrator shall not allow any Party to act in a representative capacity for any other third parties or class of third parties.

9.1.8     The arbitrator shall determine the proportion of the expenses of such arbitration which each party shall bear; provided, however, that (subject to **Section 9.2**) each party shall be responsible for its own legal fees.

9.1.9     At the request of either Party, but only if contained in the initial written demand for arbitration or in the initial response to the demand, the arbitration proceedings shall be confidential.  In such case, (a) the fact of the pending arbitration shall not be disclosed or confirmed by the Parties or the arbitrator to any person who is not a party to, or called to testify at, the proceedings until the arbitration award has been made; (b) the proceedings shall not be recorded or transcribed in any manner; and (c) all documents, testimony and records (other than the contract documents out of which the Dispute arises) shall be received, heard and maintained confidential by the arbitrator, and shall be available for inspection only by the parties, their attorneys and by experts who shall agree, in advance and in writing, to maintain the confidentiality of such information in accordance with this **Section 9.1**.  Also in such case, the confidential information shall not be described in the arbitration award in such a manner as to be commercially useful.

9.1.10    Notwithstanding anything contained in this **Section 9.1**, any Party shall be entitled to (A) commence legal proceedings (in which case the provisions of **Article 12** governing jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the obligations contained herein pending the settlement of a Dispute in accordance with the arbitration procedures set forth in this **Section 9.1**, (B) commence legal proceedings (in which case the provisions of **Article 12** governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement, or (C) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of either this Agreement or any other agreements between the Parties relating to the Hotel.

9.2    <u>Dispute Subject to Resolution by Expert.</u> Notwithstanding anything to the contrary in **Section 9.1**, any dispute, claim or issue arising under this Agreement respecting (a) the proper inclusion or exclusion of items in Gross Operating Revenue, Operating Expenses or Gross Operating Profit, (b) the proper computation of Management Fees, Centralized Charges or Reimbursable Expenses, (c) the approval of the Annual Plan and modifications thereof, or (d) other matter as to which this Agreement expressly provides for dispute resolution by the Expert, shall be resolved in accordance with this **Section 9.2**; provided, however, either party shall have the right to pursue arbitration (rather than resolution by the Expert) if the dispute involves more than $250,000.

9.2.2    Either Owner or Operator may commence the Expert resolution process by delivering notice to the other Party, in which case Operator shall select three qualified candidates to be the Expert within thirty (30) days after receipt of such notice, and Owner shall select one of such candidates as the Expert to resolve the dispute within fifteen (15) days after notification by Operator.  If Owner does not select one of the candidates proposed by Operator within such time period, Operator shall select one of the candidates as the Expert. Each Expert candidate shall (i) have at least ten (10) years experience in the area of expertise on which the dispute is based (e.g., for operational matters, expertise in the management of hotels in the same class as the Hotel, for accounting matters, expertise in hotel accounting for hotels in the same class as the Hotel), and (ii) not have any conflict of interest with either party.  The person selected as the Expert pursuant to this **Section 9.2.2** is the "**Expert**".

9.2.3    Each party may make written statements and provide documents and materials to the Expert in support of its position, and the other party may respond to such statements, documents or materials. All statements, documents, materials and responses submitted by a party shall be delivered concurrently to the Expert and the other party.  The parties shall make available to the Expert all books and records relating to the issues in dispute and shall provide the Expert with any information or assistance reasonably requested by the Expert.  The Expert shall establish a timetable for the making of submissions and replies, and endeavoring to notify the parties in writing of its decision within thirty (30) days after the date on which the Expert has been selected (or such other period as the parties may agree), but any delay in making or notifying the parties of the decision shall not affect the final and binding nature of the decision once made and noticed.

9.2.4    The Expert resolution shall be conducted in a "**baseball**" format pursuant to which each party shall submit its proposed resolution of the dispute to the Expert

(with a copy provided concurrently to the other party), and the Expert shall decide in favor of one of the positions presented by the parties, and may not make any determination other than by choosing one of the proposals presented by the parties. The Expert's authority shall be limited to deciding the specific issue presented to it, and shall have no authority to award damages, issue orders or take any other action whatsoever. The decision of the Expert shall be final and binding upon the parties and shall not be capable of appeal or other challenge, whether by arbitration or otherwise, except for manifest error or fraud.

9.3     Survival and Severance. The provisions of this Article 9 shall survive the Termination of this Agreement for any reason, regardless of whether a dispute arises before or after Termination of this Agreement, and regardless of whether the related mediation, arbitration or litigation proceedings occur before or after Termination of this Agreement. If any part of this Article 9 is held to be unenforceable, it shall be severed and shall not affect either the duties to mediate or arbitrate or any other part of this Article 9.

## 10.    NAME OF HOTEL; LICENSE AGREEMENT AND TRUMP MARK

10.1     Name of Hotel.  The Hotel shall be operated by Operator under the name "**Trump Ocean Club**," or such other name as may be mutually acceptable to Owner and Operator.

10.2     License Agreement and Trump Mark.  Owner and Operator are parties to Owner License Agreement.  In the event the Owner License Agreement expires by its terms or is sooner terminated, either party may terminate this Agreement at any time thereafter upon not less than twenty (20) days' notice.

10.3     Proprietary Materials.  In addition to the Trump Mark, Owner acknowledges that all slogans, distinguishing characteristics, copyright materials, software applications and data in written or tangible form or other intellectual property which is indicated as being confidential or which from its nature or content would be understood by a reasonable person to be confidential, relating to Operator or any of its Affiliates, the business or affairs of Operator or any of its Affiliates, or any hotel or residential project which Operator or any of its Affiliates owns or operates and manages (other than as relates exclusively to the Hotel) shall constitute Trump Proprietary Materials, shall remain the sole property of Operator and shall be under the exclusive control of Operator and its Affiliates.  "**Trump Proprietary Materials**" shall include, without limitation, (i) operational manuals (including, without limitation, Physical and Brand Operating Standards, accounting, financial administration, personnel administration, and policies and procedures manuals), (ii) corporate records of Operator and its Affiliates, provided, however, corporate records of Operator and its Affiliates that relate to the Hotel shall be available to Owner for inspection, transcription, and review for five (5) years after Termination, (iii) recipes, menus, wine lists and related materials, (iv) software and other management programs developed by or on behalf of Operator, notwithstanding any modification or alteration made for application at the Hotel and notwithstanding their maintenance or administration by any other person, (v) the operating and design standards of any hotel or resort owned or operated by Operator or any of its Affiliates and any materials relating thereto, (vi) business and marketing plans (other than as related solely to the Hotel) and (vii) internal audit reports.  Owner shall, without charge to Operator, execute, acknowledge and deliver all documents that may be necessary or desirable to enable Operator to protect or register its proprietary interest in any Trump Proprietary Materials.

PAGES 84-94 NOT INCLUDED

**TRUMP OCEAN CLUB INTERNATIONAL HOTEL & TOWER**

**AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT**

Signature Page

   **IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the 13 day of April, 2011.

**OPERATOR:**

**TRUMP PANAMA HOTEL
MANAGEMENT LLC,** a Delaware limited
liability company

By: _____
        Donald J. Trump
        President


State of New York
                              ) ss.:
County of New York


   On the 13th day of April in the year 2011 before me, the undersigned, a Notary Public in and for said State, personally appeared Donald J. Trump, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as indicated in such instrument, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MICHAEL COHEN
Notary Public, State of New York
No. 02CO6137349
Qualified in New York County
Commission Expires November 21, 2013

7404892v5

TRUMP OCEAN CLUB INTERNATIONAL HOTEL & TOWER

AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT

Signature Page

OWNER:

HOTEL TOC, INC., a Panamanian
corporation

By:_____
   Charles Niaak Stevenson
   Secretary

HOTEL AMENITIES UNITS OWNER
AND
PROMOTER/DEVELOPER:

NEWLAND INTERNATIONAL
PROPERTIES, CORP., a Panamanian
corporation

By:_____
   Roger Khafif
   President

OWNERS MEETING:

OWNERS MEETING OF THE P.H.
TOC

By:_____
   Roger Khafif
   President

Yo, Lcdo. LUIS FRAIZ DOCABO, Notario Público Primero del Circuito de
Panamá, con cédula de identidad personal No. 8-311-734.
CERTIFICO:
Que de la certeza de la identidad del (los) sujeto (s) que firmó(firmaron)
presente documento y su (s) firma (s) es (son) auténtica (s).
PANAMÁ, _____ 18 ABR 2011

_____        _____
Testigo                Testigo

Lcdo. LUIS FRAIZ DOCABO
Notario Público Primero

TRUMP OCEAN CLUB INTERNATIONAL HOTEL & TOWER

*AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT*

Signature Page

HOTEL ASSET MANAGER

OCEAN POINT DEVELOPMENT CORP.,
a Panamanian corporation

By: _____

Roger Khafif
President

Yo, Lcdo. LUIS FRAIZ DOCABO, Notario Público Primero del Circuito de
Panamá, con cédula de identidad personal No. 8-311-734,
CERTIFICO:
Que dada la certeza de la identidad del (los) sujeto(s) que firmó(firmaron) el
presente documento su (s) firma (s) es (son) auténtica (s),
PANAMA, _____        1 3 ABR 2011

_____                                    _____
Testigo                                                        Testigo

Lcdo. LUIS FRAIZ DOCABO
Notario Público Primero