# **EXHIBIT B**

## AGREEMENT IN CONNECTION WITH A BULK SALE

This **AGREEMENT IN CONNECTION WITH A BULK SALE** (this "**Agreement**") is made as of the 15th day of February, 2017, by and among **TRUMP PANAMA HOTEL MANAGEMENT LLC,** a Delaware limited liability company ("**Operator**") and **ITHACA CAPITAL INVESTMENTS I S.A.,** a Panamanian corporation ("**Ithaca I**") as purchaser of more than ten (10) Hotel Units (as hereinafter defined) and **ITHACA CAPITAL INVESTMENTS II S.A.,** a Panamanian corporation ("**Ithaca II**") as purchaser of the Hotel Amenities Units (as hereinafter defined). (Ithaca I, together with Ithaca II, the "**Purchaser**"). Operator, Ithaca I and Ithaca II are referred to herein, each, individually, as a "**Party**" and, collectively, as the "**Parties.**"

## RECITALS

A.   Newland International Properties Corp., a Panamanian corporation ("**Promoter/Developer**") has registered with the Property Section, Panama Province, of the Public Registry, the Co-Ownership Regulations (as amended, restated, modified or supplemented, from time to time, the "**Co-Ownership Regulations**") of that certain Horizontal Property Regime known as the P.H. TOC (the "P.H. TOC"), established over that certain real property two hundred and thirty four thousand two hundred and forty (234240) (referred to herein as the "**Property**"), registered in Document six hundred and seven thousand eight hundred and seventy (607870), location Code eight seven zero eight (8708) of the Property Section, Panama Province, of the Public Registry, in accordance with the Legal Provisions of Law thirty one (31) of June eighteenth (18), two thousand and ten (2010) and other pertinent legal provisions, improved and consisting of a 70 story building (the "**Building**") subdivided into hotel units ("**Hotel Units**"), hotel amenities units ("**Hotel Amenities Units**") and the other units as more particularly described in the Co-Ownership Regulations.

B.   Pursuant to the Co-Ownership Regulations, an Owners Meeting consisting of all owners of Units in the P.H. TOC, has been established as the supreme body of the P.H. TOC ("**Owners Meeting**"). Hotel TOC Inc., a Panamanian corporation ("**Owner**"), has been established as an entity owned by the Hotel TOC Foundation, a private interest foundation formed under the laws of Panama, the beneficiaries of which are all of the owners of the Hotel Units ("**Hotel Unit Owners**"), for the purpose of collectively exercising the rights and performing the obligations of the Hotel Unit Owners in connection with the operation of the Hotel Units and Hotel Amenities Units as a hotel (the "**Hotel**"), and performing the operating, management and maintenance services required for the Hotel, subject to the supervision and direction of the Operator pursuant to the Hotel Management Agreement (as defined on **Exhibit A**);

C.   In connection with the development and operations of the Building and the Hotel, Promoter/Developer, Operator, Trump Marks Panama LLC, a Delaware limited liability company ("**Licensor**"), Owners Meeting and Owner, in various combinations among themselves and with other parties, have entered into and are parties to various licensing, management, operating and other agreements, as described on **Exhibit A** hereto (the "**Hotel Agreements**");

    D.    Ithaca I wishes to purchase the Hotel Units set forth on **Exhibit B** (the "**Selected Hotel Units**") from Promoter/Developer.

    E.    Ithaca II wishes to purchase the Hotel Amenities Units from Promoter/Developer

NOW, THEREFORE, in consideration of the mutual covenants in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

    1.    <u>Co-Ownership Regulations</u>. Ithaca I acknowledges that the sale of more than ten (10) Hotel Units (a "**Bulk Sale**") is currently prohibited by the Co-Ownership Regulations and that the Co-Ownership Regulations may not be modified without the prior written approval of Operator. Subject to the terms and conditions of this Agreement including Operator's receipt of the items set forth in Section 2, Operator will, solely in its role as Operator under the Hotel Management Agreement, provide its written approval to the limited modification to the Co-Ownership Regulations that is necessary to permit a one-time Bulk Sale of the Selected Hotel Units to Purchaser (the "**Written Approval**"). Operator makes no statement or promise as to the likelihood or viability of obtaining the consents, modifications or approvals that are necessary, in addition to the Written Approval, to amend the Co-Ownership Regulations and Operator has no obligation to cooperate with Ithaca I's efforts to amend the Co-Ownership Regulation except as expressly set forth in this Section 1.

    2.    <u>Effectiveness</u>. Operator shall have no obligation to deliver its Written Approval until such time as Operator has received:

    (A) a fully executed original counterpart of the Hotel Unit Maintenance Agreement ("**Hotel Unit Maintenance Agreement**") in Operator's then current form with respect to all Selected Hotel Units. The term of such Hotel Unit Maintenance Agreement with respect to each of the Selected Hotel Units shall run from the date on which Ithaca I's purchase of the Selected Hotel Units is consummated until the date that the following two conditions are met: (i) title to the Selected Hotel Unit in question has been legally transferred to a subsequent purchaser of such Selected Hotel Unit, and (ii) the purchaser of such Selected Hotel Unit has executed a Hotel Unit Maintenance Agreement as required by the terms of the Co-Ownership Regulations (the date on which both such conditions are satisfied, the "**Release Date**"). For the avoidance of doubt, if Ithaca I transfers title to some but not all of the Selected Hotel Units, such transfer shall not release Ithaca I from its obligations under the Hotel Unit Maintenance Agreement with respect to the Selected Hotel Units that were not transferred;

    (B) a fully executed original counterpart of the Hotel Unit Rental Management Agreement ("**Rental Agreement**") in Operator's then current form with respect to all Selected Hotel Units. The term of such Rental Agreement with respect to each of the Selected Hotel Units shall run from the date on which Ithaca I's purchase of the Selected Hotel Units is consummated until the Release Date. For the avoidance of doubt, if Ithaca I transfers title to some but not all of the Selected Hotel Units, such transfer shall not release Ithaca I from its obligations under the

Rental Agreement with respect to the Selected Hotel Units which were not transferred;

   (C) a fully executed original counterpart of the Hotel Amenities Units Maintenance Agreement ("**Hotel Amenities Units Maintenance Agreement**") in Operator's then current form with respect to the Hotel Amenities Units. The term of such Hotel Amenities Units Maintenance Agreement shall run from the date on which Ithaca II's purchase of the Hotel Amenities Units is consummated until the date that the following two conditions are met: (i) title to the Hotel Amenities Units have been legally transferred to a subsequent purchaser of such Selected Hotel Unit, and (ii) the purchaser of such Hotel Amenities Units has executed a Hotel Amenities Units Maintenance Agreement;

   (D) evidence satisfactory to Operator and its Affiliates (as defined on **Exhibit C**) in their reasonable judgment that the Ithaca I has sufficient financial resources to fulfill all of the obligations associated with the ownership of the Selected Hotel Units;

   (E) evidence satisfactory to Operator and its Affiliates in their reasonable judgment that the Ithaca II has sufficient financial resources to fulfill all of the obligations associated with the ownership of the Hotel Amenities Units;

   (F) evidence satisfactory to Operator and its Affiliates in their reasonable judgment that neither Ithaca I nor any Person holding a direct or indirect interest in Ithaca I is a Prohibited Person (as defined on **Exhibit C**); and

   (G) evidence satisfactory to Operator and its Affiliates in their reasonable judgment that neither Ithaca II nor any Person holding a direct or indirect interest in Ithaca I is a Prohibited Person.

   3. <u>Acknowledgments and Covenants</u>.  Purchaser acknowledges that Operator is and shall be the operator of the Hotel pursuant to the Hotel Management Agreement and hereby covenants that until the later of the expiration or termination of (1) the Hotel Management Agreement and (2) the License Agreement:

   (A) By virtue of its purchase of the Hotel Amenities Units, Ithaca II shall be bound by the terms and conditions of the Hotel Management Agreement as successor to the Hotel Amenities Units Owner (as such term is defined in the Hotel Management Agreement). Notwithstanding anything to the contrary contained in the Hotel Management Agreement, Operator shall be the operator of the Hotel Amenities Units unless Operator elects to have a Third Party Manager (as defined in the Hotel Management Agreement) operate one or more of the Hotel Amenities Units (which decision, together with the selection of such Third Party Manager(s), must be approved as set forth in Section 1.7 of the Hotel Management Agreement). Without limiting the circumstances in which Operator may withhold its consent to the operation of any Hotel Amenities Unit by a Third Party Manager or the selection of any Third Party Manager(s) under the Hotel Management Agreement in any way, Operator may reasonably set certain minimum and maximum hours of operation of any Hotel Amenities Unit prior to approving the operation of any

such Hotel Amenities Unit by a Third Party Manager or the selection of any Third Party Manager;

(B) Any further sale of Hotel Units by Ithaca I (whether of all the Selected Hotel Units or a subset thereof) shall be subject to (i) if applicable, all restrictions on Bulk Sales as may then be contained in the Co-Ownership Regulations and (ii) Operator's right to approve the proposed purchaser of each such sale. Operator may elect, in its sole discretion, to condition its approval of the proposed purchaser of each such sale on Operator's receipt of an agreement containing the same terms and conditions as set forth in this Agreement from such proposed purchaser. By way of example and not limitation, if Ithaca I purchases 200 Hotel Units and subsequently wishes to sell 20 Hotel Units to 10 different purchasers, each such purchaser shall be subject to Operator's approval as set forth herein;

(C) Any further sale of the Hotel Amenities Units shall be subject to (i) all restrictions on a sale of the Hotel Amenities Units as may then be contained in the Co-Ownership Regulations, (ii) Operator's right to approve the proposed purchaser of the Hotel Amenities Units and (iii) Operator's receipt of written acknowledgment from the proposed purchaser of the Hotel Amenities Units that such purchaser shall be bound by the terms and conditions of the Hotel Management Agreement as successor to the Hotel Amenities Units Owner. Operator may elect, in its sole discretion, to condition its approval of the proposed purchaser of such sale of the Hotel Amenities Units on Operator's receipt of an agreement containing the same terms and conditions as set forth in this Agreement from such proposed purchaser;

(D) Purchaser shall not, directly or indirectly through any Affiliates or otherwise: (w) take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements, (x) exercise its vote with respect to any of the Hotel Units in any Owners Meeting or other constituent body of the P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., in any manner which is adverse to the interests of Operator and/or its Affiliates under and in respect of any of the Hotel Agreements, (y) take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its Affiliates and any other Person or (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates;

(E) Ithaca I shall not compete with the current rental program administered pursuant to the Rental Agreement (or such other similar rental program as may be subsequently administered by Operator or its Affiliates); and

(F) Purchaser shall not seek or accept an appointment or election to the position of manager or administrator (or other similar leadership role) of the P.H. TOC.

4. <u>Representations and Warranties</u>. Ithaca I and Ithaca II each represents and warrants, solely as to itself, that:

(A) Purchaser is a company validly existing under the laws of the Republic of Panama;

(B) this Agreement has been duly executed and delivered by Purchaser;

(C) Purchaser has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and has taken all necessary action and received all necessary approvals to authorize the execution, delivery and performance of this Agreement;

(D) Ithaca I has sufficient financial resources to fulfill all of the obligations associated with the ownership of the Selected Hotel; and

(E) Ithaca II has sufficient financial resources to fulfill all of the obligations associated with the ownership of the Hotel Amenities Units.

5. Default. In the event that: (A) Purchaser takes an action that violates the covenants set forth in Section 3, (B) any of the representations and/or warranties in Section 4 are found to be untrue or (C) Purchaser is otherwise in default of any of the terms or conditions of this Agreement, then, in each case in addition to any other rights or remedies that may be available, Operator shall have no further obligation to comply with any its obligation under Section 1 of this Agreement.

6. Notices. All notices to be given by a Party to any other Party under this Agreement shall be in writing and shall be delivered (i) in person, (ii) by certified U.S. mail, with postage prepaid and return receipt requested, (iii) by overnight courier service, or (iv) by facsimile transmittal, with a verification copy sent by overnight courier service, to the other Party at the following address or facsimile number (or to such other address or facsimile number as a Party may designate hereafter by written notice to the other Parties pursuant to this Section 6):

    A.    If to Purchaser:

Orestes Fintiklis
Ithaca Capital Investments I. SA.
2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama, Republic of Panama
Ph: +13054690917

Orestes Fintiklis
Ithaca Capital Investments II. SA.
2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama, Republic of Panama
Ph: +13054690917

    B.    If to Operator:

>Alan Garten, Esq.
>c/o Trump International Hotels Management LLC
>725 Fifth Avenue
>26th floor
>New York, NY 10022
>ph: (212) 715-3203
>fx: (212) 980-3821
>
>Eric Trump
>c/o Trump International Hotels Management LLC
>725 Fifth Avenue
>25th floor
>New York, NY 10022
>ph: (212) 715-7260
>fx: (212) 688-8135

All notices delivered by a Party under this Agreement shall be deemed to have been received by the Party to whom such notice is sent upon (i) delivery to the offices of such Party, provided that such delivery is made prior to 5:00 p.m. (local time for such Party) on a business day, otherwise the following business day, or (ii) the attempted delivery of such notice if (A) such Party refuses delivery of such notice, or (B) such Party is no longer at such address, and such Party failed to provide the sending Party with its current address pursuant to this Section 5.

7.   Successors and Assigns; Third-Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and assigns. This Agreement shall not confer any rights or remedies upon any other third party.

8.   Prevailing Party. If a Party commences a legal proceeding to interpret or enforce the terms of this Agreement, the prevailing Party shall be entitled to recover its costs and expenses incurred in such legal proceeding, including reasonable attorneys' fees and expenses, from the losing Party in such proceeding.

9.   Governing Law; Jurisdiction and Venue. This Agreement shall be governed by the laws of the State of New York, without giving effect to any conflict of law principles. Each of the Parties (a) irrevocably submit and consent to the exclusive jurisdiction of the federal and state courts of the State of New York and agree that all suits, actions or other legal proceedings with respect to this Agreement shall be brought only in the State of New York, (b) waive and agree not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceedings any claim that it is not personally subject to the jurisdiction of the federal and state courts of the State of New York, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in such courts, and (c) agree to accept service of process in any such suit, action or proceeding anywhere in the world, whether within or without the jurisdiction of any such court, in accordance with the procedures for giving notices under this Agreement.

10. <u>Recitals.</u> Each of the Recitals is hereby incorporated by references and made a part of this Agreement.

11. <u>Severability.</u> If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected terms or provisions at any other time or in any other jurisdiction.

12. <u>Entire Agreement.</u> This Agreement (including the recitals to this Agreements which are incorporated herein) sets forth the entire understanding and agreement of the Parties hereto any other agreements and understandings (written or oral) among the Parties on or prior to the date of this Agreement with respect to the matters set forth herein.

13. <u>Amendments to Agreement.</u> No amendment or modification to any terms of this Agreement, waiver of the obligations of any Party hereunder, or termination of this Agreement (other than pursuant to the terms of the Agreement), shall be valid unless in writing and signed by the Party against whom enforcement of such provision is sought.

14. <u>Counterparts.</u> This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties had signed the same signature page.

15. <u>Interpretation.</u> This Agreement shall be construed according to its fair meaning and neither for nor against either Party hereto irrespective of which Party caused the same to be drafted. Each of the Parties acknowledges that it has been, or has had the opportunity be represented by an attorney in connection with the preparation of and execution of this Agreement. Unless the language specifies or the context implies that a term of this Agreement is a condition, all of the terms of this Agreement shall be deemed and construed to be covenants to be performed by the designated party. "Shall" and "will" means "covenants to" whenever the context permits. The use of the terms such as "including", "include", and includes" followed by one or more examples is intended to be illustrative and shall not be deemed or construed to limit the scope of the classification or category to just the examples listed.

[Signatures on following page]

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

**OPERATOR:**

**TRUMP PANAMA HOTEL MANAGEMENT LLC**

By: _____
Name: Eric Trump
Title: President

**PURCHASER:**

**ITHACA CAPITAL INVESTMENTS I S.A.**

By: _____
Name: Orestes Fintiklis
Title: President

**ITHACA CAPITAL INVESTMENTS II S.A.**

By: _____
Name: Orestes Fintiklis
Title: President

## EXHIBIT A
### Hotel Agreements

1. <u>Co-Ownership Regulations</u>.

2. <u>Pre-Opening Agreement</u>: Pre-Opening Services Agreement dated as of April 13, 2011 among Newland International Properties Corp. ("**Promoter/Developer**"), Ocean Point Development Corp. (an affiliate of Promoter/Developer) and Operator, as amended by that certain First Amendment to Pre-Opening Services Agreement, dated as of July 3, 2013, and as it may hereafter be amended, restated, modified, supplemented, assigned and/or assumed from time to time, the "**Pre-Opening Services Agreement**").

3. <u>Subsequent License Agreement</u>: License Agreement dated as of April 13, 2011, Licensor, the Owners Meeting of the P.H. TOC ("**Owners Meeting**") and Hotel TOC Inc., a Panamanian corporation ("**Owner**"), as it may hereafter be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

4. <u>Hotel Management Agreement</u>: Amended and Restated Hotel Management Agreement, dated as of April 13, 2011, among Operator, Promoter/Developer, Owner and Owners Meeting, as amended by that certain First Amendment to Amended and Restated Hotel Management Agreement, dated as of July 3, 2013, and as it may hereafter be further amended, restated, modified or supplemented time to time, the "**Hotel Management Agreement**");

5. <u>Hotel Amenities Units Lease</u>:  Hotel Amenities Units Lease recorded April 13, 2011, between Promoter/Developer and Owner, as it may hereafter be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

6. <u>Hotel Unit Maintenance Agreement</u>: Hotel Unit Maintenance Agreement dated as of closing of each purchase of a Hotel Unit, among Operator, Owner and each Hotel Unit owner, as it may hereafter be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

7. <u>Hotel Unit Rental Agreement</u>:  Hotel Unit Rental Agreement dated as of date entered into by each participating Hotel Unit Owner, among Operator, Owner and each voluntarily participating Hotel Unit Owner, as it may hereafter be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

8. <u>Hotel Amenities Units Maintenance Agreement</u>: Hotel Amenities Units Maintenance Agreement dated as of April 13, 2011, among Operator, Owner (as lessee of Hotel Amenities Units) and Promoter/Developer (as owner and lessor of Hotel Amenities Units), as it may hereafter be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

9. <u>Unsold Hotel Units Participation Agreement</u>:  Unsold Hotel Units Participation Agreement dated as of April 13, 2011, between Operator, Owner and Promoter/Developer, as owner of all unsold Hotel Units, as it may hereafter be amended, restated, modified, supplemented, assigned and/or assumed from time to time (the "**Unsold Hotel Units Participation Agreement**").

10. <u>License Agreement</u>.  License Agreement, originally dated as of March 16, 2006, between Donald J. Trump, as original licensor, and K Group Developers Inc., as original licensee, as assigned to Licensor, as licensor, and to Promoter/Developer, as licensee, as amended through that certain Eighth Amendment to License Agreement, dated as of July 3, 2013,( and as it may hereafter be further amended, restated, modified, supplemented, assigned and/or assumed from time to time, the "**License Agreement**").

## EXHIBIT B

**Selected Hotel Units**

## **EXHIBIT C**

### **Select Definitions**

"**Affiliate**" means with respect to any Person, any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such Person.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of any Person, or the power to veto major policy decisions of any Person, whether through the ownership of voting securities or interests, by agreement, or otherwise. Controlling and Controlled shall have the correlative meanings related thereto.

"**Governmental Authority**" means any government or political subdivision or agency thereof.

"**Person**" means a natural person, partnership, corporation, limited liability company, Governmental Authority, trust or other legal entity.

"**Prohibited Person**" means any Person that (a) is engaged, or is an Affiliate of a Person engaged, in the business of owning, operating, licensing (as licensor or licensee) or franchising (as franchisor or franchisee) a hotel brand or lodging system; (b) is engaged, or is an Affiliate of a Person engaged, in the business of owning, operating, licensing (as licensor or licensee) or franchising (as franchisor or franchisee) a residential brand; (c) is not generally regarded in the business community as a person of high character and with a favorable reputation for integrity, honesty and veracity; (d) is or has been under indictment or convicted or is then under investigation by any Governmental Authority (or any Person Controlling it has been convicted) of a felony or crime of fraud or similar malfeasance; (e) could jeopardize any licenses, permits, approvals, certificates and/or other authorizations (x) required or desirable to operate the Property or (y) otherwise held by Donald J. Trump, Operator or any of their respective Affiliates; (f) could cause Operator or any of its Affiliates to violate any applicable law, or could cause any of their assets or interests, to be subject to any fines, penalties, sanctions, confiscation or similar liability or action under any law of the United States of America; or (g) is a Person or an Affiliate of a Person with whom Operator or any of its Affiliates (x) have in the past had, unsatisfactory business dealings or (y) maintain a conflict of interest with Operator or its Affiliates as reasonably determined by Operator.