# **EXHIBIT C**

ARBITRATION ADMINISTERED BY
INTERNATIONAL CHAMBER OF COMMERCE

CASE NO. _____

**HOTEL TOC, INC.,**

*Claimant,*

-against-

**TRUMP PANAMA HOTEL MANAGEMENT LLC, TRUMP INTERNATIONAL
HOTELS MANAGEMENT, LLC, and JOHN DOES 1-5,**

*Respondents.*

---

## REQUEST FOR ARBITRATION

---

Joshua D. Bernstein
Darryl R. Graham
Kathleen M. Prystowsky
Vanessa I. Garcia
**AKERMAN LLP**

Jose Carrizo
Orlando Tejeira
**MORGAN & MORGAN**

666 Fifth Avenue, 20th Floor
New York, New York 10103
Telephone 212.880.3800
Facsimile: 212.880.8965

MMG Tower, 23rd Floor
Avenue Paseo del Mar, Costa del Este
Panama, Republic of Panama
Telephone: 507.265.7777
Facsimile: 507.265.7700

*Attorneys for Claimant Hotel TOC, Inc.*

**October 14, 2017**

Claimant Hotel TOC, Inc. ("Owner" or "Hotel TOC") hereby files this Request for Arbitration against Trump Panama Hotel Management LLC, Trump International Hotels Management, LLC (collectively "Operator"), and John Does 1-5 ("Does," and collectively with Operator, "Respondents"), and states as follows.

## NATURE OF ACTION

1.      This arbitration arises out of Operator's utter mismanagement of the Trump International Hotel & Tower Panama f/k/a the Trump Ocean Club International Hotel & Tower (the "Hotel"), a premier hotel property in Panama and Latin America, which Operator was charged to manage and operate pursuant to the parties' hotel management agreement (the "Management Agreement," as further defined herein)[1] as a luxury hotel, with a level of service and quality generally considered to be luxury, and in a manner designed to maximize the profitability and long term value of the Hotel.

2.      As a direct result of Operator's abysmal management of the Hotel, material breaches of the Management Agreement and its fiduciary duties to Owner, the economic performance, physical condition, and guest service levels of the Hotel have dramatically declined.  The Hotel is one of the finest hotels in Panama and Latin America; yet, as a result of Operator's conduct, including that detailed herein, the Hotel has been virtually empty resulting in abysmal occupancy rates and RevPAR, all the while guest complaints go unanswered, rooms go uncleaned, and Hotel amenities remain substantially underutilized.

3.      By virtue of Operator's conduct, the Hotel (despite being a physically stunning structure with the best amenities and finishes in the market) has fallen to the very bottom of any

---

[1] A true and correct copy of the Amended and Restated Hotel Management Agreement for Trump Ocean Club International Hotel & Tower among Trump Panama Hotel Management LLC, Newland International Properties Corp., Hotel TOC Inc. and Owners Meeting of the P.H. TOC, dated as of April 13, 2011, is attached hereto as Exhibit 1 (without schedules). A true and correct copy of the First Amendment to the Amended and Restated Hotel Management Agreement, dated as of July 3, 2013, is attached hereto as Exhibit 2.

meaningful competitive set and guest satisfaction scores have plummeted, as evidenced by, among other things, ratings on TripAdvisor.com, Hotels.com, and Oyster.com.

4.       While occupancy levels for the Hotel have collapsed over the last few years, significantly depressing revenues, Owner has been shouldering the burden of the Hotel operation out of its own pocket.  Yet, Operator has provided Owner only sparse and deficient financial disclosure, all the while failing to make required distributions and develop an effective marketing plan to address the problems plaguing the Hotel caused by Operator's incompetence.

5.       By contrast, Operator (and upon information and belief Operator's affiliates John Does 1-5) have enjoyed nothing but upside while the Hotel continues to lose market share at an alarming rate and while expenses are significantly higher than its regional luxury competitors.

6.       Beneficiaries of the Owner have repeatedly raised these concerns and implored Operator to develop a sales and marketing strategy that will target the right market, encourage group and contract business to engage with the Hotel, reduce bloated expenses, and drive occupancy.  Operator's gross incompetence and deficient sales organization stands in the way of Owner making any profit on its investment, all the while lining Operator's pockets.

7.       Despite its obligation under the Management Agreement to operate the Hotel as a luxury hotel, perform its services "in accordance with the Operating Standard,"[2] and "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel," Operator has materially breach the Management Agreement and done anything but act reasonably or maximize the Hotel's profitability.

---

[2] The Operating Standard is defined in the Management Agreement to mean "the level of service and quality generally considered to be luxury and no less than the level of service and quality prevailing from time to time at the Trump Brand Hotels, (b) [sic] consistent with the Trump Brand Standards, and (c) in accordance with this Agreement, and taking into consideration local custom, usage and standards in Panama, as agreed to by the parties...."

8.    By its wrongful acts, incompetence, and violations of its own standards, Operator has not only cost Owner in excess of $15 million in damages, but has irreparably devastated the reputation, value and future success of the Hotel and Owner's investment therein.

9.    Accordingly, on October 14, 2017, Hotel TOC served Operator with a Notice of Default (the "Default Notice")[3] detailing specific breaches of the Management Agreement and demanding that those breaches be cured (to the extent curable). However, as many, if not all, of the breaches articulated in the Default Notice are incurable pursuant to the express terms of the Management Agreement, Owner is entitled to immediately terminate the agreement as a matter of law.

10.   Based on Operator's failure and/or inability to cure the defaults articulated in the Default Notice, Owner brings this arbitration seeking, among other things: (i) a declaration that uncured Events of Default have occurred entitling Owner to terminate the Management Agreement, including, but not limited to, breaches of Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 4.2, 4.4, 4.6, 5.2(a), 5.2(e), 5.2(f), and 5.2(h); (ii) a declaration that, even if an Event of Default has not occurred, Owner is entitled to terminate the Management Agreement under the laws of personal services contracts and agency; and (iii) damages in an amount to be proven but no less than $15 million to compensate Owner for Operator's flagrant, calculated and material breaches of the Management Agreement and its fiduciary duties to Owner, including interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

11.   **ICC Arbitration**. This dispute is governed by the arbitration provision in the Amended and Restated Hotel Management Agreement for Trump Ocean Club International Hotel & Tower made among Trump Panama Hotel Management LLC, Newland International

---

[3] A true and correct copy of the Default Notice is attached hereto as Exhibit 3.

Properties Corp. ("Hotel Amenities Unit Owner," now owned by Ithaca Capital Investments II, S.A.), Hotel TOC, Inc., and Owners Meeting of the P.H. TOC (the "P.H. TOC"), dated as of April 11, 2011, and as amended (the "Management Agreement").  Pursuant to Article 9, disputes arising out of the Management Agreement, including, but not limited to, Events of Default, are to be resolved by binding arbitration before the International Chamber of Commerce (the "ICC").

12.     Section 9.1 of the Management Agreement provides:

> Unless otherwise specifically provided for in this Agreement, all disputes, controversies, claims or disagreements arising out of or relating to the Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner.
>
> 9.1.1   Either Party may submit the Dispute to the International Chamber of Commerce for binding arbitration under then existing ICC Commercial Arbitration Rules. ...

13.     Since the disputes raised herein in this Request for Arbitration concern Operator's material breaches of the Management Agreement and Owner's right to terminate Operator, these claims are properly brought before the ICC.

14.     **Language and Place of Arbitration**.  Pursuant to Sections 9.1.2 and 9.1.5 of the Management Agreement, the language of the arbitral proceedings shall be English and the place of the arbitration shall be Panama City, Panama.

15.     **Governing law**.  Section 12.3 of the Management Agreement further provides that "all disputes relating to the performance or interpretation of any term of this Agreement... shall be construed under and governed by the internal laws of the State of New York...."

## APPOINTMENT OF ARBITRATOR

16.     The Management Agreement provides that any arbitration conducted in accordance with Article 9 of the agreement will be conducted by a panel of three arbitrators.

17.     Specifically, arbitrators must meet the following qualifications:

> Each arbitrator shall have not fewer than 10 years of experience (at the time the request for arbitration is filed) in the luxury hotel business as construed under U.S. market standards (and no fewer than five years of experience in the luxury condominium business), shall be independent of the parties as provided by the ICC Commercial Arbitration Rules, and shall not be an Affiliate of or a Person who has any past (within the prior three years from the date the arbitration is filed), present, or currently contemplated future business or personal relationship with Owner, Promoter/Developer, any owner of 10% of the Hotel Units or any other category of Units, or Operator.

Management Agreement at § 9.1.1.

18.     The Management Agreement also provides the method for appointing an arbitration panel and specifies that each party to the arbitration is entitled to select one arbitrator. Specifically, the Section 9.1.1 provides:

> Each of Operator, on the one hand, and any one or more of the other Parties, on the other hand, shall propose one arbitrator by written notice incorporated into the request for arbitration and the answering statement, to the other Party, and the two arbitrators selected shall, within twenty (20) days after their appointment, select a third arbitrator. If either Party does not select an arbitrator within twenty days after the Dispute is submitted, then an arbitrator shall be selected for that Party under the ICC Commercial Arbitration Rules. In the event that the parties are unable to obtain the services of arbitrators which meet the qualifications set forth in this **Section 9.1.1**, the parties shall use diligent efforts to obtain the services of arbitrators whose qualifications are substantially similar to those set forth above.

*Id.* (emphasis in original).

19.     Hotel TOC hereby designates Cecilia Fanelli as its party appointed arbitrator.  Ms.

Fanelli's contact information is as follows:

> Cecelia L. Fanelli, Esq.
> Steptoe & Johnson LLP
> 1114 Avenue of the Americas
> New York, New York 10036
> Tel.: 212.506.3925
> Fax: 212.506.3950
> cfanelli@steptoe.com

## THE PARTIES

20.     Claimant, Hotel TOC, Inc., is a corporation formed under Panamanian law, with

its principal place of business located at la Propiedad Horizontal P.H. TOC, Ciudad de Panamá,

República de Panamá.

21.     All communications to Hotel TOC in connection with this proceeding should be

sent to its counsel, as follows:

> Joshua D. Bernstein
> Darryl R. Graham
> Kathleen M. Prystowsky
> Vanessa I. Garcia
> AKERMAN LLP
> 666 Fifth Avenue, 20th Floor
> New York, New York 10103
> Tel: 212.880.3800
> Fax: 212.259.7181
> Joshua.Bernstein@akerman.com
> Darryl.Graham@akerman.com
> Kathleen.Prystowsky@akerman.com
> Vanessa.Garcia@akerman.com
>
> Jose Carrizo
> MORGAN & MORGAN
> MMG Tower, 23rd Floor
> Avenue Paseo del Mar, Costa del Este
> Panama, Republic of Panama
> Tel.: 507.265.7777
> Fax: 507.265.7700
> Jose.Carrizo@morimor.com

22.     Respondent Trump Panama Hotel Management LLC is a limited liability company formed under Delaware law, with its principal place of business at 725 Fifth Avenue, 26th Floor, New York, New York 10022.

23.     Pursuant to the Management Agreement, all communications to Respondent Trump Panama Hotel Management LLC should be sent to all of the following:

Allen Weisselberg
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 26th Floor
New York, New York 10022
Tel:    212.715.7224
Fax:    212.832.5396
weisselberg@trumporg.com

Jason Greenblatt, Esq.
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 26th Floor
New York, New York 10022
Tel:    212.715.7212
Fax:    212.980.3821
jgreenblatt@trumporg.com

Donald J. Trump, Jr.
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7247
Fax:    212.688.8135
djtjr@trumporg.com

Ivanka Trump
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7256
Fax:    212.688.8135
itrump@trumporg.com

Eric Trump
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022

Tel:   212.715.7256
Fax:   212.688.8135
etrump@trumporg.com

Jim Petrus
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:   212.715.7227
Fax:   212.688.8135
jpetrus@trumporg.com

24.     Upon   information   and   belief,   Respondent   Trump   International   Hotels
Management, LLC is a limited liability company formed under Delaware law, with its principal
place of business at 725 Fifth Avenue, 26th Floor, New York, New York 10022.

25.     Upon   information   and   belief,   Respondent   Trump   International   Hotels
Management, LLC assigned certain of its interests in the Management Agreement to Respondent
Trump Panama Hotel Management LLC.

26.     All communications to Respondent Trump Panama Hotel Management LLC
should be sent to all of the following:

Allen Weisselberg
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 26th Floor
New York, New York 10022
Tel:   212.715.7224
Fax:   212.832.5396
weisselberg@trumporg.com

Jason Greenblatt, Esq.
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 26th Floor
New York, New York 10022
Tel:   212.715.7212
Fax:   212.980.3821
jgreenblatt@trumporg.com

Donald J. Trump, Jr.
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7247
Fax:    212.688.8135
djtjr@trumporg.com

Ivanka Trump
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7256
Fax:    212.688.8135
itrump@trumporg.com

Eric Trump
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7256
Fax:    212.688.8135
etrump@trumporg.com

Jim Petrus
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7227
Fax:    212.688.8135
jpetrus@trumporg.com

27.     Upon information and belief, Respondents John Does 1-5 are individuals and/or

legal entities, affiliated with Operator, the names and addresses of which are presently unknown.

28.     Upon information and belief, at all relevant times, John Does 1-5 are individuals

and/or entities that dominated and controlled Operator, and primarily transacted Operator's

business instead of its own.

29.     Upon information and belief, John Does 1-5 used their control and domination of

Operator to breach Operator's legal duties, causing damages to Owner.

30.     Indeed, upon information and belief, Operator is nothing but a pass-through entity created by John Does 1-5 to manage the Hotel and purportedly and fraudulently shield John Does 1-5 from liability to Operator's creditors (including Hotel TOC), thereby attempting to make Operator judgment proof so as to prevent an actual recovery for Operator's breaches of the Management Agreement and its fiduciary duties, among other things.

31.     Accordingly, pursuant to New York law (which governs the Management Agreement and this proceeding), Hotel TOC is entitled to pierce the corporate veil and to a judgment in this arbitration declaring that John Does 1-5 are liable for all damages awarded.

## FACTUAL BACKGROUND

### I.     The Development of the Trump Ocean Club International Hotel & Tower

32.     The Trump International Hotel & Tower Panama is part of a 70-story, luxury mixed-use, multi-component tower located on the waterfront overlooking Panama Bay in the Punta Pacifica area of Panama City, Panama, which includes a hotel, residences, event space, restaurants, and casino.

33.     The tower complex is comprised of five components: the Hotel, residential condominiums, offices, commercial space, and a casino.  Collectively, these components are governed by a horizontal property regime known as the P.H. TOC, a condominium association.

34.     The Hotel, one of the finest luxury hotel properties in Latin America, consists of 369 Hotel Units and a Hotel Amenities Unit, each of which are owned by individual unit owners. To ensure effective management of the Hotel, these individual unit owners are beneficiaries in an entity known as the Hotel TOC Foundation, which in turn controls Hotel TOC, Inc. – the Claimant here.

35.     The tower's developers envisioned that the P.H. TOC and Hotel TOC would be managed and operated by an international luxury hotel brand to ensure the efficient and

11

comprehensive operation of the tower as a luxury property that would maximize the investment for all component owners.

36.     In connection with this project, the developer entered into a series of agreements with Donald J. Trump and his affiliates to brand, manage and operate the Building, including a condominium management agreement, hotel management agreement, and license agreement. These agreements streamlined the management of the Building to ensure that all the components, particularly the Hotel and condominium, would be maintained and operated in a cohesive manner as a luxury property.

37.     To that end, on or about March 16, 2006, K Group Developers Inc. entered into a License Agreement with Donald J. Trump to license the "Trump" trademark as the brand for the tower.[4]  Pursuant to that agreement, the developer received a license to use the Trump Mark to brand the tower.

38.     In connection with the development of the tower, P.H. TOC entered into a twenty-year management agreement with a Trump affiliate, known as the Trump Panama Condominium Management LLC ("Trump Condo"), to operate common areas of the tower.   Under that agreement, Trump Condo agreed to provide luxury services to P.H. TOC, including the maintenance and operation of the tower.

39.     Upon information and belief, the P.H. TOC Management Agreement was terminated after allegations arose concerning Trump Condo's gross negligence and potentially fraudulent conduct, including the commingling of accounts for the various components and the distribution of funds from P.H. TOC bank accounts without authorization.   Upon information

---

[4] Thereafter, K Group Developers Inc. assigned its interests in the agreement to Newland and Mr. Trump assigned his interest in the agreement to Trump Marks Panama LLC.

and belief, Trump Condo agreed to the termination of the P.H. TOC Management Agreement pursuant to a Mutual Release and Settlement Agreement.

40.     Additionally, on or about August 11, 2008, Hotel TOC (as Owner of the Hotel component and representative of the individual hotel unit owners) entered into the Management Agreement, which is the subject of this arbitration, with Respondent Operator (another Trump affiliate) to manage and operate the Hotel Units and Hotel Amenities Units[5] as a first class, luxury hotel.  Operator's obligations under the Management Agreement are described more fully below.

## II.     **The Hotel Management Agreement**

### A.     **Operator's Contractual and Fiduciary Obligations to Owner**

41.     In connection with the Management Agreement, Operator held itself out to be a sophisticated international luxury hotel manager that could position the Hotel as a luxury property and maximize the revenue stream to Owner.

42.     Indeed, the express purpose of retaining Operator was to "operate the Hotel Units and Hotel Amenities Units as a first class, luxury hotel."  Management Agreement at p.2.

43.     Based on these representations, Owner engaged Operator "as its agent to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel."  *Id.* at § 2.1.1.

44.     The initial term of the Management Agreement is for a period of twenty (20) years after the Opening Date, which runs until July 6, 2031.  *Id.* at § 5.1.  While the Management Agreement includes an automatic five (5) year Renewal Term, both the Owner and the Operator

---

[5] In connection with the Management Agreement, the Hotel Amenities Unit Owner leased the Hotel Amenities Unit to Owner.  Pursuant to the Management Agreement, Operator is contractually obligated to oversee compliance of the lease and cause Owner to perform its obligations under the lease.  *See* Management Agreement at § 2.2.29.

have the right to forgo the Renewal Term by terminating the agreement by notice given twelve

(12) months prior to the expiration date. *Id.* at § 5.1.2.

45.    Under the Management Agreement, Operator is contractually obligated to "use its

commercially reasonable efforts to operate the Hotel in a manner to endeavor to maximize the

profitability and long term value of the Hotel." *Id.* at § 2.2.

46.    Specifically, Section 2.2 provides:

> Operator hereby accepts the foregoing engagement and covenants
> and agrees to manage the Hotel and perform Operator Hotel
> Services and Other Operator Services during the Term of this
> Agreement in accordance with the Operating Standard and to ***use
> its commercially reasonable efforts to operate the Hotel in such a
> manner to endeavor to maximize the profitability and long term
> value of the Hotel***. Without limiting the generality of the
> foregoing, but subject to the limitations set forth in Sections 2.3
> and 2.6-2.11 and the other provisions of this Agreement, Operator
> shall have the authority and duty, as necessary or advisable for the
> proper operation and maintenance of the Hotel and performance of
> the other Operator Services in accordance with the Operating
> Standard....

*Id.* at § 2.2 (emphasis added).

47.    Moreover, Operator also has the "authority and duty" to operate and maintain the

Hotel in accordance with the Operating Standard, *i.e.* as a luxury hotel. *Id.*

48.    The definition of "Operating Standard" in the Management Agreement provides:

> <u>Operating Standard</u> - means the ***level of service and quality
> generally considered to be luxury*** and no less than the level of
> service and quality prevailing from time to time at the Trump
> Brand Hotels, (b) consistent with the Trump Brand Standards, and
> (c) in accordance with this Agreement, and taking into
> consideration local custom, usage and standards in Panama, as
> agreed to by the parties; provided however, in the event the Parties
> are unable to agree upon the local standard, if any, to be applied,
> such dispute shall be resolved pursuant to Section 9.1 hereof.

*Id.* at 15 (emphasis added).

49.     To that end, and evidencing Operator's overall power and control over the Hotel, the Management Agreement states that "except as may otherwise be expressly provided for [therein], Owner delegates all authorities and responsibilities for operation of the Hotel to Operator." *Id.* at § 2.1.3.

50.     This delegation to Operator includes providing customary hotel operator services, supervising Hotel personnel, causing the Hotel to be maintained in good order, and making "all necessary repairs, replacements, corrections and maintenance ... to maintain the competitive position of the Hotel in its market." *See e.g.*, *id.* at §§ 2.2.14-2.2.15, 2.2.19, 2.2.27, 2.2.32.

51.     Operator is also charged with the authority to operate the Hotel as Owner's agent in all of the following aspects, among others:

- "[T]he establishment and maintenance of the Hotel Accounts..." *Id.* at § 2.1.3.

- "[D]irecting all Gross Operating Revenue/Hotel and Gross Operating Revenue/Hotel Amenities Units, respectively to the appropriate bank account." *Id.*

- "[D]etermining room rates, food and beverage menu prices and charges to Hotel Guests for Other Operator Services." *Id.*

- Determining "the terms of guest occupancy and admittance to the Hotel, use of rooms for commercial purposes, policies relating to entertainment, labor policies, publicity and promotion activities and technology services and equipment to be used in the Hotel..." *Id.*

- Establishing and implementing "marketing, sales and reservations programs and systems to secure reservations for the Participating Units, including all arrangements with wholesale and bulk volume purchasers." *Id.* at § 2.2.1.

- Supervision and procurement of "all inventories, provisions, consumable supplies and OS&E as Operator..." *Id.* at § 2.2.19.

15

- Performance of "such other tasks as are customary in the performance of the hotel operator services at hotels the standard of the Operating Standard." *Id.* at § 2.2.32.

52.     Operator also has the obligation under the Management Agreement to maintain the Hotel's accounts in accordance with the Uniform System of Accounting and to provide regular, detailed statements of accounts to Owner. *Id.* at § 2.5.

53.     For example, Operator is required to provide Owner with monthly operational statements that provide a "statement of net cash flow from operations in reasonable detail for such month as well as the cumulative Fiscal Year-to-date," "balance sheet including current month and prior beginning of year balance comparisons and differences in reasonable detail," and "schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion." *Id.* at § 2.5.3.

54.     Operator is also obligated to make distributions to the Hotel Unit Owners and the Hotel Amenities Unit Owner based on quarterly financial statements detailing the performance of each such Hotel Unit Owner's Hotel Unit(s) during that period. *Id.* at § 2.5.4.

55.     Operator, like any hotel operator, is also responsible for developing a cogent and effective sales and marketing plan for the Hotel.   Specifically, Section 2.3.1(c) of the Management Agreement provides that the plan must include the following:

> Operator's intentions for the next Fiscal Year for the promotion and positioning of the Hotel, including a plan for the activities to be undertaken by Operator pursuant to Section 2.2, which plan shall include a description of the Hotel's target markets, the Hotel's relative position in those markets, the proposed room rate structures for each market segment, the current and future sales plan for the Hotel, the advertising and public relations plan for the Hotel, and the proposed staffing for the sales and marketing activities of the Hotel ("Marketing Plan").

56.     In exchange for these services, Operator charges Owner a Base Fee of 3.5% of Gross Operating Revenue for the Hotel for fiscal year 2017, which increases to 3.75% for fiscal years 2018 – 2031.

57.     An incentive fee of 10% over and above the Base Fee is also included in the Management Agreement if certain contractually prescribed benchmarks are met, as motivation for Operator to fully perform its obligations under the agreement.

58.     Operator has not come close to reaching the required benchmarks to receive the incentive fee in the last few years.

59.     Rather, Operator has consistently and materially breached its contractual and fiduciary obligations by failing to develop an effective sales and marketing strategy to target the proper market, encourage group and contract business to engage in the Hotel, and to drive occupancy.  Instead, Operator has been losing market share steadily and stands in last place among its peer luxury hotels in all the relevant metrics for success in the hotel industry, including ADR, RevPAR, and occupancy.  This decline in occupancy has a direct impact on the Hotel's bottom line.  The resulting decline in revenues has been particularly precipitous in the past two years, leaving Owner to shoulder the financial burden of the Hotel on its own, all the while Operator lines its pockets with ill-gotten management fees.

**B.     Owner's Contractual Rights to Terminate the Management Agreement**

60.     The Management Agreement provides Owner with a contractual mechanism to terminate Operator in the event Operator defaults on its obligations under the Management Agreement.

61.     Pursuant to Section 5.2 of the Management Agreement, Owner is entitled to serve a Notice of Default upon a specified "Event of Default."  These defaults include:

a.   the failure of Operator to disburse any amount to Hotel Unit Owners or Hotel Amenities Unit Owner as provided for in this Agreement ... for a period of thirty (30) days after the date on which notice of the failure has been given to the defaulting party by the other party;

\*      \*      \*

e.   the commission of fraud, crime of moral turpitude or willful misconduct or gross negligence which does not otherwise constitute a breach of any express covenant or obligation under this Agreement;

f.   a termination of the ... Condominium Management Agreement[6] in accordance with [its] terms, for any reason, for which there shall be no opportunity to cure under this Agreement;

h.   the failure of any Party to fulfill any of the other material covenants, undertakings, obligations, or conditions set forth in this Agreement, and the continuance of any such default for a period of thirty (30) days after written notice of the failure; provided that if upon the receipt of any notice the defaulting party promptly and with all due diligence attempts to cure the default and, if the non-monetary default is not susceptible of being cured within the thirty (30) days period and the defaulting party advises the other party in writing of the reasonable period which will be required to cure the default and with all due diligence takes and continues action to cure and cures the failure within the reasonable period so advised, then no Event of Default shall be deemed to have occurred unless and until the defaulting party has failed to take or to continue to take action or to complete the cure within such reasonable period.

*Id.* at § 5.2

62.   The Management Agreement further provides that the non-defaulting party may, "without prejudice to any other recourse at law or in equity" issue a notice of termination upon the defaulting party, and that such termination "shall be effective no earlier than thirty (30) days and no later than ninety (90) days following the date the notice of termination is given." *Id.* at § 5.2.2.

---

[6] Condominium Management Agreement is defined in the Management Agreement to mean the P.H. TOC Management Agreement, referred to herein, and which has been terminated surrounding allegations of the mismanagement.

63.     Notwithstanding these provisions, pursuant to Section 5.2.4 of the Management Agreement, "[a]ny termination notice given pursuant to Section 5.2.2 ... shall not result in the termination of this Agreement if a bona fide dispute with respect to any alleged Event of Default ... has arisen and such dispute has been submitted to [the ICC for] resolution."

64.     Based on Operator's numerous defaults under the Management Agreement, as described in further detail below, and the reasonable expectation that Operator will contest Owner's Default Notice, and any forthcoming Notice of Termination, Owner submits these disputes to this arbitration panel in accordance with Sections 5.2.4 and 9.1 of the Management Agreement.

### III.     Operator's Material Breaches and Incurable Defaults of the Management Agreement

65.     Each day that the Management Agreement remains in place, Owner's investment in the Hotel is in jeopardy due to Operator's gross incompetence, deficient sales organization and failure to implement an effective sales and marketing strategy designed to drive occupancy and compete with its peer luxury hotels.

66.     Over the past few years, Operator has consistently failed to meet its obligations under the Hotel Management Agreement.  With the P.H. TOC Management Agreement now terminated, the Hotel's bottom line has been even worse.

67.     Operator has materially breached its contractual and fiduciary obligations under the Management Agreement to "supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel," operate the Hotel in accordance with the Operating Standard, and to "use its commercially reasonable efforts to operate the Hotel in such a manner as to endeavor to maximize the profitability and long term value of the Hotel."

68.     Operator has also breached its obligations to maintain the Hotel as a luxury hotel, use its commercially reasonable efforts to manage the costs and expenses of the Hotel, make disbursements to Hotel Unit Owners based on actual costs and expenses, maintain the Hotel's financial records in accordance with the Uniform System of Accounts, include the minimum disclosures required in the monthly operating reports, maintain the appropriate funds in segregated reserve accounts, and permit Owner to make monthly payment for Common Area Maintenance of the Hotel amenities and reimburse the Hotel Amenities Unit Owner for all such payments made to date.

69.     This conduct is a material breach and default of, among other things, Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 4.1, 4.2, 4.4, 4.6, 5.2(a), 5.2(e), 5.2(f), and 5.2(h) of the Management Agreement.

**A.      The Termination of the P.H. TOC Management Agreement Is an Incurable Event of Default Entitling Owner to Terminate As a Matter of Law**

70.     As explained above, the developer intended for all the components of the tower to be managed and operated as a luxury property by one international luxury brand management company – Trump and his affiliated companies – in order to realize economies of scale and maximize the profitability of the each component.

71.     Recognizing that Operator may not be able to fulfill its obligations to operate the Hotel if the P.H. TOC Management Agreement were terminated, the parties to the Management Agreement included in Section 5.2(f) a cross-termination provision, which allows Owner the option to terminate the Management Agreement as a matter of right if the P.H. TOC Management Agreement is terminated.  By contract, this default is incurable as a matter of law.

72.     Indeed, since the termination of the P.H. TOC Management Agreement in Summer 2015, the Hotel's bottom line has rapidly deteriorated.

**73.**     In addition to the loss of efficiencies and Operator's apparent lack of interest in continuing to operate the Hotel as a luxury brand, Owner has also been directly, financially impacted by the termination of P.H. TOC Management Agreement in the form of lost economies of scale and detrimental expense allocations, as evidenced by, among other things, the July 16, 2016 readjustment charged to Hotel TOC of approximately $1.5 million.

74.     Accordingly, Owner is exercising its right under Section 5.2(f) to terminate the Management Agreement, which default is incurable and results in immediate termination of Operator.

75.     On this basis alone, and as a matter of law, Owner is entitled to a declaration that the Management Agreement is terminated.

**B.     Operator's Fatally Flawed Sales and Marketing Strategy**

76.     Owner is also entitled to terminate the Management Agreement based on Operator's inability to develop an effective sales and marketing strategy, which is causing the Hotel to lose market share dramatically and which has resulted in the Hotel underperforming compared to its luxury competitors.

77.     Beneficiaries of the Owner have repeatedly raised its concerns with Operator and implored Operator to develop a sales and marketing strategy that will target the right market, encourage group and contract business to engage with the Hotel, and drive occupancy. Operator's gross incompetence and deficient sales organization stands in the way of Owner making any profit on its investment.

78.     Significantly, over the last few years, Operator has failed to generate room nights and is continuously losing market share to lower quality hotels at an exponential rate.  Operator represents itself as the manager of a luxury brand and has been given the opportunity to manage

one of the best hotels in Panama (if not the best) in terms of amenities, finishes, and waterfront location. Yet, despite Operator's boasts, the Hotel is practically empty.

79.     As compared to its peers, the property was 2 out of 7 in terms of occupancy for all of 2015, but fell to 7 out of 7 in 2016 and remains in last place for most of 2017.

80.     This decline in occupancy has a direct impact on the Hotel's bottom line. In May 2017, the Hotel was outperformed in RevPAR by lesser hotels with substandard amenities, smaller rooms, and lower quality finishes, including select service hotels like the Courtyard by Marriott. This decline in revenue relative to not only its luxury peers, but also to bargain hotels in Panama City, is the direct result of Operator's gross incompetence and failure to implement a commercially reasonable strategy to market the Hotel.

81.     Operator has also failed to dedicate the standard brand resources to marketing the Hotel. For example, even though Latin America is the Hotel's primary source market, the Global Sales Office has only one person dedicated to that market. Of the seven individuals working in the Global Sales Office, not a single person is located in Florida, Brazil, Colombia or Mexico, despite those being some of the main markets for guests to the Hotel.

82.     Moreover, upon information and belief, only a fraction of room nights (approximately 5%, or even less) comes through Operator's reliance on its brand resources; whereas a typical international luxury hotel management company produces approximately 18-22% of room nights, with some at 30%.

83.     However, despite recognizing that lead generation is a significant issue plaguing the Hotel, Operator has not developed any, much less an effective, sales and marketing strategy. Rather than address the growing concern of market saturation as any other reasonable operator would, including by ensuring a steady stream of corporate accounts and group stays, Operator

22

has in fact lost this business. In an attempt to reverse course, beneficiaries of the Owner solicited dozens of corporate accounts in order to have some regular room nights at the Hotel, but Operator failed to use commercially reasonable efforts to solicit these accounts.

84.     Additionally, despite knowing that the W Hotel will be opening a new hotel in Panama City this year, Operator has refused to develop a detailed strategic plan to mitigate further market saturation, does not know what to do, and has refused to develop any contingency plans to ensure sufficient occupancy and revenues after the W Hotel opens. This same failure has occurred twice before, with the openings of the Hilton Panama and the Westin Panama Hotel.

85.     As a result of Operator's continued failure to implement an effective sales strategy, occupancy has declined significantly over the last two years and revenue generation is down approximately 35% from 2015, an unprecedented decline for any hotel, in any market, especially since over half of that decline occurred in 2017, without a new luxury hotel entering the market year to date.

86.     Furthermore, Operator has failed to take reasonable cost saving measures based on the steep decline in occupancy and revenue. Rather, Operator's costs are far higher when compared to regional luxury competitors. Based on a review of the scant financial information that Operator provides, it appears that costs relating to rooms, payroll, food and beverage, and administrative and general expenses, among others, are materially and needlessly higher (especially given the abysmal occupancy rates at the Hotel).

87.     Alarmingly, the one area where Operator appears to have reduced costs is marketing – the very place where dollars are needed and should be wisely invested in order to ensure appropriate occupancy and revenue levels for this luxury Hotel.

23

88.     Beneficiaries of the Owner have repeatedly notified Operator of its objections to Operator's sales and marketing strategy (for example, the July 13, 2017 meeting in New York and the August 27, 2017 meeting at the Hotel, as well as many other meetings and communications).

89.     Beneficiaries of the Owner has also repeatedly offered solutions that Operator could implement to generate room nights, including engaging wholesalers to increase group business, implementing a performance review for the Director of Sales and Marketing, developing well-articulated value propositions against each of its competitors based on a SWOT analysis, and prioritizing lost accounts based on the volume they generate in the Panama market, among other things.

90.     In response to these critiques, Operator admitted that it needs to improve its sales and marketing strategy.  But despite this acknowledgement, Operator has not taken any of the obvious and imminently reasonable steps recommended and has not developed any other reasonable or effective steps that any reasonable operator would – and as the Hotel's competitors clearly have.  Moreover, Operator has failed to develop its own plans to improve occupancy, decrease costs, and improve the long term value of the Hotel.

91.     Based on Operator's inability to develop an effective sales and marketing strategy over the last two years, and the Hotel's continued decline relative to both its luxury peers and lesser quality hotels, Operator has materially breached its obligations under the Management Agreement, including, but not limited to, Sections 2.1, 2.2, 2.3, 2.4, and 2.6.  Operator is, therefore, in default pursuant to Sections 5.2(e) and 5.2(h) of the Management Agreement, which defaults cannot be cured, as evidenced by Operator's prior attempts to implement an effective sales and marketing strategy.

92.    Accordingly, Owner is entitled to both a declaration that an Event of Default has occurred and damages in an amount not less than $15 million resulting from Operator's material breaches of the Management Agreement, including interest, costs, and attorneys' fees.

### C.    Operator's Failure to Operate the Hotel as a Luxury Property

93.    As reflected by the Hotel's abysmal and unsustainable financial performance for the 2015 and 2016 fiscal years, Operator has also failed to operate the Hotel as a luxury hotel in accordance with the Operating Standard.

94.    Recent guest reviews made on third-party websites, such as TripAdvisor, Hotels.com, and Oyster.com evidence Operator's failure to maintain and operate the Hotel as a luxury property.  For example, reviews from TripAdvisor for the period March 2017 through the present include guest complaints about service problems, and rooms that have not been cleaned.

95.    The reviewers repeatedly noted that management did not seem invested in the property with at least two guests described the Hotel as feeling "abandoned."  Repeat guests have also noted the changes in the Hotel, with one guest, who had stayed at the property 6 times, explaining "it is unlikely we will return as the changes we experienced are too drastic from the last time we stayed."

96.    In response to many of these guest complaints, Operator provides a boilerplate response that admits it did not provide the luxury stay expected, further damaging the Hotel's reputation.  For example, in June 2017, the Guest Relations Manager of the Hotel responded to a guest's complaint that the hotel room door was broken and that an employee entered without even knocking with its standard response, as follows:

> TOCGM, Guest Relations Manager at Trump International Hotel
> & Tower Panama, responded to this review
>
> Responded June 30, 2017

Dear Guest,

Thank you for taking the time to share your feedback. It is feedback like this that we learn from and use to improve. We work hard to deliver an exceptional guest experience, and it's apparent in this case that we fell short. If you give us a chance to earn back your trust, I can assure you that we will do our best to give you the great hotel experience that so many of our guests have grown so fond of.

Sincerely,
TrumpPanama
Executive Office Manager

97.     By failing to maintain the service levels that its guests expect from a luxury hotel, provide clean rooms, and adequately and appropriately address guest's complaints, Operator has violated its duty to operate the Hotel as a luxury hotel and caused severe reputational damage to the Hotel.    Accordingly, it has materially breached its obligations under the Management Agreement, including, but not limited to, Sections 2.1, 2.2, 2.3, 2.4, and 2.6, and is thus in default of Sections 5.2(e) and 5.2(h), which defaults cannot be cured.

98.     For these reasons, Owner is entitled to a declaration that an Event of Default has occurred and damages for these material breaches of the Management Agreement, including interest, costs, and attorneys' fees.

**D.     Operator's Failure to Make Regular Disbursements to Unit Owners**

99.     In addition to the breaches described above, Operator has also breached the Management Agreement by failing to make distributions to the unit owners in accordance with Sections 2.5 and 4.6.

100.     Significantly, rather than calculate distributions to Unit Owners based on actual revenues and actual costs, Operator has impermissibly chosen to calculate distributions based on budgeted costs, which far exceed the Hotel's actual expenditures due to such abysmal occupancy levels.    This results in Unit Owners receiving little in distributions, while Operator hoards

Owner's cash, possibly in order to fund prior deficiencies and unfunded reserves, in violation of Sections 2.5, 4.4, and 4.6 of the Management Agreement.

101.    Pursuant to Section 5.2(a) of the Management Agreement, an Event of Default has occurred based on Operator's failure to disburse owed amounts to Hotel Unit Owners and the Hotel Amenities Unit Owner.

102.    Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, an order that Operator must make distributions in accordance with the Management Agreement, as explained herein, and damages resulting from Operator's failure to make such distributions, with interest.

E.    **Operator's Failure to Make Regular Disclosures**

103.    Operator has also failed to meet its obligation to make disclosures of financial information that is necessary for Owner to properly evaluate how the Hotel and Operator are actually performing.

104.    Operator's meager disclosures do not meet the standards required in Section 2.5 of the Management Agreement.  For example, the Operator is not providing all aspects of the Consolidated Income Statement in accordance with the Uniform System of Accounts, including portions of the base management fee, brand marketing fee, and FFE Reserve related to the revenues of the Food and Beverage department.  Other deficiencies include the failure to provide an adequate monthly statistical report, and a detailed labor analysis.  These deficiencies result in misstatements, including understated Food and Beverage profit and Gross Operating Profit, as well as understated marketing expenses, management fees, and Non-Operating Income and Expenses.

105.    Operator has also failed to provide Owner all contractually required information in the monthly reports, including, but not limited to:

27

- A statement of net cash flow from operations in reasonable detail for such month as well as the cumulative Fiscal Year-to-date;

- A statement of the amount of the Management Fees and Reimbursable Expenses payable or reimbursable to Operator or its Affiliates;

- A balance sheet including current month and prior beginning of year balance comparisons and differences in reasonable detail;

- A schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion;

- The monthly bank statements and reconciliation;

- A monthly statistical report, including room availability and room sales;

- A detailed labor analysis in such form as Owner shall reasonably request; and

- The general ledger for the prior month.

106. Moreover, Operator failed to timely provide Owner with audited financial statements, which arrived more than 8 months after the close of the fiscal year, prompting Owner to question the integrity of Operator's accounting operations.

107. Similarly, the 2016 budget was not issued until January 2017 – three months late. Operator's purported excuse was that P.H. TOC would not cooperate with Operator and provide actual figures, so Operator could not develop a budget. Given the termination of the P.H. TOC Management Agreement, Operator eventually produced a budget relying on budgeted figures for P.H. TOC. Operator could have produced this "budget" in October 2016, as required by the Management Agreement.

108. Most recently, in a meeting on October 3, 2017, Operator failed to present the Owner or the beneficiaries of the Owner with an annual budget for 2018 for their comment and

28

approval in compliance with the Management Agreement. Rather, Operator claims that it (Operator) has approved the budget because it acts for Hotel TOC, the Owner.

109.    Upon information and belief, Operator never presented the 2018 budget to the board of Hotel TOC, the Assembly of Shareholders, or any of the Beneficiaries of the Foundation for their approval, but instead has purported to usurp control of Hotel TOC and dispensed with corporate formalities, in flagrant violation of its contractual and fiduciary obligations to Owner.

110.    These failures constitute material breaches of Sections 2.1, 2.2, 2.3, and 2.5 of the Management Agreement, among others, as well as breaches of fiduciary duties. Owner is, therefore, entitled to a damages resulting from these breaches and a declaration that an Event of Default has occurred pursuant to Sections 5.2(e) and 5.2(h).

### F.    Operator's Additional Breaches of the Management Agreement and Breaches of Fiduciary Duty

111.    Additionally, Operator has violated other provisions of the Management Agreement meant to maintain the integrity of Operator's accounting records.

112.    Notably, Section 4.2 of the Management Agreement requires Operator to maintain certain separate Capital Reserve Funds for the Hotel Units and the Hotel Amenities Units, which Operator is only entitled to use "for the purpose of the funding of Capital Improvements and replacement and renewal of FF&E for the Hotel Units, Hotel Amenities Unit, and Hotel Common Areas."

113.    In a meeting on October 3, 2017, Operator produced a written presentation to beneficiaries of the Owner, admitting a reserves funding shortfall of approximately $1.9 million. Upon information and belief, not only do the reserve accounts have a deficit of $1.9 million, but Operator has also commingled these accounts in violation of the Management Agreement.

114.    Upon information and belief, Operator has drained these reserve accounts to cover operational expenses, all the while lining its pockets with management fees.

115.    For example, Hotel TOC's 2016 Audited Financials state in Note 14:

Provision for food, beverage, furniture and equipment

Transactions in the provision for purchases of food, beverages, furniture, and equipment are summarized below:

|  | 2016 | 2015 |
|---|---|---|
| Provision for food and beverage |  |  |
| Beginning balance | 1,073,019 | 826,983 |
| Provision charged to expenses | 268,519 | 236,046 |
| Project, acquisition of food and beverage | (153,212) | - |
| Ending balance | 1,188,326 | 1,073,019 |

The bank account as of December 31, 2016 maintains a balance available for the provision for purchase of food and beverages of USD785,500, showing an insufficiency with respect to the provision for USD402,825.

|  | 2016 | 2015 |
|---|---|---|
| Provision for furniture and equipment |  |  |
| Beginning balance | 1,996,161 | 1,530,857 |
| Provision charged to expenses | 383,774 | 465,304 |
| Project, acquisition of furniture and equipment | (929,886) | - |
| Ending balance | 1,450,049 | 1,996,061 |

The bank account as of December 31, 2016 maintains a balance available for the provision for purchase of furniture and equipment of USD518,339, showing an insufficiency with respect to the provision on for USD931,710.

***Hotel Toc, INC. has account receivable from unit owners for an amount of B/.392,859 (See Note 6) which explains in part the insufficiency of funds to make the contributions to the reserve fund.***

Hotel TOC's 2016 Audited Financials, n. 4 (emphasis added).

116.   The auditor's note confirms that Operator is not funding the reserves as required, but is in fact using what reserves remain to fund operational expenses.  Moreover, the auditor's note confirms that Operator is routinely withdrawing funds from the reserve accounts and, at times, replacing those withdrawals with funds from other sources (such as the receivables referred to above), expressly breaching the requirement that reserves can only be funded from Hotel revenues and must be segregated, not commingled.

117.   Moreover, based on Operator's admission that the unfunded reserves have increased from the approximately $1.3 million indicated in the 2016 Audited Financials to $1.9 million today, Operator has also breached Section 4.2 of the Management Agreement by not funding the reserve accounts, while also making distributions to unit owners.  In particular, Operator was aware in January 2017 that there was a binding agreement in place to sell the majority of Hotel Units and the Hotel Amenities Unit.  Despite this knowledge, Operator made distributions to unit owners who were in the process of selling their units without first funding the reserve accounts, as required under the Management Agreement, to the detriment of Owner and the current beneficiaries of Owner.

118.   As a result, Operator is liable to Owner for conversion and breach of fiduciary duties and must immediately fund the entire reserve shortfall, resulting from Operator's systemic, continued, and intentional breaches of Section 4.2. of the Management Agreement.

119.   Similarly, in accordance with the P.H. TOC Management Agreement, Operator was required to maintain segregated accounts for the various components, including Hotel TOC Inc. and the P.H. TOC.  However, upon information and belief, the funds for the two entities were commingled and the accounts looted.

31

120.    In addition to Owner's concerns that Operator is improperly commingling and distributing reserve funds, upon information and belief, that there have been significant improprieties in the procurement department and the way Operator's corporate expenses have been allocated to Owner.

121.    Operator is liable to Owner for damages resulting from Operator's breach of fiduciary duties and conversion, including interest, costs, and attorneys' fees.

## IV.    **Owner's Default Notice**

122.    On or about October 14, 2017, by reason of the breaches of the Management Agreement described above, Owner served Operator with a Default Notice.

123.    This Default Notice informed Operator that, by virtue of its wrongful acts and conduct, Operator was in default of, among other things:

> Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 4.1, 4.2, 4.4, and 4.6, 5.2(a), 5.2(e), 5.2(f), and 5.2(h) of the Management Agreement in that, by virtue of the foregoing conduct Operator has failed to, among other things: (i) supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel, including establishing a market-driven sales and marketing strategy that drives occupancy and is responsive to the Hotel's target market; (ii) operate the Hotel in accordance with the Operating Standard; and (iii) "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel."

124.    Pursuant to the procedures set forth in the Management Agreement, Owner put Operator on further notice that it was required to cure the enumerated defaults (to the extent curable – and many are not curable) by November 20, 2017 (the "Cure Date"), that being at least thirty (30) days from service of the Notice of Default, or Owner could terminate the Management Agreement.

125.    The Notice of Default required Operator to cure the defaults by taking the following actions:

[C]ompensating Owner for all damages caused by the foregoing conduct in an amount of up to at least $15 million;[7] (ii) increasing the average yearly occupancy level of the Hotel to 65%; (iii) achieving RevPAR penetration against the Competitive Set of at least 100%; (iv) developing immediate contingency plans that will generate more group lead generation; (v) developing a contingency plan to address the opening of the W Hotel in Panama; (vi) utilizing Operator's brand resources to contribute at least 18% in both group and transient sales; (vii) reviewing the job performance of the Director of Sales and Marketing; (viii) developing a detailed tactical sales action plan that clearly articulates strategic goals that are precise and objectively measureable to compare the Hotel's performance against that of its competitors; (ix) conducting a SWOT analysis against each of the Hotel's competitors; (x) revamping its cleaning and maintenance program; (xi) having a Management level employee respond to guest comments on publicly available review platforms, which includes a sales pitch of other Hotel amenities the guest may not have been aware of; (xii) permitting Hotel TOC to pay Common Area Maintenance for the Hotel amenities and reimburse all such payments to date; and (xiii) including Owner in Operator's regular sales meetings.

126.    The Notice of Default also notified Operator that some, if not all, of the foregoing defaults are incurable, including, but not limited to, the termination of the P.H. TOC Management Agreement pursuant to Section 5.2(f) of the Management Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

127.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 126 hereof as though fully set forth herein.

128.    The Management Agreement constitutes a legally binding and enforceable contract.

129.    The Management Agreement requires Operator to, among other things, (i) supervise, direct, and control the management, operation, and promotion of all aspects of the

---

[7] Owner reserves the right to seek additional and other damages for Operator's breaches of the Management Agreement and its fiduciary duties, including, but not limited to, the diminution in value of the Hotel, as well as damages that accrue in the future.

Hotel, including establishing a market-driven sales and marketing strategy that drives occupancy and is responsive to the Hotel's target market, Management Agreement at § 2.1; (ii) operate the Hotel in accordance with the Operating Standard, *id.*, at 2.2; and (iii) "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel," *id.*

130.    Operator breached the Management Agreement by, among other things, failing to perform according to Operating Standard, and failing to make commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel by, among other things, (i) employing fatally flawed sales and marketing strategies, (ii) failing to properly manage the Hotel staff and physical condition of the Hotel, (iii) failing to address the plummeting occupancy levels, declining revenues, and increased costs despite repeated demands by Owner, and (iv) wasting funds and assets, all to Owner's detriment.

131.    By virtue of Operator's breaches of these contractual obligations of the Management Agreement, Owner has been damaged in an amount to be determined through arbitration but not less than $15 million, plus interest, costs, and attorneys' fees.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

132.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 131 hereof as though fully set forth herein.

133.    The Management Agreement required Operator to, among other things, (i) make disbursements to Hotel Units Owners based on actual costs and expenses; (ii) maintain the Hotel's financial records in accordance with the Uniform System of Accounts; (iii) include in the minimum disclosures required in the monthly operating report; and (iv) maintain the appropriate funds in segregated reserve accounts.

134. Operator has failed to perform all of these obligations.

135. Owner has fully complied with its obligations under the Management Agreement.

136. By virtue of Operator's breaches of these obligations under the contract, Owner has been damaged in an amount to be determined through arbitration but not less than $5 million, plus interest, costs, and attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Conversion)

137. Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 126 hereof as though fully set forth herein.

138. Claimant has a possessory right or interest in the Hotel property and assets.

139. Operator has dominion over Hotel property and assets, namely Hotel funds and revenue.

140. In derogation of Owner's right or interest in the Hotel assets, Operator interfered with and converted Hotel assets by, among other things, failing to maintain segregated bank accounts for Hotel TOC and P.H. TOC. Instead, upon information and belief, the funds for the two entities were commingled up until 2015 and the accounts looted.

141. By reason of Operator's conduct, Claimant has been damages in the amount of the stolen funds, which is an amount to be determined at arbitration but not less than $3 million, plus interest, costs, and attorneys' fees.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

142. Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 141 hereof as though fully set forth herein.

143. Pursuant to Section 2.1.1 of the Management Agreement, Operator serves as Owner's "agent" to "supervise, direct, and control the management, operation, and promotion of

all aspects of the Hotel in accordance with and subject to the terms and conditions of [the Management Agreement]."

144. Further, pursuant to Section 2.1.2, Operator agreed to operate the Hotel "for the account" of Owner.

145. Because Operator undertook to operate and manage the Hotel solely on Owner's behalf and pursuant to the inherent agency powers granted by the Management Agreement, Operator is Owner's agent and owes it fiduciary duties.

146. Further, even if Operator were an independent contractor and not an agent, Operator nonetheless owes Owner a fiduciary duty.

147. Indeed, Operator undertook the duty to act on behalf of Owner.

148. Owner was induced by Operator to, and did, repose trust and confidence in Operator and in its knowledge and expertise to (i) manage the Hotel; (ii) engage in honest dealings with Owner's best interests in mind; and (iii) perform its responsibilities under the Management Agreement.

149. Additionally, upon information and belief, Operator appointed directors to Owner's Board of Directors in an effort to further control the Hotel, Owner's sole asset during the time of the relevant breaches.

150. Accordingly, Operator held a position of authority and trust and retained control over the day-to day operations of the Hotel.

151. Because, among other things, Operator induced reliance independent of the Management Agreement, Operator owes fiduciary duties to Owner.

152. By reason of Operator's wrongful acts and conduct, including but not limited to (i) looting its accounts, (ii) failing to maintain segregated accounts, (iii) operating the Hotel

without regard to the maximization of the Hotel's long term value and profitability, and (iv) causing the Hotel's reputation to be severely injured by its conduct, Operator has breached its fiduciary duties to Claimant.

153.    As a direct and proximate result of Operator's breaches of its fiduciary duties to Owner, Owner has been damaged in an amount be determined at arbitration but not less than $15 million, plus interest, costs, and attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

154.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 152 hereof as though fully set forth herein.

155.    Under New York Law, which governs the Management Agreement, the covenant of good faith and fair dealing is implied in every contract.

156.    The Management Agreement imposed on Operator the duty to use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel.

157.    By reason of Operator's wrongful acts and conduct described above, Operator breached the covenant of good faith and fair dealing and unfairly frustrated the agreed upon common purpose of the Management Agreement, disappointed Owner's reasonable expectations of Operator, and thereby deprived Owner of the benefits of the Management Agreement.

158.    By virtue of Operator's breaches of the covenant of good faith and fair dealing, Owner has been damaged in an amount to be determined through arbitration but not less than $15 million, plus interest, costs, and attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Declaratory Judgment)

159.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 158 hereof as though fully set forth herein.

160.    Pursuant to Section 5.2(f) of the Management Agreement, an Event of Default has occurred based on the termination of the P.H. TOC Management Agreement.

161.    Pursuant to the Management Agreement, Owner has the option to elect to terminate the Management Agreement based on this default, which default is incurable pursuant to the express provisions of the Management Agreement.

162.    On October 14, 207, Owner notified Operator of this Event of Default in its Default Notice in accordance with the terms of the Management Agreement.

163.    As a matter of contract and a matter of law, Operator cannot cure this default.

164.    Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on a default of Section 5.2(f) of the Management Agreement.

165.    Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement.

166.    Accordingly, Owner is entitled to a declaration that the termination of the P.H. TOC Management Agreement constitutes an incurable Event of Default, and as such, Owner may terminate Operator.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Declaratory Judgment)

167.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 166 hereof as though fully set forth herein.

168.    Pursuant to Sections 5.2(e), and 5.2(h), of the Management Agreement, an Event of Default has occurred based on Operator's failure to "supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel," operate the Hotel in accordance with the Operating Standard, and "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel."

169.    These material breaches and gross negligence and/or willful misconduct includes, but is not limited to, Operator's failure to develop an effective sales and marketing strategy, to maintain the Hotel as a luxury hotel, to use its commercially reasonable efforts to manage the costs and expenses of the Hotel, to maintain the Hotel's financial records in accordance with the Uniform System of Accounts, to include the minimum disclosures required in the monthly operating report, to maintain the appropriate funds in segregated reserve accounts; and to permit Owner to make monthly payments for Common Area Maintenance of the Hotel amenities.

170.    On October 14, 207, Owner notified Operator of these defaults in its Default Notice in accordance with the terms of the Management Agreement.

171.    Despite repeated requests by Owner, Operator has failed to cure or commence curing the defaults set forth in the Default Notice.  Upon information and belief, Operator is unable to cure the defaults set forth in the Notice of Default.

172.    Furthermore, some, if not all, of the defaults set forth in the Default Notice are incurable.

173.    Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on a default of Sections 5.2(e) and/or 5.2(h) of the Management Agreement.

174.    Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement.

175.    Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Declaratory Judgment)

176.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 175 hereof as though fully set forth herein.

177.    Pursuant to Section 5.2(a) of the Management Agreement, an Event of Default has occurred based on Operator's failure to make distributions to the Hotel Unit Owners and Hotel Amenities Unit Owner based on actual costs and actual expenses in accordance with Section 4.6 of the Management Agreement.

178.    On October 14, 2017, Owner notified Operator of these defaults in its Default Notice in accordance with the terms of the Management Agreement.

179.    Despite repeated requests by Owner, Operator has failed to cure or commence curing the defaults set forth in the Default Notice.  Upon information and belief, Operator is unable to cure the defaults set forth in the Notice of Default.

180.    Furthermore, some, if not all, of the defaults set forth in the Default Notice are incurable.

181.    Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on a default of Section 5.2(a) of the Management Agreement.

182.    Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement.

183.    Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Declaratory Judgment)

184.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 183 hereof as though fully set forth herein.

185.    Under New York common law, it is a well-settled matter of public policy that personal services contracts can be terminated at any time and cannot be specifically enforced or compelled.

186.    Under New York law, it is also recognized that hotel management agreements are classic examples of personal services contracts that may not be enforced by injunction.

187.    Pursuant to the Management Agreement, Owner agreed to provide "Operator Hotel *Services*" that are "consistent with the Operating Standard." Management Agreement at § 1.4.1.

188.    The Operating Standard relates to the "level of *service* and quality" Operator must provide, *e.g.,* luxury. *Id.* at 15. Operator also has great discretion to operate the Hotel in accordance with the Operating Standard through its provision of "General Manager *Services*." *Id.* at § 2.1.

189.    Owner has the absolute right under New York law to terminate the Management Agreement as a personal services contract.

190.    Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on Owner's rights under personal services contract law.

191.    Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement on personal services contract grounds.

192.    Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis that the agreement is a personal services contract.

**AS AND FOR A TENTH CAUSE OF ACTION**
**(Declaratory Judgment)**

193.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 192 hereof as though fully set forth herein.

194.    Under New York law, it is well-settled that a principal has the power to revoke his agent's authority to represent him at any time.

195.    Operator serves as Owner's "agent" under the Management Agreement, and is repeatedly referred to as an "agent" in the agreement.   Management Agreement at §§ 2.4.3; 2.6.1; 4.1.1; 12.3.

196.    The Management Agreement also specifies that "*Operator and Owner are not joint venturers, partners, or joint owners* with respect to the Hotel ...." *Id.* at § 12.3 (emphasis added).

197.    Owner has the absolute right under New York law to terminate the Management Agreement under agency law.

198.    Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on Owner's rights under agency law.

199.    Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement on agency law grounds.

200.    Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis of agency law.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Declaratory Judgment)

201.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 200 hereof as though fully set forth herein.

202.    Upon information and belief, at all relevant times, John Does 1-5 dominated and controlled Operator.

203.    Upon information and belief, John Does 1-5 used their control and domination of Operator to breach Operator's legal duty and cause Owner's losses.

204.    Indeed, upon information and belief, Operator is nothing but a pass-through entity created by John Does 1-5 to manage the Hotel and purportedly and fraudulently shield John Does 1-5 from liability to Operator's creditors (including Owner) thereby attempting to make Operator judgment proof so as to prevent an actual recovery for Operator's breaches of the Management Agreement and its fiduciary duties.

205.    In fact, upon information and belief, Operator and all of the John Does 1-5 routinely commingle assets, disregard corporate formalities and are all part of the same family office known as the "Trump Organization" controlled by John Does 1-5.

206.    Thus, Operator is, by design, nothing more than a shell that John Does 1-5 created and used to fraudulently shield them from liability under, among other things, the Management Agreement.  Operator is intentionally undercapitalized, is funded solely by contributions from John Does 1-5, and those contributions were, upon information and belief, intentionally

insufficient to pay Operator's obligations, including those obligations under the Management Agreement.

207.    Accordingly, pursuant to New York law (which governs the Management Agreement and this proceeding), Owner is entitled to judgment in this arbitration declaring that it can pierce the corporate veil and that John Does 1-5 are liable for all damages awarded to Owner.

208.    Claimant is, therefore, entitled to a declaration that under the theory of corporate piercing, John Does 1-5 are personally liable for any damages awarded to Owner.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (Accounting)

209.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 208 hereof as though fully set forth herein.

210.    Operator undertook to operate and manage the Hotel solely for the account of Owner, as its agent and fiduciary, exercising exclusive control over the Hotel's revenue, assets, and books and records.

211.    Operator breached its fiduciary duties owed to Owner concerning the management and operation of the Hotel.

212.    Claimant has an interest in the Hotel as the Hotel's Owner.

213.    Owner is entitled to an accounting pursuant to Section 2.5.1 of the Management Agreement, which provides that "[a]ll books of account and other financial records shall be available at the Hotel to Owner … at all reasonable times and on reasonable notice for examination, audit, inspection and copying…"

214.    Accordingly, Owner is entitled to an accounting of all Hotel assets.

## STATEMENT OF RELIEF SOUGHT

215.    Hotel TOC respectfully requests that upon final hearing the Arbitral Tribunal without prejudice to any other or further claims that Hotel TOC may make in this arbitration enter an award as follows:

a.    On its First Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $15 million, plus interest;

b.    On its Second Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $5 million, plus interest;

c.    On its Third Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $3 million, plus interest;

d.    On its Fourth Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $15 million, plus interest;

e.    On its Fifth Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $15 million, plus interest;

f.    On its Sixth Cause of Action, a declaration that the termination of the P.H. TOC Management Agreement constitutes an incurable Event of Default, and as such, Owner may terminate Operator;

g.    On its Seventh Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement;

h.    On its Eighth Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement;

i.    On its Ninth Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis that the agreement is a personal services contract;

j.    On its Tenth Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis of agency law;

k.   On its Eleventh Cause of Action, a declaration that under the theory of corporate piercing, John Doe Entities 1-5 are personally liable for any damages awarded to Hotel TOC;

l.   On its Twelfth Cause of Action, an accounting;

m.   Interest, cost, and attorneys' fees in an amount to be determined through arbitration but not less than $50,000.00; and

n.   Such other and further relief as the Arbitrator deems just and proper.

216.    Hotel TOC estimates that the amount in controversy in this dispute is approximately $15 million.

Dated:  October 14, 2017

Respectfully submitted,

By: _____

Joshua D. Bernstein, Esq.
E-mail: joshua.bernstein@akerman.com
Darryl R. Graham, Esq.
Email: darryl.graham@akerman.com
Kathleen M. Prystowsky, Esq.
E-mail: kathleen.prystowsky@akerman.com
Vanessa I. Garcia, Esq.
E-mail: vanessa.garcia@akerman.com
**AKERMAN LLP**
666 Fifth Avenue, 20th Floor
New York, New York 10103
Telephone: 212.880.3800
Facsimile: 212.880.8965

Jose Carrizo
E-mail: Jose.Carrizo@morimor.com
Orlando Tejeira
E-mail: Orlando.Tejeira@morimor.com
MORGAN & MORGAN
MMG Tower, 23rd Floor
Avenue Paseo del Mar, Costa del Este
Panama, Republic of Panama
Telephone: 507.265.7777
Facsimile: 507.265.7700

*Attorneys for Claimant Hotel TOC, Inc.*

47