# **EXHIBIT D**

INTERNATIONAL CHAMBER OF COMMERCE

| | |
|---|---|
| HOTEL TOC, INC.,<br><br>       *Claimant*,<br><br>  -against-<br><br>TRUMP PANAMA HOTEL MANAGEMENT LLC,<br>TRUMP INTERNATIONAL HOTELS<br>MANAGEMENT, LLC, and JOHN DOES 1-5,<br><br>       *Respondents*. | Case No.: 23149/MK<br><br>**RESPONDENTS' ANSWER,<br>COUNTERCLAIMS, REQUEST<br>FOR JOINDER AND THIRD-<br>PARTY CLAIMS** |

TRUMP PANAMA HOTEL MANAGEMENT LLC,
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT, LLC,

       *Counterclaimants*,

  -against-

HOTEL TOC, INC.,

       *Counterclaim-Respondent*.

TRUMP PANAMA HOTEL MANAGEMENT LLC,
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT, LLC,

       *Third-Party Claimants*,

  -against-

ORESTES FINTIKLIS, GARY LUNDGREN,
ITHACA CAPITAL INVESTMENTS I, S.A.,
ITHACA CAPITAL INVESTMENTS II, S.A.,
MORGAN & MORGAN, OWNERS MEETING OF
THE P.H. TOC, HOTEL FOUNDATION, INC.
(SOLE SHAREHOLDER OF CLAIMANT) AND
JOHN DOES 1-10,

       *Third-Party Respondents*.

## <u>TABLE OF CONTENTS</u>

Page

INDEX OF EXHIBITS ................................................................................................... ii

NATURE OF PROCEEDINGS.......................................................................................1

    I.    Overview ..............................................................................................................1

    II.   Claimant's and Third Party Respondents' Wrongful Conduct .......................4

ALL PARTIES TO THESE PROCEEDINGS................................................................8

JURISDICTION, VENUE AND GOVERNING LAWS ...........................................12

APPOINMENT OF ARBITRATORS...........................................................................19

FACTS COMMON TO ALL CLAIMS .......................................................................21

    I.    LUNDGREN'S AND OWNERS MEETING'S PRIOR ICC PROCEEDINGS ..........21

    II.   THE BULK SALE TO FINTIKLIS ..........................................................23

    III.  FINTIKLIS MAKES HIS NEXT MOVE IN FURTHERANCE OF HIS FRAUD AND UNLAWFUL RICO SCHEME ...............................................................26

    IV.  THE HOTEL TOC "LUNCH MEETING" .............................................27

    V.   THE "OCTOBER 14 MEETINGS," NOTICE OF DEFAULT, AND REQUEST FOR ARBITRATION .....................................................................................28

    VI.  THE SHAM DEFAULT NOTICE AND OPERATOR'S RESPONSE.......................36

    VII.  THE NOVEMBER 2017 TERMINATION LETTER ................................39

    VIII. DENIAL OF CLAIMANT'S CLAIMS.....................................................40

CLAIMS FOR RELIEF ................................................................................................40

RESERVATION OF RIGHTS ......................................................................................71

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | Amended and Restated Hotel Management Agreement for Trump Ocean Club® International Hotel & Tower Among Trump Panama Hotel Management LLC, Newland International Properties Corp., Hotel TOC Inc. And Owners Meeting of the P.H. TOC, as further amended |
| B | Agreement in Connection with a Bulk Sale by and among Trump Panama Hotel Management LLC, Ithaca Capital Investments I, S.A. and Ithaca Capital Investments II, S.A., dated February 15, 2017 |
| C | Statement of Claim, *Trump Panama Condominium Management LLC v. Owners Meeting of the P.H. TOC, Ocean Club Casino Incorporated, Sun International Limited and Sun International Co.*, No. 21415/RD (before the International Chamber of Commerce) |
| D | Mutual Release and Settlement Agreement by and between Owners Meeting of the P.H. TOC, the board of directors of Owners Meeting of the P.H. TOC, and Trump Panama Condominium Management LLC |
| E | Notice of Default, dated October 14, 2017 |
| F | Trump Ocean Club® International Hotel & Tower Panama P.H. TOC Management Agreement by and between Trump Panama Condominium Management LLC, as Manager, And Owners Meeting of the P.H. TOC, dated April 13, 2011, as amended |
| G | Respondents' Request for Extension, Objection to Fanelli, and Nomination of Goodwin 11.8.2017 |
| H | Respondents' Reply Letter Challenging Fanelli, dated December 1, 2017 |
| I | Co-Ownership Regulations of the Building PH TOC |
| J | Operator's Written Approval of the Bulk Sale |
| K | October 3, 2017 Presentation |
| L | Fintiklis's October 3, 2017 Email |
| M | Partial Transcript of October 14, 2017 Meeting |
| N | Hotel Foundation, Inc. Foundation Charter/Articles of Incorporation |
| O | Foundation Minutes, filed October 16, 2017 |
| P | Claimant Minutes, filed October 16, 2017 |
| Q | Response to Notice of Default, dated November 6, 2017 |
| R | Termination Notice, dated November 21, 2017 |
| S | Response to Termination Notice, dated November 22, 2017 |

Pursuant to the Arbitration Rules of the International Chamber of Commerce, Respondents Trump Panama Hotel Management LLC ("Trump Panama" or "Operator") and Trump International Hotels Management, LLC ("Trump International," and together with Trump Panama, "Respondents," "Counterclaimants" and/or "Third-Party Claimants"), by their undersigned attorneys, Pryor Cashman LLP, hereby submit their Answer and Counterclaims in response to the Request for Arbitration of Claimant Hotel TOC, Inc. ("Claimant" or "Hotel TOC"), dated October 14, 2017 (the "Request"), along with a Request for Joinder and third-party claims against Third-Party Respondents Orestes Fintiklis ("Fintiklis"), Gary Lundgren ("Lundgren"), Ithaca Capital Investments I, S.A. ("Ithaca I"), Ithaca Capital Investments II, S.A. ("Ithaca II"), Morgan & Morgan and Owners Meeting of The P.H. TOC ("Owners Meeting"), Hotel Foundation, Inc. ("Hotel Foundation") and John Does 1-10 ( the "Third-Party Respondents"), upon information and belief,  as follows:

## NATURE OF PROCEEDINGS

### I.      Overview

1.      Fintiklis is an attorney and a Cypriot citizen who apparently resides in Florida. He purports to be the "authorized representative" of Claimant Hotel TOC, Inc. in said purported capacity, Fintiklis, together with Third-Party Respondents, has caused Claimant to commence this arbitration against Respondents alleging sham, fabricated breaches of the Hotel Management Agreement (the "HMA") relating to the Trump International Hotel Panama (the "Hotel").[1] These same sham defaults, which lack credibility and which were resoundingly refuted by Operator in a detailed letter to Fintiklis dated November 6, 2017 (to which Fintiklis never responded), form the

---

[1] A true and correct copy of the Amended and Restated HMA, as further amended, is attached hereto as **Exhibit A** (without schedules).

basis of the bogus termination notice that was subsequently served by Fintiklis in his (un)authorized capacity.

2.      In fact, Fintiklis has unlawfully conspired with the Third-Party Respondents in an effort to unlawfully seize control of the Hotel, in breach of numerous covenants and in violation of laws, including, but not limited to, civil RICO statutes.

3.      Furthermore, Fintiklis by and through his alter ego vehicles, Ithaca I and Ithaca II, obtained control of over 200 hotel units in 2017 by sheer fraud and deceit.

4.      Fintiklis and his alter ego vehicles knew they needed the written consent of Trump Panama as Operator to achieve any bulk purchase over ten hotel units.  To obtain such consent to the acquisition of more than 200 units, Fintiklis and Ithaca I and II fraudulently promised by written agreement dated as of February 15, 2017 (the "Consent to Bulk Sale Agreement" annexed hereto as **Exhibit B**) to refrain from taking any action, directly or indirectly, to interfere with or undermine the rights of Operators, including the exercise of any votes with respect to the Hotel or any components or units thereof which would be adverse to Operator.

5.      Shortly after closing on the acquisition of these units, in direct breach of the Consent to Bulk Sale Agreement, Fintiklis, together with Lundgren and Third-Party Respondents, organized what they falsely said was an informal lunch to be held on October 14, 2017 on the Hotel premises.  As surreptitiously planned and conspired, the "informal lunch" and "meet and greet" quickly morphed into two purported "board meetings" of Hotel TOC and Hotel Foundation, called without proper notice.

6.      At the purported "board" meetings, Fintiklis, Lungdren and the Third-Party Respondents staged an unlawful corporate take-over; unlawfully removing board members and appointing themselves in their stead.  In preparation for their corporate maneuver, Fintiklis already

had a contrived, pre-arranged Notice of Default prepared by counsel and ready for service on Respondents.

7.      As if this weren't enough, further evidencing the pre-textual and contrived nature of these notices, on the same date the purported "board" meetings were held, Fintiklis and his co-conspirators commenced this sham arbitration.

8.      Thus, on October 14, 2017, Fintiklis purporting to act as the "Authorized Representative" of both Claimant and Hotel Foundation personally signed and delivered to Respondents a purported Notice of Default under the HMA alleging sham breaches of the HMA and demanding cure of the same (if applicable under the HMA).  Every aspect of the Notice of Default is fraudulent including the purported claim for $15 million in damages, which was inserted by Fintiklis' lawyer for the sole purpose of attempting to insure that there could be no cure.  To be clear, there is and was at the time of the delivery of the default notice, zero basis for the phony damages claim.

9.      Of course, the Notice of Default demanding a cure was a complete sham because that very same day, Fintiklis and the Third-Party Respondents caused Claimant to file the instant sham arbitration demand, "based on [Respondents'] failure and/or inability to cure the defaults" and sought various declarations alleging Claimant's purported right to terminate the HMA, and damages relating thereto.

10.     Conspicuously absent from Claimant's Request for Arbitration are the facts and circumstances leading up to the fraudulent events of October 14, 2017.  These facts and circumstances reveal these proceedings to constitute sham litigation under New York law:  A fraud upon this tribunal by which Fintiklis and his co-conspirators are abusing legal process in a tortious and unlawful attempt to injure Respondents' rights through their 37 entities owning Units in the

Hotel, and by and through their corporate alter egos, and the Third-Party Respondents – all with the design to wrongfully seize control over the hotel property.

## II.   **Claimant's and Third Party Respondents' Wrongful Conduct**

11.     Lundgren, effectively *persona non grata* in the United States, has previously litigated with Affiliates of Respondents concerning his unlawful activities with respect to the management of the condominium portion of the property.  That litigation took place in a 2015 proceeding before the ICC (the "Lundgren Proceeding').  A copy of that complaint is annexed hereto as **Exhibit C**.  The Lundgren Proceeding settled by agreement in February 2016 (the "Lundgren Settlement Agreement").  The Lundgren Settlement Agreement, to which Lundgren is personally bound, affirmed (i) that as of February 2016, there were no material breaches of the HMA; and (ii) that Lundgren will take no actions to interfere with Respondents or Operator in the management of the Hotel.  A copy of the Lundgren Settlement Agreement is annexed hereto as **Exhibit D**.

12.     A mere four months after the Lundgren Settlement Agreement, Fintiklis, with knowledge of Lundgren Proceeding, met with Respondents concerning his proposed bulk purchase of over 200 Units in the Hotel.

13.     On or about February 15, 2017, by execution of the Consent to Bulk Sale Agreement, Fintiklis fraudulently obtained, by and through his alter egos Ithaca I and Ithaca II, Respondents' consent, required under the governing documents and the HMA, to purchase 202 Units in the Hotel (through Ithaca I) and the 13 Hotel Amenities Units (through Ithaca II) from the Hotel developer/promoter ("Newland" and together, the "Bulk Sale"), which was then involved in bankruptcy proceedings.  Fintiklis accomplished this purchase with financing from Canal Bank.

Fintiklis and Canal Bank performed significant due diligence on the Hotel, in advance of the purchase, including the financial condition of the Hotel.

14. By agreement dated February 15, 2017, Respondents' gave their consent to the Bulk Sale, but conditioned their consent upon the material promise and consideration that Ithaca I and Ithaca II:

> shall not, directly or indirectly through any Affiliates or otherwise: (w) **take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements,** (x) **exercise its vote** with respect to any of the Hotel Units in any Owners Meeting or other constituent body of P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., **in a manner which is adverse to the interests of the Operator and/or its Affiliates under and in respect of any of the Hotel Agreements**, (y) take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its affiliates and any other Person, or (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates.

*See* Consent to Bulk Sale Agreement at **Ex. B** (emphasis added).

15. Deeds evidencing the Bulk Sale were recorded in Panama on August 10, 2017. Following that closing and together with Lundgren, who purportedly through at least 35 separate entities claims to own 50 Units in the Hotel, the two at best may have wielded 68.2% of the votes of Third-Party Respondent Hotel Foundation, Inc., the sole shareholder of Claimant.[2] A vote of the Hotel Foundation, Inc. with 75% of its voting interests, together with cause (*i.e.*, the occurrence of an Event of Default), is required in order to terminate the HMA. Lundgren and Fintiklis were knowingly lacking both a 75% super-majority and a genuine Event of Default -- but neither chose to see those glaring defects as an impediment to their tortious acts and conspiracy.

---

[2] As set forth below, in fact, Lungdren's alleged ownership in those 50 units, via his affiliates, is in material violation and breach of Operator's rights under the HMA and of the Co-Ownership Regulations and therefore is subject to resolution by the ICC pursuant to Respondents' claims against the Third-Party Respondents. In fact, Fintiklis and his Third-Party Respondents co-conspirators have far less than even 68% of the required votes.

16.     Mere weeks after the closing the Bulk Sale, Fintiklis arranged a "lunch meeting" under false representations and pretence, purportedly to meet unit owners at the Hotel.  No notice of this meeting was given to the Council of Hotel Foundation, Inc., the sole shareholder of Claimant, as required by Panamanian law.

17.     Despite the lack of notice, Fintiklis, together with Lungdren and an attorney from Morgan & Morgan – Claimant's Panama counsel in these proceedings – proceeded to have a purported set of board meetings of Hotel TOC and Hotel Foundation on October 14, 2017, and soon after the beginning of this supposed meeting, excluded Respondents' representative from such meeting, despite Respondents having Board representatives, owning the Hotel Administrative Unit of the Hotel and operating the Hotel for the benefit of all Owners.

18.     At this purported board meeting of Hotel TOC and Hotel Foundation, Fintiklis and his attorney and a John Doe under Fintiklis's control, purported to install themselves on the board of Claimant and Hotel Foundation and, following their installation, immediately and simultaneously declared an alleged Event of Default under the HMA by serving – that same day – a Notice of Default to Respondents which had been prepared well in advance of the meeting with the obvious assistance of counsel.  Additionally, that same day, October 14, 2017, Fintiklis, Lundgren and the Third Party Respondents caused Claimant to commence the instant arbitration proceedings, despite the contractual right of Operator to cure such alleged (sham) defaults over the next 30 days.

19.     The simultaneous orchestration on October 14, 2017 by Fintiklis, Lundgren and the Third Party Respondents of calling an "informal lunch" under false pretence, (1) which morphed into two purported Board meetings, (2) simultaneously produced a Notice of Default, with 30 days to cure but (3) which also simultaneously resulted in an immediate arbitration proceeding, is

evidence of the malicious intent, fraud and RICO conspiracy by and amongst the Third Party Respondents.

20.      Indeed, their unlawful conspiracy produced a lawless coup despite wielding less than the 75% super majority number of votes required to terminate Operator, and despite lacking an actual Event of Default to do so under the HMA.  To be clear, Fintiklis, Lundgren, Ithaca and their Panama counsel Morgan & Morgan (who now, unsurprisingly, purports to represent Claimant in these proceedings) had prepared *in advance* of the October 14, 2017 Meeting documents seeking to terminate the HMA and commencing these proceedings.  Moreover, Fintiklis, by and through, without limitation,  his alter egos Ithaca I and Ithaca II and John Does 1-10, brazenly violated every covenant in the Consent to Bulk Sale Agreement upon which the purchase of his 200-plus Hotel Units was predicated including, but not limited to, voting his Units to terminate the HMA.

21.      Notably, the Notice of Default, is signed by Fintiklis personally as the purported "Authorized Representative of Hotel TOC, Inc. and Hotel Foundation, Inc."  The Notice complains of, among other things, the purported collapse of occupancy levels "over the past few years" (and citing occupancy rankings from 2015 and 2016).  The Notice of Default also relied on purported outperformance by other hotels in RevPAR "in May 2017."[3]

22.      The complaints in the Notice of Default, however, are a complete sham and a fraud upon this Honourable tribunal as they are belied by the extensive pre-purchase due diligence deny performed by Fintiklis, Ithaca I and II, and their Panama lender Canal Bank in the weeks and months preceding service of the alleged Notice of Default.  Moreover, despite reciting years-long decline in the property and concerns regarding the Hotel management, Third Party Respondent and co-conspirator Lundgren, as of February 2016, agreed in the Lundgren Settlement Agreement

---

[3] For the avoidance of doubt, Respondents hereby deny each and every claim asserted by Claimant in the Request.

– as evidenced by the Lundgren Settlement Agreement -- that there were no material breaches of the HMA.  Indeed, Claimant and Third Party Respondents would have this Honourable Tribunal believe that Fintiklis and his alter egos Ithaca I and II – and Ithaca's investors – borrowed tens of millions from Canal Bank Panama for the Bulk Sale, without having done complete due diligence on the Hotel and its operations, costs, liabilities, assets, revenues, and profits.  Simply stated, the Notice of Default is a complete and total fabrication by Fintiklis and the Third-Party Respondents, constituting a sham, as is Claimant's arbitration demand for which Operator shall hold the Third Party Respondents jointly and severally liable.

23.     Fintiklis's and Lundgren's striking and swift reversal concerning the management of the Hotel is damning evidence of their scienter and exposes Claimant and the Third Party Respondents to significant liability resulting from their attempts to terminate the HMA and injure Operator.

## ALL PARTIES TO THESE PROCEEDINGS

24.     **Claimant.**  Claimant Hotel TOC, Inc. is a Panamanian corporation with its principal place of business located at La Propriedad Horizontal P.H. TOC, Cuidad de Panamá, República de Panamá.

25.     Upon information and belief, Third-Party Respondents Fintiklis, Lundgren, Ithaca I and Ithaca II, together with others John Does 1-10, dominate and control Claimant and caused Claimant to take actions to benefit their own interests.  Third-Party Respondents' domination of Claimant caused the damages complained of in the Counterclaims and Third-Party Claims in this proceeding and, as such, Third-Party Respondents are liable to Respondent for such damages.

26.     **Respondents.**  Respondent Trump Panama Hotel Management LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

27.     Respondent Trump International Hotels Management LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

28.     Respondents are represented in these proceedings by Todd Soloway, Esq., Perry M. Amsellem, Esq., Bryan T. Mohler, Esq. and Marion R. Harris, Esq. of Pryor Cashman LLP, 7 Times Square, New York, New York 10036.

29.     **Third-Party Respondents**.  Upon information and belief, Third-Party Respondent Orestes Fintiklis is a citizen of Cyprus, and a resident of Florida, and the president and principal of Third-Party Respondents Ithaca Capital Investments I, S.A. and Ithaca Capital Investments II, S.A., owners of various Units in the Hotel.  Third-Party Respondent Fintiklis holds himself out personally as the "Authorized Representative" of Claimant Hotel TOC, Inc. and its sole shareholder, Hotel Foundation, Inc. pursuant to invalid and illegal activities at a meeting of Hotel TOC, Inc. on October 14, 2017.  Upon information and belief, Third-Party Respondent Fintiklis receives notices at 520 W Ave #1502, Miami Beach FL 33139.

30.     Upon information and belief, Third-Party Respondent Gary Lundgren is a resident of Panamá.  In violation of the HMA and Co-Ownership Regulations, Lundgren unlawfully obtained ownership of 50 Units at the Hotel through 35 separate entities that he owns, controls and dominates.[4]  Upon information and belief, Third-Party Respondent Lundgren receives notices at

---

[4] Those Lundgren-controlled entities owning Units in the Hotel are Ocean Two Properties S.A. (6 Units), John Galt Panama S.A. (11 Units), and Celestial 10, Inc. City Scape, S.A., Comercializadora Alderbaran S.A., Destiny 12-B, S.A., Grupo Comercial Julmar, S.A., Hubert Enterprises Corp, Inversiones TMMJ, S.A., John Galt Advisors, S.A.,

c/o Griselda L. Perez, Board of Directors of P.H. TOC, 5th Floor, Office Tower, Calle Punta Colón, Punta Pacífica, Ciudad de Panamá, República de Panamá.

31.     Upon information and belief, Third-Party Respondent Owners Meeting is a Panamanian company with its principal place of business in Panama City, Panama. Owners Meeting of P.H. TOC, through its Board of Directors, represents the interests of the Condominium Unit owners at the property.   Upon information and belief, Third-Party Respondent Owners Meeting receives notices at Torre Global Bank, Calle 50 & Calle 58 Este Oficina 3501-Piso 35, Ciudad de Panamá, República de Panamá.

32.     Upon information and belief, Third-Party Respondent Ithaca Capital Investments I, S.A. is a Panamanian corporation, and the alter ego of Third-Party Respondent Fintiklis who is the president and principal of Ithaca I and who controls and dominates Ithaca I.  Fintiklis by and through Ithaca I and Ithaca II, entered into the February 15, 2017 Consent to Bulk Sale Agreement by and between Ithaca I, Ithaca II and Respondent Trump Panama Hotel Management LLC, by which Fintiklis and his alter egos fraudulently obtained the necessary consent to purchase 215 Units in the Hotel.  Upon information and belief, Respondent Ithaca I has its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama.

33.     Upon information and belief, Third-Party Respondent Ithaca Capital Investments II, S.A. is a Panamanian corporation dominated and controlled by Respondent Fintiklis who is the president and principal of Ithaca II.  Fintiklis, by and through his alter egos, entered into the Consent to Bulk Sale Agreement on behalf of Ithaca I and Ithaca II with Respondent Trump

---

John Galt Company, S.A., John Galt Properties, S.A., Ocean Club 1618, Corp., Ocean Club 2016, Corp., Ocean Club 2120, Corp., Ocean Club 2414, Corp., Ocean Club 2422, Corp., Ocean Club 2426 Corp., Ocean Club 2616, Corp., Ocean Club 2810, Corp., Ocean Club 2823, Corp., Ocean Club Properties, S.A., Palmever, Cpr., Panama TOC 010907, Inc., Phenomenal Alliance, Corp., TOC 2009, Corp., TOC 2811, Corp., TOC Condo Hotel Unit 2722, Corp., TOC Condo Hotel Unit 2819, Corp., TOC Condo Hotel Unit 2917, Corp., TOC Panama 2724, Inc., TOC2019, Inc., Trump Ocean Club 1918, Corp., Trump Ocean Club 3126, Corp. and TTC Service, Corp., each owning 1 Unit apiece.

Panama, only after misleading and fraudulently inducing and obtaining the consent of Operator. Upon information and belief, Ithaca II has its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama.

34.     Upon information and belief, Fintiklis dominates and controls Ithaca I and Ithaca II, exposing their investors and lenders to significant liabilities without their knowledge. Moreover, Fintiklis, through his domination and control of Ithaca I and Ithaca II, caused Ithaca I and Ithaca II to breach Respondents' contractual rights under the HMA and, as such, is liable for significant damages resulting therefrom.

35.     As reflected in a November 13, 2017 Unit Owner Designation Form, Third-Party Respondent Ithaca I is represented by Claimant's counsel, Akerman LLP and Morgan & Morgan. Upon information and belief, Respondents Fintiklis, Lundgren and Ithaca II are similarly represented by Akerman LLP and Morgan & Morgan.

36.     Third-Party Respondent Morgan & Morgan is a Panamanian law firm with offices at MMG Tower, 23rd Floor, Ave. Paseo del Mar, Costa del Este, Ciudad de Panamá, República de Panamá.

37.     Morgan & Morgan is Panama counsel to Claimant, Fintiklis, Ithaca I and Ithaca II. At the illegal board meetings on October 14, 2017, Morgan & Morgan, by and through attorney Orland Tejeira ("Tejeira") purported to represent all beneficiaries of Hotel Foundation, Inc., which Tejeira, described as "all of you" to the owners in attendance on October 14, 2017. Tejeira further unlawfully excluded Respondents and their representative from the illegally-noticed meetings of Hotel TOC and Hotel Foundation.

38.     At the time Morgan & Morgan, by and through Mr. Tejeira, made such false statements, none of the members of the Council of Hotel Foundation, Inc. were present. Tejeira's

and Morgan & Morgan's statement that he represents "all of [the Hotel Unit Owners]" was knowingly false, and constitutes evidence of his (and, by virtue of his position, Morgan & Morgan's) knowing participating in the fraudulent scheme described herein and for which Respondents are entitled to significant damages.

39.     Upon information and belief, Respondents John Does 1-5 are individuals and/or legal entities, affiliated with Fintiklis and Lundgren, the names and addresses of which are presently unknown.  At all relevant times, John Does 1-10 conspired with and participated in the fraudulent scheme orchestrated by Fintiklis and Lundgren to wrest control of the management of the Hotel from Respondents, causing damages to Respondents.  Respondents' reserve the right to amend this pleading as discovery progresses to identify John Does 1-10.

## JURISDICTION, VENUE AND GOVERNING LAWS

40.     **ICC Jurisdiction over all HMA Signatories.**  Section 9.1 of the HMA provides that "all disputes, controversies, claims or disagreements arising out of or relating to the Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner."  Section 9.1.1 continues to provide that "Either Party may submit the Dispute to the International Chamber of Commerce for binding arbitration under then existing ICC Commercial Arbitration Rules."

41.     Notably, this provision does not limit the jurisdiction of the ICC to hear disputes _only_ between the parties.  Indeed, as described below, the Third-Party Respondents must be joined in these proceedings to prevent against inconsistent judgments issued by different courts, produce a fair and equitable result with joint and several liability and because the Third Party Respondents are closely related persons and entities that through their acts and conduct, as set forth herein, have

created disputes, controversies, claims and disagreements which arise out of or are related to the HMA.

42.     Additionally, Section 9.1.1 of the HMA provides that "Each Party shall submit all Disputes then known to that party within the same arbitration proceeding and any such claim that is not submitted shall be barred."

43.     Accordingly, in the absence of the ICC's proper exercise and grant of its lawful jurisdiction, as set forth below under the law of New York, Respondents shall under duress risk waiver of Disputes known and set forth by Respondents herein, despite that they arise from or relate to the HMA.

44.     Claimant and Respondents are signatories to the HMA and the Claims and Counterclaims asserted in this Proceeding arise out of and relate to the HMA.  Thus, such Claims and Counterclaims are properly before the ICC in this proceeding.

45.     In addition to those reasons listed herein and below, Third-Party Claimant Ithaca II is properly joined in these proceedings as it is bound to the HMA by virtue of its ownership of the Hotel Amenities Units.  In Paragraph 3(A) of the Consent to Bulk Sale Agreement, Ithaca II specifically acknowledged that "[b]y virtue of its purchase of the Hotel Amenities Unites, Ithaca II shall be bound by the terms and conditions of the Hotel Management Agreement as successor to the Hotel Amenities Unit Owner (as such term is defined in the Hotel Management Agreement)."

46.     **ICC's Proper and Lawful Jurisdiction over the Third Party Respondents that are not HMA Signatories.**  Third-Party Respondents Ithaca I and Ithaca II are parties to Consent to Bulk Sale Agreement annexed hereto as **<u>Exhibit B</u>**.  Fintiklis signed on behalf of Ithaca I and Ithaca II, as he dominates and controls such entities which are alleged to be his alter egos.  Exhibit

A to the Consent to Bulk Sale Agreement enumerates and incorporates by reference all the Hotel-related agreements to which Ithaca I's purchase of Hotel Units and Ithaca II's purchase of the Hotel Amenities Units were and remain subject, including the HMA.  As set forth above, Ithaca I and Ithaca II, as the material consideration to the Consent to Bulk Sale Agreement promised and covenanted that they:

> Shall not, directly or indirectly…take…any action (including legal action) that would interfere with or undermine the rights…of Operator under and in respect to any of the Hotel Agreements…

47.     In short, Ithaca I and Ithaca II upon signing the Consent to Bulk Sale Agreement expressly incorporated by reference the Hotel Agreements and the HMA, as well as the arbitration agreement set forth therein, and promised to not interfere with Operator's rights under the HMA.

48.     Accordingly, Ithaca I and Ithaca II are properly joined in this proceeding as they are subject to Section 9.1 of the HMA, such terms having been expressly incorporated in and by the Consent to Bulk Sale Agreement. *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) (finding that a non-signatory to an agreement to arbitrate was bound by arbitration when such agreement to arbitrate was incorporated by reference in a subsequent agreement with the non-signatory); *Pagaduan v. Carnival Corp.*, No. 16-465, 2017 WL 4117339, at *2-3 (2d Cir. Sept. 18, 2017) (affirming an order compelling an individual to arbitrate where such individual signed an agreement that "does not contain an arbitration provision on its face.  It does, however, reference secondary documents that . . . do call for arbitration.").

49.     As Respondents' claims asserted against Ithaca I and Ithaca II unquestionably arise from and relate to the HMA and the rights and responsibilities thereunder, Ithaca I and Ithaca II are properly included in this Proceeding and the third party claims against them set forth herein should proceed.

50.     Fintiklis is also properly before this Honourable Tribunal, the ICC's jurisdiction over him is lawful under New York law and the claims against him should proceed for three independent reasons:

(i)     First, as the Notice of Default dated October 14, 2017 evidences, Fintiklis holds himself out personally as the "Authorized Representative" of Claimant and Third-Party Respondent Hotel Foundation; Fintiklis, along with his alter egos Ithaca I and Ithaca II, together with Lundgren, dominate and control Claimant and Hotel Foundation for their own benefit, such that Claimant and Hotel Foundation, with respect to the acts described herein, are alter egos of Fintiklis and Lundgren, who are liable to the same extent as, and jointly and severally with, Claimant and Hotel Foundation. *See* The Notice of Default dated October 14, 2017 annexed hereto as **Exhibit E**.

(ii)    Second, Fintiklis, the President and principal of Ithaca I and Ithaca II, derives substantial benefit from his domination and control of Ithaca I and Ithaca II (which are bound to the HMA) and their ownership of Units; Fintiklis purports to be Owner representative for the Hotel Units owned by Ithaca I, which formed the basis for Fintiklis's illegal attempted coup of the Board of Claimant on October 14, 2017. Fintiklis knowingly exploited and benefited from the agreements to which Ithaca I and Ithaca II were bound, including the Consent to Bulk Sale Agreement and HMA; as such, Fintiklis is estopped as a matter of law from denying the jurisdiction of the ICC over him concerning disputes relating thereto. *Deloitte Noraudit A/S v. Deloitte Hasks & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (compelling arbitration against a non-signatory to an agreement to arbitrate under estoppel doctrine because such non-signatory knowingly and directly benefitted from the agreement providing for arbitration); *Servaas Inc. v. Republic of Iraq*, 686 F. Supp. 2d 346, 355 (S.D.N.Y. 2010) ("Where a party derived a direct benefit from the contract containing an arbitration provision, . . . it will be estopped from 'raising any question of being a nonsignatory to the agreement.'"); *Alfa Laval U.S. Treasury Inc. v. National Union Fire Ins. Co. of Pittsburgh, Penn.*, 857 F. Supp. 2d 404, 415 (S.D.N.Y. 2012) ("The non-signatory plaintiffs have received a direct benefit from the Indemnity Agreements and are estopped from denying their obligation to arbitrate as the Agreements require."); *HD Brous & Co., Inc. v. Mrzyglocki*, No. 03 Civ. 8385, 2004 WL 376555, at *9 (S.D.N.Y. Feb. 26, 2004).

(iii)   Third, Fintiklis so dominates and controls Ithaca I and Ithaca II for his own benefit, that he knowingly caused Ithaca I and Ithaca II to take unlawful actions in breach of both the HMA and the Consent to Bulk Sale Agreement, which breaches are directly responsible for damages complained of by Respondents in this Proceeding. As such, under New York law, Respondents may pierce the veil of Ithaca I and Ithaca II, (which as discussed above are bound to the dispute resolution provisions of the HMA) to reach Fintiklis personally. *See Thomson-CSF, S.A. v. American*

> *Arbitration Ass'n*, 64 F.3d 773, 777-8 (2 Cir. 1995) (discussing that veil piercing/alter ego may be used to bind a non-signatory to an arbitration agreement).

51.     Lundgren is also properly before this Honourable Tribunal and the ICC has proper jurisdiction over him under New York Law.  Lundgren, along with Fintiklis, dominated and controlled Claimant and its sole shareholder, Hotel Foundation, causing it to commit the illegal and tortious acts that have damaged Respondents and are the subject of the Third-Party Claims asserted in this proceeding. As such, Lundgren is personally liable to Respondents for the tortious actions he caused Claimant to take and which have caused injury to Respondents; Lungdren's inclusion as a party in this proceeding is both appropriate and necessary.

52.     Additionally, an independent basis for the ICC's lawful exercise of jurisdiction over Lundgren and Third-Party Respondent Owners Meeting is because both have expressly agreed to ICC jurisdiction; Lundgren and Owners Meeting are also being sued herein, *without limitation*, for breach of the Lundgren Settlement Agreement as it relates to the facts and claims set forth herein. Lungdren and Owners Meeting just last year, in 2016, settled an ICC proceeding arising out of Lundgren's bad actions concerning the Condominium portion of the property, captioned *Trump Panama Condominium Management LLC v. Owners Meeting of the P.H. TOC et al.,* Case No. 21415/RD.[5]  Specifically, in the Lundgren Settlement Agreement, Lundgren and Owners Meeting made material promises which are at the heart of the current Dispute and Respondents' rights under the HMA:

> neither B.H. TOC nor any current or future Board of Directors nor any current or future member of the Board of Directors (**including, without limitation, Mr. Lundgren**, Ms. Perez, Mr. Graser, Mr. Soloway and Mr. McGowan), whether acting in their capacity as a director or **individually, shall**, at any time, directly or indirectly, **take any action** (including, without limitation, exercising any voting

---

[5] *See* **Exhibit C.**  Respondents, the Hotel Operator, are affiliates of Trump Panama Condominium Management LLC, a signatory to the Lundgren Settlement Agreement, and are expressly intended third-party beneficiaries of the Lundgren Settlement Agreement, as Section 6 specifically references Hotel Operator and confers benefits/imposes obligations with respect to Hotel Operator on the signatories to the Lundgren Settlement Agreement.

rights as Members of the Board of Directors) **which could reasonably be expected to interfere or compete with the duties, services, functions, management responsibilities** (including the obligation to operate the Rental Program and the Hotel Amenities Unites (as defined in the Hotel Management Agreement)), **rights and responsibilities of Hotel Operator, whether under the Hotel Management Agreement or otherwise**, or which could otherwise be expected to damage the relationship between Hotel Operator and any parties with an interest in the Building.

Lundgren Settlement Agreement, Section 6, **Ex. D** hereto (emphasis added).

53.     Section 10 of the Lundgren Settlement Agreement provides, that "all disputes relating to the performance of any term hereunder shall be decided in accordance with the procedures set forth in Article 17 of the P.H. TOC Management Agreement."  Section 17.2 thereof,[6] provides that "all disputes, controversies, claims or disagreements arising out of or relating to this Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner . . . Either party may submit the Dispute to the International Chamber of Commerce for binding arbitration under the then existing ICC Commercial Arbitration Rules" – identical to the language used in the HMA by Claimant to commence these proceedings.  *Compare* ¶ 40 *supra* and Request for Arbitration ¶ 12 (quoting HMA Section 9.1).

54.     Third-Party Respondent Owners Meeting, as a direct signatory to the Lundgren Settlement Agreement, is unquestionably bound by its terms and properly joined in this proceeding.

55.     Another independent basis for the lawful exercise of jurisdiction by the ICC over Third-Party Respondent Lundgren is that he has directly, knowingly and personally benefitted from the Lundgren Settlement Agreement and, as such, is bound by its terms, including ICC jurisdiction over any disputes arising from his breach of the Lundgren Settlement Agreement.  *See*

---

[6] A true and correct copy of the P.H. TOC Management Agreement is attached hereto as **Exhibit F**.

¶ 50 above, (collecting cases concerning the binding of non-signatories who derive direct benefits from agreements containing arbitration provisions).

56.     Moreover, the Lundgren Settlement Agreement which Lundgren signed specifically restricts Lundgren's actions with respect to Respondents rights under the HMA and provides for resolution of any disputes arising from the Lundgren Settlement Agreement in proceedings before the ICC.   Thus, joinder of Third-Party Respondent Lundgren in the instant proceedings is appropriate.

57.     Joinder of Third-Party Respondent Morgan & Morgan is also lawful and justified because Morgan & Morgan acted as an agent of Third-Party Respondents Ithaca I, Ithaca II, and Fintiklis, each of whom is bound to arbitrate in these proceedings.   As set forth below, Morgan & Morgan, by and through the actions of (at least) Orlando Tejeira, deliberately acted in furtherance of a conspiracy to tortiously interfere with Respondents' rights under the HMA and the Hotel-related agreements.   As such, Morgan & Morgan is properly joined in these proceedings and the ICC has jurisdiction over same, because Morgan & Morgan is an agent of parties that are themselves bound to arbitrate in this proceeding.   *See, e.g., Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("This Court has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'") (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)).

58.     Such joinder is particularly appropriate here since the HMA provides that all disputes relating to or arising from the HMA – which Morgan & Morgan's tortious conduct unquestionably does – must be brought in this proceeding or are barred.

59.     **Venue**.  Section 9.1.5 of the HMA provides:

The arbitration hearing shall be held in Panama City, Panama and, except for those procedures specifically set forth in this Section 9.1, including, without limitation, the application of the internal laws of the Republic of Panama or the State of New York (without regard to conflict of law principles), shall be conducted in accordance with the Commercial Arbitration Rules of the International Chamber of Commerce as in effect as on the date thereof.  The seat of arbitration shall be in the State of New York, County of New York, and any action by any party challenging the validity of the arbitration award shall be filed in the appropriate federal or state court located in the State of New York, County of New York.

60.     **Governing Law**.  The HMA, in Section 12.3, provides:

This Agreement, all disputes relating to the performance or interpretation of any term of this Agreement and the validity of any arbitration awards issued in accordance with Section 9.1 of this Agreement, shall be construed under and governed by the internal laws of the State of New York (without regard to conflict of laws principles), except to the text that the subject of the dispute arises out of or concerns the enforcement of rights where only local law is applicable such as Panama real estate or Panama real estate interests, employment, gaming and permitting from governmental entities or municipalities (such as liquor permits).

61.     The Lundgren Settlement Agreement, in Section 10, incorporates the dispute resolution provisions of Article 17 of the P.H. TOC Management Agreement, which, in Section 17.1.1, likewise provides:

This Agreement, all disputes relating to the performance or interpretation of any term of this Agreement and the validity of any arbitration awards issued in accordance with Section 9.1 of this Agreement, shall be construed under and governed by the internal laws of the State of New York (without regard to conflict of laws principles), except to the text that the subject of the dispute arises out of or concerns the enforcement of rights where only local law is applicable such as Panama real estate or Panama real estate interests, employment, gaming and permitting from governmental entities or municipalities (such as liquor permits).

## APPOINTMENT OF ARBITRATORS

62.     **Constitution of Panel**.  Article 9 of the HMA provides that this proceeding shall be conducted by a panel of three arbitrators.

63.     **Qualifications of Arbitrators.**  The HMA further provides that the arbitrators for this proceeding shall be free of conflicts with the parties and their affiliates and experienced in the luxury hotel and condominium businesses.  Specifically:

> Each arbitrator shall have not fewer than 10 years of experience (at the time the request for arbitration is filed) in the luxury hotel business as construed under U.S. market standards (and no fewer than five years of experience in the luxury condominium business), shall be independent of the parties as provided by the ICC Commercial Arbitration Rules, and shall not be an Affiliate of or a Person who has any past (within the prior three years from the date the arbitration is filed), present, or currently contemplated future business or personal relationship with Owner, Promoter/Developer, any owner of 10% of more of the Hotel Units or any other category of Units, or Operator.  Each of Operator, on the one hand, and any one or more of the other Parties, on the other hand, shall propose on arbitrator by written notice incorporated into the request for arbitration and answering statement, to the other party, and the two arbitrators selected shall, within twenty (20) days after their appointment, select the third arbitrator.  If either Party does not select an arbitrator within twenty (20) days after the Dispute is submitted, then an arbitrator shall be selected for that party under the ICC Commercial Arbitration Rules.  In the event that the parties are unable to obtain the services of arbitrators which meet the qualifications set forth in this Section 9.1.1, the parties shall use diligent efforts to obtain the services of arbitrators whose qualifications are substantially similar to those set forth above.

HMA, Section 9.1.1.

64.     **Claimant's Proposed Appointment.**  Claimant, in its Request for Arbitration, purported to nominate Cecelia L. Fanelli, Esq. of Steptoe & Johnson LLP.  As addressed in Respondents' application and reply to challenge and disqualify attorney Fanelli, respectively dated and filed  November 8, 2017 and December 1, 2017 with the ICC, which are specifically incorporated by reference herein (**Exhibit G**; **Exhibit H**), the nomination is improper as Ms. Fanelli is not qualified as an arbitrator under either the HMA or under New York law.

65.     **Respondents' Proposed Appointment.**  By letter dated November 8, 2017, Respondents notified the ICC and Claimant of its nomination of Mr. Bruce L. Goodwin as an

arbitrator in these proceedings, such correspondence being incorporated herein by reference.

(**Exhibit G**)  Mr. Goodwin's contact information is as follows:

> Goodwin & Associates
> 3027 Dalen Place
> San Diego, California 92122
> Tel: 858-558-4488
> goodwinassociates2@gmail.com

## FACTS COMMON TO ALL CLAIMS

### I.     LUNDGREN'S AND OWNERS MEETING'S PRIOR ICC PROCEEDINGS

66.     This is not the first proceeding before the ICC in which the Property and Hotel were featured.  In a proceeding commenced in 2015 and settled just last year in 2016, an Affiliate of Respondents commenced a proceeding in the ICC concerning the residential condominium portion of the Property.

67.     Specifically, the proceeding concerned Lundgren's unlawful seizure of control of the Board of Directors of Owners Meeting of P.H. TOC (the equivalent of the actions here with Fintiklis and his co-conspirators with respect to the Hotel Units) and purported to terminate Respondents' Affiliate's management agreement for the condominium units. History repeats itself.

68.     As alleged at the time, and true to this day, Gary Lundgren, over the course of his career, has never hesitated to engage in unlawful, devious and unethical business practices to line his pockets and advance his personal interests at the expense of anyone.

69.     In the United States, Lundgren, upon information and belief, has been the subject of numerous complaints, arrests and even criminal proceedings involving allegations of assault, resisting arrest, disorderly conduct, malicious destruction of private property and even domestic violence.  Moreover, Lundgren has faced a number of lawsuits and regulatory inquiries into his work in the U.S. securities industry.

70.     As a result, **Lundgren was censured by the National Association of Securities Dealers in 1983 and, as of February 2016, barred from affiliating with any securities firm that is a member of the Financial Industry Regulatory Authority (FINRA), a self-regulatory organization for broker-dealers in the United States.  In short, Lundgren is no stranger to fraud and criminality.**  Accordingly, it comes as no surprise that he and Fintiklis have unlawfully conspired to maliciously injure Operator's rights and interests through this sham proceeding and violations of law.

71.     Indeed, one of the facts giving rise to the prior ICC proceeding was Lundgren unilaterally appointing his wife, owner of a local property management company, as "Acting Interim President" of the Board of P.H. TOC.

72.     Ultimately, the 2015 ICC proceeding settled in 2016 pursuant to the Lundgren Settlement Agreement, in which the Respondents' Affiliate allowed the condominium management agreement to expire by its terms in exchange for material covenants from Owners Meeting of P.H. TOC and its board members, including Lundgren personally, which promises and covenants are directly related to the present Dispute before the ICC.

73.     Specifically, the Lundgren Settlement Agreement  provided that  Lundgren and Owners Meeting agreed as follows:

> neither B.H. TOC nor any current or future Board of Directors nor any current or future member of the Board of Directors (including, without limitation, Mr. Lundgren, Ms. Perez, Mr. Graser, Mr. Soloway and Mr. McGowan), whether acting in their capacity as a director or individually, **shall, at any time, directly or indirectly, take any action (including, without limitation, exercising any voting rights as Members of the Board of Directors) which could reasonably be expected to interfere or compete with the** duties, services, functions, management responsibilities (including the obligation to operate the Rental Program and the Hotel Amenities Unites (as defined in the Hotel Management Agreement)), **rights and responsibilities of Hotel Operator, whether under the Hotel Management Agreement or otherwise**, or which could otherwise be

expected to damage the relationship between Hotel Operator and any parties with an interest in the Building.

Lundgren Settlement Agreement, Section 6 (emphasis added).

74.    Not surprisingly, following the agreed-upon expiration of the condominium management agreement, the property management company owned by Lundgren's wife was appointed, in a blatant self-dealing manner, to manage the residential condominium portion of the Property.

75.    Now, in a continuing pattern of RICO activities, Lundgren has subsequently conspired with Fintiklis and others, including the Third-Party Respondents and John Does 1-10, for a similar purpose and in violation of Respondents' rights under the HMA and law.

76.    Specifically, Lundgren, Fintiklis, Ithaca I and II and Morgan & Morgan, and the other Third-Party Respondents conspired to unlawfully acquire Hotel Units in the Property with the goal of ousting, by *ultra vires* acts, the Respondents as managers and Operator of the Hotel.

## II.    THE BULK SALE TO FINTIKLIS

77.    In 2016, Newland, the developer of the Property, commenced bankruptcy proceedings.

78.    In or about May 2016, Newland offered the remaining 202 Hotel Units and the 13 Hotel Amenities Unit as a package for bid.  Pursuant to the P.H. TOC Co-Ownership Regulations, however, any sale of this size required consent from Respondents, as Hotel Operator and Licensor.[7]

---

[7] Article 75.4 of the Co-Ownership Regulations provides:

> **The extent to which 4. NUMBER OF HOTEL UNITS.** No **OWNER** of a **HOTEL UNIT** may subdivide his / her **HOTEL UNIT**; no **OWNER** may purchase, possess or control, directly or indirectly through affiliates, related parties or in any other way, more than ten (10) **HOTEL UNITS**. For these effects, ownership or control of a **HOTEL UNIT** shall be considered to exist if said **HOTEL UNIT** belongs, directly or indirectly to the **OWNER**, a family member of the **OWNER**, any entity where the **OWNER** or the **OWNERS** family members may have an interest or are partners, or any partner, affiliate, controlling company or affiliate of any of the above. The limitation

In addition, the HMA provides Respondents with the right to consent or reject any purchase or acquisition of more than 10 Units.

79.     On October 14, 2016, Fintiklis, operating by and through both of his Ithaca alter egos, came to Respondents' New York offices accompanied by Newland's representatives to meet about a potential purchase of those Units. Four days later, Fintiklis sent an email to those in attendance at the meeting, and stated that he (or, rather, Ithaca) "look[ed] forward to closing the transaction and working together to turning around this wonderful property." That was the beginning of a series of knowingly false representations made by Fintiklis to Respondents with the fraudulent intent that Respondents would rely upon the false statements to their detriment, which they did and which caused them resulting damages.

80.     Fintiklis intended to close the purchase, and did in fact close the purchase, using in part tens of millions of dollars in loan proceeds obtained from Canal Bank, a Panama entity.  The extent to which Canal Bank has relevant information or was defrauded by Fintiklis or participated in any manner in aiding and abetting this massive fraud and series of unlawful RICO acts shall be determined by and through discovery in this proceeding, and other proceedings in New York and Panama if and as necessary. Upon information and belief, as part of that financing transaction, Canal Bank performed extensive due diligence into the Property on which it was extending tens of millions in financing, as did Ithaca I and Ithaca II, the alter egos of Fintiklis.

---

above shall not apply to the **LICENSOR** or any entity or purchaser buying more than ten (10) **HOTEL UNITS** from the **LICENSOR**, provided that any **OWNER** possessing or owning more than ten (10) **HOTEL UNITS** shall only be allowed to resell these **HOTEL UNITS** in one exclusive transaction. As an example, but not limiting, if the **LICENSOR** sells twenty (20) **HOTEL UNITS** to a buyer, said buyer shall only be allowed to resell those twenty (20) **HOTEL UNITS** to another purchaser in a single transaction.

Co-Ownership Regulations of the Building P.H. TOC (the "COR"), Art. 75.4, attached hereto as **Exhibit I**.

81.     Fintiklis executed the first version of the Consent to Bulk Sale Agreement in or about January 2017 on behalf of Ithaca I and Ithaca II, which were incorporated in Panama and created to commit fraud and further an unlawful RICO scheme by and through the Bulk Sale. Before Respondents countersigned the Consent to Bulk Sale Agreement, Fintiklis requested further changes to it, specifically that the sale be bifurcated between his two alter egos: Ithaca I as the purchaser of the 202 Hotel Units, and Ithaca II as the purchaser of the thirteen Hotels Amenities Units.

82.     After making revisions requested by Fintiklis, Respondents – to avoid the very scenario giving rise to these sham proceedings conceived and commenced by Fintiklis and the Third-Party Respondents – clarified the language of Section 3(d) of the Consent to Bulk Sale Agreement.

83.     Simply stated, in exchange for allowing the Bulk Sale, Section 3(d) of the Consent to Bulk Sale Agreement is the main consideration that Respondents were to receive from Fintiklis and his alter egos: express covenants by Ithaca I and Ithaca II that they and their Affiliates shall not directly or indirectly take any actions to interfere with or undermine  ANY of Respondents' rights under or in respect to ANY of the related Hotel Agreements, including specifically the HMA, including but not limited with respect to any voting rights to any of the Hotel Units, or Hotel TOC, or any and all components of the P.H. TOC.

84.     Section 3(d) states as follows:

Purchaser shall not, directly or indirectly through any Affiliates or otherwise: (w) take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements, (x) *exercise its vote with respect to any of the Hotel Units in any Owners Meeting or other constituent body of the P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., in any manner which is adverse to the interests of Operator and/or its Affiliates under and in respect of any of the Hotel Agreements,* (y) *take (or refrain from taking) any*

*action (including any legal action) that could materially damage the relationship between Operator, its Affiliates and any other Person or* (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates.

Consent to Bulk Sale Agreement § 3(D) (emphasis added).

85.     Section 3(F) of the Consent to Bulk Sale Agreement further restrained Ithaca I and Ithaca II and its Affiliates from taking, directly or indirectly, any leadership positions within the P.H. TOC regime. That provision states in part that "Purchaser shall not seek or accept an appointment or election to the position of manager or administrator (or other similar leadership role) of the P.H. TOC." *Id.* § 3(F).

86.     In February 2017, Fintiklis personally executed the Consent to Bulk Sale Agreement, on behalf of his alter egos Ithaca I and Ithaca II, which were formed for the purpose of furthering the unlawful fraud and RICO scheme set forth herein. Respondents countersigned in good faith believing that Fintiklis was an honest businessman.  Pursuant to the Consent to Bulk Sale Agreement, Operator's required Written Approval necessary for the purchase was deposited in escrow with Newland's attorney, with release pending acceptance of the Licensing Fee.

87.     On July 30, 2017, the P.H. TOC Board of Directors issued its Paz y Salvo (a certificate that the property is unencumbered by liens), allowing Newland to close the deal.

### III.     FINTIKLIS MAKES HIS NEXT MOVE IN FURTHERANCE OF HIS FRAUD AND UNLAWFUL RICO SCHEME

88.     On or about August 10, 2017, the deeds to the 202 Hotel Units and the 13 Hotel Amenities Units were recorded in the Panama Public Registry, reflecting Ithaca I as the owner of 202 Hotel Units, and Ithaca II as the owner of the 13 Hotel Amenities Units.

89.     On August 25, 2017, Operator received the License Fee pursuant to the Consent Agreement and, accordingly, Operator released its Written Approval of the Bulk Sale the same day. (**Exhibit J**)

90.     Following the transfer of ownership of the 202 Hotel Units and the 13 Hotel Amenities Units, Fintiklis again met with high-ranking members of Respondents on August 28, 2017, this time in Panama.  At this meeting Jeff Wagoner, EVP of Hotel Operations for Trump Hotels, made two presentations. The first presentation reviewed Respondents' sales and marketing strategies at the corporate level; and the second presentation discussed market highlights, financial performance, and key Hotel objectives at the property level.

91.     A little over a month later, on October 3, 2017, Fintiklis again met with five high-ranking members of Respondents, as well as the entire Hotel Executive Committee, in Panama. At that meeting, Jeff Wagoner again made a presentation (**Exhibit K)**, this time concerning new initiatives and revenue strategies to mitigate the effects of the increasingly saturated high-end hotel market in Panama City, Panama, an issue that has been building over the past few years. The presentation also included a preview of the Hotel's budget for 2018.

**IV.     THE HOTEL TOC "LUNCH MEETING"**

92.     On October 3, 2017 at 9:03 PM local Panama time—the same day Fintiklis met with the Respondents in Panama — Fintiklis sent a mass email to all Hotel Unit Owners requesting their attendance "at a meeting of the beneficiaries of Hotel Foundation, Inc. (*i.e.*, all Hotel Unit Owners) on 14 October 2017," declaring that it was an opportunity to meet as many Hotel Owners as possible and "hear [Hotel Unit Owners'] thoughts and ideas."  (**Exhibit L**)  This was another false statement made by Fintiklis and his alter ego entities which was designed to mislead Operator and Respondents and made to further the fraud, unlawful acts and RICO violations set forth herein.

93.     Upon learning of this proposed Hotel Unit Owners meeting, Respondents contacted Fintiklis directly to remind him of his obligations under the Consent to Bulk Sale Agreement—specifically the covenants and acknowledgements as laid out in Section 3, quoting subsections (D)–(E).  Specifically, Respondents noted that Ithaca I and II "expressly bound themselves and committed that they 'shall not seek or accept an appointment or election to the position of manager or administrator (or other similar leadership role) of the PH TOC.'"  Respondents further requested that its General Manager of the Hotel attend the meeting, and that Fintiklis notify Respondents of any future plans to convene Hotel Unit Owners.

94.     Fintiklis fraudulently responded to Respondents, and continued to make further knowingly false statements in furtherance of the fraud and RICO violations set forth herein. Fintiklis wrote, "With regard to the second point, this is not a legal point.  So you prefer for the positions to continue to be vacant and hotel to continue to be exploited and extorted?  What is this business issue/detriment to your organization form us appoint the position we are entitled to the board of PH Toc under the PH condo docs?"  Fintiklis and his alter egos further confirmed their awareness of the provisions quoted, and claimed that the meeting was merely an informal lunch that he put together because he was being approached by Hotel Unit Owners and thought that a "lunch meeting" would be a good way to meet everyone. Fintiklis also agreed to have the General Manager in attendance, a knowingly false statement made with the intent that Respondents would rely upon it to their detriment and damage, which they did. At this point, Ithaca I had been the majority shareholder of the Foundation for a little under two months.

## V.     THE "OCTOBER 14 MEETINGS," NOTICE OF DEFAULT, AND REQUEST FOR ARBITRATION

95.     On Saturday, October 14, 2017, Fintiklis, Lundgren, Ithaca I and II, Morgan & Morgan and John Does 1-10, met with Hotel Unit Owners at the Hotel, under the guise and deceit

of an informal lunch. The Hotel's General Manager, Carlos Abaunza, who is an employee and representative of Respondents, was in attendance for the first 10 or 15 minutes of the meeting, until he was forced to leave by the Third-Party Respondents.

96.     Fintiklis effectively started the meeting by declaring that "we called the meeting because most of you have been telling us you are troubled by the fact that . . . every month you have to reach into your pocket and make a payment to support what you thought was an otherwise profitable investment, which is clearly not the case . . . ." He continued, "if we have the best hotel why are we losing money [?] [S]o that's wh[y] we're here . . . to discuss . . . basically we think and we heard from you . . . [t]he Operator is supposed to perform the functions of the Operator . . . [but] the owner and the Operator have effectively been the same person." (**Exhibit M**)  Those statements are false, were knowingly false when made and were made in furtherance of the unlawful fraud and RICO scheme set forth herein. Among other things, Fintiklis, and the Third Party Respondents who participated and orchestrated this sham meeting know very well that Operator has never been the Owner and never held itself out to be the Owner.

97.     Lundgren, through various corporate entities which had fraudulently obtained ownership of 50 Hotel Units without the required consent of Respondents, was present and spoke at the meeting as well in furtherance of the fraud and RICO scheme set forth herein.

98.     Orlando Tejeira, of Morgan & Morgan, was also in attendance at the meeting and stated as follows:

Orlando Tejeira:   good afternoon ok so as I mentioned my name is Orlando Tejeira an attorney for Morgan and Morgan representing Ithaca and all of you.  I just want to make sure that first of all and prior for me to reading the resolution that you are voting as beneficiaries of the foundation and as owners.  I have to say that I am compelled by law to establish that this information that I am going to read is privileged and strictly confidential only for the beneficiaries

of the foundation so everyone who is not an owner should please leave room for the next 10-15 minutes then can come in . . . .

*See* **Ex. C** hereto.

99.     When Operator, by and through the General Manager of the Hotel, attempted to inform Fintiklis, Lundgren, the Ithaca alter egos and Morgan & Morgan that it had lawful proxies for votes, Fintiklis and the Third-Party Respondents ordered him – and effectively Respondents – out of the room.   Morgan & Morgan's assertions that it and Tejeira represented the all of the Beneficiaries (i.e., all of the Unit Owners) of the Foundation in this meeting is patently FALSE as he and Morgan & Morgan are not the Legal Representative of Hotel Foundation, Inc. and certainly could not have been at the time that statement was made, before any sham vote had even been taken.   Moreover, Morgan & Morgan and knew that no Board of Directors meeting had been properly noticed, and knew in fact it was falsely and deceptively called "a lunch meeting" for the purpose of orchestrating this fraud and series of RICO acts and violations. In fact, after Operator by and through its agent the Hotel's General Manager said "we were told this meeting was a simple meet and greet," Fintiklis said:   **"Ok.  It don't matter what was the purpose of the meeting now we have everybody here and I don't think people here have an issue."**

100.     Article 5 of Hotel Foundation, Inc. Foundational Charter (attached hereto as **Exhibit N**) establishes that the "Legal Representative of the Foundation shall be the President of the Council. In his absence, the legal representative shall be whomever is elected by the majority of the votes of the Members of the Council." (Foundation Charter, Art. 5). Before, as of and on October 14, 2017, the Legal Representative and President of the Foundation was Roger Khafif. Mr. Khafif, Hotel Foundation, Inc.'s Legal Representative, did not receive notice of the meeting, nor did he attend.

101.    The failure to provide notice to Mr. Khafif was no mistake, but rather an intentional fraudulent act designed to ensure that Fintiklis, Lundgren, and Ithaca, together with the able assistance of Morgan & Morgan and John Does 1-10, could exercise their unlawful scheme without protest or bound by legal impediments, such as notice to and participation by the duly-installed Council of Hotel Foundation, Inc., in violation of law.

102.    Tejeira of Morgan & Morgan continued aiding and abetting the fraud and RICO scheme set forth herein, claiming that Morgan & Morgan, as purported counsel to ALL hotel unit owners was duly "compelled by law to establish that [the resolution] that [Tejeira] is going to read is privileged and strictly confidential—only for the Beneficiaries of the Foundation," and thus all non-Hotel Unit Owners were required to leave.  This purportedly included the Hotel's General Manager and Respondents' on-site representative, Carlos Abaunza.

103.    Under Article 11 of the Foundational Charter, meetings of the Beneficiaries may only be convened by the Foundation Council or upon written request of Beneficiaries representing 35% of Hotel Units, provided notice is given not less than 10, but no more than 60, days before the meeting. (Foundation Charter, Art. 11).  Because the Foundation Council did not convene the meeting, because the meeting was held under the fraud and deceit of being an informal lunch and because no written request was made to have a board meeting, much less by any requisite percentage of Hotel Units, and because no member of the incumbent Foundation Council was notified about the October 14, 2017 meeting, the so-called "meeting" on October 14, 2017 was not a valid Meeting of the Beneficiaries as laid out in Article 11 and was merely one of several acts orchestrated and enacted in furtherance of the fraud, RICO violations and unlawful acts set forth herein from which Respondents have suffered significant damages.  In short, Fintiklis, Lundgren, Morgan & Morgan, Owners Meeting, Ithaca I, Ithaca II, and John Does 1-10 are engaged in a

complete sham to usurp unlawful control of Hotel TOC and Hotel Foundation, in an effort to injure Respondents, which sham includes there commencement of this arbitration proceeding in violation of Section 487 of the New York Judiciary Law.

104.    After the Respondents, represented by the Hotel General Manager, were directed to leave, Fintiklis, and his alter egos Ithaca I and II represented at this meeting in person by Morgan & Morgan & Morgan, together with Lundgren – in direct and knowing violation of their collective obligations under the Consent to Bulk Sale Agreement  and the Lundgren Settlement Agreement – purported to hold an unlawful "Meeting of the Beneficiaries" to change the composition of the Foundation Council, and at the same time, an unlawful "Assembly of the Shareholders" to change the members of the Board of Directors of Claimant.

105.    The foregoing events occurred in furtherance of Fintiklis's, Lundgren's and Third-Party Respondents' fraud and RICO scheme, including for the purpose to wrongfully usurp control of Hotel TOC and its sole shareholder Hotel Foundation, remove Operator in violation of its rights under the HMA and remove from the Foundation Council the incumbent President James Petrus; the incumbent Secretary Michael Dieter Straube; and the incumbent Treasurer Charles Mark Stevenson; and to elect Fintiklis as President of the Foundation Council; Alfredo Guerra as Secretary; and Jamie Fernandez as Treasurer.

106.    The Minutes of the alleged October 14, 2017 Meeting of the Beneficiaries filed on October 16, 2017 with the Panama Public Registry (attached hereto as **Exhibit O**) confirms as much and states that:

> [A] meeting of the Beneficiaries . . . of the Hotel Foundation, Inc. . . . was held on October 14, 2017 at 12:00 PM  at the [H]otel . . . . Upon approval and designation of the Beneficiaries . . . Orestes Fintiklis, Director – President and Legal Representative of Ithaca Capital Investments S.A. I, a Panamanian corporation and Beneficiary of the Foundation, acted as President of this meeting. . . Upon approval and designation of the Beneficiaries, Orestes Fintiklis, Director – President and

Legal Representative of Ithaca Capital Investments S.A. II acted as Secretary of this meeting. . . . The President of the meeting [Fintiklis] declared that there were present in person and/or duly represented by proxy at the meeting 284 of the 369 Beneficiaries of the Foundation and that notice of the meeting was sent and given to all the Beneficiaries of the Foundation pursuant to Article Eleventh of the Foundational Charter of the Foundation.

(Foundation Minutes, filed Oct. 16, 2017).

107.   The Foundation Minutes, which the Third-Party Respondents caused to be filed declaring that 284 of the 369 Beneficiaries of the Foundation were in attendance or represented by proxy and that proper notice was given pursuant to Article 11 of the Foundation Charter is false, were knowingly false when made and were made in furtherance of the fraud and RICO scheme herein for which Respondents assert Counterclaims and Third Party claims and seek relief.

108.   Fintiklis, acting as both ad-hoc President *and* Secretary of the meeting, (Foundation Minutes, Oct. 14, 2017), and blatantly disposing with any corporate formalities as it were, quickly "resolved" to remove the three aforementioned Council Members so as to elect himself and those under his control, including his lawyer Alfredo Guerra, to Council Member positions, enabling Fintiklis to control the Foundation Council, which is "responsible for the management, administration and representation of the Foundation." (Foundation Charter, Art. 4(k)).

109.   The Minutes of the alleged "Shareholder's Assembly Meeting" of October 14, 2017, filed with the Panama Public Registry on October 16, 2017 state that Fintiklis again acted as ad-hoc President and Secretary of the meeting. (Claimant Minutes, Oct. 14, 2017, attached hereo as **Exhibit P**). The alleged Shareholder Meeting Minutes go on to say that "[t]he President of the meeting [Fintiklis] declared in the presence and/or representation of all of the issued and outstanding shares of the company, the notice of call could be waived, and the quorum being in force, the meeting could proceed to deal with any matter submitted to it." *Id.*

110.    Again, as explained above, the assertion that all the issued and outstanding shares of the company were lawfully present and/or represented at the alleged October 14th Meetings is false, was knowingly false when made and was made in furtherance of an unlawful RICO and fraudulent scheme.

111.    The alleged Shareholder Minutes further state that Fintiklis, as ad-hoc President, informed the alleged Shareholders Assembly that it was resolved in the alleged Meeting of the Beneficiaries to (i) remove Mark Hawthorn (an employee of Operator), Charles Thierry Baurez and Carlos Abaunza (both Operator's representatives) as current Directors and Officers of the Corporation; and to, in turn, (ii) appoint Jaime Fernandez as Director and Treasurer; Fintiklis as Director and President, and Alfredo Guerra as Director and Secretary.  These are the same three people that were allegedly voted to the Foundation Council.

112.    Even though the General Manager of the Hotel, Carlos Abaunza, a Director of Claimant was present at the beginning of the "lunch meeting," Fintiklis and the Third-Party Respondents unlawfully excluded him from the alleged Shareholders Assembly Meeting by demanding that he leave before the alleged "Meeting of the Beneficiaries" and alleged votes took place, without disclosing that such an alleged Shareholders Assembly Meeting would be held in the next hour.  These acts were undertaken by and through the conspiracy of the Third Party Respondents in furtherance of the fraud and RICO scheme set forth herein.

113.    Upon information and belief, the Third Party Respondents caused Fintiklis to be wrongfully elected, together with those under his control, to the Foundation Council and Claimant's Board of Directors to wrest control of the Hotel Management, injure Respondents, wrongfully terminate the HMA, and to effectuate the fraud and RICO scheme set forth herein.

114.   Under Panama law, the Foundation Charter would require an affirmative vote of 75% of all Beneficiaries (Hotel Unit Owners) or the written consent of all Beneficiaries to "[t]erminat[e] for cause, and/or decision not to renew any agreements entered into by the [Corporation] with any hotel operator and/or manager with respect to the operation of the Hotel." (Foundation Charter, Art. 10(b)(iv)). Even assuming the meetings had been properly noticed and called, which they were not, this additional legal requirement was not met.

115.   Moreover, under the express voting prohibitions of the Consent to Bulk Sale Agreement and Lundgren Settlement Agreement, neither Fintiklis nor his alter ego Ithaca entities, or Lundgren and his affiliated entities could take any vote or take any action adverse to Operator or which would undermine Operator's rights under the HMA. Accordingly, the decision orchestrated by Third Party Respondents to terminate the HMA, whether under Article 10(b)(iv) of the Foundation Charter or otherwise, is invalid.

116.   Tellingly, the same day these meetings – arranged by Fintiklis and Third-Party Respondents in furtherance of their fraud and RICO scheme – took place, Fintiklis, purporting to act as an authorized representative of Claimant Hotel TOC and Hotel Foundation, served Respondents with a seven-page sham Notice of Default under the HMA, dated October 14, 2017. That this Notice of Default was served the same day as the alleged meetings occurred is certainly no coincidence and was planned and conspired by the Third-Party Respondents in furtherance of their fraud and RICO scheme.  To the extent that unknown parties John Does 1-10, including lawyers and law firms, took part in this fraudulent scheme, they shall be discovered in the ICC proceedings and identified and sued in the place of John Does.

117.   Fintiklis and the Third-Party Respondents apparently convened these alleged October 14th Meetings without proper notice and obstructing the participation of Operator's

representatives as well as the President and Legal Representative of the Foundation, to falsely claim that 75% of the Beneficiaries approved the termination of the HMA, prompting the simultaneous service of a sham Notice of Default and bogus ICC Arbitration filing dated *the exact same day.*  This is fraud and a violation of RICO, without limitation.

118.    Even worse, the very same day that the alleged "Meetings" were held and the Notice of Default was sent, Fintiklis and others John Does 1-10, caused the filing of a 47-page sham Request for Arbitration with the ICC pursuant to HMA § 9.1, purporting to act on behalf of Claimant the same day that Fintiklis fraudulently appointed himself to Claimant's Board of Directors.

119.    That these three events,  (1) the fraudulent meeting; (2) the Notice of Default; and (3) the Request for Arbitration, all occurred on the same day, October 14, 2017, compels the conclusion that Fintiklis, and Lundgren, their controlled alter ego entities and affiliates, together with Morgan & Morgan and the Third-Party Respondents, including John Does 1-10, designed this fraud and RICO scheme to usurp control of the Hotel and to injure Operator's rights and interests under the HMA, long before October 14, 2017.

**VI.    THE SHAM DEFAULT NOTICE AND OPERATOR'S RESPONSE**

120.    The Notice of Default, dated October 14, 2017 and signed personally by Fintiklis as an alleged "authorized representative of Hotel TOC, Inc. and Hotel Foundation, Inc.," purported to provide notice of the:

> ongoing, material defaults under the [HMA], in particular Operator's failure to comply with its contractual and fiduciary obligations to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel; operate Hotel in accordance with the Operating Standard; and 'to maximize profitability and long term value of the Hotel.

(Notice of Default, at 2) (quoting HMA §§ 2.1, 2.2).

121.   The Notice of Default further alleges "Operator has provided Owners only sparse and deficient financial disclosure, all the while failing to make required distributions, develop an effective marketing plan to address Owners problems plaguing the Hotel caused by Operator's incompetence, and obtain Owner's consent to amend the Annual Plan." (*Id.* at 3) (citing HMA §§ 2.1—2.5, 4.2, 4.4, 4.6, 5.2(a), 5.2(e), 5.2(h)).

122.   Section 5.2.1 provides a list of example "events [that] shall constitute an 'Event of Default' by the party as to which such event occurs."

123.   Subsection 5.2.2 of the HMA provides the procedure by which a party to whom an "Event of Default" has occurred under the HMA may seek recourse:

> Upon the occurrence of any Event of Default pursuant to Section 5.2.1, the non-defaulting Party may, without prejudice to any other recourse at law or in equity which the non-defaulting Party may have, give to the defaulting Party notice of its intention to terminate this Agreement, which termination shall be effective no earlier than thirty (30) days and no later than ninety (90) days following the date the notice of termination is given.

HMA §5.2.2.[8]

124.   Fintiklis and Third-Party Respondents caused Claimant to issue the Notice of Default pursuant to Section 5.2.2 under the HMA, and required Operator to cure any defaults by November 20, 2017.

125.   However, because Fintiklis and the Third-Party Respondents caused Claimant to also file its Request for Arbitration on October 14, 2017, the same day of the sham Notice of Default (and sham "lunch meeting"), Section 5.2.4 was triggered which states:

> Any termination notice given pursuant to Section 5.2.2 . . . **shall not result in the termination** of this Agreement **if a bona fide dispute with respect to any alleged Event of Default** . . . entitling a party to terminate this Agreement has arisen between the parties and such dispute has been submitted to resolution pursuant to Section 9.1.

---

[8] For the avoidance of doubt, Respondents deny each and every claim asserted by Claimant in the Request.

*Id.* § 5.2.4 (emphasis added).

126.   Section 5.2.4 further clarifies that once a party submits the issue of whether an Event of Default under the HMA has occurred is submitted to resolution by the ICC pursuant to Section 9.1, the HMA requires the arbitrator to determine that an Event of Default has occurred and that the party seeking to terminate the Agreement is so entitled. The specific language of Section 5.2.4 is as follows,

> If an arbitrator determines that an Event of Default has in fact occurred or that any other event entitling a party to terminate this Agreement has in fact occurred . . . the party entitled to terminate this Agreement may give notice to the other party of its intention to terminate this Agreement upon a date to be specified in such notice, which date shall be not less than 30 days from the date of such determination. In the event such notice is given, this Agreement shall terminate upon the date specified in such notice.

*Id.*

127.   On November 7, 2017, Respondents duly responded to the Notice of Default ("Notice Response") a copy of which is annexed hereto as **Exhibit Q**.  In the Notice Response, Respondents asserted, in great detail, their rejection of the Notice of Default. As a matter of law, Fintiklis and the Third-Party Respondents have no authority to act on behalf of Claimant.  Thus, Respondents provided numerous examples of how the Notice of Default was clearly a contrived sham to mount baseless claims of nonperformance under the HMA.  In reality, no Event of Default exists.

128.   As a result of Respondents' November 7 letter, together with Respondents' instant pleading, the "Events of Default" alleged are certainly in dispute and have been submitted to resolution by the ICC pursuant to Section 9.1 of the HMA. Consequently, even if Fintiklis could establish under law that he is the authorized representative of Claimant, Claimant could not lawfully terminate the Agreement until an arbitration has determined Claimant is so entitled.

## VII.    THE NOVEMBER 2017 TERMINATION LETTER

129.    In flagrant violation of Section 5.2.4 of the HMA, which expressly prohibits termination of the HMA where a bona fide dispute has been submitted to arbitration, on November 21, 2017, Fintiklis and Third-Party Respondents furthered this fraud and RICO scheme when they caused to be issued a purported letter notice of termination ("Termination Notice"), effective December 22, 2017, attached hereto as **Exhibit R**.  As explained above, this Termination Notice is improper because the issue has already been submitted to the ICC pursuant to Section 9.1, and thus the Claimant and the Third Party Respondents through which it acts must now wait until the parties agree otherwise, or an arbitrator orders "the party entitled to terminate this Agreement [to] give notice to the other party of its intention to terminate this Agreement upon a date to be specified in such notice, which date shall be not less than 30 days from the date of such determination." HMA § 5.2.4.  On November 22, 2017, Operator responded,[9] rejecting the Termination Notice and reminding Claimant of Section 5.2.4, confirming that there is a bona fide dispute concerning the existence of an Event of Default that has been submitted to arbitration pursuant to Section 9.1.

130.    Neither Claimant, Fintiklis or his conspirator Third Party Respondents parading as some "authorized representative" of Claimant, is entitled to terminate the HMA; despite this, Fintiklis, masquerading as an "authorized representative" of Claimant, has sent Respondent numerous—and often duplicative—notices and correspondence, alleging that Respondents' continued alleged default under the HMA entitles Claimant to take further action under the HMA. This is simply false and are further acts undertaken in furtherance of the fraud and RICO scheme.

131.    In reality, the continued persistence of Fintiklis and the Third Party Respondents in threatening  the immediate termination of the HMA in violation of its plain language and in the

---

[9] A true and correct copy of the November 22, 2017 Response to Termination Notice is attached hereto as **Exhibit S**.

face of the sham proceeding they have commenced is part and parcel of the fraudulent RICO scheme devised by Fintiklis, Lundgren and the Third-Party Respondents, the goal of which is to injure Respondents and remove Respondents from the Property at all costs, contractual requirements and legal restrictions be damned.

132.    These actions alleged above and herein, however, themselves violate the HMA, New York and Panama laws and entitle Respondents to significant damages, including but not limited to treble damages for RICO violations and attorneys' fees.

## VIII.   DENIAL OF CLAIMANT'S CLAIMS

133.    Respondents hereby deny each and every Claim in the Request for Arbitration and all material allegations in support thereof.

## CLAIMS FOR RELIEF

## FIRST COUNTERCLAIM
## BREACH OF THE HMA

134.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

135.    Claimant Hotel TOC, Inc. and Respondents are party to the HMA, which has an initial term of 20 years.  Absent an Event of Default or performance-related issues under Section 5.3, the HMA may not be terminated.

136.    No such Event of Default exists and Claimant does not assert default under Section 5.3 of the HMA. Accordingly, Claimant's service of Notice of Default is a sham, designed to carry out an unlawful scheme and breaches the HMA.

137.    Moreover, subsequent to commencing this arbitration, Claimant has notified Respondents of its unlawful intention to terminate Respondents as Hotel Operator and remove Respondents from the Hotel property.  Such conduct blatantly violates the HMA.

138.    Specifically, Section 5.2.4 of the HMA provides:

Any termination notice given pursuant to Section 5.2.2, 5.3 or 5.4 **shall not result in the termination** of this Agreement **if a bona fide dispute with respect to any alleged Event of Default or other event entitling a party to terminate this Agreement has arisen between the parties and such dispute has been submitted to resolution pursuant to Section 9.1**.

139.    A bona fide dispute clearly exists between Claimant and Respondents concerning the existence of an Event of Default (*see, e.g., ¶¶ 146* - *150 supra*).  Fintiklis, Lundgren and the Third-Party Respondents, conspired to undertake unlawful *ultra vires* acts and have no authority to act on Claimant's behalf or to take any adverse actions against Operator, and such all Disputes arising under or related to the HMA have been submitted for resolution in this proceeding.

140.    Accordingly, Claimant's persistent threats to terminate Respondents is a material and unequivocal repudiation and breach of the HMA, including, but not limited to, Section 5.2.4.

141.    As a direct result of Claimant's breaches of the HMA, Respondents have suffered damages in an amount to be proven at the hearing in this proceeding, but in no event less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

## SECOND COUNTERCLAIM
## DECLARATORY JUDGMENT

142.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

143.    There exists real and justiciable controversies affecting the rights of Respondents and Claimant that are ripe for determination.

144.    The October 14, 2017 meeting of the Hotel Foundation, Inc. violated its Articles of Incorporation by failing to provide notice to all Beneficiaries and failing to achieve at least 75% participation of Beneficiaries for the decisions undertaken.   Because of this failure, Hotel Foundation, Inc.'s actions with respect to the composition of the Board of Claimant are null and void, and Claimant's subsequent actions are *ultra vires*. Even assuming *arguendo*, that meeting had been called on proper Notice and even assuming 75% of those beneficiaries with valid

ownership and valid voting rights had voted – which neither fact exists or occurred – Third Party

Respondents Ithaca I and II, Fintiklis and Lundgren and the Lundgren-related affiliates and entities

had zero right to vote or cause to be voted any matters undermining the Operator or averse to

Operator's interests under the Consent to Bulk Sale Agreement and the Lundgren Settlement

Agreement .

145.    As a result of the *ultra vires* acts taken on and after October 14, 2017 by Claimant,

Respondents are entitled to a declaration that:

(i)      the removals and appointments purportedly made to the Foundation Council and
         Hotel TOC, Inc. BOD on October 14, 2017 are null and void;

(ii)     Fintiklis, is not an authorized representative of Claimant, had no authority to issue
         the Notice of Default, and consequently, the Notice of Default is null and void;

(iii)    any termination of the HMA authorized by Fintiklis or other persons purportedly
         appointed to the Foundation Council and the Hotel TOC, Inc. BOD during the
         October 14, 2017 Meeting is null and void;

(iv)     the claims fraudulently asserted by Claimant in this Arbitration Proceeding are *ultra
         vires* and null and void.

## THIRD COUNTERCLAIM
## DECLARATORY JUDGMENT

146.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

147.    There exists real and justiciable controversies affecting the rights of Respondents

and Claimant that are ripe for determination.

148.    Absent an expiration of the HMA by the natural the passage of time, the HMA may

only be terminated in an Event of Default (under Section 5.2) or performance-related issues (under

Section 5.3).[10]  Claimant's Notice of Default is predicated on the existence of alleged fictional Events of Default under the HMA.

149.    As demonstrated in the November 7 Response to the Notice of Default, no such Events of Default exist, however, and Respondents continue to perform their obligations under the HMA, as agreed by Lundgren and Owners Meeting in the Lundgren Settlement Agreement and as discovered by the Third Party Respondents, *i.e.*,  Fintiklis, Ithaca I and Ithaca II, their lawyers Morgan & Morgan, John Does 1-10   and the lender of Fintiklis's alter egos,  Canal Bank, during their extensive pre-purchase due diligence.

150.    Accordingly, because no Event of Default exists under the HMA, Respondents are entitled to a declaration that:

(i)      no Event of Default exists under the HMA;

(ii)     Claimant's Notice of Default is improper and ineffective under the HMA; and

(iii)    the claims fraudulently asserted by Claimant in this Arbitration Proceeding are ultra vires and null and void.

### FIRST THIRD-PARTY CLAIM
### VIOLATION OF RICO, 18 U.S.C. § 1962(c)
*(against Ithaca I, Ithaca II, Fintiklis, Lundgren and Morgan & Morgan)*

151.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

152.    The Federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, *et seq.*, applies in New York by virtue of the supremacy clause of the U.S. Constitution (Art. IV, Clause 2).  Courts in the State of New York have concurrent jurisdiction to hear actions under the Federal RICO Act.  *Tafflin v. Levitt*, 493 U.S. 455 (1990).  Accordingly, claims under the Federal RICO Act arising from or relating to the HMA are properly included in this proceeding.

---

[10] In effect, under the HMA and because of the failure to build out certain amenities, including the beach club, there is no performance test that can be violated under Section 5.3.  In any event, no such violation is asserted in this proceeding by Claimant.

153.    Pursuant to 18 U.S.C § 1964(c), this Third-Party Claim seeks relief from Third-Party Respondents Ithaca I, Ithaca II, Fintiklis, Lundgren, Morgan & Morgan and John Does 1-10 (together, the "<u>RICO Respondents</u>") for violation of 18 U.S.C. § 1962(c).

154.    At all relevant times, the RICO Respondents were and are each a "person" within the meaning of 18 U.S.C. §§ 1962(c) and 1961(3).

155.    The RICO Respondents violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs and as further described below.

### *The RICO Enterprise*

156.    At all relevant times, Fintiklis, individually and through his agents, employees and/or representatives, including but not limited to Ithaca I and Ithaca II, together with Lundgren, individually and through his agents, employees and/or representatives, Morgan & Morgan, along with John Does 1-10 and other known and unknown Unit owners and entities relating to the Property, associated in fact with each other so as to constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "<u>RICO Enterprise</u>").

157.    At all times relevant to these proceedings, the RICO Enterprise was engaged in, and its activities affected, interstate and foreign commerce, including, *without limitation*, because Fintiklis and Lundgren (i) communicated with each other about their fraudulent scheme; and (ii) made fraudulent misrepresentations and omissions to Plaintiffs using interstate and international wires through (a) telephone calls to and from the United States; and (b) emails to and from the United States that traveled through email servers in the United States.

158.    The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the members of the RICO Enterprise engaged. Specifically, the members of the RICO Enterprise associated with the RICO Enterprise through

their personal involvement in the underlying racketeering offenses as well as by (1) making fraudulent misrepresentations and omissions to Respondents through in-person meetings, telephone calls and emails; (2) fraudulently inducing Respondents to enter into the Consent to Bulk Sale Agreement; (3) promoting the RICO Enterprise's activities and goals to others, including Hotel Unit Owners, and concealing them from Respondents.

159.    The members of the RICO Enterprise associated with one another for the common purpose of injuring Respondents and improperly wresting control of the management of the Property – including its Hotel and Condominium components – from Respondents and their affiliates via unlawful acts alleged above, including an improper takeover of Unit Owner organizations relating to the Property, including Claimant.

160.    The RICO Enterprise began as early as 2010 and continues to this day.

161.    During this time period, in furtherance of the RICO Enterprise, the members of the RICO Enterprise committed numerous predicate acts of racketeering activity, including (1) violations of the wire fraud statute (18 U.S.C. § 1343); and (2) mail fraud statute (18 U.S.C. § 1341).

162.    The members of the RICO Enterprise directly or indirectly benefitted from the fraudulent scheme due to, among other things, receipt by Ithaca I, Ithaca II and Fintiklis of the consent to bulk sale from Respondents, resulting in the transfer of 215 Units in the Property on false pretenses (202 Hotel Units and 13 Hotel Amenities Units).

### The Purpose and Object of the Racketeering Activity

163.    The members of the RICO Enterprise associated with each other for the common purpose of improperly wresting control of the management of the Property – including its Hotel and Condominium components – from Respondents.

164.    The members of the RICO Enterprise agreed to engage in a pattern of racketeering activity to further the objectives of the RICO Enterprise.

### Direction of the RICO Enterprise's Affairs

165.    The RICO Respondents knowingly conducted or participated in, directly or indirectly, the RICO Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), 1962(c).

166.    Additionally, each of the RICO Respondents was "employed by or associated with" the RICO Enterprise within the meaning of 18 U.S.C. §§ 1962(c).

167.    The RICO Respondents, individual and through their agents, employees and or/representatives, participated in the operation or management of the RICO Enterprise by, among other things, (i) knowingly and fraudulently aiding, abetting and/or inducing Respondents to consent to the bulk sale of 215 Units to Ithaca I and Ithaca I; (ii) making fraudulent misrepresentations and omissions in in-person meetings and emails to Respondents and others concerning the Property.

168.    The fraudulent scheme carried out by members of the RICO Enterprise could not have succeeded without the fraudulent and false statements and omissions of Fintiklis, Ithaca I and Ithaca II, to obtain the consent to bulk sale of Units from Respondents, and without the fraudulent and false material statements and omissions by Fintiklis, Lundgren, Ithaca I and II, Morgan & Morgan and John Does 1-10 made at the October 14, 2017 so-called Board meeting of Claimant and Hotel Foundation.

### *The Pattern of Racketeering Activity*

169.    In the course of conducting and participating the in RICO Enterprise, the RICO Respondents committed numerous predicate acts of racketeering activity, under 18 U.S.C. §1961(1)(B).

170.    Specifically, the RICO Respondents executed a pattern of predicate acts of racketeering as defined in 18 U.S.C. §§ 1961(1) and 1961(5), in violation of 18 U.S.C. § 1962(c), including but not limited to (a) wire fraud in violation of 18 U.S.C. § 1343; and (b) mail fraud in violation of 18 U.S.C. § 1341.

### *Wire Fraud*

171.    In furtherance of the RICO Enterprise, as described herein, the RICO Respondents, individually and through their respective agents, employees and/or representatives, used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. § 1343.

172.    Specifically, the RICO Respondents communicated about and facilitated the fraudulent scheme through wire facilities including (1) telephone calls to and from the United States; and (2) emails to and from the United States that traveled through servers in the United States.

173.    In addition, Third-Party Respondents Fintiklis, Ithaca I and Ithaca II and John Odes 1-10, made fraudulent misrepresentations and omissions to Respondents via (1) telephone calls placed to or from the United States and (2) emails to or from the United States that traveled through servers in the United States.

*Mail Fraud*

174.    In furtherance of the RICO Enterprise, as described herein, the RICO Respondents, individually and through their respective agents, employees and/or representatives, used the mail for purposes of executing their fraudulent scheme, in violation of 18 U.S.C. § 1341.

175.    Specifically, the RICO Respondents made fraudulent misrepresentations and omissions to Respondents by use of the mail, including those misrepresentations that induced Respondents to consent to the bulk sale of Units to Fintiklis and his alter egos, Ithaca I and Ithaca II, in furtherance of the RICO Enterprise.

*Relationship*

176.    The RICO Respondents conducted these and other predicate acts to further the common purpose of the RICO Enterprise to injure Respondents and improperly wrest control of the management of the Property – including its Hotel and Condominium components – from Respondents and their Affiliates via an improper and unlawful takeover of Unit Owner organizations relating to the Property, including Claimant.

177.    These predicate acts of racketeering had the same or similar participants, victims, methods of commission and results and were not related or isolated events.

*Continuity*

178.    The pattern of racketeering activity set forth herein extended over a substantial period of time, beginning as early as 2010 and continuing to this day.

179.    The RICO Respondents intend to continue the fraudulent scheme indefinitely. Indeed, the pattern of racketeering activity was designed to oust Respondents, which Claimant (now under the control and influence of the RICO Enterprise) is purporting to do by proceeding

with termination of the HMA despite submitting a dispute concerning default under the HMA for resolution in this proceeding.

180.    The RICO Respondents participation in the fraudulent scheme became a regular way of conducting affairs and will continue absent intervention.

### *The RICO Enterprise Directly Caused Injury to Respondents*

181.    Respondents are limited liability companies organized in the United States and based in New York, New York.  The RICO Enterprises interactions with Respondents, including the fraudulent misrepresentations and omissions, occurred in or were directed to the United States.

182.    Respondents have been injured as a direct and proximate result of the RICO Enterprise's violations, described above, of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

183.    Respondents injuries are clear and definite and include, among other injuries, (i) the loss of revenue by virtue of the RICO Enterprise's actions to terminate the HMA; (ii) reputational damage to Respondents' brand as a result of the RICO Enterprise's actions; and (3) being compelled to incur direct and indirect losses and liabilities as a result of the RICO Enterprise's actions.

184.    Respondents became aware of their RICO-related injuries caused by members of the RICO Enterprise on or about October 14, 2017, after Fintiklis purported to install himself on the board of Claimant, by and through the aiding and abetting of Lundgren and the RICO Respondents.

### *Respondents' Entitlement to Treble Damages*

185.    As a result of the violations of 18 U.S.C. § 1962(c) by the RICO Enterprise, Respondents have suffered substantial damages in an amount to be proved at the hearing in this

proceeding, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

186.    The RICO Respondents are jointly and severally liable for the acts of one another and for the acts of the other members of the RICO Enterprise.

187.    Pursuant to 18 U.S.C. § 1964(c), Respondents are entitled to recover treble their damages to $150,000,000 [One Hundred and Fifty Million U.S. Dollars] plus interest, costs, and attorneys' fees incurred by reason of the RICO Respondents' violations of 18 U.S.C. § 1962(c).

### SECOND THIRD-PARTY CLAIM
### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
*(against Ithaca I, Ithaca II, Fintiklis, Lundgren and Morgan & Morgan)*

188.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

189.    In violation of 18 U.S.C. § 1962(d), the RICO Respondents knowingly conspired with each other to violate 18 U.S.C. § 1962(c).

190.    The object of the conspiracy included, but was not limited to, unlawfully wresting control of the management of the Property – including its Hotel and Condominium components – from Respondents and their affiliates via an improper takeover of Unit Owner organizations relating to the Property, including Claimant.

191.    At all relevant times, Fintiklis, individually and through his agents, employees and/or representatives, including but not limited to Ithaca I and Ithaca II, together with Lundgren, individually and through his agents, employees and/or representatives, and Morgan & Morgan, along with John Does 1-10 and other known and unknown Unit owners and entities relating to the Property, combined and agreed to perform a criminal or unlawful act, or a lawful act by criminal or unlawful means.

192.   The RICO Respondents, individual and through their agents, employees and or representatives, objectively manifested agreement to the commission of substantive RICO violations and to the commission of two or more predicate acts of racketeering through participation in the conduct and affairs of the RICO Enterprise.

193.   The RICO Respondents' agreement to engage in a pattern of racketeering activity is manifested by the racketeering offenses committed by them as alleged above.

194.   The RICO Respondents committed overt acts to achieve the purpose of the conspiracy, including, but not limited to, (1) making fraudulent misrepresentations and omissions to Respondents; (2) purporting to call a meeting of Hotel Foundation, Inc. and Claimant under false pretenses; and (3) causing Claimant to take action to terminate the HMA without lawful grounds.

195.   As described above, by committing numerous acts of wire fraud and mail fraud in furtherance of the RICO Enterprise, the RICO Respondents engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).

196.   The RICO Respondents knew that their acts in furtherance of the conspiracy were part of a pattern of fraudulent activity.

197.   As a direct and proximate result of the RICO Respondents' participation in a conspiracy to violate 18 U.S.C. § 1962(c), Respondents have suffered substantial damages in an amount to be proven at the hearing in this matter, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

198.   As described above, Respondents suffered domestic U.S. injuries.

199.   The RICO Respondents are jointly and severally liable for the acts of one another and for the acts of the other members of the RICO Enterprise.

200.    Pursuant to 18 U.S.C. § 1964(c), Respondents are entitled to recover treble their damages, $150,000,000 [One Hundred and Fifty Million U.S. Dollars] plus interests, costs, and attorneys' fees incurred by reason of the RICO Respondents' violations of 18 U.S.C. § 1962(d).

### THIRD THIRD-PARTY CLAIM
**FRAUD**
*(against Fintiklis, Ithaca I and Ithaca II)*

201.    Respondents repeat and reallege the foregoing as if set forth at length herein.

202.    Ithaca I and Ithaca II are parties to the Consent to Bulk Sale Agreement, along with Respondents. Fintiklis so dominates and controls Ithaca I and II such that they are his alter egos and he is personally, jointly and severally liable for their wrongs.

203.    In the Consent to Bulk Sale Agreement, as well as discussions leading up to it, Ithaca I and Ithaca II made statements, by and through Fintiklis, that they would take no actions adverse to the interests of Respondents in operating the Hotel.

204.    Indeed, in Section 3(D) of the Consent to Bulk Sale Agreement, Ithaca I and Ithaca II (by and through Fintiklis), as Purchaser, agreed:

> Purchaser shall not, directly or indirectly through any Affiliates or otherwise: (w) take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements, (x) exercise its vote with respect to any of the Hotel Units in any Owners Meeting or other constituent body of the P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., in any manner which is adverse to the interests of Operator and/or its Affiliates under and in respect of any of the Hotel Agreements, (y) take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its Affiliates and any other Person or (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates.

205.    At the time of those statements were made, and prior to those statements being made, Fintiklis, and Ithaca I and II intended to, and did, take actions directly adverse to the interests of Respondents in operating the Hotel, rendering such statements false at the time they were made.

206.     Indeed, Fintiklis subsequently caused Ithaca I and Ithaca II to vote its Units to terminate the HMA, as part of a fraud and RICO scheme and conspiracy to, *inter alia*, wrest control of the management of the Hotel.

207.     At the time Fintiklis made those statements on behalf of Ithaca I and Ithaca II they were knowingly false and made with an intent to deceive and defraud Respondents such that they would rely upon them to their detriment, which they did.

208.     Respondents reasonably relied on those knowingly false statements to their detriment and substantial damages resulted therefrom.

209.     Accordingly, Respondents are entitled to an award of damages in an amount to be proven at the hearing in this proceeding and in no event less than but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

## FOURTH THIRD-PARTY CLAIM
### FRAUD
*(against Fintiklis, Ithaca I and Ithaca II)*

210.     Respondents repeat and reallege the foregoing as if set forth at length herein.

211.     The facts set forth above at paragraphs 66 through 119 above set forth numerous knowingly false statements of facts and material omissions of material fact which Fintiklis, Ithaca I and Ithaca II made and/or omitted concerning Respondents and which they intended for Respondents to rely upon to their detriment and which Respondents did.

212.     Without limitation thereof, Fintiklis and Ithaca I and II were fully aware of their promises under Section 3(d) of the Consent to Bulk Sale Agreement, promises which they made before and after the execution of the Agreement. Thereafter, on October 3, 2017, Fintiklis emailed all Hotel Unit Owners requesting their attendance "at a meeting of the beneficiaries of Hotel

Foundation, Inc. on 14 October 2017," declaring that it was an opportunity to meet as many Hotel Owners as possible and "hear [Hotel Unit Owners'] thoughts and ideas."

213.    In response to Fintiklis's email, Respondents contacted Fintiklis directly to remind him of his obligations under the Consent to Bulk Sale Agreement—specifically the covenants and acknowledgements as laid out in Section 3, quoting subsections (D)–(E).  Respondents further requested that its General Manager of the Hotel attend the meeting, and that Fintiklis notify Respondents of any future plans to convene Hotel Unit Owners.

214.    Fintiklis responded to Respondents, hoping to lull and defraud Respondents with false comforting statements allegedly confirming that he was well aware of the provisions quoted, and falsely representing that the meeting was an merely "an informal lunch" that he put together because he was being approached by Hotel Unit Owners and thought that a "lunch meeting" would be a good way to meet everyone. Fintiklis even falsely stated that he agreed to have the Operator's representative and General Manager in attendance.

215.    Fintiklis made knowingly false representations and material omissions of material fact because, *inter alia*, the "lunch meeting" was not intended to "meet everyone," but rather to part of a fraud and RICO scheme designed to usurp unlawful control of Hotel Foundation, Inc. and Claimant by holding bogus meetings for unlawful exercise of votes intended to harm Respondents and cause Claimant to terminate the HMA.

216.    The subject of any prospective meeting of Claimant or Hotel Foundation, Inc. is plainly material to Respondents, who operate the Hotel.

217.    Fintiklis made knowing false statements and knowing material omissions of material facts with an intent that Respondents would reasonably rely thereon to their detriment.

218.    Respondents reasonably relied on Fintiklis's statements by, among other things, not taking immediate action to protect their rights under the Consent to Bulk Sale Agreement and HMA.

219.    As a result of Fintiklis's fraud, Respondents have been damaged in an amount to be proven at the hearing, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

### FIFTH THIRD-PARTY CLAIM
**FRAUDULENT INDUCEMENT**
*(against Fintiklis, Ithaca I and Ithaca II)*

220.    Respondents repeat and reallege the foregoing as if set forth at length herein.

221.    Ithaca I and Ithaca II are parties to the Consent to Bulk Sale Agreement, along with Respondents.

222.    In the discussions leading up to the Consent to Bulk Sale Agreement, including in an earlier version of the agreement, Ithaca I and Ithaca II made knowingly false statements promises and representations, by and through Fintiklis, that they would take no actions, including the exercise of voting rights and even legal actions, which were or could be in any manner adverse to the interests of Respondents under the HMA in their operation of the Hotel.

223.    At the time those knowingly false statements and representations were made, and even before they were made, Fintiklis – and, by virtue of his domination and control over his alter egos – Ithaca I and Ithaca II, intended to and did take actions directly adverse to the interests of Respondents under the HMA and in the operation of the Hotel and in direct contradiction to the promises, statements and representations they made.

224.    Indeed, Fintiklis unlawfully and in breach caused Ithaca I and Ithaca II to vote its Units to terminate the HMA.

225.     Fintiklis knowingly made those false statements on behalf of Ithaca I and Ithaca II with an intent to deceive Respondents and with the intent that Respondents would reasonably rely upon them to their detriment, and specifically to induce Respondents into granting their consent to the sale of 215 Units in the Hotel to Ithaca I and Ithaca II and to enter into the Consent to Bulk Sale Agreement.

226.     Respondents reasonably relied on those statements to their detriment and substantial damages resulted therefrom.

227.     Accordingly, Respondents are entitled to an award of damages in an amount to be proven at the hearing in this proceeding but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

## SIXTH THIRD-PARTY CLAIM
### FRAUDULENT CONCEALMENT
*(against Fintiklis, Ithaca I and Ithaca II)*

228.     Respondents repeat and reallege the foregoing as if set forth at length herein.

229.     On October 3, 2017, Fintiklis emailed all Hotel Unit Owners requesting their attendance "at a meeting of the beneficiaries of Hotel TOC Foundation on 14 October 2017," declaring that it was an opportunity to meet as many Hotel Owners as possible and "hear [Hotel Unit Owners'] thoughts and ideas."

230.     Fintiklis acts for a beneficiary of Hotel TOC Foundation by virtue of his interests in Ithaca I and Ithaca II, which own Units in the Hotel.  Upon information and belief, Fintiklis has dominated and controlled Ithaca I and Ithaca II at all relevant times.  Ithaca I and Ithaca II are mere devices for Fintiklis to further his own personal business.  Specifically, Fintiklis used Ithaca I and Ithaca II in furtherance of his fraudulent scheme to take control of Hotel TOC, Inc. and Hotel TOC Foundation.

231.     In response to Fintiklis's email, Respondents contacted Fintiklis directly to remind him of his obligations under the Consent to Bulk Sale Agreement—specifically the covenants and acknowledgements as laid out in Section 3, quoting subsections (D)–(E).  Respondents further requested that its General Manager of the Hotel attend the meeting, and that Fintiklis notify Respondents of any future plans to convene Hotel Unit Owners.

232.     Under the Consent to Bulk Sale Agreement, Fintiklis, as the authorized representative of Ithaca I and Ithaca II, had a contractual duty to not take actions adversely affecting the interests of Respondents in operating the Hotel.

233.     In abrogation of that duty, however, Fintiklis concealed his true purpose in calling the October 14 meetings, stating instead that the meeting was an informal lunch that he put together because he was being approached by Hotel Unit Owners and thought that a "lunch meeting" would be a good way to meet everyone. Fintiklis agreed to have the General Manager in attendance.

234.     Fintiklis's concealment of his true purpose was a material omission to Respondents in violation of his duties under the Consent to Bulk Sale Agreement.

235.     Respondents reasonably relied on Fintiklis's omissions and false statement by, among other things, not taking immediate action to protect their rights under the Consent to Bulk Sale Agreement and HMA.

236.     As a result of Fintiklis's fraudulent concealment, Respondents have been damaged in an amount to be proven at the hearing, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

<u>SEVENTH THIRD-PARTY CLAIM</u>
**BREACH OF THE HMA**
*(against Ithaca II and Fintiklis)*

237.    Ithaca II, as the alleged "successor" to Newland International Properties Corp.,

along with Claimant and Respondents, are party to the HMA, which has an initial term of 20 years.

Absent an Event of Default or performance-related issues under Section 5.3 (not raised by

Claimant in its Notice of Default), the HMA may not be terminated.

238.    No such Event of Default exists. Accordingly, Claimant's service of Notice of

Default breaches the HMA.

239.    Despite the absence of an Event of Default, Ithaca II, as part of the unlawful fraud

and RICO scheme of Fintiklis, Lundgren and Third-Party Respondents, unlawfully voted its Units

to purportedly replace the board of Claimant and cause Claimant to issue the Notice of Default.

240.    Moreover, subsequent to commencing this arbitration, Claimant -- under the

unlawful control and domination of Fintiklis and Third-Party Respondents – notified Respondents

of its intention to terminate Respondents as Hotel Operator and remove Respondents from the

Hotel property.   Such threats and repudiations of obligations blatantly violates the HMA and

Operator's rights thereunder.

241.    Specifically, Section 5.2.4 of the HMA provides:

Any termination notice given pursuant to Section 5.2.2, 5.3 or 5.4 **shall not result
in the termination of this Agreement if a bona fide dispute with respect to any
alleged Event of Default** or other event entitling a party to terminate this
Agreement **has arisen between the parties and such dispute has been submitted
to resolution pursuant to Section 9.1**.

242.    A bona fide dispute clearly exists between Claimant and Respondents concerning

the existence of an Event of Default (*see, e.g., ¶¶ 146 - 150 supra*) as well as the authority of those

purporting to act on Claimant's behalf and such disputes have been submitted for resolution in this proceeding.

243.    Accordingly, Claimant's persistence – by and through Fintiklis and his alter egos Ithaca I and Ithaca II – in proceeding to terminate Respondents is a material and unequivocal repudiation and breach of the HMA including, but not limited to, Section 5.2.4.

244.    But for Ithaca II's actions in violation of its obligations under the HMA and the consent to Bulk Sale Agreement, Claimant would not have breached the HMA, causing Respondents to suffer damages in an amount to be proven at the hearing in this proceeding, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

245.    Fintiklis has dominated and controlled Ithaca II at all relevant times.  Ithaca II is a mere alter ego device for Fintiklis to further his own personal business and interests.  Specifically, Fintiklis used Ithaca II in furtherance of a fraud and RICO scheme to take control of Hotel TOC, Inc. and Hotel Foundation, Inc., resulting in Claimant's breach of the HMA.  Ithaca II and Fintiklis are jointly and severally liable to Respondent for breach of the HMA.

## EIGHTH THIRD-PARTY CLAIM
## TORTIOUS INTERFERENCE WITH THE HMA
### *(against Ithaca I, Ithaca II, Lundgren and Fintiklis)*

246.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

247.    Respondents, along with Ithaca II, are parties to the HMA.

248.    Ithaca I, Ithaca II, Lundgren and Fintiklis are aware and have knowledge of the HMA and its terms.  Indeed, Fintiklis, Ithaca I and Ithaca II are party to the Consent to Bulk Sale Agreement, which explicitly incorporates the HMA by reference. Moreover, Lundgren, by virtue of the Lundgren Settlement Agreement has full knowledge of the HMA and all Hotel-related agreements and is charged with knowledge of all of the terms therein.

249.     Through their wrongful conduct, Ithaca I, Ithaca II, Lundgren and Fintiklis intentionally interfered with Respondents' rights under the HMA, including by unlawfully causing Claimant to serve a sham Notice of Default and take steps to terminate the HMA.

250.     Claimant's Notice of Default and steps to terminate the HMA are a material breach of the terms of the HMA.

251.     Claimant's breach of the HMA was caused by the intentional interference of Ithaca I, Ithaca II, Lundgren and Fintiklis.

252.     Lundgren, Fintiklis and Ithaca I and II agreed and conspired to oust Respondents as Hotel Operator by any means necessary, including those tortious or otherwise illegal.  Lundgren and Fintiklis and their alter ego entities, through the unlawful voting of their entities' respective Hotel Units, took overt action in furtherance of their agreement and conspiracy.  Accordingly, Lundgren, Fintiklis, Ithaca I and Ithaca II are jointly and severally liable for their tortious conduct with respect to the HMA.

253.     Respondents have been damaged by the tortious interference of Ithaca I, Ithaca II, Lundgren and Fintiklis, which precipitated the material breach of the HMA, in an amount to be determined at the hearing in this matter, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

### NINTH THIRD-PARTY CLAIM
### BREACH OF CONSENT TO BULK SALE AGREEMENT
*(against Ithaca I, Ithaca II and Fintiklis)*

254.     Respondents repeat and reallege each and every allegation as if fully set forth at length herein.

255.     The Consent to Bulk Sale Agreement was executed on February 15, 2017, by Respondent Trump Panama Hotel Management LLC and the alter egos of Fintiklis, Ithaca I, and

Ithaca II with Fintiklis acting as sole signatory for Ithaca I and Ithaca II, the alter egos which he dominates and controls.

256.    The Consent to Bulk Sale Agreement, and the promises made therein by Ithaca I and II and their alter ego Fintiklis, were reasonably relied upon by Respondents to their detriment, and are enforceable promises under law.

257.    Operator performed all of its obligations and duties under the Consent to Bulk Sale Agreement.

258.    Ithaca I and Ithaca II, as controlled and dominated by Fintiklis, failed to deliver the central material consideration they promised to Respondents under the Consent to Bulk Sale Agreement.   Specifically, in material breach of paragraph 3(D), Ithaca I and Ithaca II (by and through Fintiklis's actions) willfully, completely and materially interfered with and undermined Operator's and Respondents' rights under the HMA by – without limitation of the facts set both above – fraudulently purporting to usurp control of the Claimant's board, and materially interfering with Respondents' rights as Hotel Operator.

259.    In addition, Ithaca I and II and Fintiklis breached paragraph 3(F) through Fintiklis' actions in seeking and purportedly accepting appointment to the Foundation Council and the Hotel TOC, Inc. BOD.

260.    Through these actions, Ithaca I and Ithaca II and Fintiklis breached its covenants in paragraph 3, which were material terms of the Consent to Bulk Sale Agreement.

261.    Fintiklis has dominated and controlled Ithaca I and Ithaca II at all relevant times. Ithaca I and Ithaca II are alter ego vehicles through which Fintiklis advances his personal interests. Fintiklis used Ithaca I and Ithaca II in furtherance of his fraudulent scheme to take control of Hotel

TOC, Inc. and Hotel Foundation, Inc.  Accordingly, Fintiklis is jointly and severally liable with Ithaca I and Ithaca II for breach of the Consent to Bulk Sale Agreement.

262.    Respondents have been damaged by the breach of the Consent to Bulk Sale Agreement in an amount to be determined at the hearing in this matter, but not less than $50,000,000 [Fifty Million Dollars exclusive of interests and attorneys' fees, and the Third-Party Respondents Ithaca I, Ithaca II and Fintikilis are jointly and severally liable therefor.

<u>**TENTH THIRD-PARTY CLAIM**</u>
**TORTIOUS INTERFERENCE WITH THE CONSENT TO BULK SALE AGREEMENT**
*(against Lundgren)*

263.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

264.    Respondents, along with Ithaca I and Ithaca II, are parties to the Consent to Bulk Sale Agreement.

265.    Upon information and belief, Lundgren knew of the Consent to Bulk Sale Agreement, such agreement being an instrumentality of the fraud and unlawful RICO scheme enacted by Lundgren, Fintikilis and the Third-Party Respondents to improperly wrest control of the management of the Hotel and violate Operator's rights.

266.    Through wrongful conduct, Lundgren intentionally interfered with Respondents' rights under the Consent to Bulk Sale Agreement, including by causing and inducing, and conspiring with Fintikilis, Ithaca I and Ithaca II, to violate the covenant of non-interference under the Consent to Bulk Sale Agreement and otherwise cause the breach of the Consent to Bulk Sale Agreement.

267.    The tortious acts of Fintikilis, Ithaca I and Ithaca II's – including the votes of their Units at the two sham "informal lunch" meetings on October 14, 2017 – are material breaches of the Consent to Bulk Sale Agreement.

268.    The breach by Fintikilis, Ithaca I and Ithaca II of the Consent to Bulk Sale Agreement was aided, abetted and caused by the intentional interference of, and conspiracy with Lundgren.

269.    Respondents have been damaged by the tortious interference of Lundgren, which precipitated the material breach of the Consent to Bulk Sale Agreement, in an amount to be determined at the hearing in this matter, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

**ELEVENTH THIRD-PARTY CLAIM**
**BREACH OF THE LUNDGREN SETTLEMENT AGREEMENT**
(*against Owners Meeting and Lundgren*)

270.    Respondents repeat and reallege each and every allegation as if fully set forth at length herein.

271.    The Lundgren Settlement Agreement is a binding contract between the Owners Meeting, the Board of Directors of the Owners Meeting, and Trump Panama Condominium Management LLC, an Affiliate of Respondents.

272.    The Lundgren Settlement Agreement expressly "inures to the benefit of and is binding upon each of the Parties hereto and their respective agents, representatives, executors, administrators, trustees, personal representatives, partners, directors, officers, shareholders, agents, attorneys, insurers, employees, representatives, predecessors, successors, heirs and assigns." (Lundgren Settlement Agreement, ¶ 11.)

273.    The Lundgren Settlement Agreement is binding upon Lundgren both individually and as a then-director of Owners Meeting.  In fact, Lundgren was a signatory of the Lundgren Settlement Agreement, and the Lundgren Settlement Agreement specifically addressed his conduct both "as a director or individually."

274.    The Hotel Operator is specifically referenced in the Lundgren Settlement Agreement \ as a party for whose benefit paragraph 6 – set forth below exists; Operator is an intended third-party beneficiary of the Lundgren Settlement Agreement.

275.    Owners Meeting and Lundgren have breached their obligations under the Lundgren Settlement Agreement.  Specifically, Owners Meeting and Lundgren breached paragraph 6 of the Lundgren Settlement Agreement, whereby they promised that:

> neither the P.H. TOC nor any current or future Board of Directors nor any current or future member of the Board of Directors (including, without limitation, **Mr. Lundgren**, Ms. Perez, Mr. Fraser, Mr. Soloway and Mr. McGowan), **whether acting in their capacity as a director or individually**, shall, at any time, directly or indirectly, take any action (including, without limitation, exercising any voting rights as members of the Board of Directors) **which could reasonably be expected to interfere or compete with the duties, services, functions, management responsibilities . . ., rights and responsibilities of Hotel Operator,** whether under the Hotel Management Agreement or otherwise, or which could reasonably be expected to damage the relationship between Hotel Operator and any parties with an interest in the Building.

Lundgren Settlement Agreement, ¶ 6 (emphases added)

276.    Owners Meeting and Lundgren breached paragraph 6 of the Lundgren Settlement Agreement  through, without limiting the allegations above, Lundgren's actions and conduct on October 14, 2017 and by aiding and abetting, and conspiring with Fintiklis and the Third Party Respondents to take unlawful control of the Board of Directors of Claimant and Hotel Foundation, including, but not limited to, Lundgren unlawfully voting his alleged Hotel Units to support the efforts of Fintiklis and the Third Party Respondents to injure Operators rights and terminate the HMA in breach of contract and violation of law.

277.    Respondents have been damaged by the Owners Meeting's and Lundgren's material breach of the Lundgren Settlement Agreement in an amount to be determined at the hearing in this

matter, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

## TWELFTH THIRD-PARTY CLAIM
## TORTIOUS INTERFERENCE WITH THE LUNDGREN SETTLEMENT AGREEMENT
### *(against Fintiklis, Ithaca I and Ithaca II)*

278.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

279.    The Lundgren Settlement Agreement is a binding contract between the Owners Meeting, the Board of Directors of the Owners Meeting, and Trump Panama Condominium Management LLC, and Affiliate of Respondents.

280.    The Lundgren Settlement Agreement "inure[d] to the benefit of and [was] binding upon each of the Parties hereto and their respective agents, representatives, executors, administrators, trustees, personal representatives, partners, directors, officers, shareholders, agents, attorneys, insurers, employees, representatives, predecessors, successors, heirs and assigns." (Lundgren Settlement Agreement, ¶ 11.)

281.    Respondents, as the Hotel Operator is specifically referenced in the Lundgren Settlement Agreement in paragraph 6 thereof and are intended third party beneficiaries of the Lundgren Settlement Agreement.

282.    Fintiklis, Ithaca I and Ithaca II are aware and have knowledge of the Lundgren Settlement Agreement, a breach of such agreement being an instrumentality of the fraud and unlawful RICO scheme and conspiracy enacted by Lundgren, Fintikilis and the Third-Party Respondents to improperly wrest control of the management of the Hotel.

283.    Through their wrongful conduct, Ithaca I, Ithaca II and Fintiklis intentionally interfered with Respondents' rights under the Lundgren Settlement Agreement, including by

causing and inducing Lundgren to violate and breach the covenant of non-interference under the Lundgren Settlement Agreement.

284.     Lundgren's actions, including the vote of his alleged Units (all of which he obtained in violation of Operator's rights and for which Operator sues herein below) on October 14, 2017, are a material breach of the Lundgren Settlement Agreement.

285.     Lundgren's breach of the Lundgren Settlement Agreement was caused by the intentional interference of Ithaca I, Ithaca II and Fintiklis.

286.     Respondents have been damaged by the tortious interference of Ithaca I, Ithaca II and Fintiklis, which precipitated the material breach of the Lundgren Settlement Agreement, in an amount to be determined at the hearing in this matter, but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

## THIRTEENTH THIRD-PARTY CLAIM
### DECLARATORY JUDGMENT
*(against Hotel Foundation)*

287.     Respondents repeat and reallege the foregoing as if set forth at length herein.

288.     Hotel Foundation is the sole shareholder of Claimant.

289.     As discussed above, some meeting of Hotel Foundation was purportedly called by Fintiklis and/or his alter egos or one or more of the Third-Party Respondents for October 14, 2017. The notice of the October 14, 2017 meeting was not sent to members of the Council of the Hotel Foundation, Inc. as required by its charter.

290.     Rather, Fintiklis proceeded with an alleged meeting without the Council, and without its President and Legal Representative, and instead Fintiklis falsely assumed the role of purported President and Secretary.

291.    During this purported meeting of Hotel Foundation, the composition of the Council was purportedly changed by removing certain members and installing Fintiklis and others under his control, in order to permit Fintiklis to purport to install himself on the board and "authorized representative" of Claimant.

292.    Fintiklis's subsequent self-installation on the Board of Claimant was simultaneous with the Notice of Default and the commencement of this proceeding which he and the Third-Party Respondents orchestrated.

293.    Thus, Respondents have an actual controversy with Hotel Foundation that is ripe for adjudication.

294.    Specifically, the purported October 14, 2017 meeting of Hotel Foundation violated law, and the acts that occurred therein should be declared null and void and of no effect.  The October 14, 2017 meeting of the Hotel Foundation violated its Articles of Incorporation by failing to provide notice to all Beneficiaries and failing to achieve at least 75% participation of Beneficiaries for the decisions undertaken.   Because of this failure, Hotel Foundation's actions with respect to the composition of the Board of Claimant are null and void, and Claimant's subsequent actions are *ultra vires*. Even assuming *arguendo*, that meeting had been called on proper Notice and even assuming 75% of those beneficiaries with valid ownership and valid voting rights had been exercised – which neither fact exists or occurred – Third Party Respondents Ithaca I and II, and Fintiklis and Lundgren and the Lundgren-related affiliates and entities had zero right to vote or cause to be voted upon any matters undermining the Operator or averse to Operator's interests under the Consent to Bulk Sale Agreement and the Lundgren  Settlement Agreement .

295.    For the reasons set forth above, Respondents are entitled to a declaration that the events purporting to take place at the improperly-noticed October 14, 2017 meeting of Hotel Foundation are null and void.

### FOURTH COUNTERCLAIM/FOURTEENTH THIRD-PARTY CLAIM
### DECLARATORY JUDGMENT & PERMANENT INJUNCTION
*(against Claimant, Hotel TOC Foundation, Fintiklis, Ithaca I, Ithaca II and Lundgren)*

296.    Respondents repeat and reallege the foregoing as if set forth at length herein.

297.    Fintiklis, by and through Ithaca I and Ithaca I, and in concert with Lundgren, purport to act on behalf of Claimant and Hotel TOC Foundation as a result of actions taken at an improperly-called meetings of Claimant and Hotel TOC Foundation on October 14, 2017.

298.    The actions taken at the improperly-called meetings by Fintiklis, Ithaca I, Ithaca II and Lundgren violate agreements that those Third-Party respondents had concerning the Operator. Specifically, actions taken by Fintiklis, Ithaca I and Ithaca II violate the Consent to Bulk Sale Agreement (*see* ¶¶ 263 - 269), while those taken by Lundgren violate the Lundgren Settlement Agreement (*see* ¶¶ 270 - 277).

299.    As discussed above, the actions purportedly taken at the October 14, 2017 meetings of Claimant and Hotel TOC Foundation are *ultra vires* and contrary to law.

300.    Thus, a real and live controversy exists between Respondents and Claimant, Hotel TOC Foundation, Fintiklis, Ithaca I, Ithaca II and Lundgren that is ripe for adjudication.

301.    Specifically, the purported October 14, 2017 meeting of Hotel TOC Foundation violated law, and the acts that occurred therein should be declared null and void and of no effect. First, because the actions that took place at the October 14, 2017 meeting of Claimant are predicated on the improper meeting of Hotel TOC Foundation, which, as described above, was ineffective.  (¶¶ 287 – 295).  Moreover, the voting of Units owned by Ithaca I and Ithaca II for the actions taken at the October 14, 2017 meetings of Claimant and Hotel TOC Foundation violate the

Consent to Bulk Sale Agreement and are void.  The voting of Units owned by Lundgren violate the Lundgren Settlement Agreement, as well as the Co-Ownership Regulations and the HMA, by virtue of the lack of Operator consent given to Lundgren's holding of more than 10 Units at the Hotel.

302.    For the reasons set forth above, Respondents are entitled to a declaration that:

    a.  the actions taken by Fintiklis, Ithaca I and Ithaca II at the October 14, 2017 meetings violate the Consent to Bulk Sale Agreement;

    b.  the actions taken by Lundgren at the October 14, 2017 meetings violate the Lundgren Settlement Agreement;

    c.  Lundgren's ownership of more than 10 Units violates the Co-Ownership Regulations and HMA;

    d.  The Notice of Default issued by Fintiklis as the "authorized representative" of Claimant and Hotel TOC Foundation is null and void, as Fintiklis is not the authorized representative of Claimant or Hotel TOC Foundation; and

    e.  There has been no termination of the HMA, as any actions purporting to terminate it have been *ultra vires* and/or unauthorized.

303.    The actions of Fintiklis, Ithaca I, Ithaca II and Lundgren demonstrate gross disregard for contractual obligations and the rule of law.  As such, Respondents are additionally entitled to and hereby request the entry of a permanent injunction enjoining Claimant, Hotel TOC Foundation, Fintiklis, Ithaca I, Ithaca II and Lundgren from:

    a.  taking any further action on the basis of the authority to act on behalf of Claimant and/or Hotel TOC Foundation based on the October 14, 2017 meetings of Claimant and Hotel TOC Foundation;

    b.  taking any actions, including the vote of any Units, contrary to the interests of Operator in its maintenance of the Hotel, consistent with pre-existing contractual obligations; and

    c.  pursuing or taking any action to pursue the termination of the HMA on the basis of the actions at the October 14, 2017 meetings of Claimant or Hotel TOC Foundation.

## FIFTEENTH THIRD-PARTY CLAIM
## BREACH OF THE HMA/CO-OWNERSHIP REGULATIONS
### *(against Lundgren)*

304.    Respondents repeat and reallege the foregoing as if set forth at length herein.

305.    Lundgren, by and through 35 distinct entities, is the alleged owner 50 Hotel Units

pursuant to, inter alia, the Co-Ownership Regulations.

306.    Article 75(D)(4) of the Co-Ownership Regulations provides:

No **OWNER** of a **HOTEL UNIT** may subdivide his / her **HOTEL UNIT**; no
**OWNER** may purchase, possess or control, directly or indirectly through affiliates,
related parties or in any other way, more than ten (10) **HOTEL UNITS**. For these
effects, ownership or control of a **HOTEL UNIT** shall be considered to exist if said
**HOTEL UNIT** belongs, directly or indirectly to the **OWNER**, a family member
of the **OWNER**, any entity where the **OWNER** or the **OWNERS** family members
may have an interest or are partners, or any partner, affiliate, controlling company
or affiliate of any of the above.

307.    The Co-Ownership Regulations further provide, in Article 1(C) that when the "**CO-**

**OWNERSHIP REGULATIONS** or the law, do not expressly provide an applicable provision to

a particular or specific case that is intended to be analyzed, the following principles shall apply . .

. The terms and conditions of the **LICENSE AGREEMENT**, the **HOTEL MANAGEMENT**

**AGREEMENT** and the **MANAGEMENT AGREEMENT OF P.H. TOC**."

308.    Respondents, as Hotel Operator and Licensor, are intended third-party beneficiaries

of the Co-Ownership Regulations and therefore have standing to pursue claims relating thereto.

309.    Respondents, as Hotel Operator, have never given written consent to Lundgren's

ownership of more than 10 Hotel Units as limited by the Co-Ownership Regulations.

310.    Accordingly, Lundgren, by owning, directly or indirectly, more than 10 Hotel

Units, is in breach of his obligations under the Co-Ownership Regulations and HMA; moreover,

any votes which Lundgren purports to have  exercised,  directly or indirectly,  in excess of 10 --

even assuming *arguendo* that a lawful Shareholder meeting had been lawfully called and proper

notice given  and that Lundgren had not been a RICO Respondent involved in a fraud and RICO scheme (which is not the case) --  are null and void and Respondents are entitled to a Declaratory Judgment  to that effect.

311.    Lundgren's breach of the Co-Ownership Regulations/HMA have caused Respondents substantial damage in an amount to be proven at the hearing in this proceeding but not less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

## RESERVATION OF RIGHTS

Respondents reserve their due process and lawful rights to amend this pleading to assert any additional Counterclaims or Third-Party Claims, and add additional new parties, that may become apparent through discovery or otherwise.

**WHEREFORE**, Respondents seek an award:

(i)     dismissing of all claims asserted by Claimant with prejudice;

(ii)    of damages against Claimant on the First Counterclaim in an amount to be established at the hearing of this matter, but no less than $50,000,000.00 [Fifty Million U.S. Dollars];

(iii)   against Claimant on the Second Counterclaim, declaring:

    a.   the removals and appointments purportedly made to the Foundation Council and Hotel TOC, Inc. BOD on October 14, 2017 are null and void;

    b.   Fintiklis, is not an authorized representative of Claimant, had no authority to issue the Notice of Default, and consequently, the Notice of Default is null and void;

    c.   any termination of the HMA authorized by Fintiklis or other persons purportedly appointed to the Foundation Council and the Hotel TOC, Inc. BOD during the October 14, 2017 Meeting is null and void;

    d.   the claims fraudulently asserted by Claimant in this Arbitration Proceeding are *ultra vires* and null and void.

(iv)    against Claimant on the Third Counterclaim, declaring:

    a.   no Event of Default exists under the HMA;

b. Claimant's Notice of Default is improper and ineffective under the HMA; and

c. the claims fraudulently asserted by Claimant in this Arbitration Proceeding are ultra vires and null and void.

(v) of damages against Third-Party Respondents on its third-party claims in an amount to be established at the hearing of this matter, but no less than $50,000,000.00 [Fifty Million U.S. Dollars];

(vi) of treble damages on the First and Second Third-Party Claims pursuant to 18 U.S.C. § 1964(c);

(vii) of attorneys' fees and disbursements that Respondents have incurred in connection with this proceeding, including those available under 18 U.S.C. § 1964(c);

(viii) against Hotel TOC Foundation on the Thirteenth Third-Party Claim, declaring that the events purporting to take place at the improperly-noticed October 14, 2017 meeting are null and void;

(ix) against Claimant on the Fourth Counterclaim and against Hotel TOC Foundation, Fintiklis, Ithaca I, Ithaca II and Lundgren on the Fourteenth Third-Party Claim, declaring:

a. the actions taken by Fintiklis, Ithaca I and Ithaca II at the October 14, 2017 meetings violate the Consent to Bulk Sale Agreement;

b. the actions taken by Lundgren at the October 14, 2017 meetings violate the Lundgren Settlement Agreement;

c. Lundgren's ownership of more than 10 Units violates the Co-Ownership Regulations and HMA;

d. The Notice of Default issued by Fintiklis as the "authorized representative" of Claimant and Hotel TOC Foundation is null and void, as Fintiklis is not the authorized representative of Claimant or Hotel TOC Foundation; and

e. There has been no termination of the HMA, as any actions purporting to terminate it have been ultra vires and/or unauthorized.

(x) against Claimant on the Fourth Counterclaim and against Hotel TOC Foundation, Fintiklis, Ithaca I, Ithaca II and Lundgren on the Fourteenth Third-Party Claim, permanently enjoining them from:

a. taking any further action on the basis of the authority to act on behalf of Claimant and/or Hotel TOC Foundation based on the October 14, 2017 meetings of Claimant and Hotel TOC Foundation;

   b. taking any actions, including the vote of any Units, contrary to the interests of Operator in its maintenance of the Hotel, consistent with pre-existing contractual obligations; and

   c. pursuing or taking any action to pursue the termination of the HMA on the basis of the actions at the October 14, 2017 meetings of Claimant or Hotel TOC Foundation.

(xi)    of costs of this proceeding, including the fees of the arbitration panel, against Claimant and Third-Party Respondents; and

(xii)   such other and further relief as the arbitrator deems appropriate.

Dated: New York, New York
       December 4, 2017

                           PRYOR CASHMAN LLP

                           By: _____
                               Todd E. Soloway
                               Perry M. Amsellem
                               Bryan T. Mohler
                               Marion R. Harris
                               7 Times Square
                               New York, New York 10036
                               (212) 421-4100

                           *Attorneys for Respondents, Counterclaimants and
                           Third-Party Claimants*

2761101                          73