**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

ITHACA CAPITAL INVESTMENTS I, S.A., ITHACA
CAPITAL INVESTMENTS II, S.A., and ORESTES
FINTIKLIS,

Civil Action No. 1:18-cv-390-ER

                Plaintiffs,

    v.

TRUMP PANAMA HOTEL MANAGEMENT LLC,
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT, LLC,

                Defendants.
------------------------------------------------------------------x

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

PRYOR CASHMAN LLP

Todd E. Soloway
Perry M. Amsellem
Bryan T. Mohler
Marion R. Harris
7 Times Square
New York, NY 10036
(212) 421-4100
tsoloway@pryorcashman.com
pamsellem@pryorcashman.com
bmohler@pryorcashman.com
mharris@pryorcashman.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 4

A.  Plaintiffs Surreptitiously Take Control of Hotel Owner and Claimant Hotel TOC, Inc. By and Through the Bulk Sale Consent Agreement .......... 6

B.  Plaintiffs Close on the Bulk Sale and Immediately Stage a Coup in Panama ...................................................................................... 7

LEGAL STANDARDS ........................................................................................ 9

I.  The Arbitration Agreement Refers All Questions of Arbitrability to the ICC .......... 9

II.  Plaintiffs Cannot Show a Clear and Substantial Likelihood of Success on the Merits ......................................................................... 10

III.  Anti-Arbitration Injunctions are Unavailable under the Panama Convention .......... 10

ARGUMENT ...................................................................................................... 11

I.  The Court Lacks Subject Matter Jurisdiction over this Action ............................ 11

II.  The Complaint Fails to State a Claim upon Which Relief May Be Granted ............ 14

III.  A Preliminary Injunction Is Not Warranted Here ................................................ 15

A.  Plaintiffs Cannot Demonstrate a Clear and Substantial Likelihood of Success ................................................................................... 15

1.  Plaintiffs Ithaca I and Ithaca II are Bound to Arbitrate Because the HMA is Expressly Incorporated by Reference in the Bulk Sale Consent Agreement ................................................ 16

2.  All Plaintiffs are Estopped from Avoiding Arbitration, including Fintiklis ............................................................ 18

3.  In Addition To Estoppel Doctrine, Fintiklis Is Bound To The HMA Because He Dominates And Controls Ithaca I, Ithaca II And Hotel TOC Inc. ......................................................... 20

4.  The Forum and Merger Clauses Are Not Dispositive ................... 20

B.  Plaintiffs' Delay is Fatal And Public Interests Favor Arbitration ................. 24

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(s)**

*Accenture LLP v. Spreng,*
   No. 10 CIV 9393 VM, 2010 WL 5538384 (S.D.N.Y. Dec. 23, 2010) ................................................10

*Accordia Ne., Inc. v. Thesseus Int'l Asset Fund, N.V.,*
   205 F. Supp. 2d 176 (S.D.N.Y. 2002).........................................................................................20

*Aetna Life Ins. Co. of Hartford Conn. v. Haworth,*
   300 U.S. 227 (1937)..................................................................................................................11

*Alamontaser v. New York City Dep't of Educ.,*
   519 F.3d 505 (2d Cir. 2008) ......................................................................................................10

*Alfa Laval U.S. Treasury Inc. v. National Union Fire Ins. Co. of Pittsburgh, Penn.,*
   857 F. Supp. 2d 404 (S.D.N.Y. 2012)........................................................................................19

*American Bureau of Shipping v. Tencara Shipyard S.P.A.,*
   170 F.3d 349 (2d Cir. 1999) ......................................................................................................18

*Applied Energetics, Inc. v. NewOak Capital Mkts., LLC,*
   645 F.3d 522 (2d Cir. 2011) ...........................................................................................11, 21, 22

*Arcinaga v. Gen. Motors Corp.,*
   460 F.3d 231 (2d Cir. 2006) ......................................................................................................25

*Bank Julius Baer & Co. v. Waxfield Ltd.,*
   424 F.3d 278 (2d Cir. 2005) ................................................................................................22, 23

*Benefits in a Card, LLC v. Talx Corp.,*
   No. 6:06-CV-03655-GRA, 2007 WL 750638 (D.S.C. Mar. 7, 2007) ..................................19

*Bremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*
   No. CV-11-4934 (LDW), 2012 WL 760564 (E.D.N.Y. Mar. 8, 2012) ...............................11

*Clarendon Nat'l Ins. Co. v. Lan,*
   152 F. Supp. 2d 506 (S.D.N.Y. 2001).......................................................................................9, 16

*Correspondent Services Corp. v. First Equities of Florida,*
   442 F.3d 767 (2d Cir. 2006)......................................................................................................12

*Deloitte Noraudit A/S v. Deloitte Hasks & Sells, U.S.,*
   9 F.3d 1060 (2d Cir. 1993) ........................................................................................................19

*Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont,*
   565 F.3d 56 (2d. Cir. 2009) .......................................................................................................13

**CASES**                                                                  **PAGE(s)**

*Fidelity & Guar. Ins. Co. v. W. Point Realty, Inc.*,
    No. 02 Civ. 1951 (LMM), 2002 WL 1933780 (S.D.N.Y. Aug. 21, 2002)..........................................16

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ............................................................................................................ 9, 21

*Fisser v. International Bank*,
    282 F.2d 231 (2d Cir. 1960) ...........................................................................................16

*Ghassabian v. Hematian*,
    No. 08 Civ. 4400 (SAS), 2008 WL 3982885 (S.D.N.Y. Aug. 27, 2008) .................................... 14, 15

*Gilman v. Waters*,
    61 F. Supp. 3d 794 (S.D. Ind. 2014) ...........................................................................................24

*Goldman Sachs & Co. v. Golden Empire Schools Financing Authority*,
    922 F. Supp. 2d 435 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014) .................................. 21, 22

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ...........................................................................................10

*Hartford Acc., and Indemn. Co. v. Swiss Reins. America Corp.*,
    246 F.3d 219 (2d Cir. 2001) ...........................................................................................9

*HD Brous & Co. v. Mrzyglocki*,
    No. 03 Civ. 8385(CSH), 2004 WL 376555 (S.D.N.Y. Feb. 26, 2004) .................................................19

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ...........................................................................................9

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ...........................................................................................12

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
    803 F. Supp. 2d 270 (S.D.N.Y. 2011)...........................................................................................18

*Limonium Maritime S.A. v. Mizushima Marinera, S.A.*,
    No. 96 Civ. 1888 DC, 1999 WL 46721 (S.D.N.Y. Feb. 1, 1999),
    *aff'd*, 201 F.3d 431 (2d Cir. 1999) ...........................................................................................16

*Local No. 503 of Graphic Commc'ns Conference of Int'l Bhd. Of Teamsters v. Cascades Containerboard*
    *Packading-Lancaster*, No. 17-CV-6605 (MAT), 2017 WL 6497624 (W.D.N.Y. Dec. 19, 2017)........25

*Long v. Silver*,
    248 F.3d 309 (4th Cir. 2001)...........................................................................................18

**CASES**                                                                          **PAGE(s)**

*MAG Portfolio Consultant GMBH v. Merlin Biomed Grp., LLC,*
   268 F.3d 58 (2d Cir. 2001) ........................................................................................20

*Mina v. Foot Locker, Inc.,*
   No. 09 CIV. 0472 (DAB), 2009 WL 3241551 (S.D.N.Y. Sept. 30, 2009)..........................9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983) .....................................................................................................15

*Pagaduan v. Carnival Corp.,*
   No. 16-465, 2017 WL 4117339 (2d Cir. Sept. 18, 2018) ....................................16

*Paine Webber Inc. v. Bybyk,*
   81 F.3d 1193 (2d Cir. 1996) ......................................................................................24

*Phillips Petroleum Co. v. Texaco,*
   415 U.S. 125 (1974) .................................................................................................13

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela,*
   991 F.2d 42 (2d Cir. 1993) ......................................................................................16

*Red Earth LLC v. United States,*
   657 F.3d 138 (2d Cir. 2011) ......................................................................................10

*Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.,*
   668 F.3d 60 (2d Cir. 2012) ......................................................................................13

*Servaas Inc. v. Republic of Iraq,*
   686 F. Supp. 2d 346 (S.D.N.Y. 2010)........................................................................19

*Shaw Grp. Inc. v. Triplefine Int'l Corp.,*
   322 F.3d 115 (2d Cir. 2003) ......................................................................................24

*Sheldon v. Sill,*
   49 U.S. 441 (1850) ...................................................................................................11

*Skelly Oil Co. v. Phillips Petroleum Co.,*
   339 U.S. 667............................................................................................................11

*Thomson-CSF, S.A. v. American Arbitration Ass'n,*
   64 F.3d 773 (2d Cir. 1995) ................................................................................ 16, 19

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
   60 F.3d 27 (2d Cir. 1995) ................................................................................ 10, 24

**CASES**                                                  **PAGE(s)**

*Tongkook Am., Inc. v. Shipton Sportswear Co.,*
  14 F.3d 781 (2d Cir. 1994) ................................................................. 12

*Transcience Corp. v. Big Time Toys, LLC,*
  50 F. Supp. 3d 441 (S.D.N.Y. 2014) ................................................... 10

**STATUTES**                                                 **PAGE(s)**

Fed. R. Civ. P. 11 ................................................................................. 13

Fed. R. Civ. P. 12 ................................................................................... 1

Fed. R. Civ. P. 12(b)(1) ....................................................................... 12

Fed. R. Civ. P. 12(b)(6) ....................................................................... 14

Fed. R. Civ. P. 65(a) ............................................................................ 11

9 U.S.C. § 202 ................................................................................ 11, 13

9 U.S.C. § 203 ...................................................................................... 14

9 U.S.C. § 206 ...................................................................................... 14

9 U.S.C. § 207 ...................................................................................... 14

9 U.S.C. § 302 ................................................................................ 11, 14

9 U.S.C. § 305 ...................................................................................... 13

9 U.S.C. § 307 ................................................................................ 11, 14

28 U.S.C. § 1331 ............................................................................. 12, 13

28 U.S.C. § 1332 .................................................................................. 12

28 U.S.C. § 2201 .................................................................................. 11

28 U.S.C. § 2201 *et seq.* ..................................................................... 15

**ADMININSTRATIVE REGULATIONS**

FINRA Rule § 12200 ....................................................................... 21, 22

**TREATY**

The Inter-American Convention on International Commercial Arbitration
  Jan. 30, 1975, S. Treaty Doc. 97-12, O.A.S.T.S. No. 42, 14 I.L.M. 336 ................................ 13, 14

Defendants Trump Panama Hotel Management LLC and Trump International Hotels Management, LLC ("Defendants"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction.[1]

## PRELIMINARY STATEMENT

This dispute, and the underlying arbitration commenced by affiliates controlled by Plaintiffs, -- all of whom are represented by the same attorneys who represent Plaintiffs here -- arise out of Plaintiffs' fraud and conspiracy to injure Defendants' rights under a hotel management agreement (the "HMA") for the Trump Panama International Hotel (the "Hotel"). The HMA contains a broad international arbitration clause under the auspices of the International Chamber of Commerce ("ICC"). The facts before this Court, as controlled by the law of the Second Circuit, bind the Plaintiffs here to the HMA arbitration clause. Moreover, the ICC rules to which the Plaintiffs are bound specifically call for the ICC itself to decide issues of joinder of additional parties to the arbitration. Defendants joined Plaintiffs in the arbitration on December 4, 2016. Plaintiffs subsequently asked the ICC to stay its adjudication of the joinder issue, however the ICC declined Plaintiffs' application for a stay and the issue of joinder is *sub judice* with the ICC.   On this basis alone Plaintiffs' Motion should be denied.

Furthermore: All of the facts and events giving rise to Defendants' injuries and claims asserted in the Arbitration took place in Panama City, Panama; nearly all, if not all, of the witnesses and documents are located in Panama City, Panama; Plaintiff Fintiklis executed and caused to be issued both the Notice of Default and Notice of Termination to Defendants under the HMA that is the subject of the Arbitration; Plaintiffs caused the pending ICC international arbitration to be commenced against Defendants by and through two Panamanian entities they control; the HMA arbitration clause requires the evidentiary hearing to take place in Panama City, Panama. Plaintiffs Ithaca I and Ithaca II are Panamanian entities formed by a Cypriot attorney, Plaintiff Orestes Fintiklis

---

[1] Defendants submit this Memorandum of Law in Opposition to Plaintiffs' Motion (the "Motion" or Mot.) before their time to respond to the Complaint in this action has expired (which deadline, by agreement of the parties, is currently February 23, 2018).  By submission of this Memorandum, Defendants do not waive – and, indeed, expressly reserve – all defenses, objections and/or counterclaims they may have to the Complaint, which will be asserted in due course pursuant to Fed. R. Civ. P. 12, in the event the Court does not dispose of this Action consistent with Defendants' instant opposition.

("Fintiklis").  Ithaca I and Ithaca II were formed by Fintiklis in Panama for the purpose of furthering

a fraud and usurping unlawful control over Hotel TOC, Inc., the Panamanian corporation that "owns"

the Hotel.  Critically, the Hotel bears Defendants' trademarks and tradenames and is lawfully managed

by Defendants under the HMA.

Plaintiffs knew that the HMA and several hotel-related agreements required Defendants'

written consent as a condition for Plaintiffs to purchase in bulk 215 hotel units and thereby obtain

Plaintiffs' effective control over the Hotel. Simply put, Defendants had the absolute right to block

that bulk sale precisely to prevent parties like Plaintiffs from gaining outsized control over the asset

and then maliciously injuring Defendants' rights under the HMA by engaging in the exact conduct at

issue here for which Defendants sued Plaintiffs in the Arbitration. Thus as a condition to granting

consent to Plaintiffs' acquisition of 215 hotel units, Plaintiffs entered into a written agreement which

provides that, upon acquisition, they would not take any action against Defendants relating to their

management of the Hotel under the HMA.  A few weeks after signing that agreement, the Plaintiffs

conspired to do just that. The Bulk Sale Consent Agreement Sec. 3 (D) provides:

> Purchaser shall not, directly or indirectly through any Affiliates or otherwise: (w) take
> (or refrain from taking) any action (including any legal action) that would interfere with
> or undermine the rights or obligations of Operator under and in respect of any of the
> Hotel Agreements, (x) exercise its vote with respect to any of the Hotel Units in any
> Owners Meeting or other constituent body of the P.H. TOC (or any of its
> components), including without limitation, Hotel TOC Inc., in any manner which is
> adverse to the interests of Operator and/or its Affiliates under and in respect of any
> of the Hotel Agreements, (y) take (or refrain from taking) any action (including any
> legal action) that could materially damage the relationship between Operator, its
> Affiliates and any other Person or (z) make, issue, solicit or endorse any statement that
> would damage or undermine the reputation of Operator or any of its Affiliates.

Ex. 2.[2]  Recitals B and C, together with Paragraph 3, of the Bulk Sale Consent Agreement expressly

incorporate the HMA and all Hotel-related agreements: Plaintiffs intentionally failed to address the

import of these clauses in making the instant motion to enjoin the arbitration which they caused to be

commenced against Defendants, hoping the deflect the Court's attention from the material facts.

Soon after purchasing the 215 units in bulk and executing the restrictive Bulk Sale Consent

---

[2] Unless otherwise noted, all Exhibits are those annexed to the Declaration of Perry M. Amsellem submitted herewith.

Agreement, Plaintiffs' conspiracy to injure Defendants' rights under the HMA went into action. On October 14, 2017, Plaintiffs: 1) under knowingly false pretenses of calling a "lunch meeting," held two so-called "Board Meetings" in Panama despite lack of notice to Defendants' representatives on the Boards; caused Defendants' representatives to be excluded from the alleged "Board" meetings; and claimed to hold "votes" whereby they (of course) installed themselves as corporate officers claiming to have effective control of the Panama corporation that owns the Hotel; 2) simultaneously, that same day Plaintiffs sent a bogus Notice of Default – pre-executed by Plaintiff Orestes Fintikilis as an "authorized representative of Hotel TOC, Inc.," by which he purported to default Defendants under the HMA, (*see* Ex. 17) ; 3) on that same day Plaintiffs, by and through Fintiklis, caused Hotel TOC, which Plaintiffs control, to commence the ICC Arbitration against Defendants under the HMA, (despite that the Notice of Default contains a 30 day cure period as required under the HMA) (*see* Ex. 8) ; and 4) after commencing an arbitration seeking, among other things, a declaration that a default existed under the HMA, Plaintiffs caused a bogus notice of termination to be sent under the HMA purporting to oust Defendants as Operator of the Hotel. (*see* Ex. 18).

   Six weeks after Defendants asserted their third party claims against Plaintiffs in the ICC arbitration, based on the same facts as set forth above, Plaintiffs moved this Court seeking to enjoin the ICC proceedings so as to prejudice Defendants with bifurcated proceedings here.  Having not sought any interim relief from this Court by way of TRO or even Order to Show Cause, Plaintiffs instead wrote to the ICC requesting that it stay the issue of joinder as to Plaintiffs and not permit the arbitration to proceed as against Plaintiffs.  The ICC denied Plaintiffs' request.  As noted above, the issue is *sub judice* with the ICC.  Ex. 10, February 2, 2018 Letter from ICC.

   Plaintiffs' motion should be denied because: (i) the HMA, as a matter of law, binds the Plaintiffs to the ICC arbitration on the facts at bar; (ii) the ICC has jurisdiction to decide the issue of joinder and is the proper juridical body to decide the interrelated disputes falling squarely under the HMA and its broad arbitration clause; (iii) revealing a desire to forum shop and delay their own arbitration, Plaintiffs brought this action six weeks after having notice of their joinder in the ICC arbitration  a fatal delay; (iv) this instant action lacks subject matter jurisdiction and even if subject

3

matter jurisdiction existed, the Complaint fails to state a claim cognizable for which relief may be granted under the Panama Convention; (v) Plaintiffs fail to meet the amount in controversy threshold for bringing claims under diversity jurisdiction in the federal courts, and cannot overcome this hurdle by reference to the third party claims asserted by Defendants against Plaintiffs in the ICC arbitration; and (vi) Plaintiffs should not be permitted to conflate the narrow question before this Court  whether an agreement to arbitrate exists and reasonably binds certain non-signatories  with a host of other questions of arbitrability that are explicitly reserved to the ICC under the law of this Circuit.  The parties to this Action are bound to arbitrate pursuant to the language of the HMA and the law of this Circuit.

Finally, where Plaintiffs Ithaca I and II are Panamanian corporations, and where Fintiklis is a Cypriot attorney who controls the Hotel by and through Panamanian entities, this Court should respectfully take judicial notice that Plaintiffs are asking this Court to hold that they are not bound to arbitrate in the ICC, despite the fact that the courts in Panama, which have jurisdiction over the parties and the Hotel  the subject matter of the arbitration – cannot as a matter of law enjoin the ICC arbitration as against Plaintiffs pursuant to the Panama  Constitution:  Panama recognizes and enforces *competence-competence* pursuant to its Constitution.  *See* Political Constitution of the Republic of Panama, Article 202.  Plaintiffs' forum shopping offends principles of international comity and should be denied.

## STATEMENT OF FACTS

Plaintiffs control the Hotel located in Panama City, Panama, by and through their control of two entities:  1) Hotel TOC, Inc. a Panamanian corporation which is the "Owner" of the Hotel, and 2) Hotel TOC Foundation, which is a Panamanian entity which is the sole shareholder of Hotel TOC, Inc.  *See* Ex. 12, Hotel TOC Foundation Charter; Ex. 13, Hotel TOC, Inc. Articles of Incorporation. Hotel TOC, Inc. is also the Claimant which Plaintiffs caused to commence the ICC arbitration against Defendants.  The Hotel, together with Defendants' rights under the HMA, comprise the subject matter of all disputes between Plaintiffs and Defendants in the ICC. The Defendants and Hotel TOC,

Inc. are bound to arbitration in the ICC by and through the HMA.[3]  Hotel TOC, Inc. is represented in the ICC arbitration by Plaintiffs' instant counsel, Akerman.

As incorporated by reference and attached as exhibits in the Bulk Sale Consent Agreement, the Hotel is operated pursuant to a network of coordinated agreements between and among numerous parties. These agreements all reference, rely on and subject Hotel Unit owners and parties to the HMA to a series of constitutional agreements and documents governing the Hotel and its ownership structure, including the Co-Ownership Regulations, the House Rules and the Hotel Management Agreement ("HMA").  Plaintiffs, and ICC Claimant Hotel TOC, Inc., which Plaintiffs control, together with Defendants and other third party respondents joined by Defendants in the ICC are bound by the HMA; all the hotel-related agreements  all contain the identical ICC arbitration clause:

> Unless otherwise specifically provided for in this Agreement, <u>all disputes, controversies, claims or disagreements arising out of or relating ot this Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner</u>. . . Either Party may submit the Dispute to the International Chamber of Commerce for binding arbitration under the then existing ICC Commercial Arbitration Rules.

Ex. 1, HMA, § 9.1 (emphasis added); *see also* Ex. 4 Hotel Unit Rental Management Agreement ("HURMA"), § 8.21; Ex. 4, Hotel Unit Maintenance Agreement ("HUMA"), § 19(j);  Ex. 5, Hotel Amenities Units Lease Agreement ("HAULA"), § 16(i); Ex. 3, Co-Ownership Regulations of the P.H. TOC Building ("COR"), Article 86.

The dispute resolution mechanism upon which the entire Hotel property ownership and management structure relies (including all persons having any interests in the Hotel or any Hotel Unit/Hotel Amenities Unit therein) is binding arbitration before the ICC.  Indeed, the Hotel-related agreements, including the HMA – each of which are incorporated by reference and attached to the Bulk Sale Consent Agreement – seek to establish an orderly international arbitration in Panama City of all related claims before the ICC, and requires parties "to submit all Disputes then known to that

---

[3] The HMA and other relevant documents are annexed to the accompanying Declaration of Perry M. Amsellem ("Amsellem Dec."). The facts underlying the dispute between Defendants and Plaintiffs in arbitration are set for the Defendants' responsive pleading submitted in the ICC and annexed to the Amsellem Dec. at Ex. 8. To the extent possible, Defendants here will seek to limited the repetition of those facts and respectfully refer the Court to Ex. 8 for the facts concerning the dispute pending before the ICC.

party within the same arbitration proceeding *and any such claim that is not submitted shall be barred.*" Ex. 1, HMA, § 9.1.1; Ex. 4, HURMA, § 8.21; Ex. 5, HUMA, § 19(j); Ex. 6, HAULA, § 16(i); Ex. 16, License Agreement with Owners Meeting and Hotel TOC, Inc. ("License Agreement"), § 20(a). **In short, this Court should take judicial notice that if Defendants here had not asserted its third party claims against Plaintiffs in the ICC Arbitration, such claims would have been waived under the HMA.**

On or about October 14, 2017, Plaintiffs, by and through the Panamanian entity they control, Hotel TOC, Inc., commenced an arbitration before the ICC, alleging that Defendants had breached the HMA, and seeking declaratory relief along with damages. *See* Ex. 8. On or about December 4, 2017, Defendants responded with their Answer, Counterclaims and Request for Joinder asserting third party claims against Plaintiffs, among others, with all third party claims arising out of or related to the HMA.[4] The facts leading up to and including the October 14, 2017 Notice for Termination, and Demand for Arbitration underscore the propriety of the ICC arbitration as against Plaintiffs.

### A. Plaintiffs Surreptitiously Take Control of Hotel Owner and Claimant Hotel TOC, Inc. By and Through the Bulk Sale Consent Agreement

In October 2016, Fintiklis sought to purchase in bulk 215 Hotel related Units. Pursuant to, *inter alia*, the Co-Ownership Regulations governing the Hotel (which includes the same arbitration clause as in the HMA), Plaintiffs were required to obtain Defendants' written consent as a condition to the sale of more than 10 Hotel Units. On or about February 15, 2017, Defendants and Plaintiffs agreed to the terms of Defendants' consent to the bulk sale by Newland, a Panamanian corporation, to Plaintiffs. Fintiklis created two Panamanian corporations to accomplish this purchase from Newland – Plaintiffs Ithaca I and Ithaca II.

Fintiklis signed the Bulk Sale Consent Agreement and it contained an exhibit enumerating all of the Hotel-related agreements, including the HMA; the Bulk Sale Consent Agreement specifically

---

[4] Article 7 of the ICC Rules clearly provides for the joinder of additional parties, which Defendants filed as against Plaintiffs on December 4, 2017. Likewise, Article 6 of the ICC Rules provide a procedure by which participants may raise "pleas concerning the existence, validity or scope of the arbitration agreement," with such pleas to be decided by the arbitral tribunal or, upon reference, by the 17-member International Court of Arbitration of the ICC, whereupon the arbitration "shall proceed if and to the extent that the Court is *prima facie* satisfied that an arbitration agreement under the [ICC Rules] may exist." ICC Rules, Article 6(4), attached hereto as Ex. 11.

bound Ithaca I and Ithaca II to the terms of such agreements.  Moreover, the Bulk Sale Consent Agreement required Ithaca I to execute, as is required of all Hotel Unit owners, a Hotel Unit Maintenance Agreement and Hotel Unit Rental Management Agreement.  Ex. 2, § 2(A)-(B).  Together with the HMA, each of these agreements provided for binding arbitration before the ICC of any disputes arising under or related to the HMA.  Finally, Plaintiffs Ithaca I and Ithaca II further agreed to "not . . . take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator [Defendants] under and in respect of any the Hotel Agreements."  Ex. 2, § 3(D).  Likewise, the parties agreed that Ithaca I and Ithaca II "shall not seek or accept an appointment or election to the position of manager or administrator (or other similar leadership role) of the P.H. TOC [which includes the Hotel]."  Ex. 2, § 3(F).

The Bulk Sale Consent Agreement has a narrow forum selection clause which provides that all actions with respect to [the Bulk Sale Consent Agreement] shall be brought in the State of New York.  Ex. 2, § 9.  The Bulk Sale Consent Agreement contains a merger clause expressly limited only to the parties thereto, and providing, in relevant part, that the agreement "sets forth the entire understanding and agreement of the Parties hereto and any other agreements or understandings (written or oral) among the Parties on or prior to the date of this Agreement with respect to the matters set forth herein."  Ex. 2, § 12.  The Bulk Sale Consent Agreement does not abrogate or repudiate the binding arbitration dispute resolution mechanisms of any of the Hotel-related agreements; instead, it specifically incorporates them by reference and attaches them.  It was manifestly clear that upon obtaining the permission of the Defendants to purchase in bulk 215 units in the Hotel, that any and all disputes, controversies, claims or disagreements arising out of or relating to the HMA, including the management of the Hotel and Defendants' rights as Hotel Operator, were subject to binding arbitration before the ICC under Article 9 of the HMA.

### B.  Plaintiffs Close on the Bulk Sale and Immediately Stage a Coup in Panama

Plaintiffs closed on their purchase of 215 Units on July 30, 2017; the deeds evidencing those transactions were recorded in Panama on August 10, 2017.  Fintiklis then reached out to the Hotel

unit owners, falsely claiming to have a "lunch meeting."  In reality, the October 14, 2017 "luncheon" was anything but.  Fintiklis commenced the meeting with a barrage of untrue and slanderous criticisms of Defendants, and then turned the floor over to his attorneys Morgan & Morgan, P.A, who then falsely informed the Beneficiaries, *i.e.*, those Hotel unit owners which happened to be in attendance, that Morgan & Morgan legally represented *all* of the Beneficiaries of Hotel TOC Foundation.  That statement was demonstrably false, as Morgan & Morgan, P.A. had not been retained by Hotel TOC Foundation or its Beneficiaries at the time; indeed, at that time Defendants' representative Roger Khafif was President of the Hotel TOC Foundation Council with sole authority to hire counsel for Hotel TOC Foundation – and he was not even present for Plaintiffs' unlawful takeover, posing as a lunch meeting.

Morgan & Morgan then proceeded to eject Defendants' representatives from the meeting, in order to discuss alleged "privileged" information.  Following that discussion, a supposed vote of Hotel TOC Foundation was purportedly held in the absence of its President roger Khafif whereby Plaintiffs caused three Foundation Council members to be unlawfully removed (unsurprisingly, all associated with Defendants), and Plaintiff caused three new Foundation Council members to be appointed, one of whom was Fintiklis himself. Ex. 14, Hotel TOC Foundation Minutes of October 14, 2017 Meeting. Furthermore on October 14, 2017, Plaintiffs caused Fintiklis to be named as "President" of the ICC Claimant's Board of Directors.  Ex. 15, Hotel TOC, Inc. Minutes of October 14, 2017 Meeting.  In addition, at that purported meeting, the Beneficiaries of Hotel TOC Foundation (which Ithaca I and Ithaca II control) passed "a resolution that authorized the Foundation to take all steps necessary to terminate [Defendants'] management of [the Hotel]. . . which included, among other things, commencing an arbitration before the ICC as provided under the HMA." Compl. ¶ 30.  **In other words, the beneficial shareholders of Hotel TOC Foundation, including Ithaca I and Ithaca II, knowingly voted their interests to pursue an arbitration against Defendants before the ICC; by doing so, Ithaca I and Ithaca II obtained direct benefits under the HMA and further bound themselves to the HMA and its broad arbitration clause.**

Late that same October 14, 2017, Defendants received a Notice of Default from Hotel TOC,

Inc., signed by Fintiklis as its "Authorized Representative," asserting baseless and, for purposes of this action, irrelevant, grounds for default.  Ex. 18.  Later that same October 14, 2017, Plaintiffs caused a Request for Arbitration to be filed against Defendants in the ICC by Morgan & Morgan, P.A. and Akerman LLP (Plaintiffs' counsel here), on behalf of Hotel TOC Inc. Ex. 8.

## LEGAL STANDARDS

## I.   <u>The Arbitration Agreement Refers All Questions of Arbitrability to the ICC</u>

The Supreme Court has unequivocally held that when an arbitration agreement submits all disputes arising under the agreement to arbitration, questions of "arbitrability," and the scope of the arbitration provision are for the arbitral tribunal to decide, not the court.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).  It is well established in this District that "federal policy and New York law strongly favor arbitration agreements, broadly interpreting the clauses that authorize arbitration." *Mina v. Foot Locker, Inc.*, No. 09 CIV. 0472 (DAB), 2009 WL 3241551, at \*2 (S.D.N.Y. Sept. 30, 2009); *see also Hartford Acc., and Indemn. Co. v. Swiss Reins. America Corp.,* 246 F.3d 219, 226 (2d Cir. 2001) ("the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability").

The strong policy in favor of arbitration is even stronger where, as here, the arbitration clause broadly refers to arbitration of "all disputes arising out of an agreement" and is not limited by reference to the signatories.  *Clarendon Nat'l Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 514 (S.D.N.Y. 2001) (holding that because the dispute at issue "touch[ed] matters" covered by the arbitration agreement, which contained a broad "all disputes arising out this agreement" language, the non-signatories were required to arbitrate the dispute).

Here, Section 9.1 of the HMA clearly submits "all disputes, controversies, claims, or disagreements arising out of or relating to this Agreement . . ." to ICC Arbitration. Such broad language, which on its face is not limited to the parties of the HMA, has been held to encompass non-signatories.  Thus, once this Court is satisfied that the Plaintiffs are bound to the HMA, because Defendant's claims against Plaintiffs in the ICC Arbitration clearly "touch matters" related to the

obligations, rights, and performance of the HMA, they must be resolved in arbitration.

## II.   Plaintiffs Cannot Show a Clear and Substantial Likelihood of Success on the Merits

Preliminary injunctions are one of "'the most drastic tools in the arsenal of judicial remedies,'" and must be used with great care. *Accenture LLP v. Spreng*, No. 10 CIV 9393 VM, 2010 WL 5538384, at *1 (S.D.N.Y. Dec. 23, 2010) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).  A party seeking a preliminary injunction has the burden of demonstrating "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial,[5] with a balance of hardships tipping decidedly in the movant's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 457 (S.D.N.Y. 2014) (Ramos, J.) (citing *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)).  Where, as here, Plaintiffs seek a preliminary injunction "alter[ing], rather than maintain[ing], the status quo," Plaintiffs  "must meet the more rigorous standard of demonstrating a 'clear' and 'substantial' showing of likelihood of success on the merits." *Alamontaser v. New York City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)).  Where this Court does not have subject matter jurisdiction, and where the Complaint fails to state a claim for which this Court may grant relief consistent with the Panama Convention, Plaintiffs cannot make "'clear' and 'substantial' showing of likelihood of success on the merits" as required to alter the status quo before the ICC.

## III.   Anti-Arbitration Injunctions are Unavailable under the Panama Convention

A preliminary injunction is inappropriate here because 1) this Court lacks subject matter jurisdiction over the action and 2) the Complaint fails to state a claim upon which relief may be granted. Indeed, while the Motion asserts that "[f]ederal courts routinely enjoin arbitrations," such assertion – as applied to the international arbitration at issue here – is plainly wrong.  This international ICC arbitration will be heard in Panama, between parties a majority of whom are citizens of states having

---

[5] Plaintiffs' Motion makes arguments only concerning their likelihood of success on the merits, which is the basis on which Defendants submit the instant Memorandum in Opposition.

ratified the Panama Convention and concerns the management of a hotel in Panama City, Panama. Thus, this Court must adhere to the Panama Convention, applying Chapter 1 of the FAA (which is applicable to domestic arbitrations) only "to the extent chapter 1 is not in conflict with this chapter or the [Panama Convention] as ratified by the United States." 9 U.S.C. § 307.

Plaintiffs' Motion cites *no* authority for the issuance of anti-arbitration injunctions directed at international arbitrations governed by the Panama Convention; indeed, as discussed *infra*, such injunctions are contrary to the limited remedies provided by the Panama Convention and inappropriate. Rather, Plaintiffs' Motion relies upon decisions enjoining domestic FINRA arbitrations, pursuant to Chapter 1 of the FAA, which is utterly irrelevant to the ICC arbitration at-issue in this action. *See* Motion at 12-13 (citing *Bremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. CV-11-4934 (LDW), 2012 WL 760564, at *5 (E.D.N.Y. Mar. 8, 2012) and *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC,* 645 F.3d 522, 525-26 (2d Cir. 2011), both concerning domestic FINRA arbitrations).

## ARGUMENT

### I.  The Court Lacks Subject Matter Jurisdiction over this Action

Federal courts are courts of limited jurisdiction, and subject matter jurisdiction is the touchstone of this Court's authority to act. *See Sheldon v. Sill*, 49 U.S. 441 (1850). Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 65(a), respectively. Neither alleged basis for relief provides this Court with federal subject matter jurisdiction over the action. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ("'The operation of the Declaratory Judgment Act is procedural only.' Congress enlarged the range of remedies available in federal court but did not extend their jurisdiction.") (quoting *Aetna Life Ins. Co. of Hartford Conn. v. Haworth*, 300 U.S. 227, 240 (1937)). Accordingly, Plaintiffs' Motion should be denied for the simple reason that this Court lacks subject matter jurisdiction.[6]

---

[6] The United States and Panama are both signatories to the Panama Convention. Pursuant to 9 U.S.C. § 202 (applicable to the Panama Convention by virtue of 9 U.S.C. § 302), "An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the [Panama] Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." Here, even if all the participants in the arbitration were U.S. citizens

The Complaint purports to identify two, independent bases for original federal subject matter jurisdiction over this action – diversity jurisdiction, 28 U.S.C. § 1332, and federal question jurisdiction, 28 U.S.C. § 1331.  *See* Compl. ¶¶ 18-19.  Each is inapplicable to the instant action, and no other bases of original federal subject matter jurisdiction exist.  Accordingly, dismissal of this action is warranted and, consequently, a preliminary injunction is inappropriate.[7]

*First*, while the parties are completely diverse in their citizenship, the amount in controversy requirements of 28 U.S.C. § 1332 have not been met.  The Complaint attempts to satisfy the amount in controversy by bootstrapping the $150,000,000 in counterclaims asserted by Defendants in the ICC arbitration; however, such counterclaims are not part of the case or controversy presented by this action.

Instead, Plaintiffs' Complaint seeks equitable relief  a declaration concerning *where* the parties must resolve their disputes – in the federal courts of New York or before the ICC.  Plaintiffs' Complaint does not satisfy the amount in controversy requirement.  The location of where Plaintiffs must litigate their disputes is clearly the "object of litigation," and its value is zero.  *See Correspondent Services Corp. v. First Equities of Florida*, 442 F.3d 767, 769 (2d Cir. 2006) (affirming the dismissal of an action where the "object of the litigation" has no value) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)); Compl. ¶ 11 (action brought to "seek a declaration that the Bulk Sale Agreement requires [Defendants] to assert [their] claims against Plaintiffs . . . in the state and federal courts of the State of New York and to enjoin [Defendants] from asserting those claims in the ongoing Arbitration").  Lacking the requisite amount in controversy, this action does not give rise to subject matter jurisdiction under 28 U.S.C. § 1332 and must be dismissed.  *Tongkook Am., Inc. v. Shipton Sportswear Co.,* 14 F.3d 781 (2d Cir. 1994) (vacating district court order and remanding case to be dismissed for want of federal subject matter jurisdiction in light of plaintiff's failure to satisfy amount

---

– which they are not – the Panama Convention would nonetheless apply given the significant relationship to foreign property.

[7] These arguments concerning subject matter jurisdiction are presented herein in order to demonstrate the baselessness of Plaintiffs' Motion and the lack of success on the merits.  Plaintiffs reserve the right to expand upon this argument in their response to the Complaint, pursuant to Fed. R. Civ. P. 12(b)(1), along with any other defenses, objections and/or counterclaims the Defendants may assert, if deemed necessary by this Court.

in controversy requirements).

Second, Plaintiffs' Complaint improperly relies upon the existence of two counterclaims (out of 13) asserted by Defendants in the ICC arbitration under the Federal Racketeer-Influenced and Corrupt Organizations (RICO) Act, and improperly argues that they give rise to federal question jurisdiction under 28 U.S.C. § 1331.[8]  Compl. ¶¶ 8-9.  In either case, the counterclaims asserted by Defendants in arbitration are not part of the case or controversy presented to this Court by the Complaint and the relief demanded therein, and cannot serve as a basis of subject matter jurisdiction.  As the Supreme Court reiterated in *Phillips Petroleum Co. v. Texaco*, 415 U.S. 125, 128 (1974):

> This Court has repeatedly held that, in order for a claim to arise 'under the Constitution, laws, or treaties of the United States,' a right or immunity created by the Constitution or the laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.  The federal questions must be disclosed upon the face of the complaint, unaided by the answer.  Moreover, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense.

(internal citations & quotations omitted).

Original federal subject matter jurisdiction is simply lacking here.  As made clear by the Second Circuit, this Court's analysis under the Federal Arbitration Act (FAA), applicable to agreements governed by The Inter-American Convention on International Commercial Arbitration (the "Panama Convention"),[9] Jan. 30, 1975, S. Treaty Doc. 97-12, O.A.S.T.S. No. 42, 14 I.L.M. 336,[10] does *not* vest this Court with original subject matter jurisdiction.  *Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) ("**The FAA does not 'independently confer subject matter jurisdiction on the federal courts'**") (quoting *Durant, Nichols, Houston, Hodgson &*

---

[8] Elsewhere in the Complaint, Plaintiffs deride these claims as "an outlandish conspiracy theory" and subject to dismissal under Fed. R. Civ. P. 11 if they were pled in federal court.  Curiously, if the RICO claims were as facially deficient as Plaintiffs assert – which they are not – then a federal court could disregard them as a basis for satisfying itself of subject matter jurisdiction in an action in which they were asserted.  For purposes of this action, however, the existence of RICO counterclaims asserted only in the ICC arbitration is wholly irrelevant to determining the existence of federal subject matter jurisdiction, or any other question presented by the Complaint.

[9] *See* 9 U.S.C. § 202 (providing that commercial arbitrations, unless solely between citizens of the United States respecting U.S. interests, "fall under the [New York] Convention").  The Panama Convention applies here because the majority parties in arbitration are citizens of countries that are signatories to the Panama Convention (Panama and the United States).

[10] While the New York Convention may otherwise apply by its terms to this arbitration agreement, pursuant to the First Reservation of the United States in its ratification of the Panama Convention, the Panama Convention applies.  9 U.S.C. § 305.

*Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 63 (2d. Cir. 2009)).  While original federal subject matter jurisdiction would exist under the Panama Convention if this were an action to confirm or vacate an award in an arbitration governed by the Panama Convention by virtue of 9 U.S.C. § 203 (applicable to agreements covered by the Panama Convention by virtue of 9 U.S.C. § 302), the Panama Convention does not permit actions to enjoin arbitrations and, as such, there is no original federal subject matter jurisdiction over this action.[11]

Federal subject matter jurisdiction does not lie in this Court.  Should the Court disagree, however, Plaintiffs' Motion should nonetheless be denied on its merits.

**II.   The Complaint Fails to State a Claim upon Which Relief May Be Granted**

The Complaint seeks declaratory and injunctive relief to enjoin a pending international commercial arbitration under the auspices of the Panama Convention.  However, the Panama Convention provides for no such relief, and the Complaint and Motion on their face invoke no authority to the contrary.  Because the Complaint asserts causes of action that are non-cognizable and for which relief may not be granted consistent with the Panama Convention, it must be dismissed for failure to state claim upon which relief may granted pursuant to Fed. R. Civ. P. 12(b)(6).  *Ghassabian v. Hematian*, No. 08 Civ. 4400 (SAS), 2008 WL 3982885, at *2 (S.D.N.Y. Aug. 27, 2008).

Like its counterpart, *i.e.*, the New York Convention, relief under the Panama Convention is limited to this Court's recognition and enforcement of arbitral awards; provisions of Chapter 1 of the FAA (applicable to domestic arbitrations) may apply to Panama Convention arbitrations only "to the extent Chapter 1 is not in conflict with this chapter or the [Panama Convention] as ratified by the United States." 9 U.S.C. § 307.  **In the implementing statute for the New York and Panama Conventions, "[p]ower is expressly conferred on the federal courts to compel arbitration, to appoint arbitrators, or to confirm an arbitration award."**  *Ghassabian,* 2008 WL 3982885, at *2 (emphasis added).

As recognized by Judge Scheindlin in *Ghassabian*, which concerned an arbitration under the

---

[11] The structure of the Panama Convention mirrors its enabling statute, codified as Chapter 3 of the FAA, respectively.  *See* 9 U.S.C § 206, 302 (empowering Courts to compel arbitration); 9 U.S.C. § 207, 302 (empowering courts to confirm arbitral award, and referring to applicable convention for the grounds for refusing to do so).

New York Convention (analytically identical for these purposes):

> Given this enumerated list of judicial powers, according to the canon of statutory interpretation *expression unius est exclusion alterius* ('the express mention of one thing excludes all others') it is unreasonable to infer the existence of further remedies [beyond those explicitly provided in Chapter 2 of the FAA]. . .Thus neither the New York Convention nor federal law implementing it creates a cause of action allowing a party to stay arbitration.

*Id.*[12]   Because of the clear interpretation of applicable federal law implementing the New York Convention, the Complaint in *Ghassabian* was dismissed with prejudice for failure to state a claim.  The same result obtains here:  Plaintiffs' Complaint seeking to enjoin an arbitration under the Panama Convention must be dismissed for failure to state a claim.

## III.   A Preliminary Injunction Is Not Warranted Here

Should the Court ultimately conclude that it may entertain Plaintiffs' Motion on the merits, it should deny it as Plaintiffs cannot demonstrate the clear and substantial likelihood of success on the merits, especially where, as here, Plaintiffs ask this Court to disturb the status quo, not to maintain it. Additionally, Plaintiffs' significant six week delay in bringing this motion demonstrates the lack of harm – let alone irreparable harm – to Plaintiffs from participating in the arbitration, as their interests (and, indeed, liability) are already squarely before the ICC as it concerns claims against Hotel TOC, Inc., over which Plaintiffs maintain control, are the majority owners and over which ICC jurisdiction is not contested.  Finally, public interests strongly favor arbitration and weigh heavily against plaintiffs' forum shopping.

### A.  Plaintiffs Cannot Demonstrate a Clear and Substantial Likelihood of Success

At the outset, the FAA evinces a strong federal policy favoring arbitration.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  Well-settled New York law binds a person or entity to an arbitration agreement, notwithstanding the absence of a signature thereto (a "non-

---

[12] Any decisions contrary to *Ghassabian* fail to recognize this critical distinction with respect to the Court's powers as it concerns arbitrations.  With respect to arbitrations covered by the New York and Panama Conventions, the Court is exercising legal authority derived from the statutes enacted by Congress to enable each of those Conventions, which do not include an anti-arbitration injunctions.  Had Congress intended to give federal courts the authority to enjoin New York and Panama Convention arbitrations, it could have done so but did not.  Indeed, Congress can authorize specific forms of relief in federal courts, as it did with the Declaratory Judgment Act, codified at 28 U.S.C. § 2201 *et seq.*

signatory"). Indeed, as noted by the Second Circuit, "[i]t does not follow [that] . . . an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Fisser v. International Bank*, 282 F.2d 231, 233 (2d Cir. 1960). As articulated by the Second Circuit in *Thomson-CSF, S.A. v. American Arbitration Ass'n*, New York law recognized over 23 years ago, in 1995, at least five "traditional bases" of contract and agency that can bind a non-signatory to an agreement to arbitrate: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego; and (5) estoppel." 64 F.3d 773, 776-778 (2d Cir. 1995).

### 1. Plaintiffs Ithaca I and Ithaca II are Bound to Arbitrate Because the HMA is Expressly Incorporated by Reference in the Bulk Sale Consent Agreement

A party, despite not signing the original agreement to arbitrate, may nonetheless bind itself to arbitrate a dispute by executing an agreement that expressly incorporates the agreement to arbitrate. *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993); *Pagaduan v. Carnival Corp.*, No. 16-465, 2017 WL 4117339, at *2-3 (2d Cir. Sept. 18, 2018) (affirming an order compelling an individual to arbitrate where such individual signed agreement that "does not contain an arbitration agreement on its face. It does, however, reference secondary documents that . . . do call for arbitration"); *Clarendon Nat'l Ins. Co.*, 152 F. Supp. 2d at 520 (holding nonsignatory bound by arbitration where the guaranty, entered into between signatory and non-signatory to agreement to arbitrate, expressly incorporated the arbitration agreement); *Fidelity & Guar. Ins. Co. v. W. Point Realty, Inc.*, No. 02 Civ. 1951 (LMM), 2002 WL 1933780 (S.D.N.Y. Aug. 21, 2002).

As a threshold matter – one not addressed by the Plaintiffs – the arbitration agreement in the HMA is sufficiently broad "to allow nonsignatories' disputes to be brought within its terms." *Limonium Maritime S.A. v. Mizushima Marinera, S.A.*, No. 96 Civ. 1888 DC, 1999 WL 46721, at *2 (S.D.N.Y. Feb. 1, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999); *see also Progressive Cas. Ins.*, 991 F.2d at 48-9; *Clarendon*, 152 F. Supp. 2d at 520. As discussed herein, Ithaca I and Ithaca II are bound to arbitrate because each is party to an agreement whereby it explicitly agreed to be bound by the HMA, which contains a broad agreement to arbitrate.

Ithaca II, as purchaser of the Hotel Amenities Units, is bound to arbitrate before the ICC

because it expressly agreed to be bound by the HMA, which was incorporated by reference in the Bulk Sale Consent Agreement. The Bulk Sale Consent Agreement provides, in relevant part, that "Ithaca II shall be bound by the terms and conditions of the Hotel Management Agreement as successor to the Hotel Amenities Unit Owner [Newland]." Ex. 2, § 3(A); Ex. 6, HAULA, § 16(i); Ex. 7, Assignment & Assumption Agreement; Ex. 16. The HMA, in Section 9.1, provides for binding arbitration before the ICC concerning "all disputes, controversies, claims or disagreements arising out of or relating to [the HMA]." Ex. 1, § 9.1. Plaintiffs, by and through ICC Claimant Hotel TOC, Inc., caused the ICC arbitration to be commenced under the HMA against Defendants. Thus, it is clear that Ithaca II is bound to arbitrate in the proceedings.

Likewise, Ithaca I is bound to arbitrate before the ICC because in purchasing Hotel Units, it expressly subjected itself to the Co-Ownership Regulations, as well as executed Hotel Unit Rental Management and Hotel Unit Maintenance Agreements, each containing substantively identical arbitration provisions, compelling arbitration of all disputes relating to such agreements before the ICC. Ex. 4, HURMA, § 8.21; Ex. 5, HUMA, § 19(j); License Agreement, § 20(a); *see also* Ex. 1, Bulk Sale Consent Agreement at Recitals A – D, ¶¶ 1-3. As described *supra*, these coordinated agreements, all set forth in the Bulk Sale Consent Agreement, provide for binding arbitration before the ICC concerning any and all issues relating to the management of Hotel, which unquestionably concerns the Notice of Default and Demand for Arbitration which Plaintiffs caused Hotel TOC, Inc.to commence against Defendants on October 14, 2017.

Finally, both Ithaca I and Ithaca II, pursuant to the Bulk Sale Consent Agreement, explicitly covenanted to take no actions adverse to the interests of Defendants under and in respect of any of the "Hotel Agreements," which expressly identifies and includes the HMA. Ex. 2, § 3(D). Again, Plaintiffs' covenants are an express recognition of the interrelated and codependent nature of the Hotel-related agreements governing the management of the Hotel, which uniformly provide for binding arbitration before the ICC. When Plaintiffs covenanted to take no action adverse to Defendants under those Hotel-related agreements, they bound themselves to the HMA, including its agreement to arbitrate; where Plaintiffs, through their tortious actions, caused injuries to Defendants'

rights under the HMA, as Defendants' Answer, Counterclaims and Request for Joinder lays bare, Plaintiffs cannot be heard to complain of surprise that they are bound by the HMA, which was expressly incorporated by reference in the Bulk Sale Consent Agreement.

### 2.  All Plaintiffs are Estopped from Avoiding Arbitration, including Fintiklis

A party is estopped from denying its obligation to arbitrate a dispute when it has received a direct benefit from the contract containing the arbitration clause. *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270 (S.D.N.Y. 2011).  Here, each and every Plaintiff is estopped from avoiding arbitration, as they have each received (and continue to receive) direct benefits from the HMA and the scheme of Hotel-related agreements by virtue of their purported control of Hotel TOC, Inc., which is unquestionably bound to arbitrate pursuant to the HMA.

Fintiklis is the president of Ithaca I and Ithaca II, which together control the majority of the beneficial interests in both 1) Hotel TOC, Inc., Claimant in the arbitration before the ICC, and 2) its sole shareholder, Hotel TOC, Foundation.  As expressly alleged in Defendants' Responsive Pleadings in the ICC, Plaintiffs, through their tortious actions, have usurped unlawful control to cause both Hotel TOC Foundation and, Hotel TOC, Inc. to declare a breach of the HMA, and commence an arbitration on behalf of Hotel TOC Inc., in the ICC, *all on the same day*.  *See* Compl. ¶¶ 29-30.  While Defendants strenuously contest that Plaintiffs lawfully control Hotel TOC Inc. – an issue that will be litigated before the ICC – the actions that Plaintiffs took to cause Hotel TOC, Inc. to commence a sham arbitration against Defendants estop Plaintiffs from avoiding arbitration themselves.  In short, Plaintiffs have obtained a direct benefit under the HMA by causing Hotel TOC, Inc. to commence the arbitration thereunder.

Indeed, the Fourth Circuit, relying on the Second Circuit's decision in *Thomson-CSF*, recognized that non-signatory shareholders may be bound by a corporation's agreement to arbitrate, where the shareholders control the activities of the corporation.  *Long v. Silver*, 248 F.3d 309, 319-321 (4th Cir. 2001) **("[W]e see little difference between a parent and its subsidiary and a corporation**

**and its shareholders, where, as here, the shareholders . . . control all of the activities of the corporation"**) (citing *Thomson-CSF,* 64 F.3d at 776); *see also Benefits in a Card, LLC v. Talx Corp.,* No. 6:06-CV-03655-GRA, 2007 WL 750638 (D.S.C. Mar. 7, 2007).  **Where the Plaintiffs here have expressly pleaded that shareholder control in their Complaint in this action and that Plaintiffs voted to commence the arbitration against the Defendants under the HMA, Plaintiffs are thus estopped from avoiding the broad arbitration clause which they invoked.** *See* Compl. ¶¶ 5, 28-30.

Similarly, Fintiklis is equally estopped from denying the arbitration clause under the HMA from which he has benefitted. He is the sole person to have acted on behalf on Ithaca I and Ithaca II, which he controlled and through which he caused his purported appointment to positions of authority with Hotel TOC Foundation and Hotel TOC, Inc.; Fintiklis then caused Hotel TOC to commence the arbitration against Defendants, represented by Mr. Fintiklis' Panamanian and U.S. counsel, all on October 14, 2017.  These facts give rise to no conclusion other than Mr. Fintiklis' complete control and domination over the events leading up to the events of October 14, 2017, including the commencement of arbitration.  *See Deloitte Noraudit A/S v. Deloitte Hasks & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir. 1993) (compelling arbitration against a non-signatory to an agreement to arbitrate under estoppel doctrine because such non-signatory knowingly and directly benefitted from the agreement providing for arbitration); *Servaas Inc. v. Republic of Iraq,* 686 F. Supp. 2d 346, 355 (S.D.N.Y. 2010) ("Where a party derived a direct benefit from the contract containing an arbitration provision, . . . it will be estopped from 'raising any question of being a nonsignatory to the agreement.'" (citation and quotations omitted); *Alfa Laval U.S. Treasury Inc. v. National Union Fire Ins. Co. of Pittsburgh, Penn.,* 857 F. Supp. 2d 404, 415 (S.D.N.Y. 2012) ("[T]he non-signatory plaintiffs have received a direct benefit from the Indemnity Agreements and are estopped from denying their obligation to arbitrate as the Agreements require."); *HD Brous & Co. v. Mrzyglocki,* No. 03 Civ. 8385 (CSH), 2004 WL 376555, at *9 (S.D.N.Y. Feb. 26, 2004).

### 3.   In Addition To Estoppel Doctrine, Fintiklis Is Bound To The HMA Because He Dominates And Controls Ithaca I, Ithaca II And Hotel TOC Inc.

Fintiklis is further bound to arbitrate before the ICC for the independent reason that he completely dominates and controls the activities of Ithaca I and Ithaca II which caused Hotel TOC, Inc. to initiate the arbitration.  Likewise, as a result of the October 14, 2017 "luncheon," Fintiklis now purports to act for Hotel TOC, Inc. and, through his individual actions, Hotel TOC, Inc. commenced the arbitration before the ICC.  A court can compel arbitration and allow veil piercing where "(1) the owner exercises complete domination over the corporation with respect to the transaction at issue, and (2) such domination was used to commit or fraud or wrong that injured the party seeking to piece the veil."  *MAG Portfolio Consultant GMBH v. Merlin Biomed Grp., LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (citation and quotations omitted).

Fintiklis caused Ithaca I and Ithaca II to be incorporated in Panama for the sole purpose of acquiring unlawful control over the Hotel.  At all points relevant to the purchase by Ithaca I and Ithaca II of 215 units, only one individual was involved – Fintiklis.  The notice address on the Bulk Sale Consent Agreement for Ithaca I and Ithaca II was Fintiklis' address.  Ex. 2, § 6(A).  Fintiklis called the October 14, 2017 "luncheon" meeting of Hotel TOC Foundation.  When Ithaca I and Ithaca II purportedly voted their units to replace members of the Hotel TOC Foundation Council, they appointed Fintiklis on that same day, October 14, 2017.  Fintiklis was then immediately assumed the role of the "authorized representative" of Hotel TOC, Inc. on October 14, 2017 in Panama and caused the at-issue arbitration to be commenced against Defendants under the HMA that same day.  The facts make clear that only one person and one person alone – Fintiklis – had any role or activities with respect to Ithaca I and Ithaca II.  The entities exist at his direction and for his benefit.  Complete domination is manifest.  *See Accordia Ne., Inc. v. Thesseus Int'l Asset Fund, N.V.*, 205 F. Supp. 2d 176, 181-2 (S.D.N.Y. 2002) (finding similar allegations of domination sufficient to defeat a motion to dismiss).

### 4.   The Forum and Merger Clauses Are Not Dispositive

Despite these obvious agreements to be bound by the HMA, including its arbitration provision,

the Plaintiffs flee the ICC arbitration they caused to be commenced in Panama City. The primary argument advanced by Plaintiffs rely on the forum selection and merger clauses in the Bulk Sale Consent Agreement. Such clauses are not dispositive of the question of whether Plaintiffs are bound to arbitrate pursuant to the HMA. *See* Mot. at 13-18. As a threshold matter, Plaintiffs' entire argument concerning the primacy of the forum selection clause in the Bulk Sale Consent Agreement rests on its false assertion that purportedly all of Defendants' claims in arbitration "are premised entirely on the rights and obligations of the parties under the Bulk Sale [Consent] Agreement." Mot. at 13. That is false. Under the HMA and Rules of the ICC, which are clearly incorporated by the HMA, what claims are or are not arbitrable under the HMA is a question of arbitrarily for the ICC, not for this Court. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

Plaintiffs' argument that *subsequent* agreements with exclusive forum selection clauses may modify *prior* agreements to arbitrate is inapposite here. Reliance by Plaintiff on *Applied Energetics* and *Golden Empire* is inapposite because, *inter alia*, Ithaca I and Ithaca II bound themselves to the HMA and the Bulk Sale Consent Agreement *at the same time*, when Plaintiffs executed the Bulk Sale Consent Agreement. Plaintiffs' assertion that "there is no dispute that the HMA preceded the Bulk Sale [Consent] Agreement" is plainly misleading as it concerns Plaintiffs' argument. Mot. at 17.

Moreover, the authority cited by Plaintiffs does not support their argument because even assuming, *arguendo,* that Plaintiffs were bound to the Bulk Sale Consent Agreement *subsequent to* the HMA (which they were not), the Bulk Sale Consent Agreement does not expressly preclude, prohibit or otherwise vitiate the HMA arbitration provision.

*Goldman Sachs & Co. v. Golden Empire Schools Financing Authority*, 922 F. Supp. 2d 435 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014), relied upon by Plaintiffs concerned a case about whether parties – an issuer and underwriter of auction rate securities – were bound to arbitrate pursuant to FINRA Rule § 12200, or whether the terms of their broker-dealer agreement, which provided for all actions to be brought in the Southern District of New York, governed. First, unlike the broad *mandatory* arbitration agreement concerning any and all disputes found in the HMA and as referenced in the Bulk Sale Consent Agreement, FINRA Rule § 12200 is a *permissive* arbitration rule whereby a

FINRA member is bound to arbitrate a dispute only if requested to do so by a customer. Second, FINRA Rule § 12200 it is not a prior – or even concurrent – agreement among the same parties; and third, the merger clause at issue in *Golden Empire*, which the Second Circuit found to bar arbitration under a related underwriting agreement, concerned a set of agreements *among identical parties*. By contrast, the facts before this Court show that several parties that did not sign the Bulk Sale Consent Agreement are parties to the HMA, such as Hotel TOC, Inc., Owner's Meeting and Newland International Properties, Corp.; this fact, omitted by Plaintiffs undercuts their argument that the Bulk Sale Consent Agreement was meant to modify or otherwise limit the HMA through the merger clause.

Additionally, Plaintiffs' reliance on *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC* is misplaced. There, the Second Circuit evaluated a merger clause in an agreement that "constitute[d] the entire understanding and agreement between the parties," and where the agreement to arbitrate was contained in an engagement agreement that "also specifically contemplated that the parties would enter into a subsequent, more formal agreement setting forth 'the terms and conditions [in the Engagement Agreement] as well as those customarily contained in agreements of such character.'" 645 F.3d at 523. By contrast, the merger clause in the Bulk Sale Consent Agreement is qualified, expressly limited to "the matters set forth herein" and seeks to merge any prior agreements "among the Parties."

The merger clause in the Bulk Sale Consent Agreement does not and cannot include the HMA because the HMA is itself an agreement among several parties **not** involved in the Bulk Sale Consent Agreement. Ex. 2, § 12 (emphasis added). Furthermore, Plaintiff's strained reliance on *Applied Energetics* further fails because the HMA, unlike the engagement letter in *Applied Energetics*, is not a preliminary agreement and does not contemplate a later agreement necessary to formalize it: To the contrary, the HMA is part and parcel of a host of inter-related Hotel Agreements, all of which were expressly incorporated by reference in the Bulk Sale Consent Agreement and attached thereto s exhibits.

Furthermore *Bank Julius Baer & Co. v. Waxfield Ltd.* is a case Plaintiffs noted as having been cited in *Golden Empire* (Mot. at 16) but which is conspicuously avoided by Plaintiffs. In that case, the

22

Second Circuit addresses an agreement containing a forum selection clause but which makes no mention of arbitration as set forth in related agreements. In *Bank Julius Baer*, the Second Circuit held that it could not "say that the . . . [c]lause, which does not even mention arbitration, either 'specifically precludes' arbitration or contains a 'positive assurance' that this dispute is not governed by the arbitration agreement." 424 F.3d 278, 284 (2d Cir. 2005).

Moreover, the merger clause in *Bank Julius*, similar to the merger clause in the Bulk Sale Consent Agreement, was qualified. *Id.* Likewise, as was the case with the agreement in *Bank Julius*, the Bulk Sale Consent Agreement makes no mention of arbitration. In fact, the Bulk Sale Consent Agreement elsewhere expressly subjects Ithaca I and Ithaca II to the very HMA which contains an agreement to arbitrate. Plaintiffs cannot with a straight face argue that these facts constitute positive assurance against arbitration or specific preclusion thereof.

Plaintiffs' argument that the HMA has somehow been restated and/or "subsumed" into the Bulk Sale Consent Agreement is baseless. The face of the Bulk Sale Consent Agreement establishes that Ithaca I and Ithaca II agree to be bound to the HMA. *See supra* at 14-5; Ex. 2, §§ 3(A), (D). There is no indication – express or implied – that the Bulk Sale Consent Agreement modified or "subsumed" the HMA or any other Hotel Agreement identified in the Bulk Sale Consent Agreement. *First*, the two agreements concern discrete and distinct subject matters: the HMA concerns Defendants' management of the Hotel and their rights thereunder; in contrast, the Bulk Sale Consent Agreement while expressly incorporating by reference the HMA, concerns the terms and conditions pursuant to which Plaintiffs Ithaca I and Ithaca II were obtaining Defendants' consent to purchase Hotel Units, which Plaintiffs otherwise would have been unable to purchase. *Second*, the HMA and Bulk Sale Consent Agreement are by and among distinct parties – Hotel TOC Inc., Newland International Properties Corp. and Owners Meeting of P.H. TOC are also parties to the HMA, but not parties to the Bulk Sale Consent Agreement.[13] *Third*, accepting Plaintiffs' arguments would undermine, if not vitiate, the entire scheme on which the Defendants' management rights of the Hotel are founded,

---

[13] The HMA was amended and restated on or about April 13, 2011 and further amended on July 3, 2013. The form of such amendment were a writing, signed by all parties to the agreement. The Bulk Sale Consent Agreement falls far short of amending any terms of the HMA.

despite that all relevant Hotel-related agreements are expressly referenced and incorporated by the Bulk Sale Consent Agreement and include identical ICC dispute resolution provisions.

Finally, Plaintiffs advance another meaningless argument: that the HMA, "to the extent it is incorporated into the Bulk Sale [Consent] Agreement, is *derivative of*, not superior to, the rights of Plaintiffs and [Defendants] under the Bulk Sale [Consent] Agreement." Mot. at 17. This argument is nonsensical. The Bulk Sale Consent Agreement is clear on its face: the HMA, as a "Hotel Agreement," is *explicitly* incorporated by reference in the Bulk Sale Consent Agreement and the parties expressly bind themselves thereto. Plaintiffs' derivative/superior argument is an improper invitation to the Court to attempt to categorize Defendants' arbitration claims into those that are governed by the HMA and those that are governed by the Bulk Sale Consent Agreement, an invitation which this Court must decline. Even assuming this Court were not to dismiss for lack of subject matter jurisdiction, or for failure to assert a cognizable claim under which relief may be granted under the Panama Convention, once this Court finds that the Plaintiffs are bound to the HMA, all other questions of arbitrability must be resolved by the ICC, as the HMA evidences a clear intent to refer all "questions of arbitrability" to the ICC. *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124-25 (2d Cir. 2003) (vacating district court's order enjoining arbitration "because the parties' arbitration agreement is broadly worded to require the submission of 'all disputes' concerning the [contract] to arbitration, and because it provides for arbitration to be conducted under the rules of the ICC, which assign the arbitrator initial responsibility to determine issues of arbitrability"); *Gilman v. Waters*, 61 F. Supp. 3d 794, 801 (S.D. Ind. 2014) (finding incorporation of AAA arbitration rules into arbitration agreement clear and unmistakable delegation of authority, relying on Second Circuit precedent); *Paine Webber Inc. v. Bybyk*, 81 F.3d 1193, 1202 (2d Cir. 1996).

## B.  Plaintiffs' Delay is Fatal And Public Interests Favor Arbitration

Finally, Plaintiffs delayed from December 4, 2017 until January 18, 2018 to serve and file the instant action. Plaintiffs' delay should bar Plaintiff's request for a preliminary injunction as such delay undermines any assertion of irreparable immediate harm. *See Tom Doherty Assocs., Inc.,* 60 F.3d at 39

("A district court should generally consider delay in assessing irreparable harm"); *Local No. 503 of Graphic Commc'ns Conference of Int'l Bhd. Of Teamsters v. Cascades Containerboard Packading-Lancaster,* No. 17-CV-6605 (MAT), 2017 WL 6497624, at *3 (W.D.N.Y. Dec. 19, 2017) (finding, *in dicta*, that an unexplained, two-month delay in seeking a preliminary injunction made it "unlikely that, even if the Court were to reach this issue, it could conclude that plaintiff had established its likelihood of suffering irreparable harm")

As noted by the Second Circuit, "it is difficult to overstate the strong federal policy in favor of arbitration." *Arcinaga v. Gen. Motors Corp.,* 460 F.3d 231, 234 (2d Cir. 2006). That policy is likewise reflected in the Panama Convention, which was ratified by the United States. The Panama Convention does not empower this Court to enjoin an international arbitration. Those important public policies strongly disfavor Plaintiffs' forum shopping here. In addition, this Court should consider principles of International Comity applicable here. If Plaintiffs – all foreigners with substantial ties to Panama and, in the case of Ithaca I and Ithaca II, no ties to the United States – had brought these claims in Panama, they would have been referred to arbitration immediately, as Panama recognizes and enforces *competence-competence* pursuant to its Constitution. *See* Political Constitution of the Republic of Panama, Article 202. For the foregoing reasons, this action should be dismissed with prejudice. In the event the Court reaches the merits of Plaintiffs' Motion, it should be denied in its entirety.

Dated: New York, New York
     February 20, 2018

                                        Respectfully submitted,

                                        PRYOR CASHMAN LLP


                                        By:   /s/ Perry M. Amsellem
                                            Todd E. Soloway
                                            Perry M. Amsellem
                                            Bryan T. Mohler
                                            Marion R. Harris
                                         7 Times Square
                                         New York, New York 10036
                                         (212) 421-4100

                                         *Attorneys for Defendants*