UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ITHACA CAPITAL INVESTMENTS I, S.A., ITHACA
CAPITAL INVESTMENTS II, S.A., and ORESTES          Civil Action No. 1:18-cv-390
FINTIKLIS,

                              Plaintiffs,

    - against -

TRUMP PANAMA HOTEL MANAGEMENT LLC,
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT, LLC,

                              Defendants.
-------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS COUNTERCLAIMS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

ALLEGATIONS RELEVANT TO THIS MOTION ............................................................. 2

    A. The Parties ................................................................................................................. 2

    B. The Lundgren Settlement .......................................................................................... 3

    C. The Bulk Sale Agreement and Ithaca's Purchase of Hotel Units ............................. 3

    D. The October Meeting, ICC Arbitration, Notice of Default, and Termination ............. 5

ARGUMENT ........................................................................................................................... 6

  I. THE COURT SHOULD DISMISS FINTIKLIS AND THE ALTER EGO
     THEORY ....................................................................................................................... 6

    A. Panama Law Governs and Warrants Dismissal ......................................................... 6

    B. Trump Fails to Sufficiently Plead Alter Ego Liability under Panama Law ................. 7

    C. If New York Law Applies (which it does not), Dismissal is still Warranted ............. 8

       1. Alter ego liability under New York law ............................................................. 8

       2. Trump fails to adequately plead "dominion" and "control" ................................. 9

       3. Trump fails to adequately plead a "fraud" or actionable "wrong" ...................... 10

  II. THE TORTIOUS INTERFERENCE CLAIMS MUST BE DISMISSED ..................... 11

    A. The Relevant Tortious Interference Standard ............................................................ 12

    B. Trump Fails to Adequately Plead Both Claims ......................................................... 12

       1. The claims fail because Trump fails to plead lack of justification ...................... 12

       2. Ithaca II cannot be liable for tortious interference of the HMA .......................... 14

       3. Trump fails to allege "actual knowledge" of the Lundgren Settlement ............... 15

  III. THE FRAUD CLAIMS MUST BE DISMISSED ......................................................... 16

    A. The Relevant Fraud Standards .................................................................................. 17

    B. The Fraudulent Inducement Claim Should Be Dismissed ......................................... 18

    C. The Fraud and Fraudulent Concealment Claims Should be Dismissed ..................... 19

       1. These fraud claims are duplicative of the breach of contract claim .................... 20

       2. Trump fails to adequately plead reliance .......................................................... 24

CONCLUSION ....................................................................................................................... 25

CERTIFICATE OF SERVICE .............................................................................................. 26

45060071

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Aekyung Co. v. Intra & Co.*,
   No. 99 Civ. 11773(LMM), 2008 WL 4974424 (S.D.N.Y. Nov. 19, 2008) ...........................11

*Almeciga v. Center for Investigative Reporting, Inc.*,
   185 F. Supp. 3d 401 (S.D.N.Y. 2016)...................................................................................20

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
   126 F. Supp. 3d 388 (S.D.N.Y. 2015)...................................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................11, 15, 24

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*,
   259 F. Supp. 3d 16 (S.D.N.Y. 2017)....................................................................................14

*Blue Whale Corp. v. Grand China Shipping Dev. Co. Ltd.*,
   722 F.3d 488 (2d Cir. 2013)...................................................................................................7

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
   98 F.3d 13 (2d Cir. 1996)...................................................................................9, 17, 18, 19

*Can't Stop Prods., Inc. v. Sixuvus, Ltd.*,
   295 F. Supp. 3d 381 (S.D.N.Y. 2018)..................................................................................12

*Clement v. Farmington Cas. Co., No. 13-cv-1026 (NSR)*,
   No. 13-cv-1026 (NSR), 2015 WL 6971565 (S.D.N.Y. Nov. 10, 2015) ................................23

*Cronos Group Ltd. v. XComIP*,
   156 A.D. 3d 54 (1st Dep't 2017) ...............................................................................20, 21, 22

*Davidowitz v. Patridge*,
   No. 08 Civ. 6962 NRB, 2010 WL 5186803 (S.DN.Y. Dec. 7, 2010) ....................................17

*DeJesus v. Sears, Roebuck & Co.*,
   87 F.3d 65 (2d Cir. 1996), *cert. denied,* 519 U.S. 1007 (1996)..............................................10

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
   387 F. Supp. 2d 265 (S.D.N.Y. 2004)....................................................................................9

*ESI, Inc. v. Coastal Power Prod. Co.*,
   995 F. Supp. 419 (S.D.N.Y. 1998) .......................................................................................15

*Ferring B.V. v. Allergan, Inc.*,
   4 F. Supp. 3d 612 (S.D.N.Y. 2014) ................................................................................15, 16

*Freeman v. Complex Computing Co.*,
    119 F.3d 1044 (2d Cir. 1997)...................................................................................10, 11

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    58 F. Supp. 2d 228 (S.D.N.Y. 1999)..................................................................................16

*Guard-Life Corp. v. S. Parker Mfg., Corp.*,
    406 N.E.2d 445 (N.Y. 1980)..............................................................................................12

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996)..................................................................................................18

*Hirsch v. Arthur Anderson & Co.*,
    72 F.3d 1085 (2d Cir. 1995)................................................................................................24

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
    679 F. Supp. 2d 395 (S.D.N.Y. 2009)..................................................................12, 13, 14

*In re Adelphia Comm'cns Corp.*,
    322 B.R. 509 (Bankr. S.D.N.Y. 2005)..............................................................................9, 10

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003)...........................................................................10, 11

*Jonas v. Estate of Leven*,
    116 F. Supp. 3d 314 (S.D.N.Y. 2015)...........................................................................6, 7, 8

*Khodir v. Sayyed*,
    323 F.R.D. 193 (S.D.N.Y. 2017) .......................................................................................24

*Kriegel v. Donelli*,
    No. 11 Civ. 9160 (ER), 2014 WL 2936000 (S.D.N.Y. June 30, 2014)..................................18

*Lehman v. Garfinkle*,
    08 Civ. 9385(SHS) (DF), 2009 U.S. Dist. LEXIS 84686 (S.D.N.Y. Aug. 24,
    2009) ...................................................................................................................................17

*Lucente v. Int'l Bus. Machs. Corp.*,
    310 F.3d 243 (2d Cir. 2002)...............................................................................................22

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
    244 F.R.D. 204 (S.D.N.Y. 2007) .......................................................................................17

*Martin Hilti Family Trust v. Knoedler Gallery, LLC*,
    137 F. Supp. 3d 430 (S.D.N.Y. 2015).................................................................................17

*Medtech Prod. v. Ranir, LLC*,
    596 F. Supp. 2d 778 (S.D.N.Y. 2008).................................................................................15

45060071

*Mehta v. Wells Fargo Bank, N.A.*,
   No. 10CV944 JLS, 2011 WL 1157861 (S.D. Cal. Mar. 29, 2011)..........................................25

*Minnie Rose LLC v. Yu*,
   169 F. Supp. 3d 504 (S.D.N.Y. 2016)........................................................................17, 22, 23

*Mohegan Lake Motors, Inc. v. Maoli*,
   No. 16-CV-06717 (NSR), 2017 WL 6335905 (S.D.N.Y. Dec. 7, 2017).................................21

*Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*,
   No. 05 Civ. 10773 (RMB), 2007 WL 1489806 (S.D.N.Y. May 21, 2017) ................6, 8, 9, 25

*Mosaic Caribe, Ltd. v. AllSettled Grp., Inc.*,
   117 A.D.3d 421 (1st Dep't 2014) ...........................................................................................23

*Nat'l Union Fire Ins. Co. of Pitts. v. Monarch Payroll, Inc.*,
   15-cv-3642, 2016 WL 634083 (S.D.N.Y. Feb. 17, 2016) ......................................................22

*Panam Mgmt Group, Inc. v. Pena*,
   No. 08-CV-2258(JFB)(ARL), 2011 WL 3423338 (E.D.N.Y. Aug. 4, 2011).......................7, 8

*Presnall v. Analogic Corp.*,
   17-cv-6662 (PKC), 2018 WL 4473337 (S.D.N.Y. Sept. 18, 2018)...................................19, 20

*Print & More Assocs., Inc. v. Stenzler*,
   40 Misc. 3d 1212(A) (N.Y. Sup. Ct. 2013)...............................................................................11

*Raji v. Societe Generale Ams. Secs., LLC*,
   15 Civ. 1144 (AT), 2016 WL 354033 (S.D.N.Y. Jan. 31, 2016)......................................12, 13

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).....................................................................................................19

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007).......................................................................................................4

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) ...............................................................................................11

*TVT Records v. Island Def Jam Music Grp.*,
   412 F.3d 82 (2d Cir. 2005).......................................................................................................20

*Vorcom Internet Servs., Inc. v. L & H Eng'g & Designs LLC*,
   No. 12 CV 2049(VB), 2013 WL 335717 (S.D.N.Y. Jan. 9, 2013)..........................................18

*Waite v. Schoenbach*,
   No. 10 Civ. 3439, 2010 WL 4456955 (S.D.N.Y. Oct. 29, 2010) ............................................10

iv

*Wang v. Feinberg*,
    17 Civ. 1452 (DAB), 2018 WL 1089293 (S.D.N.Y. Feb. 6, 2018) ........................................19

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
    8 N.Y. 3d 422 (N.Y. 2007) ........................................................................................................13

**Rules**

Fed. R. Civ. P. 8 ..................................................................................................................................11

Fed. R. CIv. P. 9(b) ..................................................................................................................... passim

v

Plaintiffs Ithaca Capital Investments I S.A. ("Ithaca I"), Ithaca Capital Investments II S.A. ("Ithaca II," with Ithaca I, "Ithaca"), and Orestes Fintiklis ("Fintiklis," collectively with Ithaca, "Plaintiffs"), submit this memorandum of law in support of their motion for an order dismissing five (5) of the counterclaims and the theory of alter ego liability ("alter ego liability") pled in the Answer with Counterclaims [ECF No. 38] (the "Answer" or "Counterclaim", as appropriate)[1] filed by Defendants Trump Panama Hotel Management LLC and Trump International Hotels Management, LLC (collectively, "Trump" or "Defendants").

## PRELIMINARY STATEMENT

This dispute started in Panama when non-party Hotel TOC, Inc. ("Hotel TOC"), a Panamanian entity, commenced an ICC Arbitration against Trump.  Through the Counterclaim, Trump asserts claims in this forum against Ithaca, two Panamanian entities that own units in the former Trump International Hotel & Tower Panama (the "Hotel"), and Fintiklis, Ithaca's president.  Due to Ithaca's ownership of units in the Hotel, it is a "beneficiary" – a Panamanian term akin to a corporate shareholder in US law – of Hotel TOC Foundation, which is a Panamanian entity that controls Hotel TOC.  In effect, the beneficiaries of Hotel TOC Foundation collectively make decisions for the Hotel, and Hotel TOC executes them for Hotel TOC Foundation.  Ithaca owns a majority of the units in the Hotel.  Due to these relationships, Trump contends that Ithaca controls Hotel TOC, that Fintiklis controls Ithaca, and thus Fintiklis controls Hotel TOC.  Distilled to its core, Trump's theory is that Fintiklis masterminded a grand fraudulent conspiracy and used these various structures to terminate Trump as the Hotel's operator.

If this convoluted background is not indication enough, Trump's "grand" theory and inventive claims are as far-fetched as they are insufficiently pled.  However, Trump's actual

---

[1] The Counterclaim incorporates paragraphs 1 through 94 of Trump's Answer. [Counterclaim, p. 16].

allegations are (just) enough to plead a claim for breach of contract regarding the Agreement in Connection with Bulk Sale ("BSA" or "Bulk Sale Agreement").[2]  And, while Trump attempts to use "fraud" labels to spin a facially compelling tale, this effort cannot turn this breach of contract case into the outlandish conspiracy pled here.  Trump's claims for fraud (Counts I-III), tortious interference (Counts IV and VI), and alter ego liability should be dismissed.

*First*, Trump's alter ego allegations are conclusory and fail to satisfy the heavy burden required under Panama (or New York) law.  Because Trump's allegations amount to nothing more than "Fintiklis controlled Ithaca," the alter ego theory (and Fintiklis) must be dismissed.

*Second*, Trump's tortious interference claims fail because Trump did not plead lack of justification.  Worse yet, Trump affirmatively pled allegations that establish Plaintiffs were justified to interfere with the Hotel Management Agreement ("HMA") and the Lundgren Settlement Agreement ("Lundgren Settlement").  Moreover, Ithaca II is a party to the HMA, and Trump failed to allege that Plaintiffs had "actual knowledge" of the Lundgren Settlement, both of which are fatal to Trump's respective claims.  *Finally*, Trump's fraud claims are nothing more than re-worded contract claims sprinkled with fraud labels (*i.e.*, "fraudulent scheme", "deceive", "fraudulent intent", "concealed", "conspiracy").  The alleged conduct at issue, however, falls squarely within the contours of the purported contractual duties owed under the BSA.  Thus, regardless of how egregious Trump subjectively believed the alleged conduct was, it cannot support fraud claims.  Separately, Trump fails to satisfy the specificity requirement of Rule 9(b).

## ALLEGATIONS RELEVANT TO THIS MOTION[3]

### A.     The Parties

Fintiklis is the president of Ithaca, which are Panamanian companies. [Counterclaim at ¶¶

---

[2] A copy of the BSA is attached as Exhibit A to the Declaration of Darryl Graham ("Graham Decl.").
[3] The following allegations (which Plaintiffs' dispute) are taken from Trump's Answer and thus must be accepted as true for purposes of this motion.

45060071

19-21]. Fintiklis acted on behalf of Ithaca. *Id.* at ¶¶ 37, 42, 114, 121. Ithaca I owns the majority of the Hotel's units (202 of 369) and Ithaca II owns the Hotel's 13 Amenities Units. *Id.* at ¶ 7; Answer at ¶¶ 5, 22. Ithaca purchased the units with "tens of millions of dollars", including financing from Canal Bank. *Id.* at ¶¶ 7, 16, 45. Non-parties Gary Lundgren and/or Zacgary Lundgren purportedly own 50 Hotel units. *Id.* at ¶¶ 4, 9.[4] In 2015, Gary Lundgren and unnamed Trump "Affiliates" litigated an ICC arbitration relating to Trump's termination as manager of the condominium portion of the Hotel. *Id.* at ¶¶ 4, 29. The Lundgren Settlement resolved this dispute in February 2016, which was before Ithaca's first meeting at Trump's office in October 2016. *Id.* at ¶¶ 5, 6, 30, 36.

### B. The Lundgren Settlement

By its terms, Gary Lundgren agreed not to "take any action … which could reasonably be expected to interfere or compete with the … rights and responsibilities of [Trump]." *Id.* at ¶ 5. Trump alleges it is a third-party beneficiary to the Lundgren Settlement. *Id.* at ¶ 150.

### C. The Bulk Sale Agreement and Ithaca's Purchase of Hotel Units

In mid-2016, Newland, the Hotel's insolvent developer, offered to sell 215 of the Hotel's units. *Id.* at ¶ 35. But, bulk purchases of units required Trump's consent. *Id.* In October 2016, Ithaca allegedly met Newland at Trump's New York office regarding "a potential purchase of those Units." *Id.* at ¶ 36. No Trump representative is alleged to have attended this meeting and, other than "Fintiklis," nobody is identified by name. While no representations are alleged to have been made during this meeting, Fintiklis is alleged to have later sent an e-mail to unidentified "other meeting attendees" (***not*** Trump) and said that Ithaca "look[ed] forward to closing the transaction and working together to turning around this wonderful property." *Id.*

---

[4] As owners of hotel units, Ithaca and Lundgren were "beneficiaries," as discussed in the preliminary statement. Because Trump did not own any units, it was not a "beneficiary."

45060071

Four months later, Ithaca and Trump executed the BSA.  *Id.* at ¶¶ 37, 42.  There are no other allegations of pre-execution representations made regarding the BSA.  Trump confirms it executed the BSA based on the "belie[f] that Fintiklis was an honest businessman."  *Id.* at ¶ 43.

By executing the BSA, Trump confirmed receiving satisfactory "evidence" that Ithaca had "sufficient financial resources" to fulfil its obligations regarding the Hotel Units and Hotel Amenities Units.  *See* Exhibit A at ¶¶ 2(D), 2(E).[5]  Also, in Section 3(D) of the BSA, Ithaca agreed to refrain from taking "any action" that would "interfere with or undermine the rights" of Trump with respect to Trump's management of the Hotel.  [Counterclaim at ¶ 40].  In Section 3(F), Ithaca agreed not to "seek or accept appointment or election to the position of manager or administrator (or other similar leadership role) of the P.H. TOC."  *Id.* at ¶ 41.  As this latter section demonstrates, the prohibition is limited to P.H. TOC, ***not Hotel TOC***.

More than six months later, Fintiklis allegedly met with certain "high-ranking members" of the Defendants and with Jeff Wagoner, EVP of Hotel Operations for ***non-party*** Trump Hotel, in Panama to discuss marketing strategies.  *Id.* at ¶ 47.  No representations are alleged to have been made at this meeting.  *Id.*  Two months later, on October 3, 2017, Fintiklis allegedly met with "five [unnamed] high-ranking members of Defendants, as well as the [unnamed individuals comprising the] entire Hotel Executive Committee, in Panama."  *Id.* at ¶ 48.  During this meeting, they allegedly discussed ways to mitigate the Hotel's poor financial performance.  *Id.*  No specific representations are alleged to have been made at this meeting.

Later that day, Ithaca sent an e-mail to the Hotel's unit owners to schedule a meeting on October 14, 2017 to discuss their "thoughts and ideas" for the Hotel.  *Id.* at ¶ 49.  Trump did not receive the e-mail but learned of it from "other sources" and then allegedly "contacted Fintiklis

---

[5] The BSA is also attached to the Counterclaim at Exhibit 4 (ECF No. 38-1 at 146-154).  *See Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007) (Documents attached to the complaint are deemed part of it and may be considered).

directly." *Id.* at ¶ 50; Answer at ¶ 28.

In this alleged communication, Trump "reminded" Fintiklis of Ithaca's contractual obligations in Sections 3(D) and 3(F) of the BSA and requested to have Trump's General Manager attend the meeting. *Id.* at ¶ 51. Ithaca acquiesced to this request, acknowledged its contractual obligations, and confirmed the future meeting's stated purpose. *Id.* at ¶ 52. Trump did not object to the meeting taking place.[6]

### D.      The October Meeting, ICC Arbitration, Notice of Default, and Termination

At the scheduled meeting, Fintiklis allegedly raised concerns regarding the Hotel's performance and Trump's mismanagement. *Id.* at ¶¶ 54-55. Carlos Abaunza, Trump's representative and General Manager, was present and "agree[d] with everything that [Fintiklis] said." *Id.* at ¶¶ 59-60, 71; Ex. 15 (ECF 38-3 at 393-4). Then, once the meeting shifted to confidential "unit owner only" matters, the non-unit owners, including Trump's General Manager, were excused. *Id.* A sufficient super-majority of the unit owners then voted to change the composition of the Foundation Council and board of Hotel TOC, and designated Fintiklis as the Authorized Representative of Hotel TOC. *Id.* at ¶¶ 66, 71, 74, 75. Later that day, Hotel TOC served Trump with a Notice of Default and commenced the ICC Arbitration against Trump. *Id.*

The Notice of Default set forth various defaults and directed Trump to cure them by November 20, 2017. *Id.* at ¶ 79. Trump responded but failed to cure the defaults. *Id.* at ¶ 82. On November 21, 2017, Hotel TOC served Trump with a Notice of Termination of the HMA, effective in 30 days, which Trump purportedly rejected. *Id.* at ¶ 83-84. On December 22, 2017, Hotel TOC terminated Trump's management of the Hotel. *Id.* at ¶ 83. After refusing to leave

---

[6] Trump contends that the meeting was improper and, in support, cites to Article 11 of the Foundational Charter. *Id.* at ¶¶64-65; Ex. 6 (ECF No. 38-2 at 29). However, the relevant page in this exhibit is ***blank***. But, if it was correctly attached it would show that Ithaca satisfied the relevant criteria, to wit: Ithaca represented more than 35% of the beneficiaries, sent written notice requesting the unit owners' attendance for a "meeting of the beneficiaries" and sent it 14 days before the meeting (*i.e.*, more than 10 but less than 60 days). *Id.* at ¶ 49; Ex. 14 (ECF No. 38-3 at 385).

voluntarily, Hotel TOC had Trump formally evicted with a court order from the Panama Courts in March 2018. *Id.* at ¶ 98.

## ARGUMENT

## I.     THE COURT SHOULD DISMISS FINTIKLIS AND THE ALTER EGO THEORY

Each claim against Fintiklis should be dismissed because Trump has failed to adequately plead alter ego liability.  The Counterclaim lazily lumps all of the alleged actions of Ithaca and Fintiklis together, claims – without any supporting facts – that Fintiklis dominated and controlled Ithaca, and seeks to have Fintiklis held liable as Ithaca's alleged "alter ego." *Id.* at ¶¶ 20-22, 119, 140, 144.[7]  However, conclusory "alter ego" allegations are insufficient to overcome Trump's heavy pleading burden. *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314 (S.D.N.Y. 2015) (Panama law); *Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, No. 05 Civ. 10773 (RMB), 2007 WL 1489806 (S.D.N.Y. May 21, 2017) (New York law).  Trump merely alleges that Fintiklis was involved in his capacity as an authorized representative, officer, and/or director of Ithaca, but the factually devoid allegations fail to plead more than typical corporate conduct. Therefore, Fintiklis and this alter ego theory must be dismissed.

### A.     Panama Law Governs and Warrants Dismissal

Panama law applies to the question of whether Trump adequately pled alter ego liability. Trump instinctively rejects this legal reality in its pre-motion letter by asserting – without legal support – that New York law controls because of the BSA's choice of law provision. [ECF No. 68 at 2].  However, had Trump read *Jonas*, which Plaintiffs cite in their pre-motion letter [ECF No. 62 at 3], Trump would have realized this position is baseless.

---

[7] Conclusory alter ego allegations are present throughout the general allegations and most of the counts, but Trump inexplicably omits them from Count I (fraud), Count VI (Lundgren tortious interference), and Count VII (declaratory judgment).  Trump doesn't explain this internal inconsistency, which is not self-evident in the pleading. Regardless, Fintiklis acted in his corporate / agency capacity in all respects, and Trump fails to adequately plead alter ego liability.  Thus, regardless of these inconsistencies, complete dismissal of Fintiklis is warranted.

45060071

Simply put, with respect to the alter ego claims, courts apply the law of the state (or country) of incorporation "even where the applicable contract contained a differing choice-of-law provision." *Jonas,* 116 F. Supp. 3d at 330 (citing *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132-3 (2d Cir. 1993) (the contractual choice of law provision is "irrelevant" because the "issue is the limited liability of shareholders of a corporation – not [the entity's] obligations under the [contract]."); *see also Blue Whale Corp. v. Grand China Shipping Dev. Co. Ltd.*, 722 F.3d 488, 496 (2d Cir. 2013) (same).   The Bulk Sale Agreement's choice-of-law provision is irrelevant.   Because Ithaca I and Ithaca II are Panamanian entities, Panama law applies.   *Jonas*, 116 F. Supp. 3d at 330 ("Since Barneli was incorporated in the Republic of Panama …, this Court will apply Panama's veil-piercing doctrine to plaintiffs' alter ego allegations.").

## B.      Trump Fails to Sufficiently Plead Alter Ego Liability under Panama Law

As a threshold issue, under Panama law, alter ego liability can only reach shareholders, ***not directors***.   *Jonas*, 116 F. Supp. 3d at 332.   Because Trump only alleges that Fintiklis is the "president and principal" of Ithaca, and not a shareholder, Fintiklis cannot be subject to liability for Ithaca's alleged wrongdoing.   *Id.* (rejecting claims against directors under Panama law).   *See* [Counterclaim at ¶¶ 19-21].

Next, even if Panama law allowed Trump to impose liability on Fintiklis, the allegations still fail.   Indeed, "Panama does not provide for mechanisms to tear the corporate veil, but the Supreme Court of Justice of Panama has recognized that it may occur in exceptional circumstances and on a provisional basis, where corporations have been used with the ***sole*** intention of defrauding third parties or violating the law, thus resulting in a case of abuse of the legal capacity."   *Jonas*, 116 F. Supp. 3d at 331 (cleaned up; emphasis added); *see also Panam Mgmt Group, Inc. v. Pena*, No. 08-CV-2258(JFB)(ARL), 2011 WL 3423338 (E.D.N.Y. Aug. 4, 2011) (same).

The Counterclaim does not come close to establishing "exceptional circumstances" or that Ithaca has been used "with the sole intention of defrauding third parties or violating the law." In fact, Trump does not allege *any* of the hallmark criteria used to plead alter ego liability, such as that Ithaca and Fintiklis intermingled corporate and personal funds, that Ithaca was undercapitalized, that Ithaca failed to observe corporate formalities by way of keeping separate books or otherwise, that Ithaca failed to pay dividends, was insolvent at the time of executing the Bulk Sale Agreement, was having its funds siphoned off by a dominate shareholder (Fintiklis or otherwise), or that Ithaca's other officers and directors were inactive. As in both *Jonas* and *Panam Mgmt Group, Inc.*, these infirmities require dismissal. *See Jonas*, 116 F. Supp. 3d at 331 (finding allegations insufficient to plead alter ego liability where factual allegations of these factors were absent); *Panam Mgmt Group, Inc.*, at 5 (dismissing alter ego claim under Panama law because plaintiff failed to plead that the corporation was solely created to perpetrate fraud or violate the law, failed to plead the individual defendants have not respected the legal entity, or breached the principle of separation of personalities.).[8]

Instead, Trump demonstrates that Ithaca's "sole" purpose was far from improper insofar as Trump pleads that Ithaca was capitalized, purchased real estate, continues to own real estate, and manages its investment in the Hotel. [Counterclaim at ¶¶ 7, 20, 21, 46, 98, 119]. Because Trump fails to satisfy Panama's "high bar," the alter ego theory must be dismissed.

### C.    If New York Law Applies (which it does not), Dismissal is still Warranted

#### 1.    *Alter ego liability under New York law*

"New York courts are reluctant to disregard the corporate entity." *Moneygram Payment*

---

[8] As further evidence of the state of alter ego liability in Panama, Panamanian attorney Edgard Salomon Muñoz Madrid supplied an affidavit outlining Panama law in this context, which confirms that the law set forth in *Jonas* and *Panama Mgmt Group* is current and accurate. A copy of Mr. Muñoz's Affidavit is attached as Exhibit B to the Graham Declaration.

*Sys.*, 2007 WL 1489806, at 7 (citation omitted).  However, upon a sufficient showing of **factual**

allegations, courts will disregard the corporate form where "the owner exercised complete

domination over the corporation with respect to the transaction at issue" **and** "such domination

was used to commit fraud or wrong that injured the party seeking to pierce the veil."  *Id.* (citation

omitted); *EED Holdings v. Palmer Johnson Acquisition Corp.,* 387 F. Supp. 2d 265, 274

(S.D.N.Y. 2004) ("To avoid dismissal, a party seeking application of the doctrine must come

forward with factual allegations as to both elements of the veil-piercing claim").

2.      *Trump fails to adequately plead "dominion" and "control"*

To make this determination, courts to look to certain factors, including the "intermingling

of corporate and personal funds, undercapitalization of the corporation, failure to observe

corporate formalities such as the maintenance of separate books and records, failure to pay

dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant

shareholder, and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc. v.*

*Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996).

As noted above, Trump has not pled any facts that would establish any of these

"dominion" and "control" criteria.  Regardless, the "key allegation … would be dominion and

control for self-serving purposes … to the exclusion of corporate interests …." *In re Adelphia*

*Comm'cns Corp.*, 322 B.R. 509, 523 (Bankr. S.D.N.Y. 2005).  While Trump includes conclusory

allegations that Fintiklis furthered his "personal business" to the exclusion of Ithaca, there are no

facts alleged to support this conclusion. [Counterclaim at ¶¶ 119, 144].  Frankly, Trump's

allegations depict ordinary conduct of an entity's officer or agent who executes contracts, secures

financing, and attends meetings on behalf of the entity.  Nothing in the Counterclaim reveals

extraordinary behavior that could support piercing the corporate veil.  Indeed, "[c]orporations are

inanimate, artificial entities that by necessity act through their officers, directors and agents."

*Adelphia Comm'cns Corp.*, 322 B.R. at 522 (citing *CFTC v. Weintraub*, 471 U.S. 343, 348-9 (1985)). The only substantive allegation that remotely touches on any of those factors actually favors dismissal of the alter ego claims. [Counterclaim at ¶ 45 (Ithaca was properly capitalized insofar as it received "tens of millions of dollars in financing" from Canal Bank)]; *see also* Exhibit A at ¶¶ 2(D), 2(E).

Simply put, Trump's failure to allege ***any*** facts to support these factors or otherwise demonstrate "self-serving purposes" compels dismissal of the alter ego theory against Fintiklis. *See DeJesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir. 1996), *cert. denied,* 519 U.S. 1007 (1996) (dismissing alter-ego claim where complaint was "devoid of *any* specific facts or circumstances supporting" plaintiff's conclusory allegations concerning defendant's domination of its subsidiary) (emphasis in original); *Waite v. Schoenbach*, No. 10 Civ. 3439, 2010 WL 4456955, at *4 (S.D.N.Y. Oct. 29, 2010) (dismissing alter ego claims because "Plaintiff's unsupported assertions that Schoenbach and Uscher, as officers and owners of the Defendant Companies, exercised complete dominion and control over the Defendant Companies and created the network of Defendant Companies to defraud creditors are purely conclusory allegations that cannot suffice to state a claim based on veil-piercing or alter ego liability, even under the liberal notice pleading standard.") (cleaned up).

   *3.*   *Trump fails to adequately plead a "fraud" or actionable "wrong"*

Lastly, the Court should also dismiss this claim because Trump fails to adequately plead the ***necessary*** "fraud" or other "wrong" element. *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) ("the district court erred in the decision to pierce [the defendant's] corporate veil solely on the basis of a finding of domination and control").[9]

---

[9] Trump suggests that pleading "fraud is an alternative basis of imposing personal liability for corporation actions." [ECF No. 68 at 3]. Trump is mistaken. *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426-7

Instead, as demonstrated below, Trump merely alleges a claim for breach of contract, which is insufficient. *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 403 (S.D.N.Y. 2015) (It is well-established that an ordinary "breach of contract, without evidence of fraud or corporate misconduct, is not sufficient to pierce the corporate veil."); *Aekyung Co. v. Intra & Co.*, No. 99 Civ. 11773(LMM), 2008 WL 4974424, at *3 (S.D.N.Y. Nov. 19, 2008) (holding that "dominance of a corporation plus fraud does not lead to piercing the corporate veil unless the corporate form was itself used to effectuate the fraud.").   Indeed, as *Freeman* explained, a simple breach of contract cannot satisfy the "wrong" component because, if it could, then this prong would become meaningless once a plaintiff established domination. 119 F.3d at 1053.  Because Trump fails to plead both necessary elements, the alter ego theory and Fintiklis should be dismissed.[10]

## II.  THE TORTIOUS INTERFERENCE CLAIMS MUST BE DISMISSED

Trump asserts two claims for tortious interference regarding the HMA (Count IV) and the Lundgren Settlement (Count VI).   Fundamentally, both claims relate to Ithaca's alleged interference that purportedly caused Hotel TOC and Lundgren to take actions adverse to Trump. With respect to the HMA, Trump alleges that Ithaca caused Hotel TOC to breach the HMA by issuing a "baseless Notice of Default."   As for the Lundgren Settlement, Trump alleges that Ithaca caused "Lundgren" to vote his hotel unit owners' interest to terminate Trump, which

---

(S.D.N.Y. 2003) confirmed that the test is conjunctive, and merely clarified that the "fraud" element need not satisfy Rule 9(b)'s heightened pleading standard to support an alter ego claim. *Id.*

[10] Trump's pre-motion letter contends that an inadequately pled alter ego claim may survive dismissal if it raises "an issue of fact requiring discovery."   [ECF No. 68 at 2].  Trump is incorrect.  *See Print & More Assocs., Inc. v. Stenzler*, 40 Misc. 3d 1212(A) (N.Y. Sup. Ct. 2013) ("Plaintiff's assertion that discovery may yield evidence substantiating its [alter ego] claims provides no basis for denying the motion [to dismiss].").  The Supreme Court recently held that "Rule 8 … does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions" and a "complaint … deficient under Rule 8 … is not entitled to discovery."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-9, 686 (2009); *see also Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 85-6 (S.D.N.Y. 2010) ("courts routinely consider, and grant, motions to dismiss" complaints that seek to impose alter-ego liability without engaging in discovery).

allegedly constitutes a breach of the Lundgren Settlement.  For the reasons discussed below, both claims should be dismissed.

### A.      The Relevant Tortious Interference Standard

The elements of tortious interference "are: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract, and (5) damages resulting therefrom." *Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp. 3d 381, 403 (S.D.N.Y. 2018).  New York requires plaintiffs to establish that the defendant also used "wrongful means" to induce the third party's breach.  *See Guard-Life Corp. v. S. Parker Mfg., Corp.*, 406 N.E.2d 445, 448-49 (N.Y. 1980) ("'Wrongful means' includes physical violence, fraud, or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.").  A simple breach of contract is insufficient.  *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406-7 (S.D.N.Y. 2009).

### B.      Trump Fails to Adequately Plead Both Claims

#### 1.      *The claims fail because Trump fails to plead lack of justification*

The law recognizes that certain individuals cannot as a matter of law "interfere" with a contract, including the parties to the contract and third parties who have an economic interest to protect in the breaching party's business.  In the latter instance, the interfering party is legally "justified" and a tortious interference claim cannot lie.  Thus, to sustain this tort, the Counterclaim must allege that Ithaca lacked justification.  Trump fails for at least two reasons.

First, as strictly a matter of pleading, Trump does not allege that Ithaca's interference was unjustified, in either the HMA or the Lundgren Settlement claim.  [Counterclaim at ¶¶ 126-135; 147-155].  This alone merits dismissal.  *See, e.g., Raji v. Societe Generale Ams. Secs., LLC*, 15 Civ. 1144 (AT), 2016 WL 354033, at *3 (S.D.N.Y. Jan. 31, 2016) (finding that the proposed

12

second amended complaint "does not state a viable tortious interference of contract claim" because, among other reasons, it "does not set forth allegations demonstrating that the breach was procured without justification.").

Next, even by incorporating all of the Counterclaim's allegations into these claims, the justification element still remains unpled, which Trump effectively concedes in its pre-motion letter. [ECF No. 68 at 2]. Rather than identifying an allegation to prove that this element was pled, Trump pointed to the alleged "baseless[ness]" of Hotel TOC's Notice of Default and, with respect to the Lundgren Settlement, to the agreement itself (not an allegation) and its purported lack of delineated justifications for interference. *Id.* Putting aside the *Raji* problem that these "allegations" don't cure, they also relate to the question of whether or not Hotel TOC and Lundgren breached their respective agreements with Trump (a different element), not whether *Ithaca's* conduct in allegedly procuring those breaches was unjustified. This distinction and Trump's failure to plead the justification element warrants dismissal.

Worse yet, Trump pleads allegations that affirmatively establish that Ithaca's alleged interference ***was*** legally justified. [Counterclaims at ¶¶ 9, 20-22, 53]. New York recognizes the "economic interest defense" in this context. *See White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y. 3d 422, 426 (N.Y. 2007) (explaining that a third-party may lawfully interfere with a contract to "protect its own legal or financial stake in the breaching party's business" and "where defendants were significant stockholders in the breaching party's business.").[11] Here, Hotel TOC (through the relevant corporate governance structure) and Lundgren vote or effectuate the votes of hotel unit owners to conduct the business of the Hotel and Hotel TOC. In turn, Ithaca is an investor and the majority owner of the Hotel's units and thus Ithaca – who

---

[11] Notably, because the pleadings demonstrate Ithaca's economic justification, merely alleging justification, without also adequately alleging that Ithaca "acted maliciously, fraudulently, or illegally" is insufficient. *IMG Fragrance Brands, LLC*, 679 F. Supp. 2d at 460.

13

consequently controls the majority of Hotel TOC – has an economic interest in protecting its legal stake in the business of the Hotel, Hotel TOC, and the individual hotel units.   Due to Ithaca's own financial stake in this collective business, Ithaca's alleged interference was economically justified.  *IMG Fragrance Brands, LLC*, 679 F. Supp. 2d 395 (dismissing tortious interference claim as justified); *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16 (S.D.N.Y. 2017) (same).

The dismissals in those two cases compel dismissal here.  In *IMG Fragrance Brands*, a combination of parent and managerial entities induced their controlled subsidiaries to breach contractual agreements with third parties. 679 F. Supp. 2d 395, 400-1, 405.  *IMG Fragrance Brands* dismissed the tortious interference claims because the defendants "ha[d] an economic interest in [subsidiaries] IMG Holdings and IMG Brands." *Id.*  Likewise, in *Benihana of Tokyo*, an investment bank owning Benihana, Inc. ("BI") allegedly interfered with BI's contract with Benihana of Tokyo. 259 F. Supp. 3d at 19-20.  Nevertheless, *Benihana of Tokyo* dismissed the tortious interference claim because the bank was "within the ambit of the economic interest defense" when it caused BI to breach its agreements with the third party.  *Id.* at 30-31; *see also id.* at 32 (encouragement of a breach was insufficient to establish that the bank "acted maliciously, fraudulently, or illegally" and this defense extends to a "managerial" relationship).

These claims, even if assumed true and well-pled, demonstrate that Ithaca was justified in interfering with the HMA and Lundgren Settlement.  As such, both should be dismissed.

### 2.    *Ithaca II cannot be liable for tortious interference of the HMA*

"Owner of the Amenities Unit" is a party to the HMA.  [Counterclaim at Ex. 1 (ECF No. 38-1 at pp. 6, 101)].  Ithaca II is the successor to the "Owner of the Amenities Unit."  [Answer at ¶ 4; Ex. 4 (ECF No. 38-1 at p. 149, ¶ 3(A))].  Specifically, the BSA states that, "[b]y virtue of its purchase of the Hotel Amenities Unit, Ithaca II shall be bound by the terms of the [HMA] as

14

successor to the Hotel Amenities Units Owners." *Id.*   Thus, Ithaca II is a party to the HMA, which is fatal.  *See ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 433 (S.D.N.Y. 1998) (dismissing tortious interference claim against successor to a party to the contract as "*not* a third party unrelated to the contract").  Count IV should be dismissed, *with prejudice*, as to Ithaca II.

### 3.   *Trump fails to allege "actual knowledge" of the Lundgren Settlement*

The Counterclaim fails to adequately plead that Ithaca had "actual knowledge" of the Lundgren Settlement on or before October 14, 2017, when Lundgren purportedly breached it. [Counterclaim at ¶ 153].   Instead, Trump generally pleads that Ithaca was aware of the "Lundgren Proceeding" – ***not*** the Lundgren Settlement – when Ithaca attended a meeting at Trumps' New York Offices in October 2016.  *Id.* at ¶ 6.   Then, without any explanation as to how or when, Trump alleges that Ithaca is "now … fully aware of the covenants" of the Lundgren Settlement. *Id.* at ¶¶ 33, 151.  Presumably, this allegation is intended to establish that Plaintiffs had knowledge of the Lundgren Settlement as of October 2017.  But, the Counterclaim is devoid of any additional factual allegations regarding how Plaintiffs actually gained "actual knowledge" of the Lundgren Settlement and its relevant prohibitions.  *Contra Iqbal,* 556 U.S. at 678 (A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Under New York law, cursory and general allegations of knowledge are insufficient.  *See Medtech Prod. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) (recognizing that being "aware" of a contract is insufficient to plead actual knowledge).  For example, in *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 626 (S.D.N.Y. 2014), the Court dismissed the tortious interference claim for lacking "any allegations evidencing … 'actual knowledge'" of the agreement, and only "the bare assertion that putative 'due diligence' and inspection of

15

45060071

documents support[] the conclusion that [defendant] 'knew'" of the relevant agreement. *Id.*
*Ferring* further explained that constructive knowledge is insufficient, and "actual" knowledge
must be pled. *Id.*; *see also Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228,
267 n.21 (S.D.N.Y. 1999) (dismissing tortious interference claim because "vague assertions" of
indirect and inferred knowledge is insufficient without "any facts" indicating that the Brokers
knew what the contract required, "let alone any language in those agreements" that required
certain conduct).

Trump neither alleges that it nor Lundgren provided Ithaca with the Lundgren Settlement,
either during Ithaca's due diligence or otherwise; the BSA does not reference the Lundgren
Settlement; and the Lundgren Settlement stemmed from a "confidential" arbitration proceeding,
which further undermines Trump's general allegation that Ithaca (a non-party to the Lundgren
Proceeding) had actual knowledge of the resulting settlement. [Counterclaim at Ex. 9 (ECF No.
38-2, p. 173) (Lundgren Proceeding's Statement of Claim indicates that it is a "confidential
proceeding")].  On balance, Trump's conclusory allegations of actual knowledge are insufficient
in light of these factors and the absence of any specific allegations of *how* Ithaca acquired actual
knowledge of the Lundgren Settlement.   For this independent reason, Count VI should be
dismissed.

## III.   THE FRAUD CLAIMS MUST BE DISMISSED

Trump's allegations are riddled with fraud-type language, and argue that Plaintiffs were
deceptive, induced conduct, and engaged in a conspiratorial "scheme designed to usurp control"
from Trump.  However, once one peels this language away, Trump's alleged fraud conduct *is* the
conduct that it alleges breached the parties' contract.   Because the duty breached and the

45060071

purported harm are identical, the fraud claims must dismissed as duplicative.[12]   In addition, Trump fails to satisfy Rule 9(b) for, among other reasons, inadequately alleging actionable representations and reliance.

### A.      The Relevant Fraud Standards

Fraud claims require a "(1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance." *Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 482 (S.D.N.Y. 2015).  The elements for fraud and fraudulent inducement are identical, but the inducement claim is temporally distinct in that it relates to a material misrepresentation or omission that induces "the party to sign the contract." *Davidowitz v. Patridge*, No. 08 Civ. 6962 NRB, 2010 WL 5186803, at *7 (S.DN.Y. Dec. 7, 2010).  A fraudulent concealment claim requires the additional element of the duty to disclose material information and failure to do so. *See Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.,* 244 F.R.D. 204, 213 (S.D.N.Y. 2007).

New York law also instructs that "no fraud claim is cognizable if the facts underlying the fraud relate to the breach of contract." *See Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 519 (S.D.N.Y. 2016) (citation omitted)); *see also Bridgestone*, 98 F.3d at 20 (where a fraud-based claim stems from an alleged breach of contract claim, it must be "sufficiently distinct from [a] breach of contract claim" to survive dismissal).  As *Bridgestone* explained, the fraud claim may only proceed in tandem with a contract claim where the fraud claim will "(i) demonstrate a legal duty separate from the duty to perform under the contract"; (ii) "demonstrate a fraudulent

---

[12]  Although Trump does not bring a claim for conspiracy – and merely sprinkles the term throughout the Counterclaim – no such cause of action exists under New York law. *See Lehman v. Garfinkle,* 08 Civ. 9385(SHS) (DF), 2009 U.S. Dist. LEXIS 84686, at *24–25 (S.D.N.Y. Aug. 24, 2009) (rejecting claim of conspiracy to breach contract because "New York law does not recognize such a theory of liability") (citation omitted).

misrepresentation collateral or extraneous to the contract"; or (iii) "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* (citations omitted).

### B.      The Fraudulent Inducement Claim Should Be Dismissed

Trump alleges that Ithaca misrepresented that it would take "no action" adverse to Trump, which purportedly induced Trump to enter into the BSA. [Counterclaim at ¶¶ 36-42, 109-116]. However, this *is* the duty set forth in the BSA, which is fatal. Further, Trump identifies a single pre-execution statement that vaguely suggests a future intent or aspiration to work together, but nothing else or more specific. *Id.* at ¶¶ 36-42. Thus, even absent the contract issue, the allegations of fraudulent inducement are insufficient as a matter of law.

First, the alleged promise that purportedly induced Trump to enter into the BSA is identical to Ithaca's alleged duty under the BSA. *Compare id.* at ¶¶ 111-112 *with id.* at ¶¶ 140-141. This alone requires dismissal. *See Kriegel v. Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000, at *14 (S.D.N.Y. June 30, 2014) (dismissing fraudulent inducement claim because purported representations were "the *exact* representations made by Defendant [in the contract]") (emphasis in original); *Vorcom Internet Servs., Inc. v. L & H Eng'g & Designs LLC*, No. 12 CV 2049(VB), 2013 WL 335717, at *4 (S.D.N.Y. Jan. 9, 2013) (dismissing because "plaintiff has failed to identify any statements made by LeDonne upon which plaintiff relied in deciding to purchase the vans from L & H, other than LaDonne's assurances that the vehicles would be delivered as promised under the contract.").

This deficiency aside, the purported inducement cannot sustain this claim. To satisfy Rule 9(b), Trump must, among other things, "detail the statements (or omissions) that the plaintiff contends are fraudulent" and "explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2d Cir. 1996). Here, however, the alleged statement – made months before executing the BSA – was that Ithaca "look[ed] forward to

closing the transaction and working together to turning around this wonderful property," *id.* at ¶ 36, which fails to provide those necessary details. *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) ("[T]he complaint does not state with particularity the specific facts in support of plaintiffs' belief that defendants' statements were false when made, and therefore fails the test[ ] of Rule 9(b)."). Also, this alleged statement is one of future expectation, which is not actionable. *See Wang v. Feinberg*, 17 Civ. 1452 (DAB), 2018 WL 1089293, *5 (S.D.N.Y. Feb. 6, 2018) (explaining that vague expressions of hope and future expectations cannot sustain a claim for fraudulent inducement) (citations omitted). Finally, Trump's other alleged but unspecified statements that allegedly induced execution of the BSA are not actionable either. [Counterclaim at ¶¶ 37-42]; *see Presnall v. Analogic Corp.*, 17-cv-6662 (PKC), 2018 WL 4473337, at *6 (S.D.N.Y. Sept. 18, 2018) ("The Complaint does not plausibly allege fraud because it describes only an unexpressed intent not to perform under the Agreement, accompanied by conclusory allegations of … concealed intent."). To the contrary, Trump executed the BSA because it "***believ[ed] that Fintiklis was an honest businessman***[,]" not because of any specific representations. [Counterclaim at ¶ 43 (emphasis added)]. Thus, for each of these reasons, this claim should be dismissed.

### C.      The Fraud and Fraudulent Concealment Claims Should be Dismissed

The gravamen of these complementary fraud claims is that subsequent to entering into the BSA, Ithaca purportedly misrepresented (or made omissions) regarding the scope of the October 14, 2017, misrepresented Ithaca's future intent to comply with the obligations set forth in the BSA, and that Trump was lulled into inaction by relying on these statements. *Id.* at ¶¶ 101-108; 118-125. However, as pled, the alleged fraud is indistinguishable from the contract claim, which is impermissible. The rule calls for dismissal unless Trump can satisfy one of the three *Bridgestone* exceptions. 98 F.3d at 20. Based on the pre-motion letters, Trump contends

that these fraud claims are based on "a present fact outside of the contractual obligations" or are "independent of any contract or the facts underlying the claim for breach of the Bulk Sale Agreement."   [ECF No. 43 at 3 n.4; ECF No. 68 at 1-2].   As discussed below, Trump's contentions are misplaced, and the fraud claims should be dismissed for several reasons.

### 1.   *These fraud claims are duplicative of the breach of contract claim*

First, Trump's specific allegations demonstrate that the purportedly fraudulent conduct derives directly from the BSA.   For example, when Trump allegedly contacted Fintiklis regarding the October 3, 2017 e-mail, Trump specifically sought to confirm that Ithaca intended to comply with its contractual obligations.   [Counterclaim at ¶ 50 ("Defendants contacted Fintiklis directly to remind him of his ***obligations under the [BSA]***." (emphasis added)].   Consistent with that reality, Trump explicitly pleads that Plaintiffs' alleged "disclosure duty" ***is*** identical to Ithaca's alleged "contractual duty" "to not take actions adversely affecting the interests of Defendants in operating the Hotel."   *Id.* at ¶¶ 121-122.   Thus, as pled, the alleged "fraud" claims are not "collateral" and directly relate to the BSA claim, and thus fail as a matter of law.   *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) ("[T]he duty to disclose must exist separately from the duty to perform under the contract."); *Almeciga v. Center for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 411-12 (S.D.N.Y. 2016) (dismissing the fraudulent concealment claim where the alleged duty to disclosure ("*i.e.* their intention to breach") is inseparable from the duty under contract); *Presnall*, 2018 WL 4473337, at *6 ("If the promise concerned the performance of the contract itself, the fraud claim is subject to dismissal as duplicative.") (citation omitted).

Next, even if the alleged conduct was collateral to the BSA (which it is not), Plaintiffs did not owe Trump a duty to inform Trump of Ithaca's alleged future intent to breach the BSA on October 14, 2017.   Indeed, no such duty exists.   *See Cronos Group Ltd. v. XComIP,* 156 A.D. 3d

20

54 (1st Dep't 2017).  In *Cronos*, the court dismissed a fraud claim predicated on allegations that, after the contract was executed, the plaintiff asked the defendant a question tantamount to whether defendant was performing its obligations under the contract, and the defendant affirmed that it was, which plaintiff relied on to not take certain action.  *Id.* at 59.  Thereafter, the plaintiff incurred damages and alleged that defendant lied when it gave plaintiff assurances that it was performing its contractual obligations.   However, in dismissing the fraud claim, *Cronos* explained that "allegations that the other party gave false assurances that it would perform its obligations under a previously executed agreement … [have] already been considered and rejected" and that "false assurances that the promisor will perform a preexisting contractual obligation is *not* collateral to the contract." *Id.* at 66-67 (emphasis in original).

Here, Trump asked about the BSA and Ithaca gave assurances (purportedly false ones) that Ithaca intended to fulfill its contractual obligations.  As demonstrated in *Cronos*, these allegations cannot support a claim for fraud. *Id.*; *see also Mohegan Lake Motors, Inc. v. Maoli*, No. 16-CV-06717 (NSR), 2017 WL 6335905, at *7-8 (S.D.N.Y. Dec. 7, 2017) (when the statements are "merely intentionally false statements demonstrating intent to perform" or are "tangential to [the contractual] obligation and would only constitute a failure to meet it" then the fraud claim is merely one for breach of contract).   And, as *Cronos* further emphasized, the formal distinction between fraud and contract claims is not a trivial matter but serves an important policy function.  156 A.D. 3d at 68 ("The rule that an insincere promise to perform a contractual obligation is not actionable as fraud – absent which contract claims would be routinely pleaded in the alternative as fraud – guards against the erosion of the distinction between the two causes of action.").

To illustrate this point, if we assume that Ithaca provided advance notice of Ithaca's

intent to not comply with its obligations under the BSA (*i.e.*, to breach it) on October 14, 2017, then Trump would have had the predicate for a claim of anticipatory breach of the BSA – a breach of contract claim, not one for fraud.  *See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty."  After a repudiation, the non-repudiating party must elect to either (a) "treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties," or (b) "continue to treat the contract as valid and await the designated time for performance before bringing suit.").  Merely because Fintiklis allegedly concealed Ithaca's intent to breach the BSA, it does not transform a contract claim into a tort for fraud.  Indeed, to do so would potentially transform every intentional breach of contract claim into a claim for fraud, which *Cronos* rejected.  And dovetailing this point, Trump's effort to couch the breach as an "instrumentality of the fraudulent scheme" has likewise been rejected as a meaningless label insufficient to convert a contract claim into one for fraud.  *See Nat'l Union Fire Ins. Co. of Pitts. v. Monarch Payroll, Inc.*, 15-cv-3642, 2016 WL 634083, at *6 (S.D.N.Y. Feb. 17, 2016) (rejecting allegations that "the contract was merely 'an instrument' in a 'larger fraudulent scheme' to obtain the $2,390,000" and finding that the "'scheme' … relates to the parties' agreement … and defendants' alleged failure to perform their obligations.").

Finally, Ithaca's alleged misrepresentation and/or omission regarding the October 14, 2017 meeting was a future statement of intent to perform, which is not actionable in fraud. *Contra Minnie Rose LLC*, 169 F. Supp. 3d at 520 ("Misrepresentations of present facts made post-contract formation are collateral or extraneous to the contract and are actionable in fraud."). In fact, *Minnie Rose* illustrates the difference between a present fact made post-contract that is

actionable (*Minnie Rose*) and a statement of future intent that is not actionable (here).

In *Minnie Rose*, plaintiff ran a women's contemporary clothing business and entered into an oral contract with defendant to handle coordinating all of the business's china-based components. As compensation, plaintiff paid defendant a commission equal to 10% of the cost of the items produced and shipped to plaintiff from China, which was evidenced on invoices that defendant issued to plaintiff in real-time. *Id* at 508-9. Eventually, plaintiff learned that defendant was inflating the price charged in each invoice to extract an extra-contractual profit and sued the defendant for fraud. *Id.* In response, the defendant argued that the fraud claim was simply one for breach of contract. *Minnie Rose* rejected this argument because the inflated invoices were "misrepresentations of present fact" that the defendant actively conveyed and concealed in real time at the moment each invoice was issued, as opposed to being statements of future intent. *Id.* at 508-510, 520-21 ("Defendants actively concealed the actual price of manufacturing each time they sent [p]laintiff invoices."). Further, this Court found that because the contract was silent as to the inflated price issue, the active misstatements of present fact were collateral to the contractual obligations to "select factories for manufacturing, supervise production and invoice [p]laintiff." *Id.* at 521.

Here, the alleged statement was limited to specific contractual obligations in the BSA, and were directed to Ithaca's future intent to comply with the BSA, as opposed to a present statement of fact. Based on *Minnie Rose*, the fraud claims fail because the statement is not an actionable present statement of fact or a statement collateral to the contract. [13]

---

[13] The fraud claims should also be dismissed because the alleged damages are indistinguishable from the contract damages, and Trump fails to plead that "special" damages were caused by the misrepresentations and are unrecoverable as contract damages. [Counterclaim at ¶¶ 108, 116, 125, and 145]. *See Clement v. Farmington Cas. Co.*, No. 13-cv-1026 (NSR), 2015 WL 6971565, at *8 (S.D.N.Y. Nov. 10, 2015) (dismissing duplicative fraud claim because, among other reasons, the "damages asserted … are identical to the damages arising from Plaintiff's breach of contract claim."). Moreover, merely seeking punitive damages is insufficient. *Mosaic Caribe, Ltd. v. AllSettled Grp., Inc.*, 117 A.D.3d 421, 422-23 (1st Dep't 2014) (dismissing fraud claim as duplicative when, *inter alia*, "apart

2.      *Trump fails to adequately plead reliance*

Lastly, Trump's duplicative and deficient fraud claims also fail to sufficiently allege actual "inaction" reliance.  On the one hand, Trump alleges that Ithaca's representation lulled Trump into "not taking immediate action to protect [its] rights under the Bulk Sale Agreement and HMA." [Counterclaim at ¶¶ 107, 124].  On the other hand, however, Trump alleges that subsequent to this statement Trump ***acted*** by communicating with Fintiklis to confirm Ithaca's intent to perform its obligations under the BSA, Trump ***acted*** to arrange to have its general manager attend the October 14, 2017 meeting, and Trump ***acted*** by having its general manager actually attend and surreptitiously record the October 14, 2017 meeting. *See id.* at ¶¶ 50-52, 59-60, Exhibit 15 (ECF 38-3 at 393-4).[14]  These specific factual allegations override Trump's general conclusory allegations of reliance by inaction and demonstrate that Trump ***did not*** in fact rely on Ithaca's alleged statements.  *See Iqbal,* 556 U.S. at 678 (A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citation omitted).

This conclusion is bolstered by Trump's lack of alleged action "tak[en] immediate[ly]" following the alleged events of October 14, 2017.  For Trump's theory to be factually plausible, when the condition that allegedly caused Trump's inaction was removed, the expectation would be that – as pled – Trump would have taken "immediate action" on or after October 14, 2017 to "protect [its] rights under the Bulk Sale Agreement and HMA." [Counterclaim at ¶¶ 107, 124].  Presumably, Trump would have done at least ***something*** to protect its rights under the BSA to evidence the alleged inaction reliance.   Yet, the Counterclaim fails to include any specific

---

from an unelaborated request for punitive damages," fraud claim "seeks the same damages as the breach of contract claim"); *Khodir v. Sayyed*, 323 F.R.D. 193, 203-4 (S.D.N.Y. 2017) (same).

[14] As discussed in footnote 4, *supra*, Trump was not a "beneficiary" and thus had no right to attend the October 14, 2017 meeting, but Ithaca nevertheless granted this request as a courtesy.

45060071

allegations of anything that Trump did to protect its rights under the BSA after October 14, 2017.

Instead, Trump took actions regarding the HMA only and sent letters rejecting Hotel TOC's Notice of Default and Termination Notice. *Id.* at ¶¶ 82, 84. But, absent allegations of action relevant to the BSA after October 14, 2017, when viewed with Trump's allegations of inaction before October 14, 2017, Trump fails to plausibly plead actual reliance. *See Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (In the context of a motion to dismiss, "[g]eneral, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint."); *see also, e.g., Mehta v. Wells Fargo Bank, N.A.*, No. 10CV944 JLS, 2011 WL 1157861, *2 (S.D. Cal. Mar. 29, 2011) ("Plaintiff attempts to plead reliance by alleging that he would have pursued other means to avoid foreclosure had Wells Fargo not promised to delay the sale. In support, Plaintiff identifies several means … [but fails to allege] whether he realistically could have pursued these options three business days before the sale. [Also, t]he SAC does not allege any facts suggesting that Plaintiff would have been successful in taking legal action").

Here, Trump's allegations fail to show that Trump actually relied on Ithaca's statements before October 14, 2017, fail to establish what Trump would have done but for those statements, and fail to show any actual action after October 14, 2017. As such, Trump fails to adequately plead reliance. For this and the other reasons, Counts I, II, and III should be dismissed.

## <u>CONCLUSION</u>

For the reasons discussed above, Trump's three fraud claims, two tortious interference claims, and the claim for alter ego liability against Fintiklis should be dismissed, *with prejudice.*

Dated:  New York, New York
        June 3, 2019

AKERMAN LLP

By:      */s Darryl R. Graham*
                Joshua D. Bernstein, Esq.
                Darryl R. Graham, Esq.
                Kathleen M. Prystowsky, Esq.
                666 Fifth Avenue, 20th Floor
                New York, New York 10103
                Tel: (212) 880-3800

*Counsel to Plaintiffs Ithaca Capital Investments I, S.A., Ithaca Capital Investments II, S.A., and Orestes Fintiklis*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to the following parties:

Todd E. Soloway, Esq.
Bryan T. Mohler, Esq.
Marion R. Harris, Esq.
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
tsoloway@pryorcashman.com
bmohler@pryorcashman.com
mharris@pryorcashman.com

*Attorneys for Trump*

                */s Darryl R. Graham*
                 Darryl R. Graham

26

45060071