UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

ITHACA CAPITAL INVESTMENTS I, S.A., ITHACA
CAPITAL INVESTMENTS II, S.A., and ORESTES
FINTIKLIS,

Civil Action No. 1:18-cv-390

Plaintiffs,

**AMENDED COMPLAINT**

- against -

TRUMP PANAMA HOTEL MANAGEMENT LLC,
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT, LLC,

Defendants.
------------------------------------------------------------------------x

Plaintiffs Ithaca Capital Investments I, S.A. ("Ithaca I"), Ithaca Capital Investments II,

S.A. ("Ithaca II," and collectively with Ithaca I, "Ithaca"), and Orestes Fintiklis ("Fintiklis")

(collectively with Ithaca, "Plaintiffs"), by and through their counsel Akerman LLP, hereby file

their Amended Complaint (the "Complaint") against defendants Trump Panama Hotel

Management LLC and Trump International Hotels Management, LLC (collectively,

"Defendants" or "Trump"), and allege as follows:

## INTRODUCTION

1.      This dispute arises out of Trump's failure to meet its obligations arising out of the

Bulk Sale Agreement, grossly mismanaging its operations of the former Trump International

Hotel & Tower Panama (the "Trump Panama Hotel" or the "Hotel"), including causing

intentional damage to the Hotel Amenities Units and failing to pay income taxes to the

Panamanian government; Trump's fraudulent inducement of Ithaca into the Bulk Sale

Agreement; and its wrongful attempt to bully, intimidate and harass third-parties by attempting

to join them to an arbitration pending before the International Chamber of Commerce (the

"ICC").

2.      As background, the Hotel is part of a 70-story, luxury mixed-use, multi-component tower located on the waterfront overlooking Panama Bay in the Punta Pacifica area of Panama City, Panama, which includes a hotel, residences, event space, restaurants, and casino.

3.      Trump managed the Hotel until March 2018 pursuant to a hotel management agreement ("HMA"), dated April 11, 2008, as amended.[1]

4.      In 2017, Ithaca I acquired 202 of the 369 hotel units in the Trump Panama Hotel, and Ithaca II acquired all 13 of the hotel amenities units, which includes the conference and restaurant spaces, among others.  In connection with their acquisition of the majority of the units in the former Trump Panama Hotel, Trump and Ithaca entered into an Agreement in Connection with Bulk Sale (the "Bulk Sale Agreement").  A copy of the February 15, 2017 Bulk Sale Agreement is attached as **Exhibit B**.

5.      Under the Bulk Sale Agreement, Ithaca II agreed to be "bound by the terms and conditions of the Hotel Management Agreement as successor to the Hotel Amenities Unit Owner."  *See* Exhibit B at ¶ 3(A).

6.      In conducting its due diligence for the purchase, Ithaca had several meetings with Trump to gain assurances that the Hotel was being properly managed.  During those meetings and in brochures provided to Ithaca thereafter, Trump repeatedly represented to Ithaca that it was a professional luxury hotel operator and that through its efforts the Hotel was out-performing the market in Panama.

---

[1] A true and correct copy of the relevant provisions of the Amended and Restated Hotel Management Agreement for Trump Ocean Club International Hotel & Tower among Trump Panama Hotel Management LLC, Newland International Properties Corp., Hotel TOC Inc. and Owners Meeting of the P.H. TOC is attached hereto as **Exhibit A** (without schedules).

49015620

7. These statements were false and made with the intention to mislead Ithaca into believing that its investment in the Hotel would be sound and would be protected by Trump's management of the Hotel.

8. Ithaca later learned that these statements were false and misleading. The Hotel was losing market share by the day and being out-performed in the Panama market not only by its luxury competitors, but also by select service hotels. Ithaca also later learned that Trump's statements were incomplete, intentionally misleading and failed to disclose that Trump had been deflating expenses, including failing to disclose that Trump did not report or fully pay social security withholdings for the Hotel's employees, and hiding the amount of the purported management fees it was taking from the Hotel's operations.

9. Unfortunately, Trump's malfeasance was only the tip of the ice berg. Trump had been mismanaging the Hotel for years. As a direct result of Trump's mismanagement of the Hotel and material breaches of the HMA, the economic performance, physical condition of the Hotel Amenities Units, and guest service levels had dramatically declined.

10. Despite managing one of the finest hotels in Panama and Latin America, Trump let the Hotel sit virtually empty, resulting in abysmal occupancy rates and RevPAR,[2] all the while guest complaints went unanswered, the Hotel went uncleaned for years, and the Hotel Amenities Units remained substantially underutilized.

11. By virtue of Trump's conduct, the Hotel (despite being a physically stunning structure with the best amenities and finishes in the market) fell to the very bottom of any meaningful competitive set, and Trump had no plan, took no initiative, and had no ability to turn the Hotel around.

---

[2] "RevPAR," or revenue per available room, is a performance metric in the hotel industry that is calculated by dividing a hotel's total guestroom revenue by the room count and the number of days in the period being measured. *See* Exhibit A at p. 17.

49015620

12.     Instead, Trump enjoyed nothing but upside while the Hotel's owners – *i.e.*, those who owned the Hotel's 369 Hotel Units and the 13 Hotel Amenities Units – continued to lose market share at an alarming rate and watched their expenses grow to be significantly higher than that of the Hotel's regional luxury competitors.

13.     Despite its obligations to Ithaca II under the HMA to comply with legal requirements, operate the Hotel as a luxury property, perform its services "in accordance with the Operating Standard,"[3] and "use its commercially reasonable efforts to operate the Hotel and the Hotel Amenities Units in such a manner to endeavor to maximize the profitability and long term value of the Hotel," Trump breached these obligations.

14.     As a result of Trump's mismanagement, the Hotel owner, Hotel TOC Inc., commenced an ICC arbitration against Trump concerning its mismanagement (the "ICC Arbitration"), which is pending, and terminated the HMA in December 2017.   A copy of the October 14, 2017 Request for Arbitration (without exhibits) is attached as **Exhibit C** and a copy of Trump's Amended Request for Joinder and Third-Party Claims, dated March 6, 2018 (without exhibits) is attached as **Exhibit D**.

15.     In the ICC Arbitration, Trump attempted to join these Plaintiffs as third-parties there.  Aside from the fact that Trump's claims are entirely fictitious and frivolous, Trump has no arbitration agreement with these Plaintiffs/third-party respondents, much less an agreement that would permit the joinder of such claims in the existing arbitration.  As such, Trump's claims against Plaintiffs should not have been brought in the ICC Arbitration.

---

[3] The Operating Standard is defined in the HMA to mean "the level of service and quality generally considered to be luxury and no less than the level of service and quality prevailing from time to time at the Trump Brand Hotels, (b) [sic] consistent with the Trump Brand Standards, and (c) in accordance with this Agreement, and taking into consideration local custom, usage and standards in Panama, as agreed to by the parties…."  *See* Exhibit A at p. 15.

49015620

16.     Accordingly, on or about March 21, 2018, this Court granted Plaintiffs' motion for a preliminary injunction, which prevented Trump from pursuing its claims against the Plaintiffs in the ICC Arbitration.

17.     Thereafter, Trump filed its Answer with Counterclaims to Plaintiffs' Complaint asserting  nearly identical claims that it had attempted to make in the ICC Arbitration.

18.     Plaintiffs file this Amended Complaint to assert their own affirmative claims against Trump, including breach of the Bulk Sale Agreement, fraudulent inducement of the Bulk Sale Agreement, and conversion, in addition to their initial claims for declaratory judgment and injunctive relief relating to Trump's abuses in the ICC Arbitration.

## THE PARTIES

19.     Plaintiff Ithaca Capital Investments I, S.A. is a Panamanian corporation, with its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama City, Republic of Panama.  Ithaca I owns 202 units in the Trump Panama Hotel.

20.     Plaintiff Ithaca Capital Investments II, S.A. is a Panamanian corporation, with its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama City, Republic of Panama.   Ithaca II owns the Hotel Amenities Unit in the Trump Panama Hotel.

21.     Plaintiff Orestes Fintiklis is a Cypriot citizen residing in Miami, Florida.

22.     Defendant Trump Panama Hotel Management LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

23.     Defendant Trump International Hotels Management, LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York

10022.  Upon information and belief, Trump International Hotels Management, LLC assigned certain of its interests in the HMA to Trump Panama Hotel Management LLC.

<u>**JURISDICTION AND VENUE**</u>

24.     This is an action for damages, declaratory relief pursuant to 28 U.S.C. § 2201 *et seq.* and Federal Rule of Civil Procedure 57, and for injunctive relief pursuant to Federal Rule of Civil Procedure 65(a).

25.     Pursuant to 28 U.S.C. § 1332(a)(2), this Court has subject matter jurisdiction over this dispute because it is between citizens of a state, and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs' Complaint for declaratory judgment and injunctive relief necessarily presents questions of federal law because Trump's claims in the Arbitration against Plaintiffs include claims under the federal civil RICO statute, 18 U.S.C. § 1962(d).  *See* Ex. D at pp. 60-69.

27.     This Court has personal jurisdiction over Trump because Trump contractually consented to this Court's jurisdiction in the Bulk Sale Agreement.  *See* Ex. B at ¶ 9.  In addition, upon information and belief, Trump is domiciled in and/or conducts business in this District.

28.     Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this District because Trump resides in this District, and because Trump contractually consented to the venue of this judicial district in the Bulk Sale Agreement.  *See* Ex. B at ¶ 9.

<u>**FACTUAL ALLEGATIONS**</u>

I.      <u>**The Development of the Trump International Hotel & Tower**</u>

29.     The former Trump Panama Hotel is part of a 70-story, luxury mixed-use, multi-component tower located on the waterfront overlooking Panama Bay in the Punta Pacifica area

49015620

of Panama City, Panama, which includes, among other things, a hotel, residences, conference facilities, retail outlets, restaurants, and casino.

30.     The tower complex is comprised of five components: the Hotel, residential condominiums, offices, commercial space, and a casino.   Collectively, these components are governed by a horizontal property regime known as the P.H. TOC, a condominium association.

31.     The Hotel, one of the finest luxury hotel properties in Latin America, consists of 369 Hotel Units and the Hotel Amenities Units, each of which are owned by individual unit owners.

32.     The tower's developer envisioned that the Hotel would be managed and operated by an international luxury hotel brand to ensure the efficient and comprehensive operation of the tower complex as a luxury property that would maximize the investment for all component owners.

33.     In connection with this project, the developer entered into a series of agreements with Donald J. Trump and his affiliates to brand, manage, and operate the Building, including a condominium management agreement, hotel management agreement, and license agreement. These agreements streamlined the management of the tower complex to ensure that all the components, particularly the Hotel and condominium, would be maintained and operated in a cohesive manner as a luxury property.

34.     To that end, on or about March 16, 2006, K Group Developers Inc. entered into a License Agreement with Donald J. Trump to license the "Trump" trademark as the brand for the tower complex.[4]   Pursuant to that agreement, the developer received a license to use the Trump Mark to brand the tower complex.

---

[4] Thereafter, K Group Developers Inc. assigned its interests in the agreement to Newland International Properties Corp. ("Newland") and Mr. Trump assigned his interest in the agreement to Trump Marks Panama LLC.

35. In connection with the development of the tower complex, on or about August 11, 2008, Hotel TOC (as Owner of the Hotel component and representative of the individual hotel unit owners) and Newland (as the Hotel Amenities Units Owner) entered into the HMA with Trump to manage and operate the Hotel Units and Hotel Amenities Units[5] as a first class, luxury hotel. Accordingly, Ithaca II (who succeeded as the Hotel Amenities Units Owner by virtue of the Bulk Sale Agreement and assignment of the amenities lease) is entitled to recover damages resulting from Trump's failure to meet its obligations under the HMA, which are described more fully below.

## II. Trump Fraudulently Induced Ithaca to Enter into the Bulk Sale Agreement

36. In 2016, Ithaca began exploring the possibility of acquiring a majority position in the Hotel through a purchase of 202 Hotel Units and the Hotel Amenities Units.

37. As part of its due diligence process, Ithaca reviewed the Hotel's structure and financials in detail.

38. In order to confirm its understanding of the Hotel's performance, prior to agreeing to purchase the Hotel Units and Hotel Amenities Units and enter into the Bulk Sale Agreement, Ithaca also had multiple meetings with Trump to ensure that the Hotel was being managed properly.

39. These meetings were of particular importance given Trump's insistence that Ithaca enter into the Bulk Sale Agreement, which would, among other things, limit certain of Ithaca's operational rights with respect to these Hotel Units and the Hotel Amenities Units.

40. On or about August 1, 2016, Orestes Fintiklis and two other Ithaca board members, met with Eric Trump and Sara Martens at Trump Tower in New York, New York.

---

[5] In connection with the HMA, the Hotel Amenities Unit Owner leased the Hotel Amenities Unit to Owner. Consequently, Trump was contractually obligated to oversee compliance of the lease and cause Owner to perform its obligations under the lease. *See* HMA at § 2.2.29.

41.     During that meeting, Eric Trump extolled the virtues of the Hotel, including how proud they were of the property.

42.     Eric Trump stated that Trump operates as a professional hotel operator, that the Hotel was their flagship property outside of the United States and a model for Trump's then-planned hotel brand expansion (which never materialized).

43.     Among other things, Eric Trump also represented that the Hotel achieving better financial results than the market in Panama, which was due to Trump's operation of the Hotel.

44.     Ithaca relied on this statement in conducting its due diligence, deciding to purchase the 202 Hotel Units and the Hotel Amenities Units, and entering into the Bulk Sale Agreement.

45.     Eric Trump's statement was false.

46.     After the meeting, Trump sent Ithaca two brochures (a development brochure and a multi-property brochure) that included in writing many of the oral statements made during the meeting.  Copies of these brochures are attached as **Exhibits E and F**, respectively.

47.     These brochures reaffirmed many of the representations that Eric Trump and Sara Martens made at the August 1, 2016 meeting.

48.     For example, the Development Brochure emphasized Trump's role as a luxury hotel operator, stating that "[t]he Trump Family has personally set out to elevate the world's expectations for what a luxury experience should be.  As a family of internationally renowned real estate developers with unprecedented experience and proven success, our name is invariably powerful, separating us from all other international real estate companies."  *See* Ex. E at p. 6.

49.     The Development Brochure also explained that the Trump Family was intimately involved in each of its hotel projects, including this Hotel, stating: "No shortcuts.  No

9

compromises. No excuses.  We are the only luxury hotel company with a family name on the door – and a family standing behind it." *Id.*

50.  Additionally, the Development Brochure represented:

> "The Trump Organization, a privately held company, is the global leader in real estate development, acquisition, sales, marketing and property management representing the highest level of excellence in luxury. … The Trump Organization has various capabilities including management, branding, and development of residential, hotel, resort, retail, office and golf properties. Donald J. Trump and his children are intimately involved in every facet of each Trump project from design and development through opening and operations."

*Id.* at p. 18.

51.  Eric Trump's statements regarding the Hotel achieving and maintaining a leading market share in Panama were also reaffirmed in the Development Brochure.

52.  Specifically, the brochure represented that that as a "Developer. Owner. Marketer. Operator." Trump had "[s]uperior market share results." *Id.* at p. 23.  The term "market share" is a term of art in the industry which is synonymous with hotel occupancy.

53.  Ithaca, again, relied on these statements to inform its due diligence, its decision to purchase the Hotel Units and the Hotel Amenities Units, and its decision to enter into the Bulk Sale Agreement.

54.  Representatives of Trump again repeated these statements to Ithaca in or about February 2017, just before Ithaca executed the Bulk Sale Agreement.

55.  On or about February 3, 2017, Orestes Fintiklis, on behalf of Ithaca, again met with Trump at Trump Tower in New York, New York regarding Ithaca's purchase of the Hotel Units and the Hotel Amenities Units.

49015620

56.     While Eric Trump was not present at this meeting, Trump was represented by Donald Trump, Jr., Eric Danziger, Jeff Wagoner, and Sara Martens.

57.     Ithaca and Trump discussed the delays that had arisen with Ithaca's purchase of the Hotel Units and Hotel Amenities Units.

58.     The parties also discussed the Hotel's performance.

59.     In particular, Eric Danziger and Jeff Wagoner represented to Ithaca that, while the market in Panama was not good, the Hotel was out-performing the market due expressly to Trump's operation and management of the Hotel.

60.     Ithaca relied on Trump's multiple representations that the Hotel was out-performing the market in Panama and that its out-performance was the result of Trump's management.

61.     In reliance on these representations, on or about February 15, 2017, Ithaca entered into the Bulk Sale Agreement and ultimately purchase the Hotel Units and Hotel Amenities Units.

62.     These representations were false and designed to mislead Ithaca into believing that the Hotel was performing better than its peers, and operating in accordance with the HMA and Panamanian law.

63.     Despite reviewing the Hotel's financials provided by Trump for Ithaca's pre-purchase due diligence, Ithaca could not have known that the Hotel's expenses represented in the provided financials (which appeared in the normal to high range) were, in fact, artificially deflated, meaning that the actual expenses of the Hotel were in excess than what Trump represented to Ithaca.

49015620

64.     Nor could Ithaca have known that the management fees Trump reported in financial statements were significantly less than the management fees that Trump actually took.

65.     Additionally, Ithaca could not have known that Trump was failing to withhold funds in reserve accounts, as audited financials for 2016 did not become available until after Ithaca's acquisition closed.

66.     Thus, Ithaca could not have known that Trump had failed to withhold funds in reserve accounts, pay income taxes on Trump's fees to the Panamanian authorities, or that Trump had under-reported Hotel employees' salaries to the Panamanian social security agency, and under-reported the total amount of management fees it took on a yearly basis, thereby making the financial and operational performance of the Hotel appear in a false light.

67.     By repeatedly representing that the Hotel was out-performing the market in Panama, Trump had a duty to inform Ithaca that this resulted from, among other things, the Hotel excluding certain expenses that should have been incurred.

68.     In August 2017, in reliance on Trump's misrepresentations and omissions, Ithaca completed its acquisition of 202 of the 369 Hotel Units in the former Trump Panama Hotel, and Ithaca II acquired all of the 13 Hotel Amenities Units.

III.    **The Bulk Sale Agreement**

69.     As explained above, in connection with Ithaca's acquisition of the majority of the Hotel, Ithaca entered into the Bulk Sale Agreement.

70.     Orestes Fintiklis executed the agreement in his capacity as Ithaca's president.

71.     As part of the Bulk Sale Agreement, Ithaca II agreed "to be bound by the terms and conditions of the Hotel Management Agreement as successor to the Hotel Amenities Units Owner (as such term is defined in the Hotel Management Agreement)." *See* Ex. B at ¶ 3(A).

49015620

72.     Accordingly, Trump was bound to provide Ithaca II services under the Hotel Management Agreement.

73.     Both Ithaca I and Ithaca II also represented that any further sales of the Hotel Units and/or Hotel Amenities Units would be subject to the Co-Ownership Regulations of the P.H. TOC and "Operator's right to approve the proposed purchaser." *Id.* at ¶¶ 3(B), (C).

74.     Ithaca also agreed to restrict certain of its operational rights in the Hotel Units and the Hotel Amenities Units as follows:

> Purchaser shall not, directly or indirectly through any Affiliates or otherwise: (w) take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements, (x) exercise its vote with respect to any of the Hotel Units in any Owners Meeting or other constituent body of the P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., in any manner which is adverse to the interests of Operator and/or its Affiliates under and in respect of any of the Hotel Agreements, (y) take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its Affiliates and any other Person or (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates;

*Id.* at ¶ 3(D).

75.     Ithaca did not know then and could have not known at the time it executed the Bulk Sale Agreement that Trump misrepresented its performance as operator of the Hotel in order to retain its control of the Hotel and drain the Hotel Units and the Hotel Amenities Units of their equity, nearly forcing the Hotel into bankruptcy.

76.     In addition to the foregoing, the Bulk Sale Agreement also contains a mandatory forum selection clause, requiring the parties to bring all suits relating to the Bulk Sale Agreement in the federal and state courts of the State of New York.

77.     In relevant part, the Bulk Sale Agreement states:

> Each of the Parties … irrevocably submit and consent to the exclusive jurisdiction of the federal and state courts of the State of New York and agree that all suits, actions or other legal proceedings with respect to this Agreement shall be brought only in the State of New York.

*Id.* at ¶ 9.

78.     The Bulk Sale Agreement also provides:

> Each of the Parties … waive and agree not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceedings any claim that it is not personally subject to the jurisdiction of the federal and state courts of the State of New York, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that [the Bulk Sale Agreement] or the subject matter hereof may not be enforced in such courts[.]

*Id.*

79.     In addition, the Bulk Sale Agreement contains a merger clause, which provides:

> [The Bulk Sale Agreement] (including the recitals to this Agreement which are incorporated herein) sets forth the entire understanding and agreement of the Parties hereto any other agreements and understandings (written or oral) among the Parties on or prior to the date of this Agreement with respect to the matters set forth herein."

*Id.* at ¶ 12.

80.     Thus, the Bulk Sale Agreement mandates that any dispute with respect to the Bulk Sale Agreement between Ithaca and Trump must be adjudicated in the federal or state courts of New York.

**IV.** **Trump's Obligations Under the Bulk Sale Agreement and HMA**

    **A.** **Trump's Contractual Obligations to Ithaca II**

    81.    In connection with the HMA, Trump held itself out to be a sophisticated international luxury hotel manager that could position the Hotel as a luxury property and maximize the revenue stream to the Hotel Amenities Units Owner.

    82.    Indeed, the express purpose of retaining Trump was to "operate the Hotel Units and Hotel Amenities Units as a first class, luxury hotel." Exhibit A at p.2.

    83.    Based on these representations, the Hotel Amenities Units Owner engaged Trump "as its agent to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel." *Id.* at § 2.1.1.

    84.    Under the HMA, Trump was contractually obligated to "use its commercially reasonable efforts to operate the Hotel in a manner to endeavor to maximize the profitability and long term value of the Hotel." *Id.* at § 2.2.

    85.    Specifically, Section 2.2 provides:

> Operator hereby accepts the foregoing engagement and covenants and agrees to manage the Hotel and perform Operator Hotel Services and Other Operator Services during the Term of this Agreement in accordance with the Operating Standard and to ***use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel***. Without limiting the generality of the foregoing, but subject to the limitations set forth in Sections 2.3 and 2.6-2.11 and the other provisions of this Agreement, Operator shall have the authority and duty, as necessary or advisable for the proper operation and maintenance of the Hotel and performance of the other Operator Services in accordance with the Operating Standard….

*Id.* at § 2.2 (emphasis added).

    86.    Moreover, Trump also had the "authority and duty" to operate and maintain the Hotel in accordance with the Operating Standard, *i.e.*, as a luxury hotel. *Id.*

49015620

87.　The definition of "Operating Standard" in the HMA provides:

> Operating Standard - means the **_level of service and quality generally considered to be luxury_** and no less than the level of service and quality prevailing from time to time at the Trump Brand Hotels, (b) consistent with the Trump Brand Standards, and (c) in accordance with this Agreement, and taking into consideration local custom, usage and standards in Panama, as agreed to by the parties; provided however, in the event the Parties are unable to agree upon the local standard, if any, to be applied, such dispute shall be resolved pursuant to Section 9.1 hereof.

*Id.* at p. 15 (emphasis added).

88.　To that end, Trump was to provide customary hotel operator services, supervising Hotel personnel, causing the Hotel to be maintained in good order, and making "all necessary repairs, replacements, corrections and maintenance … to maintain the competitive position of the Hotel in its market." *See e.g.*, *id.* at §§ 2.2.14-2.2.15, 2.2.19, 2.2.27, 2.2.32.

89.　Trump was also charged with the authority to operate the Hotel as the Hotel Amenities Units Owner's agent in all of the following aspects, among others:

- "[T]he establishment and maintenance of the Hotel Accounts…" *Id.* at § 2.1.3.

- "[D]irecting all Gross Operating Revenue/Hotel and Gross Operating Revenue/Hotel Amenities Units, respectively to the appropriate bank account." *Id.*

- "[D]etermining room rates, food and beverage menu prices and charges to Hotel Guests for Other Operator Services." *Id.*

- Determining "the terms of guest occupancy and admittance to the Hotel, use of rooms for commercial purposes, policies relating to entertainment, labor policies, publicity and promotion activities and technology services and equipment to be used in the Hotel…" *Id.*

- Establishing and implementing "marketing, sales and reservations programs and systems to secure reservations for the Participating Units, including all arrangements with wholesale and bulk volume purchasers." *Id.* at § 2.2.1.

49015620

- Supervision and procurement of "all inventories, provisions, consumable supplies and OS&E as Operator…" *Id.* at § 2.2.19.

- Performance of "such other tasks as are customary in the performance of the hotel operator services at hotels the standard of the Operating Standard." *Id.* at § 2.2.32.

90.     Trump also had the obligation under the HMA to maintain the Hotel's accounts in accordance with the Uniform System of Accounting and to provide regular, detailed statements of accounts to Owner. *Id.* at § 2.5.

91.     For example, Trump was required to provide monthly operational statements that provide a "statement of net cash flow from operations in reasonable detail for such month as well as the cumulative Fiscal Year-to-date," "balance sheet including current month and prior beginning of year balance comparisons and differences in reasonable detail," and "schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion." *Id.* at § 2.5.3.

92.     Trump was also obligated to make distributions to the Hotel Amenities Unit Owner based on quarterly financial statements detailing the performance of the Hotel Amenities Unit during that period. *Id.* at § 2.5.4.

93.     Trump, like any hotel operator, was also responsible for developing a cogent and effective sales and marketing plan for the Hotel. Specifically, Section 2.3.1(c) of the HMA provides that the plan must include the following:

> Operator's intentions for the next Fiscal Year for the promotion and positioning of the Hotel, including a plan for the activities to be undertaken by Operator pursuant to Section 2.2, which plan shall include a description of the Hotel's target markets, the Hotel's relative position in those markets, the proposed room rate structures for each market segment, the current and future sales plan for the Hotel, the advertising and public relations plan for the Hotel, and the proposed staffing for the sales and marketing activities of the Hotel ("Marketing Plan").

49015620

94.     In providing these services, Trump also agreed to comply with all legal requirements, including to "correct or avoid any violation of any laws, ordinances, rules, regulations or other applicable legal requirements," *id.* at § 2.2.15, and to "exercise commercially reasonable efforts to do or cause to be done all such acts and things in or about the Hotel as shall reasonably be necessary to comply with Legal Requirements," *id.* at § 2.2.24.

95.     In exchange for these services, Trump received a Base Fee of 3.5% of Gross Operating Revenue for the Hotel for fiscal year 2017, which increased to 3.75% for fiscal years 2018 through 2031.

96.     An incentive fee of 10% over and above the Base Fee was also included in the HMA if certain contractually prescribed benchmarks were met, as motivation for Trump to fully perform its obligations under the agreement.

97.     Trump did not come close to reaching the required benchmarks to receive the incentive fee in its last few years as operator.

98.     Rather, Trump consistently and materially breached its contractual obligations to Ithaca II by failing: a) to comply with Panamanian laws, b) to properly maintain the Hotel Amenities Units, c) to develop an effective sales and marketing strategy to target the proper market, d) to encourage group and contract business to engage in the Hotel, and e) to drive occupancy.

99.     Instead, after entering into the Bulk Sale Agreement, Ithaca learned that Trump (contrary to its representations) lost market share and stood in last place among its peer luxury hotels in all the relevant metrics for success in the hotel industry, including ADR, RevPAR, and occupancy.  This decline in occupancy had a direct impact on Ithaca II's financial performance, as the resulting decline in revenues left Ithaca II to shoulder the financial burden of the Hotel and

the Hotel Amenities Units on its own, all the while Trump lined its pockets with ill-gotten management fees.

## V.    Trump's Material Breaches

100.    Under Trump's management, Ithaca II's investment was in jeopardy due to Trump's illegal behavior, gross incompetence, deficient sales organization, and failure to implement an effective sales and marketing strategy designed to drive occupancy and compete with its peer luxury hotels.

101.    While Ithaca II purchased the Hotel Amenities Units relying on Trump's representation that it was out-performing the market and with the reasonable expectation that Trump would work with Ithaca II to turn certain operations of the Hotel around, it soon became clear that Trump was not capable of meeting, or willing to meet, its obligations.

102.    Trump consistently failed to meet its obligations under the HMA.

103.    Trump also materially breached its contractual obligations under the HMA to comply with all Legal Requirements, "supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel," operate the Hotel in accordance with the Operating Standard, and to "use its commercially reasonable efforts to operate the Hotel in such a manner as to endeavor to maximize the profitability and long term value of the Hotel."

104.    Additionally, Trump breached its obligations to maintain the Hotel as a luxury hotel, use its commercially reasonable efforts to manage the costs and expenses of the Hotel, make disbursements to Hotel Unit Owners based on actual costs and expenses, maintain the Hotel's financial records in accordance with the Uniform System of Accounts, include the minimum disclosures required in the monthly operating reports, maintain the appropriate funds in segregated reserve accounts, and permit Hotel TOC to make monthly payment for Common

Area Maintenance of the Hotel amenities and reimburse the Hotel Amenities Unit Owner for all such payments made to date.

105.     This conduct is a material breach and default of, among other things, Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 3.4, 4.1, 4.2, 4.4, and 4.6 of the HMA.

**B.     <u>Trump's Failure to Pay Income Taxes and Fully Report Employees' Salaries</u>**

106.     After Trump vacated the Hotel in March 2018 and turned management of the Hotel and Hotel Amenities Units to the unit owners, Ithaca learned that Trump had failed to comply with Panamanian tax and legal requirements, including, but not limited to, failing to pay withholding taxes on Trump's own management fees and failing to fully report employee salaries, exposing Ithaca to millions of dollars in liability.

107.     In the Spring of 2018, the Panamanian tax authorities began auditing the Hotel and identified the failure to withhold and pay income taxes relating to Trump's management fees.

108.     Under Panamanian law, Trump was required to pay 12.5% of the management fees it received for the management services it provided in Panama, with that amount withheld by the Hotel prior to making the payment to Trump.

109.     Trump used its control over the Hotel bank accounts to make payments to itself and affiliates without withholding the 12.5% tax on its management fees, thus intentionally evading taxes that would have been withheld from its management fees.

110.     Trump also made fraudulent and false claims to the Panamanian tax authorities that it was an affiliate of Hotel TOC, a Panamanian entity, in an attempt to cover up its unlawful activities.

111. As a result of Trump's failing to pay income taxes to the Panamanian government, the Hotel Unit Owners, including Ithaca I and Ithaca II, have all been exposed to liability.

112. Also, in the Spring of 2019, Ithaca learned that the total amount of the salaries for certain of the Hotel's employees that Trump had been reporting to the Panamanian social security agency and the amounts that the Hotels' employees had actually received as salary was different.

113. Ithaca learned this information only because, in the context of certain employment disputes pending in the Panamanian Court, it was determined that an employee was entitled to severance payment.

114. In calculating the total amount of severance, however, it was discovered that the employee's claimed salary was higher than the salary that had been reported to the social security agency.

115. On information and belief, this was not an isolated practice for this one employee, but a conscious decision to reduce the Hotel's expenses.

116. Trump's failure to comply with Panamanian legal requirements, including accurately reporting salaries and withholding taxes is a material breach of Trump's obligations under the HMA, which has caused direct damage to Ithaca II.

117. Additionally, Trump's failure to comply with the Legal Requirements demonstrates the falsity of the representations and omissions Trump made, as described above.

118. Had Trump been honest with Ithaca about its failure to pay taxes on the management fees it earned and its failure to properly report employee salaries to Panama's social security agency, Ithaca would have never entered into the Bulk Sale Agreement because, among

other things, (i) Ithaca would have recognized the significant, multi-million dollar tax penalty that could be imposed by the Panamanian government once it started auditing the Hotel; and (ii) Ithaca would have known that the representations made by Trump described above were false in that the Hotel was suffering from significant financial irregularities.

C.  **Trump's Failure to Operate the Hotel as a Luxury Property**

119.    Trump also failed to conduct basic maintenance of the Hotel Amenities Units and operate the Hotel as a luxury hotel in accordance with the Operating Standard.

120.    In or about the Spring 2019, after Trump's removal, the Hotels engaged a maintenance company to conduct routine maintenance throughout the Hotel Amenities Units, including cleaning the HVAC system and kitchen grease ducts.

121.    Incredibly, the maintenance company discovered that these systems had not been cleaned in *years*, leaving grease and mold to build up and cause corrosion of the equipment. A copy of the maintenance report is attached as **Exhibit G**.

122.    The HVAC system was particularly concerning, with significant build-up of mold and algae that the Hotel's guests were breathing.

123.    The Hotel Amenities Units have now been properly and thoroughly cleaned, but these systems never should have been permitted to deteriorate to the state Trump let them.

124.    As the prior manager, Trump was required to abide by its own luxury brand standards in maintaining and operating the Hotel Amenities Units, including basic and routine cleaning of the facilitates.

125.    Trump also caused significant and intentional damage to the Hotel Amenities Units prior to vacating the property in March 2018, including deliberately causing life and safety violations.

49015620

126.    Rather than peacefully vacate the Hotel and transition management after the termination of the HMA, Trump decide to fortify the Hotel and barricade itself in.

127.    Among other things, Trump constructed walls in the middle of hallways, barred emergency exits, and barricaded elevators in the Hotel Amenities Units.

128.    Trump also deliberately and intentionally shredded the Hotel's records, removed computer equipment and laptops from the Hotel, and installed software and/or malware on the Hotel's remaining computers that would delete the Hotel's files when accessed.

129.    In an attempt to cause further damage to the Hotel Amenities Units and Ithaca II, Trump also closed the restaurants and shut off booking channels to the Hotel for days.

130.    Trump's actions were a direct violation of the requirement that it peacefully transition the Hotel to new management after termination of the HMA and also constituted a failure to maintain and operate the Hotel as a luxury property.

131.    Trump's failure to maintain the Hotel Amenities Units and to cause further destruction of Ithaca II's property before vacating the Hotel are consistent with Trump's failure to maintain the Hotel as a luxury property.

132.    While appearing clean and luxurious, the Hotel was dirty and mismanaged.

133.    On information and belief, Trump failed to properly maintain the Hotel Amenities Units and the Hotel due it its mismanagement of and/or diversion of funds from the reserve accounts.

134.    For example, reviews from TripAdvisor for the period March 2017 through the present included guest complaints about service problems and rooms that had not been cleaned.

135.    The reviewers repeatedly noted that management did not seem invested in the property with at least two guests described the Hotel as feeling "abandoned."  Repeat guests have

49015620

also noted the changes in the Hotel during Trump's mismanagement, with one guest, who had stayed at the property 6 times, explaining "it is unlikely we will return as the changes we experienced are too drastic from the last time we stayed."

136.    In response to many of these guest complaints, Trump only provided a boilerplate response that admitted it did not provide the luxury stay expected, further damaging the Hotel's reputation.  For example, in June 2017, the Guest Relations Manager of the Hotel responded to a guest's complaint that the hotel room door was broken and that an employee entered without even knocking with its standard response, as follows:

> TOCGM, Guest Relations Manager at Trump International Hotel & Tower Panama, responded to this review
>
> Responded June 30, 2017
>
> Dear Guest,
>
> Thank you for taking the time to share your feedback. It is feedback like this that we learn from and use to improve. We work hard to deliver an exceptional guest experience, and it's apparent in this case that we fell short. If you give us a chance to earn back your trust, I can assure you that we will do our best to give you the great hotel experience that so many of our guests have grown so fond of.
>
> Sincerely,
> TrumpPanama
> Executive Office Manager

137.    By failing to maintain the service levels that its guests expect from a luxury hotel, provide clean rooms, and adequately and appropriately address guest's complaints, Trump also violated its duty to operate the Hotel as a luxury hotel and caused severe reputational damage to the Hotel.

49015620

138.    For these reasons, Ithaca II is entitled to damages for the harm Trump caused to its property and these material breaches of the HMA, including interest, costs, and attorneys' fees.

D.    **Trump's Fatally Flawed Sales and Marketing Strategy**

139.    Further, Trump also breached its obligations to Ithaca II due to its inability to develop an effective sales and marketing strategy, which caused the Hotel to lose even more market share.

140.    As a result of Trump's incompetence, the Hotel lost market share dramatically.

141.    Moreover, contrary to Trump's multiple misrepresentations, the Hotel was underperforming in its market, particularly in comparison to its luxury competitors.

142.    Ithaca attempted to raise its concerns with Trump and implored Trump to develop a sales and marketing strategy that would target the right market, encourage group and contract business to engage with the Hotel, and drive occupancy.

143.    Trump's gross incompetence and deficient sales organization stood in the way of Ithaca and any of the other hotel unit owners from making any profits on their investment.

144.    Ithaca came to learn that Trump was not only failing to generate room nights, but was continuously losing market share to lower quality hotels and at an exponential rate.

145.    While Trump represented itself as the manager of a luxury brand and had been given the opportunity to manage one of the best hotels (if not the best) in Panama in terms of amenities, finishes, and waterfront location, the Hotel sat practically empty.

146.    As compared to its peers, the property was 2 out of 7 in terms of occupancy for all of 2015, but fell to 7 out of 7 in 2016 and remained in last place for 2017.

147.    This decline in occupancy had a direct impact on the Hotel's bottom line. In May 2017, the Hotel was outperformed in RevPAR by lesser hotels with substandard amenities,

smaller rooms, and lower quality finishes, including select service hotels like the Courtyard by Marriott. This decline in revenue relative to not only its luxury peers, but also to bargain hotels in Panama City, was the direct result of Trump's gross incompetence and failure to implement a commercially reasonable strategy to market the Hotel.

148.     Trump also failed to dedicate the standard brand resources to marketing the Hotel. For example, even though Latin America was the Hotel's primary source market, the Global Sales Office had only one person dedicated to that market, which Trump double-charged the Hotel for. Not only did Trump cause the Hotel to pay for that individual's salary as an employee of the Hotel, but Trump also charged the Hotel marketing fees on top of that.

149.     Moreover, of the seven individuals working in the Global Sales Office, not a single person was located in Florida, Brazil, Colombia or Mexico, despite those being some of the main markets for guests of the Hotel.

150.     Additionally, upon information and belief, only a fraction of room nights (approximately 5%, or even less) came through Trump's reliance on its brand resources, whereas a typical international luxury hotel management company could expect to produce approximately 18-22% of room nights, with some at 30%, by relying on their brand resources.

151.     However, despite recognizing that lead generation is a significant issue plaguing the Hotel, Trump did not develop any, much less an effective, sales and marketing strategy. Rather than address the growing concern of market saturation as any other reasonable operator would, including by ensuring a steady stream of corporate accounts and group stays, Trump lost this business.

49015620

152.    In an attempt to reverse course, Ithaca tried to assist with soliciting dozens of corporate accounts in order to have some regular room nights at the Hotel, but Trump failed to use commercially reasonable efforts to secure these accounts.

153.    Trump also failed to develop a detailed strategic plan to mitigate further market saturation to deal with the 2018 opening of the W Hotel in Panama City.  Trump simply did not know what to do and refused to develop any contingency plans to ensure sufficient occupancy and revenues for after the W Hotel opened.  Ithaca learned that Trump failed to make similar contingency plans twice before, with the openings of the Hilton Panama and the Westin Panama Hotel.

154.    As a result of Trump's failure to implement an effective sales strategy, occupancy declined significantly in 2016 and 2017, with revenue generation down approximately 35% from 2015, an unprecedented decline for any hotel, in any market, especially since over half of that decline occurred in 2017, without a new luxury hotel entering the market that year.

155.    Ithaca also learned that Trump failed to take reasonable cost saving measures to counteract the steep decline in occupancy and revenue.  In addition to artificially deflating certain of the Hotel's expenses, Trump's costs relating to rooms, payroll, food and beverage, and administrative and general expenses, among others, were far higher when compared to regional luxury competitors.

156.    Alarmingly, the one area where Trump appeared to have reduced costs was marketing – the very place where dollars were needed and should have been wisely invested in order to ensure appropriate occupancy and revenue levels for this luxury Hotel.

157.    While Trump's luxury competitors were able to competently navigate the market in Panama, Trump could not be bothered to take any of the obvious and imminently reasonable

49015620

steps Ithaca recommended and did not develop any other reasonable or effective steps that any reasonable operator would have – and as the Hotel's competitors clearly did. Despite Trump's repeated representations that it was a professional hotel operator that had achieved superior performance relative to the market in Panama, these statements were false.

158. Yet, even after the termination of the HMA, Trump continued to represent to Ithaca, the other unit owners, and the public that it was achieving excellent results for the Hotel.

159. For example, in a December 2017 letter to the Hotel Unit Owners (excluding Ithaca),[6] Eric Trump continued to misrepresent that the hotel was outperforming the market, writing:

> Over the last three years, the hotel has outperformed the market by a wide margin – as much as 20% – by virtually every measure. This performance has only accelerated in 2017, particularly over the last 3 months. In September 2017 alone, the hotel outperformed its competitive set by as much as 37%. …

*See* Exhibit H.

160. Thus, based on Trump's inability to develop an effective sales and marketing strategy and the Hotel's continued decline relative to both its luxury peers and lesser quality hotels, Trump materially breached its obligations to Ithaca II under the HMA.

E. **Trump's Failure to Make Regular Disbursements to Unit Owners**

161. In addition to the breaches described above, Trump also breached the HMA by failing to make distributions to Ithaca II in accordance with Sections 2.5 and 4.6.

162. Significantly, rather than calculate distributions to Hotel Unit Owners and the Hotel Amenities Units Owner based on actual revenues and actual costs, Trump impermissibly chose to calculate distributions based on budgeted costs, which far exceed the Hotel's actual expenditures due to such abysmal occupancy levels. This resulted in the Hotel Amenities Units

---

[6] A copy of the December 22, 2017 letter is attached as **Exhibit H**.

49015620

Owner, as well as the other Hotel Unit Owners, receiving little in distributions, while Trump hoarded their cash, to, upon information and belief, fund prior deficiencies and unfunded reserves, in violation of Sections 2.5, 4.4, and 4.6 of the HMA.

163.     Accordingly, Ithaca II is entitled to recover damages resulting from Trump's failure to make such distributions, with interest.

F.     **Trump's Failure to Make Regular Disclosures**

164.     Trump also failed to meet its obligation to make disclosures of financial information, necessary for Ithaca II to property evaluate how the Hotel and Trump were actually performing.

165.     The meager disclosures that Trump made failed to meet the standards required in Section 2.5 of the HMA.

166.     For example, Trump refused to provide all aspects of the Consolidated Income Statement in accordance with the Uniform System of Accounts, including portions of the base management fee, brand marketing fee, and FFE Reserve related to the revenues of the Food and Beverage department. Trump also refused to provide an adequate monthly statistical report, and a detailed labor analysis.

167.     On information and belief, Trump failed to provide accurate and adequate disclosures in order to hide its malfeasance and mismanagement of the Hotel.

168.     Among other things, Trump's reporting deficiencies resulted in misstatements, including understated Food and Beverage Profit and Gross Operating Profit, as well as understated marketing expenses, management fees, and Non-Operating Income and Expenses.

169.     Thus, the limited financial reporting that Trump did provide was actually unreliable.

170.     Trump also failed to provide Ithaca II with all contractually required information in the monthly reports, including, but not limited to:

- A statement of net cash flow from operations in reasonable detail for such month as well as the cumulative Fiscal Year-to-date;

- A statement of the amount of the Management Fees and Reimbursable Expenses payable or reimbursable to Trump or its Affiliates;

- A balance sheet including current month and prior beginning of year balance comparisons and differences in reasonable detail;

- A schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion;

- The monthly bank statements and reconciliation;

- A monthly statistical report, including room availability and room sales;

- A detailed labor analysis in such form as Owner shall reasonably request; and

- The general ledger for the prior month.

171.     Trump also failed to timely provide audited financial statements, which arrived more than 8 months after the close of the fiscal year, prompting Ithaca to question the integrity of Trump's accounting operations.

172.     Moreover, Trump entirely failed to include Ithaca or any other Unit Owner in the annual budget process for 2018, as required under the HMA.

173.     Instead, Trump simply presented the 2018 budget to Ithaca in October 2017 and claimed it had already been approved by ownership.

174.     Upon information and belief, Trump never presented the 2018 budget to the board of Hotel TOC, the Assembly of Shareholders, or any of the Beneficiaries of the Foundation for

their approval, but instead has purported to usurp control of Hotel TOC and dispensed with corporate formalities, in flagrant violation of its contractual and fiduciary obligations to Hotel TOC, Ithaca II, and all the other Hotel Unit Owners.

175. These failures constitute material breaches of Sections 2.1, 2.2, 2.3, and 2.5 of the HMA, among others, entitling Ithaca II to damages.

### G.     Trump's Additional Breaches of the HMA and Other Tortious Conduct

176. Additionally, Trump violated other provisions of the HMA meant to maintain the integrity of the Hotel's accounting records.

177. Notably, Section 4.2 of the HMA required Trump to maintain certain separate Capital Reserve Funds for the Hotel Units and the Hotel Amenities Units, which Trump was only entitled to use "for the purpose of the funding of Capital Improvements and replacement and renewal of FF&E for the Hotel Units, Hotel Amenities Unit, and Hotel Common Areas."

178. In a meeting on October 3, 2017, Trump produced a written presentation to Ithaca disclosing a reserves funding shortfall of approximately $1.9 million. Upon information and belief, not only do the reserve accounts have a deficit of $1.9 million, but Trump also commingled these accounts in violation of the HMA.

179. Upon information and belief, Trump drained these reserve accounts to cover operational expenses, all the while lining its pockets with management fees.

180. For example, Hotel TOC's 2016 Audited Financials, which were received eight months after the close of that fiscal year, state in Note 14:

> Provision for food, beverage, furniture and equipment
>
> Transactions in the provision for purchases of food, beverages, furniture, and equipment are summarized below:
>
> |  | 2016 | 2015 |
> |---|---|---|
> | Provision for food and beverage | | |

| | | |
|---|---:|---:|
| Beginning balance | 1,073,019 | 826,983 |
| Provision charged to expenses | 268,519 | 236,046 |
| Project, acquisition of food and beverage | (153,212) | - |
| Ending balance | 1,188,326 | 1,073,019 |

The bank account as of December 31, 2016 maintains a balance available for the provision for purchase of food and beverages of USD785,500, showing an insufficiency with respect to the provision for USD402,825.

| Provision for furniture and equipment | | |
|---|---:|---:|
| Beginning balance | 1,996,161 | 1,530,857 |
| Provision charged to expenses | 383,774 | 465,304 |
| Project, acquisition of furniture and equipment | (929,886) | - |
| Ending balance | 1,450,049 | 1,996,061 |

The bank account as of December 31, 2016 maintains a balance available for the provision for purchase of furniture and equipment of USD518,339, showing an insufficiency with respect to the provision on for USD931,710.

***Hotel Toc, INC. has account receivable from unit owners for an amount of B/.392,859 (See Note 6) which explains in part the insufficiency of funds to make the contributions to the reserve fund.***

*See* Hotel TOC's 2016 Audited Financials, n. 4 (emphasis added).

181.    The auditor's note confirms that Trump was not funding the reserves as required, but was in fact using what reserves remained to fund operational expenses.  Moreover, the auditor's note confirms that Trump routinely withdrew funds from the reserve accounts and, at times, replaced those withdrawals with funds from other sources (such as the receivables referred to above), expressly breaching the requirement that reserves can only be funded from Hotel revenues and must be segregated, not commingled.

182.    Moreover, based on this admission that the unfunded reserves increased from approximately $1.3 million indicated in the 2016 Audited Financials to $1.9 million in October

2017, Trump also breached Section 4.2 of the HMA by failing to fund the reserve accounts, while also making distributions to Unit Owners.

183.    Trump had actual knowledge in January 2017 that there was a binding agreement in place to sell 202 of the Hotel Units and the Hotel Amenities Units to Ithaca I and Ithaca II, respectively.    Despite this knowledge, Trump made distributions to Newland, the outgoing majority Hotel Unit Owner and Hotel Amenities Units Owner, without first funding the reserve accounts, as required under the HMA, to the detriment of Ithaca.

184.    On information and belief, Trump also improperly distributed unearned funds from these reserve accounts to itself without authorization

185.    As a result, Trump is liable to Ithaca for conversion.

**VI.    Trump Asserts Baseless Claims Against Plaintiffs
in the Arbitration Relating to the Bulk Sale Agreement**

186.    Due to Trump's numerous breaches of the HMA, many of which are described above, Hotel TOC commenced the ICC Arbitration against Trump, alleging various defaults and seeking a declaration that the HMA was terminated.

187.    In response, Trump not only served Hotel TOC with an Answer and Counterclaims, but also attempted to join various third-parties to the Arbitration, including the Plaintiffs.  *See* Ex. D.[7]

188.    Yet, Trump's claims against Plaintiffs cannot proceed in the Arbitration because there is no arbitration agreement between them.

189.    Trump's relationship with Ithaca derives entirely from the Bulk Sale Agreement, pursuant to which Ithaca II agreed to be bound to the HMA as a successor to the Hotel Amenities Units Owner.

---

[7] The ICC served Plaintiffs with the initial third-party claims on or after December 26, 2017.

49015620

190.     Orestes Fintiklis has no agreement with Trump.

191.     Moreover, all of Trump's claims against Plaintiffs arise from or relate to the Bulk Sale Agreement, including whether there has been a breach of that agreement, the interpretation of that agreement, the parties' respective rights under that agreement, and whether Plaintiffs have the right to vote their units to terminate Trump and the HMA based on the terms of that agreement.  *See* Ex. D at pp. 40-57.

192.     Yet, the Bulk Sale Agreement contains a mandatory forum selection clause. Moreover, this mandatory forum selection clause modifies any arbitration agreement that may have otherwise bound Ithaca arising from the HMA.

193.     Because the Bulk Sale Agreement includes an exclusive, mandatory forum selection clause, it ***trumps*** Trump's decision to assert claims against the Plaintiffs in the ICC Arbitration, regardless of the incorporation by reference of the HMA.  Consequently, Trump is precluded from pursuing its claims against Plaintiffs in the ICC Arbitration.

## VII.     Fintiklis Is Not the Alter Ego of Ithaca I and Ithaca II

194.     In addition to Trump's incorporation by reference theory, Trump alleges jurisdiction to join Fintiklis individually in the Arbitration on the grounds that, as the authorized representative of Hotel TOC and his alleged "domination and control" over Ithaca I and Ithaca II. *See* Ex. D at ¶ 49(i).

195.     Trump also contends that Ithaca I and Ithaca II are Fintiklis' alter egos, that he "derives substantial benefit" from those entities, that he "exploit[s] and benefit[s] from the agreement to which Ithaca I and Ithaca II were bound," and that he is, therefore, allegedly estopped from denying the ICC's jurisdiction over him.  *Id.*  Due to the foregoing conclusory allegations, Trump claims that it "may pierce the veil of Ithaca I and Ithaca II … to reach Fintiklis personally." *Id.* at ¶ 49 (iii).

49015620

196.    Implicit in Trump's conclusory allegations is its recognition that Fintiklis is not a party to any agreement with Trump, much less any arbitration agreement.  To get around this preclusive fact, Trump asserts ICC jurisdiction over Fintiklis through an alter ego theory, claiming without any facts that he is dominating and controlling Ithaca I and Ithaca II.

197.    This is not true, and Trump has not (and cannot) plead otherwise.  Fintiklis is an officer and director of Ithaca I and Ithaca II – in essence their agent.  Fintiklis answers to the shareholders and investors of these entities, and they have been fully apprised of, and are in support of, all actions that he has taken to protect their investment relating to the Hotel.

198.    However, merely because Fintiklis has some degree of control regarding Ithaca, this is insufficient standing alone to subject Fintiklis to the ICC's jurisdiction (or personal liability).  Fintiklis has never manifested an intention to be personally bound by the HMA or the Bulk Sale Agreement, which is further demonstrated by the filing of this action, and Fintiklis has not derived a direct benefit from the HMA or the Bulk Sale Agreement.

199.    Unsurprisingly, on or about June 14, 2018, the ICC's Secretariat informed Mr. Fintiklis that the International Court of Arbitration of the International Chamber of Commerce granted his request and sustained his objection to be joined to the ICC Arbitration.

200.    For these reasons, among others, Fintiklis denies Trump's allegations that he is the alter ego of the Ithaca entities or is otherwise subject to the ICC's jurisdiction.

## FIRST CAUSE OF ACTON
### For Declaratory Judgment that Ithaca I is not subject to ICC Jurisdiction
### (Ithaca I Against Defendants)

201.    Ithaca I repeats and realleges each and every allegation contained in Paragraphs 1 through 200 of this Complaint with the same force and effect as if set forth here in full.

49015620

202.     Ithaca I and Trump contractually agreed to bring any dispute with respect to the Bulk Sale Agreement exclusively in this Court or the state courts of the State of New York. Ithaca I's valid and binding agreement with Trump supersedes any right that Trump may have had to arbitrate these claims in the ICC pursuant to the HMA's arbitration clause.

203.     Ithaca I is compelled to seek relief in this Court because arbitration is a creature of contract, and an arbitration panel has no authority to decide whether the parties have submitted to it under the terms of their contract.   It is well-settled law that only a court can determine whether parties agreed to arbitrate and, under the terms of the Bulk Sale Agreement, the federal and state courts of the State of New York are the exclusive, mandatory fora.

204.     As a matter of law, unless Trump is enjoined from pursuing its claims in the Arbitration, Ithaca I will suffer irreparable harm because it will (i) be deprived of its right to litigate this dispute in the forum in which the parties expressly agreed to resolve disputes, (ii) be forced to arbitrate a dispute it has not agreed to arbitrate, and (iii) be forced to incur the substantial time and expense in defending itself in the arbitration proceeding, or risk an adverse outcome in those proceedings.   Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm as a matter of law.

205.     Declaratory relief from this Court will resolve this controversy.

206.     As alleged herein, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.   Ithaca I therefore requests a declaratory judgment from this Court pursuant to 28 U.S.C. § 2201 et seq. and Rule 57 of the Federal Rules of Civil Procedure that Trump's claims are not arbitrable and that Trump must bring its claims, if at all, in the federal or state courts of the State of New York.

49015620

## SECOND CAUSE OF ACTION
### For Preliminary and Permanent Injunctive Relief
### (Ithaca I Against Defendants)

207. Ithaca I repeats and realleges each and every allegation contained in Paragraphs 1 through 200 of this Complaint with the same force and effect as if set forth here in full.

208. Trump has asserted claims for compensatory and punitive damages against Ithaca I in the Arbitration and, on information and belief, unless enjoined, will continue to pursue such claims.

209. As a matter of law, unless Trump is enjoined from pursuing its claims in the Arbitration, Ithaca I will suffer irreparable harm because it will (i) be deprived of its right to litigate this dispute in the forum in which the parties expressly agreed to resolve disputes, (ii) be forced to arbitrate a dispute it has not agreed to arbitrate, and (iii) be forced to incur the substantial time and expense in defending itself in the arbitration proceeding, or risk an adverse outcome in those proceedings. Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm as a matter of law.

210. The balance of the equities weighs heavily in favor of an injunction.

211. The public interest would be served by enjoining Trump from pursuing its meritless claims against Ithaca I in the Arbitration because, among other reasons, the Bulk Sale Agreement precludes arbitration of this dispute.

## THIRD CAUSE OF ACTON
### For Declaratory Judgment that Ithaca II is not subject to ICC Jurisdiction
### (Ithaca II against Defendants)

212. Ithaca II repeats and realleges each and every allegation contained in Paragraphs 1 through 200 of this Complaint with the same force and effect as if set forth here in full.

49015620

213.    Ithaca II and Trump contractually agreed to bring any dispute with respect to the Bulk Sale Agreement exclusively in this Court or the state courts of the State of New York. Ithaca II's valid and binding agreement with Trump supersedes any right that Trump may have had to arbitrate these claims in the ICC pursuant to the HMA's arbitration clause.

214.    Ithaca II is compelled to seek relief in this Court because arbitration is a creature of contract, and an arbitration panel has no authority to decide whether the parties have submitted to it under the terms of their contract.  It is well-settled law that only a court can determine whether parties agreed to arbitrate and, under the terms of the Bulk Sale Agreement, the federal and state courts of the State of New York are the exclusive, mandatory fora.

215.    As a matter of law, unless Trump is enjoined from pursuing its claims in the Arbitration, Ithaca II will suffer irreparable harm because it will (i) be deprived of its right to litigate this dispute in the forum in which the parties expressly agreed to resolve disputes, (ii) be forced to arbitrate a dispute it has not agreed to arbitrate, and (iii) be forced to incur the substantial time and expense in defending itself in the arbitration proceeding, or risk an adverse outcome in those proceedings.  Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm as a matter of law.

216.    Declaratory relief from this Court will resolve this controversy.

217.    As alleged herein, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Ithaca II therefore requests a declaratory judgment from this Court pursuant to 28 U.S.C. § 2201 et seq. and Rule 57 of the Federal Rules of Civil Procedure that Trump's claims are not arbitrable and that Trump must bring its claims, if at all, in the federal or state courts of the State of New York.

49015620

## FOURTH CAUSE OF ACTION
### For Preliminary and Permanent Injunctive Relief
### (Ithaca II Against Defendants)

218.     Ithaca II repeats and realleges each and every allegation contained in Paragraphs 1 through 200 of this Complaint with the same force and effect as if set forth here in full.

219.     Trump has asserted claims for compensatory and punitive damages against Ithaca II in the Arbitration and, on information and belief, unless enjoined, will continue to pursue such claims.

220.     As a matter of law, unless Trump is enjoined from pursuing its claims in the Arbitration, Ithaca II will suffer irreparable harm because it will (i) be deprived of its right to litigate this dispute in the forum in which the parties expressly agreed to resolve disputes, (ii) be forced to arbitrate a dispute it has not agreed to arbitrate, and (iii) be forced to incur the substantial time and expense in defending itself in the arbitration proceeding, or risk an adverse outcome in those proceedings.  Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm as a matter of law.

221.     The balance of the equities weighs heavily in favor of an injunction.

222.     The public interest would be served by enjoining Trump from pursuing its meritless claims against Ithaca II in the Arbitration because, among other reasons, the Bulk Sale Agreement precludes arbitration of this dispute.

## FIFTH CAUSE OF ACTON
### For Declaratory Judgment that Fintiklis is not subject to ICC Jurisdiction
### (Fintiklis Against Defendants)

223.     Fintiklis repeats and realleges each and every allegation contained in Paragraphs 1 through 200 of this Complaint with the same force and effect as if set forth here in full.

49015620

224.     Fintiklis is not bound by the HMA because he is not a party to that agreement, did not sign that agreement, and did not otherwise undertake any conduct to subject him to the HMA's arbitration clause.

225.     Fintiklis is not bound by the Bulk Sale Agreement because he is not a party to that agreement, but only executed the agreement as a representative of Ithaca, and did not evidence any intent to or otherwise undertake any conduct that could subject him to the HMA's arbitration clause.

226.     Trump's claims against Fintiklis relate entirely to the Bulk Sale Agreement, which provides for the exclusive jurisdiction of the state or federal courts of the State of New York.

227.     Fintiklis is not the alter ego of Ithaca I, Ithaca II, Hotel TOC, and/or the Foundation.

228.     Fintiklis is compelled to seek relief in this Court because arbitration is a creature of contract, and an arbitration panel has no authority to decide whether the parties have submitted to it under the terms of their contract.  It is well-settled law that only a court can determine whether parties agreed to arbitrate.

229.     As a matter of law, unless Trump is enjoined from pursuing its claims in the Arbitration, Fintiklis will suffer irreparable harm because he will (i) be deprived of his right to litigate this dispute in the forum in which the parties expressly agreed to resolve disputes, (ii) be forced to arbitrate a dispute he has not agreed to arbitrate, and (iii) be forced to incur the substantial time and expense in defending himself in the arbitration proceeding, or risk an adverse outcome in those proceedings.  Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm as a matter of law.

49015620

230. Declaratory relief from this Court will resolve this controversy.

231. As alleged herein, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Fintiklis therefore requests a declaratory judgment from this Court pursuant to 28 U.S.C. § 2201 et seq. and Rule 57 of the Federal Rules of Civil Procedure that Trump's claims are not arbitrable and that Trump must bring its claims, if at all, in the federal or state courts of the State of New York.

**SIXTH CAUSE OF ACTION**
**For Preliminary and Permanent Injunctive Relief**
**(Fintiklis Against Defendants)**

232. Fintiklis repeats and realleges each and every allegation contained in Paragraphs 1 through 200 of this Complaint with the same force and effect as if set forth here in full.

233. Fintiklis should not be required to arbitrate Trump's claims against him because he never executed the HMA in his individual or representative capacity, and he never obligated himself to arbitrate claims against Trump by signing the HMA, or by any other conduct or action. Also, Fintiklis is not the alter ego of Ithaca I, Ithaca II, Hotel TOC, and/or the Foundation.

234. Nevertheless, Trump has asserted claims for compensatory and punitive damages against Fintiklis in the Arbitration and, on information and belief, unless enjoined, will continue to pursue such claims.

235. As a matter of law, unless Trump is enjoined from pursuing its claims in the Arbitration, Fintiklis will suffer irreparable harm because he will (i) be deprived of his right to litigate this dispute in the forum in which the parties expressly agreed to resolve disputes, (ii) be forced to arbitrate a dispute he has not agreed to arbitrate, and (iii) be forced to incur the substantial time and expense in defending himself in the arbitration proceeding, or risk an

41

adverse outcome in those proceedings. Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm as a matter of law.

236. The balance of the equities weighs heavily in favor of an injunction.

237. The public interest would be served by enjoining Trump from pursuing its meritless claims against Fintiklis in the Arbitration because the Bulk Sale Agreement precludes arbitration of this dispute.

**SEVENTH CAUSE OF ACTION**
**For Breach of Contract**
**(Ithaca II Against Defendants)**

238. Ithaca II repeats and realleges each and every allegation contained in paragraphs 1 through 200 hereof as though fully set forth herein.

239. In February 2017, Trump and Ithaca II entered into the Bulk Sale Agreement.

240. Pursuant to Section 3(A) of the Bulk Sale Agreement, Ithaca II agreed to be bound by the terms and conditions of the HMA as successor to the Hotel Amenities Unit Owner.

241. Trump was contractually obligated to Ithaca II, pursuant to the Bulk Sale Agreement, to meet the obligations to the Hotel Amenities Unit Owner set forth in the HMA.

242. Under New York Law, which governs the Bulk Sale Agreement and HMA, the covenant of good faith and fair dealing is implied in every contract.

243. The HMA required Trump to, among other things, (i) supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel, including establishing a market-driven sales and marketing strategy that drives occupancy and is responsive to the Hotel's target market, HMA at § 2.1; (ii) operate the Hotel in accordance with the Operating Standard and maintain the Hotel as a luxury property, *id.* at § 2.2; and, (iii) "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel," *id.*

49015620

244.    Trump was also required to "correct or avoid any violation of any laws, ordinances, rules, regulations or other applicable legal requirements," *id.* at § 2.2.15, and "exercise commercially reasonable efforts to do or cause to be done all such acts and things in or about the Hotel as shall reasonably be necessary to comply with Legal Requirements." *Id.* at § 2.2.24.

245.    Trump breached its obligations to Ithaca II by, among other things, (i) failing to pay all taxes due and owing; (ii) failing to pay the required social security obligations for the Hotel's employees, (iii) failing to maintain the Hotel Amenities Units and the Hotel in accordance with the Operating Standard, (iv) failing to make commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel by, among other things, employing fatally flawed sales and marketing strategies, failing to properly manage the Hotel staff and physical condition of the Hotel, failing to address the plummeting occupancy levels, declining revenues, and increased costs despite repeated demands by Owner, and (v) wasting funds and assets, all to Ithaca II's detriment.

246.    By virtue of Trump's breaches of these contractual obligations, Ithaca II has been damaged in an amount to be determined through trial but not less than $10 million, plus interest, costs, and attorneys' fees.

## EIGHTH CAUSE OF ACTION
### For Breach of Contract
### (Ithaca II Against Defendants)

247.    Ithaca II repeats and realleges each and every allegation contained in paragraphs 1 through 200 hereof as though fully set forth herein.

248.    In February 2017, Trump and Ithaca II entered into the Bulk Sale Agreement.

249.    Pursuant to Section 3(A) of the Bulk Sale Agreement, Ithaca II agreed to be bound by the terms and conditions of the HMA as successor to the Hotel Amenities Unit Owner.

49015620

250.     Trump was contractually obligated to Ithaca II pursuant to the Bulk Sale Agreement to meet the obligations to the Hotel Amenities Unit Owner set forth in the HMA.

251.     Under New York Law, which governs the Bulk Sale Agreement and HMA, the covenant of good faith and fair dealing is implied in every contract.

252.     Trump was required under the HMA to, among other things, (i) make disbursements to the Hotel Amenities Units Owner based on actual costs and expenses; (ii) maintain the Hotel's financial records in accordance with the Uniform System of Accounts; (iii) include in the minimum disclosures required in the monthly operating report; and (iv) maintain the appropriate funds in segregated reserve accounts. *See e.g.* HMA at § 2.5, 4.2, and 4.6.

253.     Trump failed to perform all of these obligations.

254.     By virtue of Trump's breaches of these contractual obligations, Ithaca II has been damaged in an amount to be determined through trial but not less than $3 million, plus interest, costs, and attorneys' fees.

## NINTH CAUSE OF ACTION
### For Conversion
### (Ithaca I and Ithaca II Against Defendants)

255.     Ithaca I and Ithaca II repeat and reallege each and every allegation contained in paragraphs 1 through 200 hereof as though fully set forth herein.

256.     Ithaca has a possessory right or interest in 202 Hotel Units and the Hotel Amenities Units.

257.     Trump had dominion over Ithaca's assets, namely its funds and revenue.

258.     In derogation of Ithaca's right or interest in these assets, Trump knowingly interfered with and converted these assets by, among other things, distributing Ithaca's reserve funds to Newland and/or itself, which Trump knew it had no right to do.

49015620

259. By reason of Trump's conduct, Ithaca has been damages in the amount of the stolen funds, which is an amount to be determined at trial but not less than $2 million, plus interest, costs, and attorneys' fees.

## TENTH CAUSE OF ACTION
### For Fraud
### (Ithaca I and Ithaca II Against Defendants)

260. Ithaca I and Ithaca II repeat and reallege each and every allegation contained in paragraphs 1 through 200 hereof as though fully set forth herein.

261. In 2016 and 2017, prior to execution of the Bulk Sale Agreement, Trump made knowingly false and/or misleading representations to Ithaca concerning the Hotel's performance, Trump's management of the Hotel, and that the Hotel was performing above the market.

262. These false and misleading statements were repeated at least three times to Ithaca to induce Ithaca to sign the Bulk Sale Agreement.

263. Trump knew that these statement were false and misleading when they were made to Ithaca, but Trump nevertheless made them to Ithaca with the express intent to have Ithaca rely on them to their detriment and to induce Ithaca to enter into the Bulk Sale Agreement.

264. On or about February 15, 2017, Ithaca entered into the Bulk Sale Agreement.

265. Ithaca reasonably and actually relied on Trump's multiple misrepresentations concerning the Hotel's performance in entering into the Bulk Sale Agreement and consummating the purchase of the Hotel Units and Hotel Amenities Units to their detriment.

266. Because Trump possessed superior knowledge that was unavailable to Ithaca, Trump had a duty to disclose and failed to disclose that the Hotel's expenses were artificially deflated due to illegal activity, including, but not limited to, failing to fully report the Hotel's employees' salaries to the Panamanian social security agency and failing to pay income taxes.

49015620

267.     In mid to late 2018, Ithaca learned that these representations were indeed false, and that the Hotel's actual performance was worse than Trump had previously represented.

268.     As a direct and proximate result of Trump's false and misleading statements, Ithaca has been damaged in an amount to be determined at trial but not less than $2 million, plus punitive damages, interest, costs, and attorneys' fees.

**ELEVENTH CAUSE OF ACTION**
**For Attorney's Fees**
**(Ithaca II Against Defendants)**

269.     Ithaca II repeats and realleges each and every allegation contained in paragraphs 1 through 200 hereof as though fully set forth herein.

270.     In February 2017, Trump and Ithaca II entered into the Bulk Sale Agreement.

271.     Paragraph 8 of the Bulk Sale Agreement provides:

> If a Party commences a legal proceeding to interpret or enforce the terms of this Agreement, the prevailing Party shall be entitled to recover its costs and expenses incurred in such legal proceeding, including reasonable attorneys' fees and expenses, from the losing Party in such proceeding.

272.     On or about January 16, 2018, Plaintiffs commenced the instant action, which sought, among other things, to interpret or enforce the terms of the Bulk Sale Agreement.

273.     As set forth above, Trump has breached the Bulk Sale Agreement. As such, Ithaca II is the "prevailing party in such legal proceeding."

274.     Accordingly, pursuant to the terms of the Bulk Sale Agreement, Ithaca II is entitled to its "costs and expenses incurred in such legal proceeding, including reasonable attorneys' fees and expenses" from Trump.

**WHEREFORE**, plaintiffs Ithaca Capital Investments I, S.A., Ithaca Capital Investments II, S.A., and Orestes Fintiklis respectfully demand that judgment be entered as follows:

49015620

a.  On the First Cause of Action, for a declaratory judgment, awarding Ithaca I a declaration that it is not required to arbitrate Trump's claims in the International Chamber of Commerce;

b.  On the Second Cause of Action, for preliminary and permanent injunctive relief, enjoining, barring and prohibiting Trump or its agents from prosecuting further proceedings against Ithaca I in the International Chamber of Commerce;

c.  On the Third Cause of Action, for a declaratory judgment, awarding Ithaca II a declaration that it is not required to arbitrate Trump's claims in the International Chamber of Commerce;

d.  On the Fourth Cause of Action, for preliminary and permanent injunctive relief, enjoining, barring and prohibiting Trump or its agents from prosecuting further proceedings against Ithaca II in the International Chamber of Commerce;

e.  On the Fifth Cause of Action, for a declaratory judgment, awarding Fintiklis a declaration that he is not required to arbitrate Trump's claims in the International Chamber of Commerce;

f.  On the Sixth Cause of Action, for preliminary and permanent injunctive relief, enjoining, barring and prohibiting Trump or its agents from prosecuting further proceedings against Fintiklis in the International Chamber of Commerce;

g.  On its Seventh Cause of Action, an award of damages in an amount to be determined through trial but not less than $10 million, plus interest, costs, and attorneys' fees;

h.  On its Eighth Cause of Action, an award of damages in an amount to be determined through trial but not less than $3 million, plus interest, costs, and attorneys' fees;

i.  On its Ninth Cause of Action, an award of damages in an amount to be determined through trial but not less than $2 million, plus interest, costs, and attorneys' fees;

j.  On its Tenth Cause of Action, an award of damages in an amount to be determined through trial but not less than $2 million, plus punitive damages, interest, costs, and attorneys' fees;

k.  On its Eleventh Cause of Action, an award of damages for attorney's fees and costs incurred in litigating this action in an amount to be determined through trial;

l.  On each cause of action, awarding Plaintiffs the costs and fees associated with the prosecution of this action, including reasonable attorney's fees, together with such other, further or different relief as this Court deems just and proper in the circumstances.

47

Dated:  New York, New York
          June 3, 2019

AKERMAN LLP


By: _____/s Joshua D. Bernstein_____
          Joshua D. Bernstein, Esq.
          Darryl R. Graham, Esq.
          Kathleen M. Prystowsky, Esq.
          666 Fifth Avenue, 20th Floor
          New York, New York 10103
          Tel: (212) 880-3800

          *Counsel to Plaintiffs Ithaca Capital*
          *Investments I, S.A., Ithaca Capital*
          *Investments II, S.A., and Orestes Fintiklis*

49015620