UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ITHACA CAPITAL INVESTMENTS I S.A.,
ITHACA CAPITAL INVESTMENTS II S.A., and
ORESTES FINTIKLIS,

                                Plaintiffs,

        – against –

TRUMP PANAMA HOTEL MANAGEMENT LLC
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT LLC,

                                Defendant.

---

TRUMP PANAMA HOTEL MANAGEMENT LLC
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT LLC,

                          Counter Claimants,

        – against –

ITHACA CAPITAL INVESTMENTS I S.A.,
ITHACA CAPITAL INVESTMENTS II S.A., and
ORESTES FINTIKLIS,

                        Counter Defendants.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: March 30, 2020

**OPINION AND ORDER**

18 Civ. 390 (ER)

RAMOS, D.J.:

       Ithaca Capital Investments I S.A. ("Ithaca I"), Ithaca Capital Investments II S.A. ("Ithaca II"), and Orestes Fintiklis ("Fintiklis")(collectively, "Plaintiffs"), bring this action against Trump Panama Hotel Management LLC and Trump International Hotels Management (jointly, "Defendants"), seeking a declaratory judgment that they are not subject to the jurisdiction of the International Chamber of Commerce ("ICC") and injunctive relief barring Defendants from further prosecuting Plaintiffs before the ICC.  After this Court issued a preliminary injunction in

favor of Plaintiffs, Defendants answered with eight counterclaims sounding in fraud, tortious

interference with contract, and breach of contract. Plaintiffs now move to dismiss the

counterclaims for fraud, and tortious interference with contract as against Ithaca I and II, and all

counterclaims as against Fintiklis. In addition, Plaintiffs move for leave to file an amended

complaint to assert their own claims sounding fraud, conversion and breach of contract. For the

reasons set forth below, Plaintiffs' motion to dismiss is GRANTED in part and DENIED in part,

and Plaintiffs' motion for leave to file an amended complaint is GRANTED.

## I.   BACKGROUND

### A.  Factual Background[1]

This dispute concerns a breakdown in the relationship between Plaintiffs, the owners of a

number of units in a Panamanian condominium hotel named the Trump International Hotel &

Tower Panama (the "Hotel"), and Defendants, the companies that previously managed the Hotel.

Fintiklis is the president and principal of Ithaca I and II, two Panamanian capital investment

entities that currently own 215 of 369 units in the Hotel. Countercl. ¶¶ 20-22.

Until March 2018, Defendants managed the Hotel under a 2011 hotel management

agreement (the "HMA") between themselves and non-parties Newland International Properties

Corp. ("Newland") the Hotel's developer and promoter and owner of the Hotel's amenities

units,[2] and the Hotel TOC Foundation ("Hotel TOC").[3] *See* Doc. 38 Ex.1.

---

[1] The following facts are drawn both from Defendants' answer with counterclaims, Doc. 38 at 17-50 ("Defs' Countercl."), which the Court must accept as true for purposes of Plaintiffs' motion to dismiss, as well as from Plaintiffs' proposed amended complaint, Doc. 76-1 Ex.1 ("Am. Compl."), which are accepted as true for purposes of Plaintiffs' motion for leave to file an amended complaint.

[2] The Hotel's amenities units include, *inter alia*, the Hotel's restaurants, swimming pools and space for events and conferences.

[3] As defined by the HMA, Hotel TOC is a private interest foundation, the beneficiaries of which are the owners of the Hotel's condominium units, formed for the purpose of collectively exercising the rights and performing the obligations of owners of the Hotel's condominium units in connection with the operation of the Hotel. *Id*. at 6.

In 2015, there was a prior ICC proceeding related to management of the Hotel between Defendants and Gary Lundgren ("Lundgren"), an owner of fifty condominium units in the Hotel. Countercl. ¶¶ 4, 9. That proceeding was settled in February 2016, and the resulting settlement agreement (the "Lundgren Settlement Agreement") provides, in relevant part, that Lundgren will take no actions to interfere with Defendants' management of the Hotel. *Id.* ¶ 5. According to Defendants, Fintiklis had at all relevant times "actual knowledge of" and was "fully aware of the covenants in the Lundgren Settlement Agreement." *Id.* ¶¶ 33, 151.

Newland went bankrupt in 2016, and offered their 202 Hotel condominium units and 13 amenities units for sale in May that year. *Id.* ¶¶ 34-35. Fintiklis first met with Defendants about a proposed bulk purchase of those units in June 2016. *Id.* ¶ 6.

According to Plaintiffs, while they were conducting due diligence on the Hotel's financials in connection with the potential purchase, the parties had several meetings during which Defendants made misrepresentations about the Hotel's performance. At a meeting on August 1, 2016, Defendants' representative falsely stated, among other things, that they had "[s]uperior market share[4]" and "the Hotel was achieving better financial results than the market in Panama, which was due to [Defendants'] operation of the Hotel." Am. Comp. ¶¶ 40-45. Plaintiffs allegedly relied on these representations in their later decision to purchase the units. *Id.* ¶ 52. Plaintiffs further allege that despite reviewing the Hotel's financials, they could not have known at the time that the records provided by Defendants artificially deflated the Hotel's expenses, as they discovered later after taking control of the Hotel in March 2018. Am. Compl. ¶ 63.

---

[4] According to Plaintiffs, the term "market share" is synonymous with hotel occupancy in the industry. Am. Compl. ¶ 52.

On October 14, 2016, Fintiklis along with Newland's representatives went in Defendants' New York offices to discuss the potential purchase. *Id*. ¶ 36. Four days later, Fintiklis sent an email to all the attendees of that meeting, stating that he "looked forward to closing the transaction and working together to turning around this wonderful property." Thereafter, the parties negotiated the terms of a bulk sale agreement (the "BSA"). *See* Doc. 38 Ex. 4. In February 2017, the parties executed the BSA and closed the purchase. Countercl. ¶¶ 42-46. At Fintiklis' request, the BSA identifies Ithaca I as the purchaser of 202 condominium units, and Ithaca II as the purchaser of the 13 amenities units. Under section 3(A) of the BSA, Ithaca II agreed that it "shall be bound by the terms and conditions of the [HMA] as successor to the Hotel [a]menities [u]nits [o]wner." *See* Doc. 38 Ex. 4 at 3. In exchange for Defendants' consent to the purchase,[5] Plaintiffs agreed in section 3(D) of the BSA that they "shall not directly or indirectly take any actions to interfere with or undermine [Defendants]' rights under…the HMA…[or] exercise their voting rights in a way adverse to [Defendants]." Countercl. ¶¶ 39-40; *see also* Doc. 38 Ex. 4 at 4. The BSA also contained a forum selection clause that provides that all disputes with respect to the BSA "shall be brought only in the State of New York." *See id*. at 9.

On October 3, 2017, while he was meeting with Defendants on how to improve the Hotel's performance, Fintiklis sent a mass email to all the owners of the Hotel's condominium units requesting their attendance at "a meeting of the beneficiaries of [the Hotel TOC] on [October 14, 2017]." In the email, he called the meeting an opportunity to meet as many owners as possible and "hear their thoughts and ideas." *Id*. ¶ 49. Upon learning about this, Defendants contacted Fintiklis to remind him of his obligations under the BSA, and section 3(D) thereunder, and requested to have their general manager attend the meeting. *Id*. ¶¶ 50-51. In response,

---

[5] Under the HMA, any sale of 10 or more units required Defendants' written consent. Countercl. ¶ 35.

Fintiklis confirmed his awareness of his obligations, agreed to have Defendants' general manager attend the meeting, and claimed that the meeting was "merely an informal lunch… a good way to meet everyone." *Id*. ¶ 52.

On October 14, 2017, Plaintiffs held the meeting[6] and with Lundgren's vote, managed to install Fintiklis, his lawyer Alfredo Guerra and Jaime Fernandez[7] on the Hotel TOC's board. *Id*. ¶¶ 54-73. On that same day, the newly reorganized Hotel TOC served Defendants with a notice of default, asserting various grounds for default including but not limited to, plummeting occupancy levels, failure to take reasonable cost saving measures, and failure to maintain the Hotel's financial records. *Id*. ¶¶ 74,77; *see also* Doc. 38 Ex. 10 ("Notice of Default"). Also later that day, Hotel TOC filed a request for arbitration before the ICC.[8] *Id*. ¶¶ 12, 75.

According to Defendants, rather than waiting for the ICC arbitration, Plaintiffs, along with Lundgren, engaged in a series of self-help measures from late February to early March 2018. *Id*. ¶¶ 85-98. These measures included physically removing Defendants from the Hotel, cutting off power, attempting to forcibly enter the Hotel's executive offices, locking Defendants' employees out of the Hotel through hacking its security system and disabling all the doors, and burglarizing the Hotel's information technology room. *Id*. They also physically removed Defendants' trademarks and brand from the Hotel. *Id*.

---

[6] According to Defendants, Plaintiffs ordered their general manager out of the room shortly after the meeting began. Countercl. ¶ 60.

[7] It is unclear from the record who Jaime Fernandez is.

[8] Section 9 of the HMA provides that disputes arising out of or relating to this agreement shall be submitted to the ICC for arbitration and sets forth the manner to do so. *See id*. at 80-83.

Plaintiffs do not dispute that they took control of the Hotel in March 2018. According to Plaintiffs, with full access to the Hotel and its books and records, they discovered that Defendants had underreported their management fees and employees' salaries, failed to pay income taxes thereon, employed a flawed sales and marketing strategy, failed to make monthly distributions to the Hotel's owners, failed to properly maintain the Hotel's financial records, commingled the Hotels' revenues and capital reserves, and pocketed some of the Hotel's capital reserve funds as management fees that they were not entitled to. *See generally* Am. Compl.

### B. Procedural Background

On January 16, 2018, Plaintiffs commenced this action. Doc. 1. On March 22, 2018, a hearing was held, during which the Court granted Plaintiffs' motion for a preliminary injunction enjoining Defendants from pursuing against Plaintiffs the ICC arbitration captioned *Hotel TOC, Inc (Claimant). v. Trump Panama Hotel Management LLC and Trump International Hotels Management, LLC (Respondents/Third-Party Claimants) v. Ithaca Capital Investments I S.A., Ithaca Capital Investments II S.A., Orestes Fintiklis, et al. (Third Party Respondents)*, ICC Case 23149/MK. *See* Doc. 55 Ex. F ("Prelim. Inj. Hr'g"). On April 23, 2018, Defendants answered and counterclaimed. Doc. 38. On July 31, 2018, Plaintiffs moved to stay the action pending the ICC arbitration. Doc. 53. The Court denied the motion to stay.[9] Doc. 61. On June 3, 2019, Plaintiffs moved to dismiss and for leave to file an amended complaint. Docs. 72, 75. On October 17, 2019, Plaintiffs moved to stay the instant action again, Doc. 103, which the Court denied, Doc. 110.

---

[9] Specifically, the Court found that several of Defendants' counterclaims would not be resolved by the ICC arbitration and that Plaintiffs failed to show that the arbitration would conclude in a reasonable amount of time. *See* Doc. 61 at 4.

## II.   LEGAL STANDARD

### A.  Motion to Dismiss

The applicable standard for a motion to dismiss a claim pursuant to Rule 12(b)(6) also applies to a motion to dismiss a counterclaim.  *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F.Supp. 2d 620, 622 (S.D.N.Y. 2008); *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12 Civ. 6017 (KBF), 2013 WL 342922, at *2 (S.D.N.Y. Jan. 18, 2013).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  However, a court is not required to credit legal conclusions, bare assertions or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-81 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To survive a motion to dismiss, a complaint must contain enough factual matter to state a claim to relief that is plausible on its face.  *Id*. at 678 (citing *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  Accordingly, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id*. at 680 (quoting *Twombly*, 550 U.S. at 570).

### B.  Motion for Leave to Amend

Parties are entitled to amend their pleadings once, as a matter of course, within 21 days after serving the pleading or, if a responsive pleading is required, within 21 days after service of a responsive pleading or a Rule 12 motion.  Fed. R. Civ. P. 15(a)(1).  A party may not otherwise

amend its pleading without either the written consent of the opposing party or leave of the court. Fed. R. Civ. P. 15(a)(2). The Court should freely give leave when justice so requires. *Id*. The Supreme Court has held that it wold be an abuse of discretion, "inconsistent with the spirit of the Federal Rules," for a district court to deny leave without some justification, "such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Forman v. Davis*, 371 U.S. 178, 182 (1962).

The Second Circuit has stated that a court should allow leave to amend a pleading unless the non-moving party can establish prejudice or bad faith. *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Motions to amend are ultimately within the discretion of the district courts, *Foman*, 371 U.S. at 182, and they should be handled with a "strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)) (internal quotation marks omitted). Although permissive, the standard for leave to amend "is by no means 'automatic.'" *Billhofer v. Flamel Technologies, S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *4 (S.D.N.Y. July 30, 2012) (internal quotation omitted).

## III. DISCUSSION

Plaintiffs move to dismiss Defendants' three fraud counterclaims, two tortious interference with contract claims, and all claims against Fintiklis for failure to state a claim. The Court addresses each in turn.

**A.  Fraud Counterclaims**

Defendants assert counterclaims for fraud, fraudulent inducement and fraudulent concealment.  Under Rule 9(b), a party must state with particularity the circumstances constituting fraud or mistake.  Fed. R. Civ. P. 9(b).  A complaint must therefore:  "(1) specify the statements that the claimant contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).  Allegations that are merely conclusory or "unsupported by factual allegations" cannot meet this standard.  *Id.* (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)).

Here, the parties do not dispute that New York law governs these claims.  To state a claim for common law fraud under New York law, a claimant must allege that "(1) [the other party] made a representation as to a material fact; (2) such representation was false; (3) [the other party] intended to deceive ; (4) [claimant] believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance [claimant] sustained pecuniary loss[.]"  *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order) (internal citation omitted).  A claim for fraudulent inducement must satisfy the same elements as a claim for common law fraud.  *See Amida Capital Mgmt. II, LLC v. Cerberus Cappital Mgmt., L.P.*, 669 F.Supp. 2d 430, 444 (S.D.N.Y. 2009)(internal citation omitted).  A claim for fraudulent concealment shares these same elements with the additional requirement that a claimant must show that the other party had "a duty to disclose the material information."  *Woods v. Maytag Co.*, 807 F.Supp.2d 112, 119 (E.D.N.Y. 2011).

In addition, even where a fraud claim is sufficiently pled, "[u]nder New York law, no fraud claim is cognizable if the facts underlying the fraud relate to the breach of contract." *Auerbach v. Amir*, No. 06 Civ. 4821 (RJD), 2008 WL 479361, at *5 (E.D.N.Y. Feb. 19, 2008); *see also Kriegel v. Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000, at *13 (S.D.N.Y. June 30, 2014) ("Under New York law, a fraud-based claim must be sufficiently distinct from [a] breach of contract."). The Second Circuit has instructed that where fraud claims are brought alongside contract claims, the fraud claims may only proceed where they will "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs. Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

First, the counterclaim for fraudulent inducement must be dismissed because it is wholly duplicative of their counterclaim for breach of contract. A party's mere promise to perform its contractual obligations, even if knowingly false at the time of making, is not enough to support a claim of fraud under New York law. *Bridgestone*, 98 F.3d 13 at 19. In support of their fraudulent inducement claim, Defendants only allege that Plaintiffs promised that they would take no actions adverse to the interests of Defendants under the HMA in their operation of the Hotel. This is exactly Plaintiffs' duty as set forth in Section 3(D) of the BSA. Therefore, Defendants' claim for fraudulent inducement is entirely duplicative of their counterclaim for breach of contract, which is also based on Defendants' material breach of Section 3(D) of the BSA. Countercl. ¶ 140. This alone warrants dismissal of the counterclaim for fraudulent inducement. *See Kriegel v. Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000, at * 14 (S.D.N.Y. June 30, 2014) (dismissing fraudulent inducement claim because purported fraudulent

representations were "the exact representations made [in the contract]").  Defendants' citation to *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) is inapposite.  While Defendants are technically correct that the Second Circuit found in *Cohen* that a claim for fraud may be supported by misrepresentations made "before the formation of the contract and that induced the [claimant] to enter the contract," the Court nevertheless made clear that it was doing so with respect to "fraud that was extraneous to the contract, rather than a fraudulent non-performance of the contract itself."  *Id.* (internal citation omitted).  Indeed, the Second Circuit reaffirmed in *Cohen* that a claimant may not "dress up a breach-of-contract claim as a fraud claim," *id.* (internal quotation marks omitted), which is exactly the case here.

Next, Defendants' claim for fraudulent concealment must also fail because the alleged duty to disclose that Plaintiffs have failed to discharge is duplicative their duty to perform under the BSA.  *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) ("the duty to disclose must exists separately from the duty to perform under the contract").  Indeed, Defendants specifically identified the duty to disclose as plaintiffs' contractual duty under the BSA.  Countercl. ¶¶ 121-123 ("Fintiklis's concealment of Plaintiffs' true purpose was a material omission to Defendants in violation of Plaintiffs' duties under the [BSA]").

Lastly, Defendants' fraud counterclaim must also be dismissed as duplicative of the breach of contract claim.  The parties' dispute centers around the second *Bridgestone* exception, whether any alleged fraudulent representations are collateral or extraneous to the BSA.  Defendants have identified three statements by Plaintiffs as basis of their claim:  (1) that the October 14, 2017 meeting was an opportunity to meet as many Hotel Owners as possible and hear thoughts and ideas; and(2) that the meeting was an informal lunch; and (3) that Defendants' general manager could attend the meeting.  However, by their own account, Defendants

contacted Plaintiffs about the meeting and specifically sought to confirm that Plaintiffs intended to comply with the BSA. Countercl. ¶ 50 ("Upon learning of this…meeting, Defendants contacted Fintiklis directly to remind him of his obligations under the [BSA]"). Only in response to that inquiry did Fintiklis "confirmed his awareness of his obligations under the [BSA]" and stated that "the meeting was merely an informal lunch" and that Defendants' general manager could attend. *Id*. ¶ 52. Defendants' own allegations make clear that those statements were false assurances that Plaintiffs intended to fulfill their contractual obligation under the BSA to not take actions adverse to Defendants' interest, which are not collateral to the contract, and thus cannot support a claim for fraud. *See Cronos Grp. Ltd. V. XComIP*, 156 A.D. 3d 54 (N.Y. 1st Dep't 2017) ("false assurances that the promisor will perform a pre-existing contractual obligation are not collateral to the contract"); *see also Mohegan Lake Motors, Inc. v. Maoli*, No. 16 Civ. 6717 (NSR), 2017 WL 6335905, at *7-8 (S.D.N.Y. Dec. 7, 2017) (when the statements are "merely intentionally false statements demonstrating intent to perform" or are "tangential to [the contractual] obligation and would only constitute a failure to meet it" then a claim for fraud cannot lie).

Defendants' citation to *Minnie Rose* LLC, 169 F.Supp.3d 504 (S.D.N.Y. 2016) misses the point. Contrary to Defendants' assertion, Plaintiffs' purportedly false statements about the October 14 meeting are not similar to those found to be misrepresentations of present facts in *Minnie Rose*. In *Minnie Rose*, plaintiff, who ran a New York clothing retailer, had an oral agreement with defendant that defendant would be plaintiff's primary sourcing agent in China, responsible for selecting factories for manufacturing plaintiff's clothing, supervising production, negotiating prices and coordinating plaintiff's payment of the factories' invoices. 169 F.Supp. 3d at 508. In return, defendant was paid a commission of 10 percent of the cost of each item

produced and shipped to plaintiff. *Id.* Later, plaintiff learned that defendant had altered the factory invoices, inflating the manufacturing cost of each and every listed item, in order to artificially increase the commission to be paid. *Id.* at 509. Notably, the Court in *Minnie Rose* found the inflated invoices to be misrepresentations of present facts because "[d]efendant[] actively concealed the actual price of manufacturing," an existing fact, each time defendant sent plaintiff factory invoices. *Id.* at 521. Here, Plaintiffs' purportedly false statements before the meeting, are promissory statements regarding future conduct. While it is true that such statements, when made with an "undisclosed intention to not perform" may constitute a misrepresentation of "an existing fact," it is well established under New York law that where the promised performance is a contractual obligation of the promisor, "allegations of such insincere promise" are duplicative of a breach of contract claim and do not state a cause of action for fraud. *Cronos*, 156 A.D.3d 54 at 67. (internal citation omitted). Indeed, the rule that "an insincere promise to perform a contractual obligation" is not actionable as fraud, guards against "the erosion of the distinction between" a fraud claim and a breach of contract claim. *Id.*

In any event, Defendants have failed to show that they relied upon Plaintiffs' purported false statements to their detriment. Defendants allege that they were lulled by those statements into "not taking immediate action to protect [their] rights" under the BSA and HMA. However, Defendants' own allegations make clear that they were not lulled. Indeed, they acted by contacting Plaintiffs to confirm their awareness of, and intention to perform their contractual obligation under the BSA. They arranged to have their general manager to attend the October 14, 2017 meeting. Absent some factual allegations of something that they would have done, Defendants cannot rely on their general, conclusory of reliance. *See Hirsch v. Arthur Anderson*

& Co., 72 F.3d 1085, 1092 (2d Cir. 1995) ("[g]eneral, conclusory allegations need not be credited…when they are belied by more specific allegations of the complaint.").

For the foregoing reasons, the counterclaims for fraud, fraudulent inducement and fraudulent concealment must be dismissed.

### B. Tortious Interference with Contract Claims

In order to state a tortious interference with contract claim under New York law, a plaintiff must "demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting damages to the plaintiff." *Valley Lane Industries Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. App'x 102, 2012 WL 147919 at *1 (2d Cir. Jan. 19, 2012) (internal citation omitted). The Second Circuit has explained that a claim for tortious interference with contract claim, unlike one for tortious interference with business relations, does not require that "a defendant act with a wrongful purpose or utilize wrongful means." *See id*. at 3 (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004)). A plaintiff states a claim for tortious interference with contract if she can show that the "'defendant's deliberate interference resulted in a breach of the contract.'" *Id*. (internal citation omitted).

As an initial matter, Plaintiffs' contention that Defendants do not allege that Plaintiffs' interference with either the HMA or the Lundgren Settlement Agreement was "without justification," is unsupported by the record. Defendants have alleged that Plaintiffs' interference was through "wrongful conduct," which New York courts have accepted as simply another way of pleading "without justification." Countercl. ¶¶ 129, 152; *see also Lama Holding Co. v. Smith Barney In.*, 88 N.Y.2d 413, 434 (1996) ("Plaintiffs charge that Defendants' actions…wrongfully interfered with…plaintiff's agreement'").

14

Next, Plaintiffs argue that because Defendants' allegations show that both Ithaca I and II have an economic interest in the Hotel, any alleged interference was justified. Defendants correctly point out that the economic interest justification is an affirmative defense to a tortious interference claim, rather than an element to be pled. *See TechnoMarine SA v. Jacob Time, Inc.*, 905 F.Supp. 2d 482, 494 (S.D.N.Y. 2012) ("economic justification is a defense to a tortious interference claim, rather than a true element of that claim"); *see also Foster v. Churchill*, 87 N.Y.2d 744, 749-50 (N.Y. 1996) (same). In general, affirmative defenses require consideration of facts outside of the complaint and are inappropriate to consider on a motion to dismiss, unless "the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). Here, the Court disagrees with Plaintiffs' contention that the facts necessary to establish the defense are evident on the face of the complaint.

Under the economic interest justification defense, where a third party has a financial stake in an entity and interferes with an existing contract between the claimant and that entity, such interference is privileged and justified. *See White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 283 (2d Cir. 2006) (citing *Foster*, 87 N.Y.2d at 750-51). However, liability may be imposed if there has been "a showing of malice or illegality." *Id.* (internal citation omitted). Although Defendants alleged that Plaintiffs have an economic interest in the Hotel, Defendants have also alleged that Plaintiffs had an improper motive to take over the management of the Hotel forcibly, and through unlawful means such as forcible entry and burglary. Countercl. ¶¶ 20, 76, 88. Accordingly, the Court, drawing all reasonable inferences in favor of Defendants at the motion to dismiss stage, cannot conclude, solely on the basis of Defendants'

allegations, that Plaintiffs acted purely out of their economic interest, as opposed to an alternative improper motive.

Next, Plaintiffs argue that Ithaca II cannot be held liable for tortious interference with the HMA because it became bound by the HMA as a successor owner of the amenities units under the BSA. Under New York law, it is well settled that in general, "only a stranger to a contract, such as a third party, can be liable for tortious interference" with that agreement. *See e.g. Ashby v. ALM Media, LLC*, 110 A.D.3d 459 (N.Y. 1st Dep't, 2013)(internal citations omitted). However, a party to a multilateral agreement like the HMA, may still be found liable for tortious interference with the agreement, where that party has "rights and duties that are separate from those of the breaching party." *Fillmore East BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 18 (2d Cir. 2014) (internal citation omitted). Here, Ithaca II and the breaching party, Hotel TOC, have separate and distinct rights and duties under the HMA. For example, under section 5.2.2 of the HMA, Hotel TOC has the right to serve a notice of default upon the occurrence of an event of default, which Ithaca II does not. Therefore, the fact that Ithaca II is bound by the HMA is an insufficient reason to dismiss the claim. *See id*.

Lastly, Plaintiffs' contention that Defendants have merely alleged Plaintiffs' awareness of the Lundgren Settlement Agreement as opposed to "actual knowledge" thereof, is plainly refuted by Defendants' allegations. Indeed, Defendants have specifically alleged that Plaintiffs were "fully aware of the covenants in the Lundgren Settlement Agreement," and "have knowledge" thereof. Countercl. ¶¶ 33, 151. This is further bolstered by Defendants' allegations that Plaintiffs have been working "in concert with" Lundgren himself. *Id*. ¶¶ 60, 94, 97. Under New York law, Claimants need only allege that the other party knew of the existence of the relevant agreement at issue to state a claim for tortious interference therewith. *See B. Lewis*

*Productions, Inc. v. Angelou*, No. 01 Civ. 0530 (MBM), 2005 WL 1138474 at *13 (S.D.N.Y. May 12, 2005) (noting that knowledge "need not have been perfect or precise") (internal citations omitted). Indeed, Defendants need not have been "aware of the legal particulars of that contract." *Id*. (internal citations omitted).

For the foregoing reasons, Plaintiffs' motion to dismiss the counterclaims for tortious interference with the HMA and the Lundgren Settlement Agreement is denied.

### C. Claims against Fintiklis

Plaintiffs' argument that all counterclaims against Fintiklis must be dismissed because Defendants have failed to pierce the corporate veil of Ithaca I and II, is without merit. "[I]t is well-established that under New York Law, piercing the corporate veil is not required to hold a corporate officer liable for his company's torts: "a corporate officer who controls corporate conduct and thus is an active individual participant in that conduct is liable for the torts of the corporation." *City of Newburgh v. Sarna*, 690 F.Supp.2d 136, 163 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d. Cir. 1985)). Here, Fintiklis allegedly dominates and controls Ithaca I and Ithaca II as their president and principal and is alleged to have personally participated in all of the allegedly tortious conduct. Accordingly, Defendants are not required to pierce the corporate veil to assert claims against Fintiklis.

### D. Motion to Amend

Plaintiffs have moved, for the first time in this action, to amend their complaint to add new claims for fraud, breach of contract and conversion. Specifically, Plaintiffs claim that Defendants allegedly made fraudulent misrepresentations regarding the Hotel's performance inducing Plaintiffs into signing the BSA, that Defendants breached the BSA and the HMA by

mismanaging the Hotel, and that Defendants allegedly converted their share of the Hotel's revenues meant to be used for the Hotel's maintenance and renovations. In response, Defendants contend that the Court should deny leave to amend on three bases: (1) that principles of judicial estoppel bar Plaintiffs from taking inconsistent positions; (2) that Plaintiffs have unduly delayed in seeking leave to amend, which demonstrates bad faith ; and (3) that amendment would be futile. The Court addresses each in turn.

*Principles of Judicial Estoppel*

"[I]n evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is 'clearly inconsistent' with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Intellivision v. Microsoft Corp.*, 484 Fed. App'x 616, 619 (2d Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)). "[B]ecause judicial estoppel is designed 'to prevent improper use of judicial machinery,' it is 'an equitable doctrine invoked by a court at its discretion.'" *Id*. (quoting *New Hampshire*, 532 U.S. at 749-50). Moreover, the Second Circuit has limited judicial estoppel "to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *Id*. (quoting *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)) (internal quotation marks omitted).

Here, Defendants' argument that judicial estoppel bars Plaintiffs' proposed amendment is without merit. Specifically, Defendants contend that Plaintiffs, after successfully avoiding arbitrating claims relating to the HMA on the basis that they were not parties to that agreement, must be estopped from litigating claims relating to the HMA on the basis that Ithaca II is a party

18

to the HMA . That contention, however, narrowly construes Plaintiffs' position and, more importantly, mischaracterizes this Court's decision.

The relevant decision at issue here is the Court's finding in granting injunctive relief that Plaintiffs established that there was at least a serious question going to whether Defendants' claims were arbitrable. Specifically, the question before the Court there was the "threshold question of whether an agreement to arbitrate exists." Plaintiffs' argument, as the Court characterized it then, was "that the forum selection clause in the bulk sale agreement supersedes the arbitration agreement in the HMA," because "the forum selection clause was part of the more recent agreement." Prelim. Inj. Hr'g at 73:3-5, 73:16-18. In response, Defendants' argument was, as the Court characterized it then, that "the instant dispute is distinguishable because plaintiffs became bound by the HMA when it was incorporated by reference into the bulk sale agreement; therefore, both the arbitration provision [in the HMA] and the forum selection clause became binding on plaintiffs at the same time."

As an initial matter, Plaintiffs' position with respect to the BSA and the HMA has not changed. Plaintiffs continue to assert in the proposed amended complaint that the only agreement between Plaintiffs and Defendants is the BSA, which includes a forum selection clause that supersedes the arbitration clause in the HMA. Am. Compl. ¶ 4, 80, and 202. This was Plaintiffs' position as characterized by the Court at the hearing and continues to be Plaintiffs' position in the amended complaint. As there is no inconsistency in Plaintiffs' position before the Court granted injunctive relief and after, judicial estoppel is inapplicable on this basis alone.

In addition, the Court simply did not adopt a position that Plaintiffs were not parties to the HMA. In reaching its decision, the Court found that "*even if the agreements were executed*

*by Ithaca simultaneously*, ordinary principles of contractual interpretation demonstrate that plaintiffs have a likelihood of establishing that the forum selection clause precludes the arbitration of defendants' claims against them." Prelim. Inj. Hr'g at 73:24-74:3 (emphasis added). As such, whether or not Plaintiffs were parties to the HMA was immaterial to its decision that Plaintiffs have a likelihood of succeeding on the question of whether the forum selection clause in the BSA precludes the arbitration of defendants' claims against them. Accordingly, when a "position was never adopted by the district court…the requirements for invoking the doctrine of judicial estoppel are not present." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005).

In any event, judicial estoppel also cannot be applied against Plaintiffs here because they have not derived an unfair advantage. As aforementioned, whether or not Plaintiffs were parties to the HMA had no bearing on whether they could succeed in establishing that the forum selection clause in the BSA superseded the arbitration provision in the HMA. The Court further clarified that by explaining that "it is difficult to see how the parties could have signed a contract that included a mandatory forum selection clause and expected that claims…could instead be brought pursuant to arbitration under a pre-existing management agreement." Prelim. Inj. Hr'g at 74:17-22. This holds true regardless of whether Plaintiffs were parties to the HMA, the pre-existing management agreement.

Defendants' argument regarding Plaintiffs' representation that they received no direct benefits from the HMA fares no better. Specifically, Defendants contend that the Court adopted Plaintiffs' position that they received no direct benefits from the HMA except as shareholders of Hotel TOC. However, Defendants' own position was that "the beneficial shareholders of [Hotel

TOC], including Ithaca I and Ithaca II, knowingly voted their interests to pursue an arbitration against Defendants…by doing so, Ithaca I and Ithaca II obtained direct benefits under the HMA and further bound themselves to the HMA. *See* Doc. 25 (Defs.' Mem. in Opp'n re Mot. for Prelim. Inj.") at 8. As such, Defendants contended that Plaintiffs were estopped from avoiding arbitration as they had received direct benefits from the HMA "by virtue of their purported control of Hotel TOC." *Id*. at 18. Based on those contentions, the Court found that "Plaintiffs, acting as shareholders or the agents of shareholders, did not dispute that Hotel TOC was bound by the arbitration agreement in the HMA." *Id*. at 74:23-75:6. Contrary to Defendants' argument, to the extent Plaintiffs represented that they did not receive any direct benefit from the HMA, the Court did not adopt that position. Instead, the Court only narrowly found, based on Defendants' own representations, that whatever benefits Plaintiffs gained from causing Hotel TOC to pursue an arbitration against Defendants, they were only doing so as shareholders of Hotel TOC. Accordingly, because the Court did not adopt any purportedly inconsistent position by Plaintiffs, judicial estoppel cannot be applied against Plaintiffs in this case. *Stichting*, 407 F.3d at 45.

### Undue Delay and Bad Faith

The crux of Defendants' contention here is that Plaintiffs waited twenty-one months before moving for leave to add claims that they could have pleaded at the beginning of this case. However, the Second Circuit has held that "mere delay…absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Block v. First Blood Assoc.*, 988 F.2d 344, 350 (2d Cir. 1993) (internal citation omitted).

Here, Defendants' only attempt to show bad faith by Plaintiffs is without merit. In order to establish that a movant's amendment is made in bad faith, the opponent must show

"'something more than mere delay or inadvertence…,' such as seeking to derive some unique tactical advantage through their amendment." *Usov v. Lazar*, No. 13 Civ. 818 (RWS), 2014 WL 4354691, at *8 (S.D.N.Y. Sept. 2, 2014) (quoting *Primetime 24 Joint Venture v. DirecTV, Inc.*, No. 99 Civ. 3307 (RMB) (MHD), 2000 WL 426396, at *5-6 (S.D.N.Y. Apr. 20, 2000)). Defendants argue that Plaintiffs have obtained a unique tactical advantage, in the form of greater chance of success on their motion for preliminary injunction, by not originally asserting the claims they seek to add here. However, for substantially the same reasons that judicial estoppel is not applicable here, there is simply no tactical advantage to be gained by Plaintiffs here because they have not taken inconsistent positions or derived any unfair advantage. In addition, Defendants' argument is divorced from the reality that Plaintiffs brought this action to enjoin Defendants from joining Plaintiffs to the arbitration. *See generally* Doc.1.

After the Court granted the preliminary injunction, plaintiffs represented at the end of that hearing, that "I think that we have the relief that we sought from this Court, and I'm not sure that there is anything further to do in this particular case." Prelim. Inj. Hr'g at 76:9-11. Thereafter, it was Defendants' decision to assert counterclaims that have kept this case active. In any event, as Plaintiffs have made clear, many of the new underlying factual allegations in the proposed amended complaint were only uncovered after the Court granted the preliminary injunction. As such, Defendants have not shown that leave to amend should be denied on the basis of undue delay or bad faith. *Blagman v. Apple,Inc.*, 307 F.R.D. 107, 111-12 (S.D.N.Y. April 10, 2015) ("[t]he party opposing amendment has the burden of establishing that amendment would be futile or otherwise inappropriate.") (internal citations omitted).

*Futility*

Lastly, Defendants have failed to show futility. Leave to amend may be denied on the

basis of futility if the proposed claims would not withstand a Rule 12(b)(6) motion to dismiss.

*Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).

The party opposing the amendment has the burden of establishing its futility. *Blaskiewicz v.*

*Cnty. Of Suffolk*, 29 F.Supp.2d 134, 137-38 (E.D.N.Y. 1998) (internal citations omitted).

As an initial matter, because judicial estoppel cannot be applied against Plaintiffs,

Defendants' argument that the proposed breach of contract claims are futile on that basis must be

similarly rejected.

Next, Plaintiffs' proposed claim for conversion is not futile because it has identified

specific funds belonging to Plaintiffs that Defendants have improperly converted. The Court of

Appeals of New York has recognized conversion as the "unauthorized assumption and exercise

of the right of ownership over goods belonging to another to the exclusion of the owner's rights."

*New York v. Seventh Regiment Fund Inc.*, 98 N.Y.2d 249, 258 (2002). Here, Plaintiffs argue that

as owners of 215 units, they were entitled to revenues generated therefrom, a percentage of

which were to be used for maintenance and renovations. Defendants correctly state that a

conversion claim may not be predicated on a mere breach of contract. *See Andrews v. 27 Red*

*Music Publ'g, LLC*, No. 15 Civ. 7544 (AJN), 2019 WL 199893, at *5 (S.D.N.Y. Jan. 15, 2019)

(internal citations omitted). However, contrary to Defendants' contention, Plaintiffs do not only

allege that Defendants mishandled the capital reserve funds by failing to treat them as required

by the HMA, but also that Defendants were pocketing them. In any event, it is also not clear at

this juncture that punitive damages, which Plaintiffs have sought, are not available under this

claim. *See Andrews v. 27 Red Music Publ'g, LLC*, No. 15 Civ. 7544 (AJN), 2019 WL 199893, at

*5 (S.D.N.Y. Jan. 15, 2019) (internal citations omitted) (refusing to dismiss a conversion claim as duplicative of a breach of contract claim because punitive damages may be awarded for the conversion claim but not for contract breaches). Indeed, Plaintiffs allege that Defendants not only failed to properly fund the Hotel's reserve account, but have "lined [their] pockets with management fees" and "improperly distributed unearned funds from these reserve accounts to itself," which they knew they had no right to do. Accordingly, Defendants have failed to carry their burden of showing that the proposed conversion claim is futile.

Lastly, Plaintiffs' proposed claim for fraudulent inducement is not futile. First, Defendants' contention that any alleged misrepresentations are merely nonactionable puffery is without merit. Here, Plaintiffs allege that Defendants repeatedly represented that the Hotel was "achieving better financial results than the market in Panama," or "out-performing the market in Panama" due to Defendants' operation thereof. This is not puffery, which encompasses "'statements that are too general to cause a reasonable investor to rely upon them," and "lack the sort of definite positive projections that might require later correction." *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (internal citations omitted). Indeed, the Second Circuit found that a jury reasonably concluded that a similar statement—"posted RECORD-HIGH NET INCOME, and ha[d] cash available for investing…the results produced…in the second quarter are well ahead of market consensus"—was actionable rather than puffery. *Id*. Therefore, the Court is not convinced, at this point, that any alleged misrepresentation is not actionable as a matter of law.

Next, Defendants' argument that Plaintiffs, as sophisticated investment entities, cannot establish justifiable reliance on the alleged misrepresentations, fares no better. While it is true that New York law requires sophisticated investors to protect themselves by investigating the

details of the transactions and the businesses they are acquiring, such investors may nevertheless rely on "matters held to be peculiarly within defendants's knowledge" as they have no independent means for ascertaining the truth. *See Bank of Am. Corp. v. Lemgruber*, 385 F.Supp. 2d 200, 230 (S.D.N.Y. 2005) (internal citations and quotation marks omitted). That is the case here. Plaintiffs allege that they performed due diligence on the Hotel's financials provided by Defendants, but that they later learned that those financials "artificially deflated the actual expenses of the Hotel." Plaintiffs further allege that they could not have known that Defendants omitted their failure to pay income taxes and under-reported both the management fees they took and hotel employees' salaries, which made the financial and operational performance of the Hotel appear better than it actually was. Am. Compl. ¶ 66. Accordingly, the Court cannot conclude at this stage that Plaintiffs cannot carry their burden on their fraudulent inducement claim.

Lastly, Defendants contend Plaintiffs cannot establish any damages resulting from reliance on alleged misrepresentations. As New York state courts and other courts within this district have recognized, the loss causation element of a fraud claim under New York law is an issue of proximate causation, which is a question of fact generally left to the jury. *See id*. at 31; *see Kirschner v. Bennett*, No. 07 Civ. 8165 (JSR), 2012 WL 13060078, at *10 (S.D.N.Y. June 18, 2012) (internal citations omitted) ("[q]uestions of proximate cause are generally left to the jury").

For the foregoing reasons, Defendants have failed their burden of showing futility as to any of the proposed new claims. Accordingly, given the strong preference for resolving disputes on the merits and because leave should be freely granted absent some justification for refusal, Plaintiffs' motion for leave to file an amended complaint is hereby granted. *Klein v. PetroChina*

*Co. Ltd.*, 644 F. App'x. 13 at 15 (2d Cir. Mar. 21, 2016) (internal citations and quotation marks omitted).

**IV.     CONCLUSION**

For the aforementioned reasons, Plaintiffs' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, Defendants' first second and third counterclaims for fraud fraudulent inducement and fraudulent concealment are dismissed and the rest are not.  In addition, Plaintiffs' motion for leave to file an amended complaint is GRANTED.  The parties are directed to appear for a telephonic conference on **April 24, 2020 at 10:30 am**.  The Clerk of the Court is respectfully directed to terminate the motions, Doc. 72, 75.

It is SO ORDERED.

Dated:     March 30, 2020
           New York, New York

                                                            _____
                                                            Edgardo Ramos, U.S.D.J.

26