**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
ITHACA CAPITAL INVESTMENTS I, S.A., ITHACA
CAPITAL INVESTMENTS II, S.A., and ORESTES          Civil Action No. 1:18-cv-390-ER
FINTIKLIS,

      Plaintiffs,

  v.            **ANSWER TO AMENDED**
                **COMPLAINT WITH**
                **COUNTERCLAIMS**

TRUMP PANAMA HOTEL MANAGEMENT LLC,          **JURY TRIAL DEMANDED**
and TRUMP INTERNATIONAL HOTELS
MANAGEMENT, LLC,

      Defendants.
-----------------------------------------------------------------------x

## ANSWER TO AMENDED COMPLAINT

  Defendants Trump Panama Hotel Management LLC and Trump International Hotels Management, LLC ("Defendants"), by and through their undersigned counsel, hereby submit this answer to the amended complaint ("Amended Complaint") of plaintiffs Ithaca Capital Investments I, S.A. ("Ithaca I"), Ithaca Capital Investments II, S.A. ("Ithaca II") and Orestes Fintiklis ("Fintiklis" and together with Ithaca I and II, "Plaintiffs"), denials, averments and affirmative defenses, along with counterclaims against Plaintiffs for fraud, fraudulent inducement, fraudulent concealment, breach of contract, tortious interference with contract, declaratory judgment and for attorneys' fees. Defendants respond, allege and aver as follows upon information and belief:

  1.  Defendants deny the allegations in paragraph 1 of the Amended Complaint and aver that on March 20, 2020, the International Chamber of Commerce (the "ICC") issued a final award (the "Final Award"; **Exhibit 2** hereto) ordering Hotel TOC, Inc. to pay damages to Defendants in the sum of $3.38 million on account of the wrongful termination and "breach of [Defendants'] fundamental contractual rights" under the Amended & Restated Hotel Management Agreement

for Trump Ocean Club® International Hotel & Tower (the "Hotel") entered into between and among Trump Panama Hotel Management LLC, Newland International Properties Corp., Hotel TOC, Inc. and Owners Meeting of the P.H. TOC, dated April 13, 2011 (as amended, the "HMA"; **Exhibit 1** hereto), for which the ICC found "there were no excusing circumstances."

Indeed, Following years of litigation and a two day hearing before an ICC appointed tribunal in Panama City, Panama, on March 20, 2020, the ICC finally issued its Final Award ordering Hotel TOC, Inc. to pay damages to Defendants in the sum of $3.38 million on account of the wrongful termination and "breach of [Defendants'] fundamental contractual rights" under the HMA.  **Exhibit 2.**  In rendering the Final Award, however, the ICC specifically left open Defendants' right to seek additional relief and damages arising and resulting from Plaintiffs' violation of the Bulk Sale Consent Agreement:

> It is not in dispute that the Bulk Sale Agreement has its own forum selection clause in favour of New York courts, and that there is pending litigation at this time in those courts concerning that contract. The Tribunal can, therefore, readily infer that the parties to the Bulk Sale Agreement will be able to seek, and if they can do so by reference to the evidence and arguments they choose to muster before those courts, vindicate whatever rights or wrongs they allege against each other."

*Id.*; page 59.

2.      Defendants admit the allegations in paragraph 2 of the Amended Complaint.

3.      Defendants deny the allegations in paragraph 3 of the Amended Complaint, except admit that Defendants managed the Hotel until Hotel TOC, Inc. breached and wrongfully terminated the HMA.

4.      Defendants deny the allegations in paragraph 4 of the Amended Complaint and respectfully refer the Court to the February 15, 2017 Agreement in Connection with the Bulk Sale (the "Bulk Sale Consent Agreement"; **Exhibit 4** hereto), which speaks for itself.

5.      Defendants deny the allegations in paragraph 5 of the Amended Complaint to the extent that they plead facts as to which a response is required and respectfully refer the Court to the Bulk Sale Agreement, which speaks for itself.

6.      Defendants deny the allegations in paragraph 6 of the Amended Complaint, except admit that Plaintiffs met from time to time with representatives of Defendants.

7.      Defendants deny the allegations in paragraph 7 of the Amended Complaint.

8.      Defendants deny the allegations in paragraph 8 of the Amended Complaint.

9.      Defendants deny the allegations in paragraph 9 of the Amended Complaint.

10.      Defendants deny the allegations in paragraph 10 of the Amended Complaint.

11.      Defendants deny the allegations in paragraph 11 of the Amended Complaint.

12.      Defendants deny the allegations in paragraph 12 of the Amended Complaint.

13.      Defendants deny the allegations in paragraph 13 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

14.      Defendants deny the allegations in paragraph 14 of the Amended Complaint and respectfully refers the Court to the Final Award, pursuant to which the ICC ordering Hotel TOC, Inc. to pay Defendants damages in the sum of $3.38 million on account of Hotel TOC, Inc.'s wrongful termination and "breach of [Defendants'] fundamental contractual rights" under the HMA and ruled that Hotel TOC, Inc. did not have the "right to assert damages based on [Defendants'] prior performance."

15.      Defendants deny the allegations in paragraph 15 of the Amended Complaint.

16.      Defendants deny the allegations in paragraph 16 of the Amended Complaint and respectfully refers the Court to its March 23, 2018 Order, which speaks for itself.

17.      Defendants deny the allegations in paragraph 17 of the Amended Complaint and

respectfully refers the Court to Defendants April 23, 2018 Answer with Counterclaims, which speaks for itself.

18.     Defendants lack sufficient knowledge to form a belief as to the truth of the allegation by Plaintiffs as to why they filed the Amended Complaint, as alleged in paragraph 19 of the Amended Complaint.  Defendants otherwise deny all allegations in paragraph 19 to the extent they plead facts as to which a response is required.

19.     Defendants admit the allegations in paragraph 19 of the Amended Complaint.

20.     Defendants admit the allegations in paragraph 20 of the Amended Complaint.

21.     Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 21 of the Amended Complaint.

22.     Defendants admit the allegations in paragraph 22 of the Amended Complaint.

23.     Defendants admit the allegations in paragraph 23 of the Amended Complaint.

24.     Paragraph 24 of the Amended Complaint contains legal conclusions as to which no response is required.

25.     Paragraph 25 of the Amended Complaint contains legal conclusions as to which no response is required.

26.     Paragraph 26 of the Amended Complaint contains legal conclusions as to which no response is required.

27.     Paragraph 27 of the Amended Complaint contains legal conclusions as to which no response is required.

28.     Paragraph 28 of the Amended Complaint contains legal conclusions as to which no response is required.

29.     Defendants admit the allegations in paragraph 29 of the Amended Complaint,

except to the extent that they state or imply that Defendants currently manage the Hotel or possess knowledge regarding the Hotel's current components.  As to those allegations, Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 29 of the Amended Complaint.

30.     Defendants admit the allegations in paragraph 30 of the Amended Complaint, except to the extent that they state or imply that Defendants currently manage the Hotel or possess knowledge regarding the Hotel's current components or organizational structure.  As to those allegations, Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 30 of the Amended Complaint.

31.     Defendants admit the allegations in paragraph 31 of the Amended Complaint, except to the extent that they state or imply that Defendants currently manage the Hotel or possess knowledge regarding the Hotel's current components or organizational structure.  As to those allegations, Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 31 of the Amended Complaint.

32.     Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 32 of the Amended Complaint, including what the Hotel's developers envisioned.

33.     Defendants deny the allegations in paragraph 33 of the Amended Complaint and respectfully refers the Court to the HMA and other documents referenced in paragraph 33, each of which speaks for themselves.

34.     Defendants deny the allegations in paragraph 34 of the Amended Complaint and respectfully refers the Court to the March 16, 2006 License Agreement entered into between Donald J. Trump and K Group Developers Inc. (as amended, the "License Agreement"), which

speaks for itself.

35.     Defendants deny the allegations in paragraph 35 of the Amended Complaint and respectfully refers the Court to the HMA, which speaks for itself.

36.     Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 36 of the Amended Complaint.

37.     Defendants admit the allegations in paragraph 37 of the Amended Complaint.

38.     Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 38 of the Amended Complaint, except admit that Plaintiffs met from time to time with representatives of Defendants.

39.     Defendants lack sufficient knowledge to form a belief as to the truth of the allegation in paragraph 39 of the Amended Complaint and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

40.     Defendants admit the allegations in paragraph 40 of the Amended Complaint.

41.     Defendants deny the allegations in paragraph 41 of the Amended Complaint.

42.     Defendants deny the allegations in paragraph 42 of the Amended Complaint, except admits that Defendants, at all times, operated the Hotel in accordance with the HMA.

43.     Defendants deny the allegations in paragraph 42 of the Amended Complaint, except admits that Defendants, at all times, operated the Hotel in accordance with the HMA.

44.     Defendants deny the allegations in paragraph 44 of the Amended Complaint.

45.     Defendants deny the allegations in paragraph 45 of the Amended Complaint.

46.     Defendants deny the allegations in paragraph 46 of the Amended Complaint, except admit that Defendants sent Plaintiffs the brochures annexed to the Amended Complaint as Exhibits E and F, which speak for themselves.

47.     Defendants deny the allegations in paragraph 47 of the Amended Complaint and respectfully refer the Court to Exhibits E and F to the Amended Complaint, which speak for themselves.

48.     Defendants deny the allegations in paragraph 48 of the Amended Complaint to the extent that they plead facts as to which a response is required and respectfully refer the Court to Exhibit E to the Amended Complaint, which speaks for itself.

49.     Defendants deny the allegations in paragraph 49 of the Amended Complaint to the extent that they plead facts as to which a response is required and respectfully refer the Court to Exhibit E to the Amended Complaint, which speaks for itself.

50.     Defendants deny the allegations in paragraph 50 of the Amended Complaint to the extent that they plead facts as to which a response is required and respectfully refer the Court to Exhibit E to the Amended Complaint, which speaks for itself.

51.     Defendants deny the allegations in paragraph 51 of the Amended Complaint and respectfully refer the Court to Exhibit E to the Amended Complaint, which speak for itself.

52.     Defendants deny the allegations in paragraph 52 of the Amended Complaint to the extent that they plead facts as to which a response is required and respectfully refer the Court to Exhibit E to the Amended Complaint, which speaks for itself.

53.     Defendants deny the allegations in paragraph 53 of the Amended Complaint and respectfully refer the Court to the Bulk Sale Consent Agreement and the April 5, 2017 Hotel Unit Rental Management Agreement[1] ("RMA"; **Exhibit 24** hereto) executed by Ithaca I, which speak

---

[1] Pursuant to Section 7.2 of the RMA, Ithaca I acknowledged and agreed that Defendants shall not be liable to Ithaca "UNDER ANY CIRCUMSTANCES, FOR ANY CLAIMS RESULTING FROM ANY RENTAL OF OR FAILURE TO RENT ANY OF THE PARTICIPATING UNITS, INCLUDING THE SUBJECT UNIT, OR FOR FAILURE TO ACHIEVE ANY SPECIFIC LEVEL OF RENTAL INCOME FOR UNIT OWNER."

for themselves.

54.     Defendants deny the allegations in paragraph 54 of the Amended Complaint.

55.     Defendants admit the allegations in paragraph 55 of the Amended Complaint.

56.     Defendants admit the allegations in paragraph 56 of the Amended Complaint.

57.     Defendants deny the allegations in paragraph 57 of the Amended Complaint.

58.     Defendants deny the allegations in paragraph 58 of the Amended Complaint.

59.     Defendants deny the allegations in paragraph 59 of the Amended Complaint.

60.     Defendants deny the allegations in paragraph 60 of the Amended Complaint.

61.     Defendants deny the allegations in paragraph 61 of the Amended Complaint and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

62.     Defendants deny the allegations in paragraph 62 of the Amended Complaint.

63.     Defendants deny the allegations in paragraph 63 of the Amended Complaint.

64.     Defendants deny the allegations in paragraph 64 of the Amended Complaint.

65.     Defendants deny the allegations in paragraph 65 of the Amended Complaint.

66.     Defendants deny the allegations in paragraph 66 of the Amended Complaint.

---

Pursuant to Section 7.3 of the RMA, Ithaca I further acknowledged and agreed that "IN THE PERFORMANCE OF THEIR RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT, THE HOTEL OPERATOR PARTIES AND HOTEL OWNER PARTIES SHALL NOT BE LIABLE TO UNIT OWNER FOR ANY ACT OR OMISSION OF THE HOTEL OPERATOR, HOTEL OWNER OR ANY OF THE HOTEL OPERATOR PARTIES OR HOTEL OWNER PARTIES, EXCEPT TO THE EXTENT THAT ANY CLAIMS ARE CAUSED SOLELY BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE HOTEL OPERATOR, HOTEL OWNER OR ONE OR MORE OF THE HOTEL OPERATOR PARTIES OR HOTEL OWNER PARTIES.  IN NO EVENT SHALL THE HOTEL OPERATOR PARTIES OR HOTEL OWNER PARTIES BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES FOR ANY CLAIM ARISING FROM THIS AGREEMENT, EVEN IF HOTEL OPERATOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES."

67.     Defendants deny the allegations in paragraph 67 of the Amended Complaint.

68.     Defendants deny the allegations in paragraph 68 of the Amended Complaint.

69.     Defendants admit the allegations in paragraph 69 of the Amended Complaint.

70.     With respect to the allegations in paragraph 70 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

71.     With respect to the allegations in paragraph 71 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

72.     Defendants deny the allegations in paragraph 72 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

73.     With respect to the allegations in paragraph 73 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

74.     With respect to the allegations in paragraph 74 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

75.     Defendants deny the allegations in paragraph 75 of the Amended Complaint.

76.     With respect to the allegations in paragraph 76 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

77.     With respect to the allegations in paragraph 77 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for

itself.

78.     With respect to the allegations in paragraph 78 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

79.     With respect to the allegations in paragraph 79 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

80.     With respect to the allegations in paragraph 80 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

81.     Defendants deny the allegations in paragraph 81 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

82.     Defendants deny the allegations in paragraph 82 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

83.     Defendants deny the allegations in paragraph 83 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

84.     Defendants deny the allegations in paragraph 84 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

85.     With respect to the allegations in paragraph 85 of the Amended Complaint, Defendants respectfully refer the Court to the HMA, which speaks for itself.

86.     Defendants deny the allegations in paragraph 86 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

87.     With respect to the allegations in paragraph 87 of the Amended Complaint,

Defendants respectfully refer the Court to the HMA, which speaks for itself.

88.     Defendants deny the allegations in paragraph 88 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

89.     Defendants deny the allegations in paragraph 89 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

90.     Defendants deny the allegations in paragraph 90 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

91.     Defendants deny the allegations in paragraph 91 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

92.     Defendants deny the allegations in paragraph 92 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

93.     Defendants deny the allegations in paragraph 93 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

94.     Defendants deny the allegations in paragraph 94 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

95.     Defendants deny the allegations in paragraph 95 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

96.     Defendants deny the allegations in paragraph 96 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

97.     Defendants deny the allegations in paragraph 97 of the Amended Complaint.

98.     Defendants deny the allegations in paragraph 98 of the Amended Complaint.

99.     Defendants deny the allegations in paragraph 99 of the Amended Complaint.

100.     Defendants deny the allegations in paragraph 100 of the Amended Complaint.

101.     Defendants deny the allegations in paragraph 101 of the Amended Complaint.

102.     Defendants deny the allegations in paragraph 102 of the Amended Complaint.

103.     Defendants deny the allegations in paragraph 103 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

104.     Defendants deny the allegations in paragraph 104 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

105.     Defendants deny the allegations in paragraph 105 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

106.     Defendants deny the allegations in paragraph 106 of the Amended Complaint.

107.     Defendants deny the allegations in paragraph 107 of the Amended Complaint, except lack sufficient knowledge to form a belief as to any alleged audit by the Panamanian tax authorities occurring after the wrongful termination and breach of Defendants' rights under the HMA.

108.     Defendants deny the allegations in paragraph 108 of the Amended Complaint.

109.     Defendants deny the allegations in paragraph 109 of the Amended Complaint.

110.     Defendants deny the allegations in paragraph 110 of the Amended Complaint.

111.     Defendants deny the allegations in paragraph 111 of the Amended Complaint.

112.     Defendants deny the allegations in paragraph 112 of the Amended Complaint.

113.     Defendants deny the allegations in paragraph 113 of the Amended Complaint, except lack sufficient knowledge to form a belief as to certain employment disputes pending in the Panamanian Court or any information derived therefrom.

114.     Defendants lack sufficient knowledge to form a belief as to the allegations in paragraph 114 of the Amended Complaint.

115.     Defendants deny the allegations in paragraph 115 of the Amended Complaint.

116.     Defendants deny the allegations in paragraph 116 of the Amended Complaint.

117.     Defendants deny the allegations in paragraph 117 of the Amended Complaint.

118.     Defendants deny the allegations in paragraph 118 of the Amended Complaint.

119.     Defendants deny the allegations in paragraph 119 of the Amended Complaint.

120.     Defendants lack sufficient knowledge to form a belief as to the allegations in paragraph 120 of the Amended Complaint.

121.     Defendants deny the allegations in paragraph 121 of the Amended Complaint, except lack sufficient knowledge to form a belief as to the observations or findings of any maintenance company occurring after the HMA was wrongfully terminated.

122.     Defendants deny the allegations in paragraph 122 of the Amended Complaint, except lack sufficient knowledge to form a belief as to the observations or findings of any maintenance company occurring after the HMA was wrongfully terminated.

123.     Defendants deny the allegations in paragraph 123 of the Amended Complaint, except lack sufficient knowledge to form a belief as to any maintenance work performed after the HMA was wrongfully terminated.

124.     Defendants deny the allegations in paragraph 124 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

125.     Defendants deny the allegations in paragraph 125 of the Amended Complaint.

126.     Defendants deny the allegations in paragraph 126 of the Amended Complaint.

127.     Defendants deny the allegations in paragraph 127 of the Amended Complaint.

128.     Defendants deny the allegations in paragraph 128 of the Amended Complaint.

129.     Defendants deny the allegations in paragraph 129 of the Amended Complaint.

130.     Defendants deny the allegations in paragraph 130 of the Amended Complaint.

131.     Defendants deny the allegations in paragraph 131 of the Amended Complaint.

132.     Defendants deny the allegations in paragraph 132 of the Amended Complaint.

133.     Defendants deny the allegations in paragraph 133 of the Amended Complaint.

134.     Defendants lack sufficient knowledge to form a belief as to the allegations in paragraph 134 of the Amended Complaint.

135.     Defendants deny the allegations of paragraph 135 of the Amended Complaint to the extent that they plead facts as to which a response is required.

136.     Defendants deny the allegations of paragraph 136 of the Amended Complaint to the extent that they plead facts as to which a response is required and respectfully refer the Court to the specific TripAdvisor review and response, which speaks for itself.

137.     Defendants deny the allegations in paragraph 137 of the Amended Complaint.

138.     Defendants deny the allegations in paragraph 138 of the Amended Complaint.

139.     Defendants deny the allegations in paragraph 139 of the Amended Complaint.

140.     Defendants deny the allegations in paragraph 140 of the Amended Complaint.

141.     Defendants deny the allegations in paragraph 141 of the Amended Complaint.

142.     Defendants deny the allegations in paragraph 142 of the Amended Complaint, except admit discussing the sales and marketing of the Hotel with various parties.

143.     Defendants deny the allegations in paragraph 143 of the Amended Complaint.

144.     Defendants deny the allegations in paragraph 144 of the Amended Complaint.

145.     Defendants deny the allegations in paragraph 145 of the Amended Complaint.

146.     Defendants deny the allegations in paragraph 146 of the Amended Complaint.

147.     Defendants deny the allegations in paragraph 147 of the Amended Complaint.

148.     Defendants deny the allegations in paragraph 148 of the Amended Complaint.

149.     Defendants deny the allegations in paragraph 149 of the Amended Complaint.

150.     Defendants deny the allegations in paragraph 150 of the Amended Complaint.

151.     Defendants deny the allegations in paragraph 151 of the Amended Complaint.

152.     Defendants deny the allegations in paragraph 152 of the Amended Complaint, except lack sufficient knowledge to form a belief as to purported efforts by Plaintiffs to solicit business for the Hotel.

153.     Defendants deny the allegations in paragraph 153 of the Amended Complaint.

154.     Defendants deny the allegations in paragraph 154 of the Amended Complaint.

155.     Defendants deny the allegations in paragraph 155 of the Amended Complaint.

156.     Defendants deny the allegations in paragraph 156 of the Amended Complaint.

157.     Defendants deny the allegations in paragraph 157 of the Amended Complaint to the extent that they plead facts as to which a response is required.

158.     Defendants deny the allegations in paragraph 158 of the Amended Complaint to the extent that they allege that Defendants made any misrepresentations concerning the performance of the Hotel.

159.     Defendants deny the allegations in paragraph 159 of the Amended Complaint to the extent that they allege that Defendants made any misrepresentations concerning the performance of the Hotel and respectfully refer the Court to Exhibit H to the Amended Complaint, which speaks for itself.

160.     Defendants deny the allegations in paragraph 160 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

161.     Defendants deny the allegations in paragraph 161 of the Amended Complaint and

respectfully refer the Court to the HMA, which speaks for itself.

162.     Defendants deny the allegations in paragraph 162 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

163.     Defendants deny the allegations in paragraph 163 of the Amended Complaint.

164.     Defendants deny the allegations in paragraph 164 of the Amended Complaint.

165.     Defendants deny the allegations in paragraph 165 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

166.     Defendants deny the allegations in paragraph 166 of the Amended Complaint.

167.     Defendants deny the allegations in paragraph 167 of the Amended Complaint.

168.     Defendants deny the allegations in paragraph 168 of the Amended Complaint.

169.     Defendants deny the allegations in paragraph 169 of the Amended Complaint.

170.     Defendants deny the allegations in paragraph 170 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

171.     Defendants deny the allegations in paragraph 171 of the Amended Complaint.

172.     Defendants deny the allegations in paragraph 172 of the Amended Complaint and respectfully refer the Court to the HMA, which speaks for itself.

173.     Defendants deny the allegations in paragraph 173 of the Amended Complaint.

174.     Defendants deny the allegations in paragraph 174 of the Amended Complaint.

175.     Defendants deny the allegations in paragraph 175 of the Amended Complaint.

176.     Defendants deny the allegations in paragraph 176 of the Amended Complaint.

177.     Defendants deny the allegations in paragraph 177 of the Amended Complaint to the extent that they plead facts as to which a response is required and respectfully refer the Court to the HMA, which speaks for itself.

178.     Defendants deny the allegations in paragraph 178 of the Amended Complaint, except admit giving a presentation to Plaintiffs on or about October 3, 2017.

179.     Defendants deny the allegations in paragraph 179 of the Amended Complaint.

180.     Defendants deny the allegations in paragraph 180 of the Amended Complaint to the extent that they plead facts as to which a response is required.

181.     Defendants deny the allegations in paragraph 181 of the Amended Complaint.

182.     Defendants deny the allegations in paragraph 182 of the Amended Complaint.

183.     Defendants deny the allegations in paragraph 183 of the Amended Complaint, except admit that Plaintiffs were in contract to purchase certain units at the Hotel at the time the Bulk Sale Consent Agreement was executed.

184.     Defendants deny the allegations in paragraph 184 of the Amended Complaint.

185.     Defendants deny the allegations in paragraph 185 of the Amended Complaint.

186.     Defendants deny the allegations in paragraph 186 of the Amended Complaint and respectfully refers the Court to the Final Award, pursuant to which the ICC ordering Hotel TOC, Inc. to pay Defendants damages in the sum of $3.38 million on account of Hotel TOC, Inc.'s wrongful termination and "breach of [Defendants'] fundamental contractual rights" under the HMA and ruled that Hotel TOC, Inc. did not have the "right to assert damages based on [Defendants'] prior performance."

187.     Defendants deny the allegations in paragraph 187 of the Amended Complaint to the extent that they plead facts as to which a response is required.

188.     The allegations in paragraph 188 of the Amended Complaint contain legal conclusions as to which no response is required.

189.     Defendants deny the allegations in paragraph 189 of the Amended Complaint and

respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

190.    The allegations in paragraph 190 of the Amended Complaint contain legal conclusions as to which no response is required.

191.    The allegations in paragraph 191 of the Amended Complaint contain legal conclusions as to which no response is required.

192.    The allegations in paragraph 192 of the Amended Complaint contain legal conclusions as to which no response is required and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

193.    The allegations in paragraph 193 of the Amended Complaint contain legal conclusions as to which no response is required and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

194.    The allegations in paragraph 194 of the Amended Complaint contain legal conclusions as to which no response is required.  As to all other allegations, Defendants deny them and refer to Defendants' Arbitration Answer (as amended) (**Exhibit 8**), which speaks for itself.

195.    The allegations in paragraph 195 of the Amended Complaint contain legal conclusions as to which no response is required.  As to all other allegations, Defendants deny them and refer to Defendants' Arbitration Answer (as amended), which speaks for itself.

196.    The allegations in paragraph 196 of the Amended Complaint contain legal conclusions as to which no response is required.  As to all other allegations, Defendants deny them and refer to Defendants' Arbitration Answer (as amended), which speaks for itself.

197.    The allegations in paragraph 197 of the Amended Complaint contain legal conclusions as to which no response is required.  As to all other allegations, Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 197.

198.     The allegations in paragraph 198 of the Amended Complaint contain legal conclusions as to which no response is required.

199.     The allegations in paragraph 199 of the Amended Complaint contain legal conclusions as to which no response is required.  As to all other allegations, Defendants deny them and refer to the Final Award, which speaks for itself.

200.     The allegations of paragraph 200 of the Amended Complaint contain legal conclusions as to which no response is required.

201.     In response to paragraph 201 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

202.     The allegations in paragraph 202 of the Amended Complaint contain legal conclusions as to which no response is required.

203.     The allegations in paragraph 203 of the Amended Complaint contain legal conclusions as to which no response is required.

204.     The allegations in paragraph 204 of the Amended Complaint contain legal conclusions as to which no response is required.

205.     The allegations in paragraph 205 of the Amended Complaint contain legal conclusions as to which no response is required.

206.     The allegations in paragraph 206 of the Amended Complaint contain legal conclusions as to which no response is required.

207.     In response to paragraph 207 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

208.     Defendants admit that they sought to pursue claims for compensatory and punitive damages against Ithaca I in arbitration before the ICC, which (following the court's preliminary

injunction and in order to avoid substantial prejudice to Defendants' rights) are now asserted as counterclaims in this action.

209.     The allegations in paragraph 209 of the Amended Complaint contain legal conclusions as to which no response is required.

210.     The allegations in paragraph 210 of the Amended Complaint contain legal conclusions as to which no response is required.

211.     The allegations in paragraph 211 of the Amended Complaint contain legal conclusions as to which no response is required.

212.     In response to paragraph 212 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

213.     The allegations in paragraph 213 of the Amended Complaint contain legal conclusions as to which no response is required.

214.     The allegations in paragraph 214 of the Amended Complaint contain legal conclusions as to which no response is required.

215.     The allegations in paragraph 215 of the Amended Complaint contain legal conclusions as to which no response is required.

216.     The allegations in paragraph 216 of the Amended Complaint contain legal conclusions as to which no response is required.

217.     The allegations in paragraph 217 of the Amended Complaint contain legal conclusions as to which no response is required.

218.     In response to paragraph 218 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

219.     Defendants admit that they sought to pursue claims for compensatory and punitive

damages against Ithaca II in arbitration before the ICC, which (following the court's preliminary injunction and in order to avoid substantial prejudice to Defendants' rights) are now asserted as counterclaims in this action.

220.    The allegations in paragraph 220 of the Amended Complaint contain legal conclusions as to which no response is required.

221.    The allegations in paragraph 221 of the Amended Complaint contain legal conclusions as to which no response is required.

222.    The allegations in paragraph 222 of the Amended Complaint contain legal conclusions as to which no response is required.

223.    In response to paragraph 223 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

224.    The allegations in paragraph 224 of the Amended Complaint contain legal conclusions as to which no response is required.

225.    The allegations in paragraph 225 of the Amended Complaint contain legal conclusions as to which no response is required.

226.    The allegations in paragraph 226 of the Amended Complaint contain legal conclusions as to which no response is required.

227.    The allegations in paragraph 227 of the Amended Complaint contain legal conclusions as to which no response is required.

228.    The allegations in paragraph 228 of the Amended Complaint contain legal conclusions as to which no response is required.

229.    The allegations in paragraph 229 of the Amended Complaint contain legal conclusions as to which no response is required.

230.     The allegations in paragraph 230 of the Amended Complaint contain legal conclusions as to which no response is required.

231.     The allegations in paragraph 231 of the Amended Complaint contain legal conclusions as to which no response is required.

232.     In response to paragraph 232 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

233.     The allegations in paragraph 233 of the Amended Complaint contain legal conclusions as to which no response is required.

234.     Defendants admit that they sought to pursue claims for compensatory and punitive damages against Fintiklis in arbitration before the ICC, which (following the court's preliminary injunction and in order to avoid substantial prejudice to Defendants' rights) are now asserted as counterclaims in this action.

235.     The allegations in paragraph 235 of the Amended Complaint contain legal conclusions as to which no response is required.

236.     The allegations in paragraph 236 of the Amended Complaint contain legal conclusions as to which no response is required.

237.     The allegations in paragraph 237 of the Amended Complaint contain legal conclusions as to which no response is required.

238.     In response to paragraph 238 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

239.     Defendants admit the allegations of paragraph 239 of the Amended Complaint.

240.     Defendants deny the allegations in paragraph 240 of the Amended Complaint and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

241.     Defendants deny the allegations in paragraph 241 of the Amended Complaint and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

242.     The allegations in paragraph 242 of the Amended Complaint contain legal conclusions as to which no response is required.  As to all other allegations, Defendants deny them and refer to the Bulk Sale Consent Agreement and the HMA, which speak for themselves.

243.     With respect to the allegations in paragraph 243 of the Amended Complaint, Defendants respectfully refer the Court to the HMA, which speaks for itself.

244.     With respect to the allegations in paragraph 244 of the Amended Complaint, Defendants respectfully refer the Court to the HMA, which speaks for itself.

245.     Defendants deny the allegations in paragraph 245 of the Amended Complaint.

246.     Defendants deny the allegations in paragraph 246 of the Amended Complaint.

247.     In response to paragraph 247 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

248.     Defendants admit the allegations of paragraph 248 of the Amended Complaint.

249.     Defendants deny the allegations in paragraph 249 of the Amended Complaint and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

250.     Defendants deny the allegations in paragraph 250 of the Amended Complaint and respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

251.     The allegations in paragraph 251 of the Amended Complaint contain legal conclusions as to which no response is required.  As to all other allegations, Defendants deny them and refer to the Bulk Sale Consent Agreement and the HMA, which speak for themselves.

252.     With respect to the allegations in paragraph 252 of the Amended Complaint, Defendants respectfully refer the Court to the HMA, which speaks for itself.

253.     Defendants deny the allegations in paragraph 253 of the Amended Complaint.

254.     Defendants deny the allegations in paragraph 254 of the Amended Complaint.

255.     In response to paragraph 255 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

256.     The allegations in paragraph 256 of the Amended Complaint contain legal conclusions as to which no response is required.

257.     The allegations in paragraph 257 of the Amended Complaint contain legal conclusions as to which no response is required.

258.     Defendants deny the allegations in paragraph 258 of the Amended Complaint.

259.     Defendants deny the allegations in paragraph 259 of the Amended Complaint.

260.     In response to paragraph 260 of the Amended Complaint, Defendants incorporate each and every foregoing answer, denial and averment as if fully set forth herein.

261.     Defendants deny the allegations in paragraph 261 of the Amended Complaint.

262.     Defendants deny the allegations in paragraph 262 of the Amended Complaint.

263.     Defendants deny the allegations in paragraph 263 of the Amended Complaint.

264.     Defendants admit the allegations in paragraph 264 of the Amended Complaint.

265.     The allegations in paragraph 265 of the Amended Complaint contain legal conclusions as to which no response is required.  All other allegations in paragraph 265 are denied.

266.     The allegations in paragraph 266 of the Amended Complaint contain legal conclusions as to which no response is required.  All other allegations in paragraph 266 are denied.

267.     Defendants deny the allegations in paragraph 267 of the Amended Complaint.

268.     Defendants deny the allegations in paragraph 268 of the Amended Complaint.

269.     In response to paragraph 269 of the Amended Complaint, Defendants incorporate

each and every foregoing answer, denial and averment as if fully set forth herein.

270. Defendants admit the allegations in paragraph 270 of the Amended Complaint.

271. With respect to the allegations in paragraph 271 of the Amended Complaint, Defendants respectfully refer the Court to the Bulk Sale Consent Agreement, which speaks for itself.

272. With respect to the allegations in paragraph 272 of the Amended Complaint, Defendants respectfully refer the Court to the original complaint filed in this action, which speaks for itself.

273. Defendants deny the allegations in paragraph 273 of the Amended Complaint.

274. Defendants deny the allegations in paragraph 274 of the Amended Complaint.

## <u>AFFIRMATIVE & OTHER DEFENSES</u>

Without admitting any of the allegations of the Amended Complaint and without admitting or suggesting that Defendants bear the burden of proof on any of the following issues, as separate and independent defenses, Defendants state as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

275. The Amended Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Lack of Subject Matter Jurisdiction)

276. The Court lacks subject matter jurisdiction to grant the relief requested in the Amended Complaint.

### THIRD AFFIRMATIVE DEFENSE
### (Preclusion)

277. Plaintiffs' claims are precluded, in whole or in part, by the ICC Final Award.

## FOURTH AFFIRMATIVE DEFENSE
### (Lack of Justifiable Reliance)

278.     Plaintiffs Ithaca I and Ithaca II did not justifiably rely on the statements alleged to be false and misleading in the Amended Complaint, as Plaintiffs had already irrevocably agreed to purchase the Hotel Units and Hotel Amenities Units by executing their Framework Agreement with Newland prior to signing the Bulk Sale Consent Agreement with Defendants.

## FIFTH AFFIRMATIVE DEFENSE
### (Settlement & Release)

279.     Upon information and belief, Plaintiffs Ithaca I and Ithaca II disclaimed and/or released any and all claims arising out of relating to their purchase of Hotel Units and Hotel Amenities Units, respectively.

## SIXTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

280.     By virtue of Plaintiff's own fraudulent and wrongful conduct, Plaintiffs should be barred from recovery by the doctrine of unclean hands.

281.     For instance, in the ICC Arbitration, Fintiklis admitted under oath that his statement that the October 14, 2017 meeting was a "lunch meeting" was an intentionally false and misleading representation which he purposefully made for the sole purpose of deceiving Defendants into believing that he intended to comply with the terms of the Bulk Sale Consent Agreement so that Defendants' representatives would not attend the October 14, 2017 meeting and attempt to prevent his breach.

282.     On January 13, 2020, Fintiklis testified before the ICC tribunal, as follows:

Q.     So you call a meeting -- you called a meeting of the beneficiaries, right? Yes?

A.     That is correct.

Q.     And you did that and misled my client as to the nature of that meeting, right?

A.      Mislead, I mean, I didn't want them to know at the meeting because they would have stopped it.

Q.      So you told them the meeting was a meet and greet instead of telling them the truth, right?

A.      I mean, I didn't disclose all the fact for obvious reasons.

Q.      So you then attend the meeting in which you remove Trump Hotel Management from the board, correct?

A.      Correct, I appointed my representatives because without that, we couldn't get anything.

**Exhibit 2**; page 21.

## SEVENTH AFFIRMATIVE DEFENSE
### (Mootness)

283.      Finally, Plaintiffs' declaratory and injunctive claims are mooted by the completion of the ICC Arbitration and issuance of the ICC Final Award.

## JURY TRIAL DEMANDED

284.      Defendants hereby demand a jury trial on all issues so triable.

## COUNTERCLAIMS

Defendants Trump Panama Hotel Management LLC and Trump International Hotels Management, LLC, repeat, reallege and incorporate each of the allegations, averments, responses, denials and affirmative defenses set forth in paragraphs 1 through 276 of the Answer to the Amended Complaint as if fully set forth herein and further allege against Plaintiffs upon information and belief, unless otherwise noted, as follows:

## NATURE OF PROCEEDINGS

1.      Fintiklis is an attorney and Cypriot citizen who resides in Florida.  On October 14, 2017, purporting in writing to be the "Authorized Representative" of Hotel TOC Inc and Hotel TOC Foundation, Fintiklis, together with Ithaca and others, caused Hotel TOC, Inc. to commence

an ICC arbitration against Defendants, alleging breaches of the HMA relating to the Hotel.[2] Fintiklis signed the Notice of Default dated October 14, 2017 not as an officer of Hotel TOC but in his personal capacity as its purported "Authorized Representative." Fintiklis has repeatedly referred to himself publicly as the "owner" of the Hotel.

2.     After Plaintiffs commenced the ICC arbitration in the name of Hotel TOC, Inc., Plaintiffs abandoned all pretense of complying with the HMA and its arbitration resolution procedures. Beginning on or about February 22, 2018, Plaintiffs engaged in a forcible and public take over the Hotel property and physically removed Defendants as Hotel Operator.

3.     On March 5, 2018, Fintiklis and Plaintiffs tortiously interfered with Defendants' rights under the HMA and caused Hotel TOC to breach both the HMA and the arbitration agreement contained therein, by seeking and obtaining an attachment for the administration of the Hotel in the Panamanian Courts, and using such Panama court order to claim a right to take over the Hotel and to remove Defendants and their tradenames and brand from the Hotel. Defendants seek damages here for, inter alia, that tortious interference, having been preliminarily enjoined by this Court from asserting such claims against Plaintiffs in the ICC arbitration which they caused to be commenced. These actions orchestrated by Plaintiffs blatantly violate the contractual obligations under the HMA and other agreements, and have caused (and are causing) severe damage to Defendants rights and their trademarks and brand. Plaintiffs have obtained a preliminary injunction enjoining Defendants from asserting the instant claims against them in the ICC by having represented to this Court that all of Defendants' claims arise from or relate to the Bulk Sale Consent Agreement. (*See* Complaint ¶¶ 10, 39); accordingly Plaintiffs' are now each estopped from seeking to adjudicate the instant claims in any other forum.

---

[2] A true and correct copy of the Amended and Restated HMA, as further amended, is attached hereto as **Exhibit 1** (without schedules).

**I.      Events Leading Up to the Commencement of the Pending ICC Arbitration**

4.      Defendants' Affiliates were previously involved in a related ICC arbitration with Gary Lundgren, among others, regarding his unlawful activities related to the management of the condominium portion of the Property.  That arbitration took place in a 2015 proceeding before the ICC (the "<u>Lundgren Proceeding</u>").  Gary Lundgren and his son Zacgary Lundgren are additional third party respondents who were properly joined by Defendants here to the pending ICC Arbitration between Hotel TOC and Defendants.

5.      The Lundgren Proceeding settled in February 2016 (the "<u>Lundgren Settlement Agreement</u>").  The Lundgren Settlement Agreement, to which Lundgren is personally bound, affirmed (i) that as of February 2016, there were <u>no material breaches of the HMA</u>; and (ii) that <u>Lundgren will take no actions to interfere with Defendants or Operator</u> in the management of the Hotel.  A copy of the Lundgren Settlement Agreement is annexed hereto as **<u>Exhibit 9</u>**.  The covenant not to interfere with Defendants' rights to operate and manage the Hotel, which is the central consideration in the Lundgren Settlement Agreement, is substantially similar if not virtually identical to the same non-interference covenant which Plaintiffs here agreed to in Paragraph 3(D) of the Bulk Sale Consent Agreement.

6.      A mere four months after the Lundgren Settlement Agreement, Fintiklis, with knowledge of the Lundgren Proceeding, met with Defendants concerning his proposed bulk purchase of over 200 Units in the Hotel.  Fintiklis fraudulently obtained Defendants' consent, required under the governing documents and the HMA, to purchase 202 Units in the Hotel (through Ithaca I) and the 13 Hotel Amenities Units (through Ithaca II) (the "<u>Bulk Sale</u>") from the Hotel developer/promoter ("<u>Newland</u>"), which was then involved in bankruptcy proceedings.  Fintiklis accomplished this purchase with financing from Canal Bank.

7.      By and through the Bulk Sale Consent Agreement, Defendants gave their consent to the Bulk Sale, but expressly conditioned their consent at Paragraph 3(D) thereof upon the material promise and consideration that Ithaca I and Ithaca II:

> shall not, directly or indirectly through any Affiliates or otherwise: (w) **take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements,** (x) **exercise its vote** with respect to any of the Hotel Units in any Owners Meeting or other constituent body of P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., **in a manner which is adverse to the interests of the Operator and/or its Affiliates under and in respect of any of the Hotel Agreements,** (y) take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its affiliates and any other Person, or (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates.

*See* **Exhibit 4, ¶ 3(D)**.

8.      Deeds evidencing the Bulk Sale were recorded in Panama on or about August 10, 2017.  Thereafter Fintiklis, together with Lundgren – who claims to own 50 Units in the Hotel through at least 35 separate entities – at best may have wielded 68.2% of the votes of Hotel TOC Foundation, the sole shareholder of Hotel TOC, Inc.  A vote of Hotel TOC Foundation with 75% of its voting interests, together with cause (*i.e.,* an Event of Default), is required to terminate the HMA.  Plaintiffs, however, knowingly lacked both a 75% super-majority and a genuine Event of Default.

9.      Mere weeks after closing the Bulk Sale, Fintiklis arranged a supposed "lunch meeting" for October 14, 2017, purportedly to meet unit owners at the Hotel.  No notice of this meeting was given to the Council of Hotel TOC Foundation, the sole shareholder of Hotel TOC, Inc., as required by Panamanian law, or to Defendants.

10.     At this meeting, Fintiklis and an attorney from Morgan & Morgan proceeded to hold a purported set of board meetings of Hotel TOC, Inc. and Hotel TOC Foundation – despite

the lack of required notice.  Fintiklis and his attorney excluded Defendants' representative from the meeting, despite Defendants having Board representatives, owning the Hotel Administrative Unit, and operating the Hotel for the benefit of all Owners.

11.    At this meeting, Fintiklis, his attorney Orlando Guerra, and a John Doe under Fintiklis's control, purported to install themselves on the board of Hotel TOC, Inc. and Hotel TOC Foundation.  Immediately following their installation, Fintiklis declared an Event of Default under the HMA by serving Defendants with a Notice of Default, which had been prepared with counsel well in advance of the meeting.  Moreover, that same day, Plaintiffs, in concert with others, caused Hotel TOC, Inc. to commence the aforementioned arbitration proceeding before the International Chamber of Commerce, despite the Hotel Operator's contractual right under the HMA to cure the alleged defaults over the next 30 days.

12.    The simultaneous orchestration on October 14, 2017 by Plaintiffs, in concert with others, of (1) two purported Board meetings without proper notice, (2) service of an already-prepared Notice of Default, and (3) the commencement of an arbitration proceeding is evidence of the fraudulent intent and conspiracy by and among Plaintiffs and others to breach Defendants' rights under the HMA, the Bulk Sale Consent Agreement, and the Lundgren Settlement Agreement: this is the plain and simple basis upon which Defendants sought to join Plaintiffs in the pending arbitration before the ICC which they caused to be commenced.

13.    The Notice of Default is signed by Fintiklis personally as the purported "Authorized Representative of Hotel TOC, Inc. and Hotel TOC Foundation." *See* **Exhibit 10**. The Notice complains of, among other things, the purported collapse of occupancy levels "over the past few years" (and citing occupancy rankings from 2015 and 2016). *Id.* at 3.  The Notice of Default also relied on purported outperformance by other hotels in RevPAR "in May 2017." *Id.*

31

14.     The complaints alleged in the Notice of Default, however, are belied by the extensive pre-purchase due diligence performed by Plaintiffs and Canal Bank in the weeks and months preceding service of the Notice of Default.

15.     Fintiklis, Ithaca I and II, and Ithaca's investors did not borrow tens of millions of dollars from Canal Bank without first having done complete due diligence on the Hotel and its operations, occupancy rates, costs, liabilities, assets, revenues, and profits.  Simply stated, the Notice of Default is a ploy by Plaintiffs in an attempt to improperly take control of the Hotel.

## THE PARTIES

16.     Defendant Trump Panama Hotel Management LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

17.     Defendant Trump International Hotels Management LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

18.     Plaintiff Orestes Fintiklis is a citizen of Cyprus, an attorney, a resident of Florida, and the president and principal of Ithaca I and Ithaca II, owners of various Units in the Hotel. Fintiklis holds himself out personally as the "Authorized Representative" of Hotel TOC, Inc. and its sole shareholder, Hotel TOC Foundation, pursuant to the purported Board meetings of October 14, 2017.

19.     Plaintiff Ithaca Capital Investments I, S.A. is a Panamanian corporation, and the alter ego of Fintiklis, the president and principal of Ithaca I.  Fintiklis, by and through Ithaca I and Ithaca II, entered into the Bulk Sale Consent Agreement by which Fintiklis and his alter egos fraudulently obtained the necessary consent to purchase 215 Units in the Hotel.  Upon information

and belief, Ithaca I has its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama.

20.    Plaintiff Ithaca Capital Investments II, S.A. is a Panamanian corporation dominated and controlled by Third-Party Respondent Fintiklis, the president and principal of Ithaca II. Fintiklis, by and through his alter egos, entered into the Bulk Sale Consent Agreement only after misleading and fraudulently inducing and obtaining the consent of Operator.  Upon information and belief, Ithaca II has its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama.

21.    Upon information and belief, Fintiklis dominates and controls Ithaca I and Ithaca II, exposing their investors and lenders to significant liabilities without their knowledge.  Moreover, Fintiklis caused Ithaca I and II to breach Defendants' contractual rights under the HMA and, as such, is liable for significant damages resulting therefrom.

## JURISDICTION AND VENUE

22.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

23.    Plaintiffs have waived any and all objections to venue in the Southern District of New York by having commenced suit here and having obtained provisional relief from this Court in this Action.  In addition, venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the counterclaims occurred in this district, where Defendants maintain their principal place of business.

## FACTS COMMON TO ALL COUNTERCLAIMS

### I.   THE HOTEL AND GOVERNING DOCUMENTS

24.   This dispute arises out of a fraud and conspiracy by Plaintiffs, together with other non-parties which are involved in the aforementioned ICC arbitration, in an effort to injure Defendants' rights as Operator for the Trump International Hotel & Tower Panama.

25.   The Hotel is operated pursuant to a network of coordinated agreements between and among numerous parties.   These documents all reference, rely on and subject Hotel Unit owners and parties to a series of interrelated agreements governing the Hotel and ownership structure, including the Co-Ownership Regulations, the House Rules, and the HMA.

26.   Until Plaintiffs' (and those working in concert with Plaintiffs) unlawful activities on March 5, 2018, the Hotel bore Defendants' trademarks and was operated and managed by Defendants under the HMA.

27.   Pursuant to the HMA, Defendants operated the Hotel in such a manner as to endeavor to maximize the profitability and long term value of the Hotel.   **Exhibit 1**, HMA, § 2.2.

### II.   LUNDGREN'S AND OWNERS MEETING'S PRIOR ICC PROCEEDING

28.   The ICC arbitration commenced by Hotel TOC, Inc. on October 14, 2017 is not the first arbitration proceeding featuring the Property and Hotel.   In a proceeding commenced in 2015 and settled in 2016, an Affiliate of Defendants commenced an ICC proceeding concerning the residential condominium portion of the Property.   The proceeding concerned Gary Lundgren's attempt to seize control of the Board of Directors of Owners Meeting and wrongfully terminate Defendants' Affiliate's management agreement for the condominium units (the equivalent of the actions here with Fintiklis and his newly-acquired Hotel Units).

29.     Ultimately, the 2015 ICC proceeding settled in 2016 pursuant to the Lundgren Settlement Agreement, in which the Defendants' Affiliate allowed the condominium management agreement to expire by its terms in exchange for material covenants from Owners Meeting of P.H. TOC and its board members, including Lundgren personally.

30.     Specifically, the Lundgren Settlement Agreement provided that Lundgren and Owners Meeting agreed as follows:

> **Non-Interference with Hotel Operator.** The P.H. TOC Parties acknowledge that Hotel Operator is currently the sole manager of the Hotel, with full authority to manage and operate the Hotel notwithstanding the expiration of the P.H. TOC Management Agreement. Until such time as the Hotel Management Agreement expires or is determined pursuant to the procedures set forth in <u>Section 9</u> thereof to have been properly terminated, neither the P.H. TOC nor any current or future Board of Directors nor any current or future member of the Board of Directors (including, without limitation, Mr. Lundgren, Ms. Perez, Mr. Fraser, Mr. Soloway and Mr. McGowan), whether acting in their capacity as a director or individually, shall, at any time, directly or indirectly, take any action (including, without limitation, exercising any voting rights as members of the Board of Directors) which could reasonably be expected to interfere or compete with the duties, services, functions, management responsibilities (including the obligation to operate the Rental Program and the Hotel Amenities Units (as defined in the Hotel Management Agreement)), rights and responsibilities of Hotel Operator, whether under the Hotel Management Agreement or otherwise, or which could reasonably be expected to damage the relationship between Hotel Operator and any parties with an interest in the Building.

**<u>Exhibit 9</u>**, Lundgren Settlement Agreement § 6 (emphasis added).

31.     Following the agreed-upon expiration of the condominium management agreement, the property management company owned by Lundgren's wife was appointed, in a blatant self-dealing manner, to manage the residential condominium portion of the Property.

32.     Now, fully aware of the covenants in the Lundgren Settlement Agreement, Plaintiffs have conspired with Lundgren to take over the Hotel, in violation of Defendants' rights under the HMA and law.

### III.   FINTIKLIS FRAUDULENTLY INDUCES DEFENDANTS TO CONSENT TO THE BULK SALE

33.     In 2016, Newland, the developer of the Property, commenced bankruptcy proceedings.

34.     In or about May 2016, Newland offered the remaining 202 Hotel Units and 13 Hotel Amenities Units as a package for bid.  Pursuant to the P.H. TOC Co-Ownership Regulations, however, any sale of 10 or more units, such as here, required the written consent from Defendants, as Hotel Operator and Licensor.[3] In addition, the HMA provides Defendants with the right to reject any purchase or acquisition of more than 10 Units.

35.     On October 14, 2016, Fintiklis came to Defendants' New York offices, accompanied by Newland's representatives, to meet about a potential purchase of those Units. Four days later, Fintiklis sent an email to the other meeting attendees, stating that he (or, rather, Ithaca) "look[ed] forward to closing the transaction and working together to turning around this wonderful property."

---

[3] Article 75(D)(4) of the Co-Ownership Regulations, which also has substantially identical arbitration provisions, provides:

> **4. NUMBER OF HOTEL UNITS**. No **OWNER** of a **HOTEL UNIT** may subdivide his / her **HOTEL UNIT**; no **OWNER** may purchase, possess or control, directly or indirectly through affiliates, related parties or in any other way, more than ten (10) **HOTEL UNITS**. For these effects, ownership or control of a **HOTEL UNIT** shall be considered to exist if said **HOTEL UNIT** belongs, directly or indirectly to the **OWNER**, a family member of the **OWNER**, any entity where the **OWNER** or the **OWNERS** family members may have an interest or are partners, or any partner, affiliate, controlling company or affiliate of any of the above. The limitation above shall not apply to the **LICENSOR** or any entity or purchaser buying more than ten (10) **HOTEL UNITS** from the **LICENSOR**, provided that any **OWNER** possessing or owning more than ten (10) **HOTEL UNITS** shall only be allowed to resell these **HOTEL UNITS** in one exclusive transaction. As an example, but not limiting, if the **LICENSOR** sells twenty (20) **HOTEL UNITS** to a buyer, said buyer shall only be allowed to resell those twenty (20) **HOTEL UNITS** to another purchaser in a single transaction.

Co-Ownership Regulations of the Building P.H. TOC (the "COR"), Art. 75(D)(4), attached hereto as **Exhibit 11**.

36.     Fintiklis executed the first version of the Bulk Sale Consent Agreement in or about January 2017 on behalf of Ithaca I and Ithaca II.  Before Defendants countersigned the Bulk Sale Consent Agreement, Fintiklis requested further changes to it, specifically that the sale be bifurcated between his two alter egos: Ithaca I, as the purchaser of the 202 Hotel Units, and Ithaca II as the purchaser of the 13 Hotels Amenities Units.

37.     After making the requested revisions, Defendants – to avoid the very dispute and injury being addressed both in the ICC and here – clarified the language of Section 3(D) of the Bulk Sale Consent Agreement.

38.     Simply stated, in exchange for consenting to Plaintiffs' purchase of 215 units via the Bulk Sale, Section 3(D) is the main consideration that Defendants were to receive from Fintiklis and his alter egos: express covenants that they shall not directly or indirectly take any actions to interfere with or undermine Defendants' rights <u>under ANY of the related Hotel Agreements</u>, including the HMA – including a covenant not to exercise their voting rights in a way adverse to Defendants.

39.     Section 3(D) states as follows:

> Purchaser shall not, directly or indirectly through any Affiliates or otherwise: (w) take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements, (x) *exercise its vote with respect to any of the Hotel Units in any Owners Meeting or other constituent body of the P.H. TOC (or any of its components),* <u>*including without limitation, Hotel TOC Inc.,*</u> *in any manner which is adverse to the interests of Operator and/or its Affiliates under and in respect of any of the Hotel Agreements,* (y) *take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its Affiliates and any other Person or* (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates.

**Exhibit 4**, Bulk Sale Consent Agreement § 3(D) (emphasis added).

40.     Section 3(F) of the Consent to Bulk Sale Agreement further restrained Ithaca I and Ithaca II from taking, directly or indirectly, any leadership positions within the P.H. TOC regime. That provision states in part that "Purchaser shall not seek or accept an appointment or election to the position of manager or administrator (or other similar leadership role) of the P.H. TOC." *Id.* § 3(F).

41.     In February 2017, Fintiklis personally executed the Bulk Sale Consent Agreement, on behalf of Ithaca I and Ithaca II.

42.     Defendants countersigned in good faith, believing that Fintiklis was an honest businessman.  Pursuant to the Bulk Sale Consent Agreement, Operator's Written Approval, necessary for the purchase, was deposited in escrow with Newland's attorney, with release pending acceptance of the Licensing Fee.

43.     On July 30, 2017, the P.H. TOC Board of Directors issued its Paz y Salvo (a certificate that the property is unencumbered by liens), allowing Newland to close the deal.

44.     Fintiklis closed the purchase, using in part tens of millions of dollars in loan proceeds obtained from Canal Bank.  Upon information and belief, as part of that financing transaction, Canal Bank performed extensive due diligence concerning and related to the Property on which it was extending tens of millions of dollars in financing, as did Fintiklis, Ithaca I and Ithaca II.

### IV.     FINTIKLIS MAKES HIS NEXT MOVE IN FURTHERANCE OF THE FRAUDULENT SCHEME

45.     On or about August 10, 2017, the deeds to the 202 Hotel Units and 13 Hotel Amenities Units were recorded in the Panama Public Registry, reflecting Ithaca I and II as the respective owners.  On August 25, 2017, Operator received the License Fee pursuant to the

Consent Agreement and, accordingly, Operator released its Written Approval of the Bulk Sale the same day. **Exhibit 12**.

46.     Following the transfer of ownership of the 202 Hotel Units and 13 Hotel Amenities Units, Fintiklis met in Panama with high-ranking members of Defendants on August 28, 2017.  At this meeting Jeff Wagoner, EVP of Hotel Operations for Trump Hotels, made two presentations. The first presentation reviewed Defendants' sales and marketing strategies at the corporate level; and the second presentation discussed market highlights, financial performance, and key Hotel objectives at the property level.

47.     A little over a month later, on October 3, 2017, Fintiklis again met with five high-ranking members of Defendants, as well as the entire Hotel Executive Committee, in Panama.  At that meeting, Jeff Wagoner again made a presentation (**Exhibit 13)**, this time concerning new initiatives and revenue strategies to mitigate the effects of the increasingly saturated high-end hotel market in Panama City, Panama, an issue that has been building over the past few years.  The presentation also included a preview of the Hotel's budget for 2018.

48.     On October 3, 2017 at 9:03 PM local Panama time – the same day Fintiklis met with Defendants in Panama – Fintiklis sent a mass email to all Hotel Unit Owners requesting their attendance "at a meeting of the beneficiaries of Hotel Foundation (*i.e.*, all Hotel Unit Owners) on 14 October 2017," declaring that it was an opportunity to meet as many Hotel Owners as possible and "hear [Hotel Unit Owners'] thoughts and ideas."  **Exhibit 14**.

49.     Upon learning of this proposed Hotel Unit Owners meeting, Defendants contacted Fintiklis directly to remind him of his obligations under the Bulk Sale Consent Agreement, including to not take any actions adverse to Defendants' rights as Operator under the HMA and to

refrain from taking any leadership positions within Hotel TOC or any other constituent body of the P.H. TOC regime.

50.     Defendants further requested that their General Manager of the Hotel attend the meeting, and that Fintiklis notify Defendants of any future plans to convene Hotel Unit Owners.

51.     In response, Fintiklis confirmed his awareness of his obligations under the Bulk Sale Consent Agreement, and claimed that the meeting was merely an informal lunch that he put together because he was being approached by Hotel Unit Owners and thought a "lunch meeting" would be a good way to meet everyone.  Fintiklis also agreed to have the General Manager in attendance.

52.     At this point, Ithaca I had been the majority shareholder of the Hotel TOC Foundation for just under two months.

**V.     THE "OCTOBER 14 MEETINGS," NOTICE
        OF DEFAULT, AND REQUEST FOR ARBITRATION**

53.     On October 14, 2017, Fintiklis met with Hotel Unit Owners at the Hotel for the "lunch meeting."  After just 10 or 15 minutes, it became clear that Fintiklis misrepresented to Defendants the purpose of the meeting.

54.     Fintiklis began the meeting by declaring that "we called the meeting because most of you have been telling us you are troubled by the fact that . . . every month you have to reach into your pocket and make a payment to support what you thought was an otherwise profitable investment, which is clearly not the case . . . ."  He continued, "if we have the best hotel why are we losing money [?] [S]o that's wh[y] we're here . . . to discuss . . . basically we think and we heard from you . . . [t]he Operator is supposed to perform the functions of the Operator . . . [but] the owner and the Operator have effectively been the same person."  **Exhibit 15**.

55.     This was a materially false representation in furtherance of Plaintiffs' fraud and conspiracy to injure Defendants' rights.  Plaintiffs know very well that Operator has never been the Owner and never held itself out to be the Owner.

56.     Orlando Guerra of Morgan & Morgan, Panamanian counsel to Plaintiffs (as well as Hotel TOC, Inc.) attended the meeting and stated as follows:

> good afternoon ok so as I mentioned my name is Orlando Guerra an attorney for Morgan and Morgan representing Ithaca and all of you.  I just want to make sure that first of all and prior for me to reading the resolution that you are voting as beneficiaries of the foundation and as owners.  I have to say that I am compelled by law to establish that this information that I am going to read is privileged and strictly confidential only for the beneficiaries of the foundation so everyone who is not an owner should please leave room for the next 10-15 minutes then can come in . . . .

*See id.***,** attached hereto.

57.     Morgan & Morgan's assertions, made on behalf of Fintiklis, were patently false, as Morgan & Morgan was not the Legal Representative of Hotel Foundation and certainly could not have been at the time of that statement, before any purported vote had even been taken.  Moreover, Morgan & Morgan and Fintiklis knew that no Board meeting had been properly noticed, and knew it was deceptively called a "lunch meeting" for the purpose of orchestrating this fraudulent scheme.

58.     In fact, after Defendants, through Hotel's General Manager, said "we were told this meeting was a simple meet and greet," Fintiklis said:  **<u>"Ok.  It don't matter what was the purpose of the meeting now we have everybody here and I don't think people here have an issue."</u>**

59.     When Defendants, through the Hotel's General Manager, attempted to inform Fintiklis, Lundgren, the Ithaca alter egos and Morgan & Morgan that it had lawful proxies for votes, Fintiklis and the Third-Party Defendants ordered him – and effectively Defendants – out of the room.

60.     Roger Khafif, the President of Hotel Foundation prior to and on October 14, 2017, did not receive notice of the meeting, nor did he attend.

61.     Article 5 of the Hotel TOC Foundation Charter establishes that the "Legal Representative of the Foundation shall be the President of the Council. In his absence, the legal representative shall be whomever is elected by the majority of the votes of the Members of the Council." **Exhibit 6**, Foundation Charter, Art. 5.

62.     The failure to provide notice to Mr. Khafif was intentionally done so that Plaintiffs and their co-conspirators could exercise their fraudulent scheme without protest, and without the participation of the duly-installed Council of Hotel TOC Foundation.

63.     Under Article 11 of the Foundation Charter, meetings of the Beneficiaries may only be convened by the Foundation Council or upon written request of Beneficiaries representing 35% of Hotel Units, provided notice is given not less than 10, but no more than 60, days before the meeting. (*Id.*, Art. 11.)

64.     Because the Foundation Council did not convene the meeting, no written request was made to have a board meeting (much less by any requisite percentage of Hotel Units), and no incumbent member of the Foundation Council was notified about the meeting, the meeting was not a valid Meeting of the Beneficiaries as laid out in Article 11.

65.     After the Defendants' agent was forced to leave, Plaintiffs and their co-conspirators purported to hold a "Meeting of the Beneficiaries" to change the composition of the Foundation Council, removing President James Keith Petrus, Secretary Michael Dieter Straube, and Treasurer Charles Mark Stevenson from the Foundation Council; and electing Fintiklis as President, Alfredo Guerra (Fintiklis's lawyer) as Secretary, and Jaime Fernandez as Treasurer.

66.     Plaintiffs also purported to hold a meeting of the "Assembly of the Shareholders" to change the members of the Board of Hotel TOC, Inc.

67.     The Minutes of the alleged October 14, 2017 Meeting of the Beneficiaries filed on October 16, 2017 with the Panama Public Registry (attached hereto as **Exhibit 16**) states that:

> [A] meeting of the Beneficiaries . . . of the Hotel TOC Foundation . . . was held on October 14, 2017 at 12:00 PM at the [H]otel . . . . Upon approval and designation of the Beneficiaries . . . Orestes Fintiklis, Director – President and Legal Representative of Ithaca Capital Investments S.A. I, a Panamanian corporation and Beneficiary of the Foundation, acted as President of this meeting. . . Upon approval and designation of the Beneficiaries, Orestes Fintiklis, Director – President and Legal Representative of Ithaca Capital Investments S.A. II acted as Secretary of this meeting. . . . The President of the meeting [Fintiklis] declared that there were present in person and/or duly represented by proxy at the meeting 284 of the 369 Beneficiaries of the Foundation and that notice of the meeting was sent and given to all the Beneficiaries of the Foundation pursuant to Article Eleventh of the Foundational Charter of the Foundation.

**Exhibit 16**, Foundation Minutes, filed Oct. 16, 2017.

68.     Plaintiffs caused to be filed the Foundation Minutes, which falsely declared that 284 of the 369 Beneficiaries of the Foundation were in attendance or represented by proxy and that proper notice was given pursuant to Article 11 of the Foundation Charter.

69.     The Minutes of the alleged "Shareholder's Assembly Meeting" of October 14, 2017, filed with the Panama Public Registry on October 16, 2017, state that Fintiklis also acted as ad-hoc President and Secretary of this meeting.  Hotel TOC Minutes, Oct. 14, 2017, attached hereto as **Exhibit 17**.  The Minutes state that "[t]he President of the meeting [Fintiklis] declared in the presence and/or representation of all of the issued and outstanding shares of the company, the notice of call could be waived, and the quorum being in force, the meeting could proceed to deal with any matter submitted to it." *Id.*

70.     The alleged Shareholder Minutes further state that Fintiklis, as ad-hoc President, informed the alleged Shareholders Assembly that it was resolved in the alleged Meeting of the

Beneficiaries to (i) remove Mark Hawthorne (an employee of Operator), Charles Thierry Baurez and Carlos Abaunza (both Operator's representatives) as current Directors and Officers of the Corporation; and to, in turn, (ii) appoint Jaime Fernandez as Director and Treasurer; Fintiklis as Director and President, and Alfredo Guerra as Director and Secretary – the same three people that were allegedly voted to the Foundation Council.

71.     Under Panama law, the Foundation Charter would require an affirmative vote of 75% of all Beneficiaries (Hotel Unit Owners) or the written consent of all Beneficiaries to "[t]erminat[e] for cause, and/or decision not to renew any agreements entered into by the [Corporation] with any hotel operator and/or manager with respect to the operation of the Hotel." **Exhibit 6**, Foundation Charter, Art. 10(b)(iv).  Even assuming the meetings had been properly noticed and called, which they were not, this additional legal requirement was not met.

72.     Moreover, under the express voting prohibitions of the Bulk Sale Consent Agreement, Plaintiffs could take any vote or action adverse to Defendants as Hotel Operator.

73.     Tellingly, the exact same day these meetings took place, Fintiklis, purporting to act as an authorized representative of Hotel TOC, Inc. and Hotel TOC Foundation, served Defendants with a purported Notice of Default.

74.     Plaintiffs, by and through their control of Hotel TOC, Inc., also simultaneously commenced an ICC Arbitration against Defendants *the exact same day*.

75.     That these three events – (1) the fraudulent Meetings; (2) the Notice of Default; and (3) the Request for Arbitration – all occurred on the same day compels the conclusion that Fintiklis, and his alter ego entities, Ithaca, together with their co-conspirators, designed this scheme to usurp control of the Hotel long before October 14, 2017.

## VI.   THE SHAM DEFAULT NOTICE AND OPERATOR'S RESPONSE

76.   The Notice of Default, dated October 14, 2017 and signed personally by Fintiklis as an alleged "authorized representative of Hotel TOC, Inc. and Hotel TOC Foundation," purported to provide notice of the:

> ongoing, material defaults under the [HMA], in particular Operator's failure to comply with its contractual and fiduciary obligations to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel; operate Hotel in accordance with the Operating Standard; and "to maximize profitability and long term value of the Hotel.

**Exhibit 10**, Notice of Default, at 2 (quoting HMA §§ 2.1, 2.2).

77.    Section 5.2.1 of the HMA provides a list of example "events [that] shall constitute an 'Event of Default' by the party as to which such event occurs."  Subsection 5.2.2 of the HMA provides the procedure by which a party to whom an "Event of Default" has occurred under the HMA may seek recourse:

> Upon the occurrence of any Event of Default pursuant to Section 5.2.1, the non-defaulting Party may, without prejudice to any other recourse at law or in equity which the non-defaulting Party may have, give to the defaulting Party notice of its intention to terminate this Agreement, which termination shall be effective no earlier than thirty (30) days and no later than ninety (90) days following the date the notice of termination is given.

**Exhibit 1**, HMA § 5.2.2.

78.   Plaintiffs and their co-conspirators caused Hotel TOC, Inc. to issue the Notice of Default pursuant to Section 5.2.2 under the HMA, and required Defendants to cure any defaults by November 20, 2017.

79.   However, because Plaintiffs and their co-conspirators caused Claimant to also file its Request for Arbitration on October 14, 2017, Section 5.2.4 of the HMA was triggered, which states:

> Any termination notice given pursuant to Section 5.2.2 . . . **shall not result in the termination** of this Agreement **if a bona fide dispute with respect to any alleged Event of Default** . . . entitling a party to terminate this Agreement has arisen between the parties and such dispute has been submitted to resolution pursuant to Section 9.1.

*Id.* § 5.2.4 (emphasis added).

80.     Section 5.2.4 further clarifies that once a party submits the issue of whether an Event of Default under the HMA has occurred for resolution by the ICC pursuant to Section 9.1, the HMA requires the arbitrator to determine that an Event of Default has occurred and that the party seeking to terminate the Agreement is so entitled. The specific language of Section 5.2.4 is as follows:

> If an arbitrator determines that an Event of Default has in fact occurred or that any other event entitling a party to terminate this Agreement has in fact occurred . . . the party entitled to terminate this Agreement may give notice to the other party of its intention to terminate this Agreement upon a date to be specified in such notice, which date shall be not less than 30 days from the date of such determination. In the event such notice is given, this Agreement shall terminate upon the date specified in such notice.

*Id.*

81.     On November 7, 2017, Defendants responded to the Notice of Default ("Notice Response") a copy of which is annexed hereto as **Exhibit 18**.  In the Notice Response, Defendants rejected the Notice of Default and provided a detailed refutation of the baseless claims of nonperformance stated in the Notice of Default.

**VII.    THE NOVEMBER 2017 TERMINATION LETTER**

82.     In flagrant violation of Section 5.2.4 of the HMA, which expressly prohibits termination of the HMA where a bona fide dispute has been submitted to arbitration, Plaintiffs and their co-conspirators caused the issuance by Hotel TOC, Inc. of a purported notice of termination ("Termination Notice") on November 21, 2017, with a stated termination date of December 22,

2017, attached hereto as **Exhibit 5**.  As explained above, this Termination Notice was improper because the Dispute had already been submitted to the ICC pursuant to Section 9.1, and thus Hotel TOC, Inc. (and, consequently, Plaintiffs) had to wait until the parties agreed otherwise, or an arbitrator ordered "the party entitled to terminate this Agreement [to] give notice to the other party of its intention to terminate this Agreement upon a date to be specified in such notice, which date shall be not less than 30 days from the date of such determination."  **Exhibit 1**, HMA § 5.2.4 (emphasis added).

83.     On November 22, 2017, Defendants responded,[4] rejecting the Termination Notice and reminding Hotel TOC, Inc. of Section 5.2.4, confirming that there is a bona fide dispute concerning the existence of an Event of Default that has been submitted to arbitration pursuant to Section 9.1.

## VIII.   FINTIKLIS TAKES MATTERS INTO HIS OWN HANDS

84.     Apparently displeased with the pace of the arbitral proceedings, Plaintiffs and their co-conspirators next exercised unlawful self-help by attempting to physically remove Defendants from the Property.

85.     Plaintiffs or those working at Plaintiffs' direction (i) cut off power to portions of the Hotel housing and Defendants' IT infrastructure; (ii) attempted to access by force and lock Defendants and its employees out of the executive offices of the Hotel and the Hotel's IT systems; and (iii) burglarized Defendants' IT infrastructure room. *See* **Exhibit 19**, photographs of damage.

86.     On February 22, 2018, Hotel TOC, Inc. served upon Defendants a notice purporting to terminate a License Agreement between and among Owners Meeting of P.H. TOC, Hotel TOC,

---

[4] A true and correct copy of the November 22, 2017 Response to Termination Notice is attached hereto as **Exhibit 21**.

Inc. and an affiliate of Defendants, Trump Marks Panama LLC ("License Agreement Termination Notice," attached hereto as **Exhibit 20**).[5]  The notice recites among its reasons for termination: (i) "the material defaults by Trump Panama Hotel Management LLC of [the HMA]" and (ii) "by reasons of [Claimant's] termination of the [HMA] made effective December 22, 2018, as stated in that Notice of Termination, served upon [Respondent Trump Panama Hotel Management LLC], dated November 21, 2018."

87.     A short time later, approximately 20-25 individuals acting for and at the direction of Hotel TOC, Inc., including Fintiklis, came to the Hotel in an attempt to physically by force, coercion and intimidation take over the Hotel operations and wrest control from Defendants. Fintiklis demanded access to the back offices of the Hotel, including the executive offices and the Hotel's server room where the Hotel's IT infrastructure is located.[6]  Local police were called to the Hotel, and Hotel TOC, Inc. (and, consequently, Plaintiffs) was temporarily rebuffed in its February 22 attempted forcible takeover of the Hotel.  During this unlawful effort, Fintiklis was screaming at the Hotel staff and incorrectly claiming a right to do "whatever [he] want[s]" because he "owns" the Hotel.

88.     Over the next several hours, Fintiklis attempted to personally serve employment termination notices on a number of senior Hotel executives, including the General Manager, Front Desk Manager and Director of Security, all of whom are necessary in order for Defendants to

---

[5] Defendants learned on February 23, 2018 that Owners Meeting of P.H. TOC also sent a substantively-identical notice of termination under the License Agreement on February 22, 2018.  *See* **Exhibit 22**.  If any question remained as to whether Plaintiffs were conspiring to wrest control of the Hotel, the timing and content of these Notices confirms what Defendants have repeatedly asserted – namely, that a conspiracy was executed by and among Plaintiffs and others to gain control of Hotel TOC, Inc. in order to improperly and illegally oust Defendants as operators of the Hotel.
[6] The Hotel shares certain resources with Owners Meeting, including security, which would govern access to the server room.  On February 23, 2018, Owners Meeting terminated the Security Director & Supervisor Sharing Agreement between itself and Claimant.  *See* **Exhibit 23**.  This termination, in light of the actions undertaken at the Hotel on February 22, shows Owners Meeting was worked in concert with and in furtherance of the ends of Claimant's violations the provisions of Section 5.2.4 of the HMA.

operate the Hotel.  When these employees refused to accept the termination notices, Fintiklis physically threw the notices at a number of the employees.

89.     The next morning, on February 23, 2018, Fintiklis resumed his efforts to wrongfully oust Defendants as operators of the Hotel.  First, Fintiklis took control of one of the Hotel's bank accounts, through which Hotel payroll is processed, directly compromising Hotel operations and Defendants' role as Operator of the Hotel.  Later that afternoon, P.H. TOC, the entity which controls the building in which the Hotel is located and which is under the control of Gary Lundgren, attempted to cut off the security keycard access of the Hotel's General Manager, Front Office Manager, Director of Security, Director of Finance, and Office Manager.

90.     On the afternoon of February 23, 2018, Hotel TOC, Inc. and P.H. TOC  engaged in tortious wrongs by remotely hacking and modifying the Hotel's security system such that all access to the doors leading to the Hotel offices (which are protected by keycard access) was disabled, and also attempted to remotely download the Hotel's security footage.

91.     That evening, Hotel TOC, Inc. and/or P.H. TOC engaged in further torts and wrongs by cutting off internet and phone at the Hotel, and electricity was no longer working reliably in parts of the Hotel.

92.     Moreover, Owners Meeting terminated Hotel TOC, Inc.'s Director of Security and the security sharing arrangement at the Property on February 23, 2018, causing further instability.

93.     On the afternoon of February 24, 2018, Lundgren, working in concert with Plaintiffs, directed a team of people to break into the Hotel server room.  Defendants' security team denied them access, however, at which point Lundgren screamed obscenities at an employee affiliated with Defendants.

94.     On February 26, 2018, Hotel TOC, Inc. served notices purporting to terminate rental management agreements for each of the Hotel Units, as well as the maintenance agreements for the Hotel Amenities Units and Hotel Units.  The claimed basis for these terminations is that Hotel TOC, Inc. previously terminated the HMA by notice dated December 22, 2017, purportedly triggering cross-termination provisions in the other respective agreements.  Defendants rejected these notices, explaining that, pursuant to Section 5.2.4 of the HMA, because a bona fide dispute between the parties concerning the legitimacy of the predicate Event of Default was submitted to the ICC, the December 22, 2017 termination of the Management Agreement is null and void.

95.     Thereafter, on the morning of February 27, 2018, Lundgren's wife Griselda Perez contacted an employee of Defendants to request a meeting regarding "something very important." The employee denied the requested meeting, and Perez contacted the employee again at 8:40 a.m. seeking a private meeting to purportedly discuss "a very important issue" relating to the energy system.

96.      Shortly following those communications from Perez, a team of individuals acting in concert with Plaintiffs and at Lundgren's direction and on behalf of P.H. TOC broke into Defendants' computer room.  Local police were called to the scene, and an investigation is underway.  Shortly after Defendants' employees interceded in this break-in, Lundgren and Fintiklis appeared on the scene.

97.     Plaintiffs, Hotel TOC, Inc. and their co-conspirators continued to engage in increasingly aggressive and dangerous actions, making Defendants concerned about the safety of the Hotel, its employees, and its guests.  On March 1, 2018, Fintiklis took control of another of the Hotel's bank accounts, further compromising Hotel operations and Defendants' role as operators of the Hotel.  Then, on March 5, 2018, Fintiklis and Plaintiffs caused Hotel TOC, Inc. to breach

the HMA by causing Hotel TOC, Inc. to circumvent the ICC arbitration and its jurisdiction and instead apply to the Panama Courts for an attachment of the administration of the Hotel. As noted by Chief Justice Dixon (Retired) of the Panama Supreme Court, Plaintiffs together with Hotel TOC were only able to obtain such relief from the Panama Courts by utter deception – by failing to advise the Panama Courts of the ongoing arbitration. *See* **Exhibit 3** (Dixon Affidavit). Notwithstanding,  Plaintiffs in concert with Hotel TOC, Inc. have used such application and resulting order to claim a right to take over the Hotel and to remove Defendants and their trademarks and brand from the Hotel.

## FIRST COUNTERCLAIM
### FRAUD

98.     Defendants repeat and reallege the foregoing as if set forth at length herein.

99.     The facts set forth above at paragraphs 33 through 75 set forth numerous knowingly false statements of facts and material omissions of material fact which Fintiklis, Ithaca I and Ithaca II made and/or omitted concerning Defendants and which they intended for Defendants to rely upon to their detriment and which Defendants did.

100.    Without limitation thereof, Plaintiffs were fully aware of their promises under Section 3(D) of the Bulk Sale Consent Agreement, promises which they made before and after the execution of the Agreement.  Thereafter, on October 3, 2017, Fintiklis emailed all Hotel Unit Owners requesting their attendance "at a meeting of the beneficiaries of Hotel TOC Foundation on 14 October 2017," declaring that it was an opportunity to meet as many Hotel Owners as possible and "hear [Hotel Unit Owners'] thoughts and ideas."

101.    In response to Fintiklis's email, Defendants contacted Plaintiffs directly to remind them of their obligations under the Bulk Sale Consent Agreement – specifically the covenants and acknowledgements as laid out in Section 3, quoting subsections (D)–(E).  Defendants further

requested that its General Manager of the Hotel attend the meeting, and that Fintiklis notify Defendants of any future plans to convene Hotel Unit Owners.

102.     Fintiklis responded, confirming that he was well aware of the provisions quoted and falsely representing that the meeting was merely "an informal lunch" that he put together because he was being approached by Hotel Unit Owners and thought a "lunch meeting" would be a good way to meet everyone.  Fintiklis even falsely stated that he agreed to have the Defendants' representative and General Manager in attendance.

103.     Plaintiffs made knowingly false representations and material omissions of fact because, *inter alia*, the "lunch meeting" was not intended to "meet everyone," but rather was part of a fraudulent scheme designed to usurp control of Hotel TOC Foundation and Hotel TOC, Inc.

104.     The subject of any prospective meeting of Hotel TOC, Inc. or Hotel TOC Foundation is plainly material to Defendants, who operated the Hotel at the time.

105.     Plaintiffs made knowing false statements and knowing omissions of material facts with an intent that Defendants would reasonably rely thereon to their detriment.

106.     Defendants reasonably relied on Plaintiffs' statements by, among other things, not taking immediate action to protect their rights under the Bulk Sale Consent Agreement and HMA.

107.     As a result of Plaintiffs' fraud, Defendants are entitled to an award of damages (compensatory, consequential and punitive) in an amount to be determined at trial, but in no event less than $3,000,000 [Three Million U.S. Dollars], plus applicable interest.

## SECOND COUNTERCLAIM
## FRAUDULENT INDUCEMENT

108.     Defendants repeat and reallege the foregoing as if set forth at length herein.

109.     Ithaca I and Ithaca II are parties to the Bulk Sale Consent Agreement, along with Defendants.

110.     In the discussions leading up to the Consent to Bulk Sale Agreement, including in an earlier version of the agreement, Ithaca I and Ithaca II made knowingly false statements, promises and representations, by and through Fintiklis, that they would take no actions, including the exercise of voting rights and even legal actions, which were or could be in any manner adverse to the interests of Defendants under the HMA in their operation of the Hotel.

111.     At the time those knowingly false statements and representations were made, Fintiklis – and his alter egos Ithaca I and Ithaca II – intended to and did take actions directly adverse to the interests of Defendants under the HMA and in the operation of the Hotel, in direct contradiction of their promises, statements and representations.

112.     Indeed, Fintiklis unlawfully and in breach of the Bulk Sale Consent Agreement, caused Ithaca I and Ithaca II to vote its Units to terminate the HMA.

113.     Fintiklis knowingly made those false statements on behalf of Ithaca I and Ithaca II with an intent to deceive Defendants and with the intent that Defendants would reasonably rely upon them to their detriment, and specifically to induce Defendants into granting their consent to the sale of 215 Units in the Hotel to Ithaca I and Ithaca II and to enter into the Bulk Sale Consent Agreement.

114.     Defendants reasonably relied on those statements to their detriment and substantial damages resulted therefrom.

115.     Accordingly, Defendants are entitled to an award of damages (compensatory, consequential and punitive) in an amount to be established at trial, but in no event less than $3,000,000 [Three Million U.S. Dollars], plus applicable interest.

**THIRD COUNTERCLAIM**
**FRAUDULENT CONCEALMENT**

116.     Defendants repeat and reallege the foregoing as if set forth at length herein.

117.     On October 3, 2017, Fintiklis emailed all Hotel Unit Owners requesting their attendance "at a meeting of the beneficiaries of Hotel TOC Foundation on 14 October 2017," declaring that it was an opportunity to meet as many Hotel Owners as possible and "hear [Hotel Unit Owners'] thoughts and ideas."

118.     Fintiklis acts for beneficiaries of Hotel Foundation by virtue of his interests in Ithaca I and Ithaca II, which own Units in the Hotel.  Upon information and belief, Fintiklis has dominated and controlled Ithaca I and Ithaca II at all relevant times.  Ithaca I and Ithaca II are mere devices for Fintiklis to further his own personal business.  Specifically, Fintiklis used Ithaca I and Ithaca II in furtherance of his fraudulent scheme to take control of Hotel TOC, Inc. and Hotel Foundation.

119.     In response to Fintiklis's email, Defendants contacted Fintiklis directly to remind him of his obligations under the Bulk Sale Consent Agreement – specifically the covenants and acknowledgements as laid out in Section 3, quoting subsections (D)–(E).  Defendants further requested that its General Manager of the Hotel attend the meeting, and that Fintiklis notify Defendants of any future plans to convene Hotel Unit Owners.

120.     Under the Bulk Sale Consent Agreement, Fintiklis, as the authorized representative of Ithaca I and Ithaca II, had a contractual duty to not take actions adversely affecting the interests of Defendants in operating the Hotel.

121.     In abrogation of that duty, however, Fintiklis concealed his true purpose in calling the October 14 meetings, stating instead that the gathering was an informal lunch that he put together because he was being approached by Hotel Unit Owners and thought that a "lunch meeting" would be a good way to meet everyone. Fintiklis agreed to have the General Manager in attendance.

122.     Fintiklis's concealment of Plaintiffs' true purpose was a material omission to Defendants in violation of Plaintiffs' duties under the Bulk Sale Consent Agreement.

123.     Defendants reasonably relied on Fintiklis's omissions and false statement by, among other things, not taking immediate action to protect their rights under the Bulk Sale Consent Agreement and HMA.

124.     As a result of Fintiklis's fraudulent concealment, Defendants are entitled to an award of damages (compensatory, consequential and punitive) in an amount to be established at trial, but in no event less than $3,000,000 [Three Million U.S. Dollars], plus applicable interest.

## FOURTH COUNTERCLAIM
## TORTIOUS INTERFERENCE WITH THE HMA

125.     Defendants repeat and reallege the foregoing as if fully set forth at length herein.

126.     Defendants are parties to the HMA.

127.     Ithaca I, Ithaca II and Fintiklis are aware and have knowledge of the HMA and its terms.  Indeed, Fintiklis's alter egos, Ithaca I and II, are parties to the Bulk Sale Consent Agreement, which explicitly incorporates the HMA by reference.

128.     Through their wrongful conduct, Ithaca I, Ithaca II and Fintiklis intentionally interfered with Defendants' rights under the HMA, including by unlawfully causing Hotel TOC, Inc. to serve a baseless Notice of Default and take steps to terminate the HMA.

129.     Claimant's Notice of Default and steps to terminate the HMA are a material breach of the terms of the HMA.

130.     Claimant's breach of the HMA was caused by the intentional interference of Ithaca I, Fintiklis and their co-conspirators.

131.     Fintiklis, Ithaca I and Ithaca II conspired with other non-parties to wrongfully terminate Defendants as Hotel Operator.  Fintiklis, and his alter ego entities (Ithaca), through the

unlawful voting of Ithaca's Hotel Units and Hotel Administrative Units, took overt action in furtherance of their agreement and conspiracy.

132.     Moreover, Fintiklis, Ithaca I and Ithaca II continued to interfere with the HMA via their efforts to physically and virtually evict Defendants from the Hotel Property.

133.     Accordingly, Fintiklis, Ithaca I and Ithaca II are jointly and severally liable for their tortious conduct with respect to the HMA.

134.     Defendants are entitled to an award of damages (compensatory, consequential and punitive) as a result of the tortious interference of Ithaca I, Ithaca II and Fintiklis, which precipitated a material breach of the HMA, in an amount to be established at trial, but in no event less than $3,000,000 [Three Million U.S. Dollars], plus applicable interest.

**FIFTH COUNTERCLAIM**
**BREACH OF BULK SALE CONSENT AGREEMENT**

285.     Defendants repeat and reallege each and every allegation as if fully set forth at length herein.

286.     The Bulk Sale Consent Agreement was executed on February 15, 2017, by Defendant Trump Panama Hotel Management LLC and the alter egos of Fintiklis – Ithaca I and Ithaca II – with Fintiklis acting as sole signatory for Ithaca I and II.

287.     The Bulk Sale Consent Agreement, and the promises made therein by Ithaca I and II (and Fintiklis) were reasonably relied upon by Defendants to their detriment, and are enforceable promises under law.

288.     Defendants, as Hotel Operator, performed all of its obligations and duties under the Bulk Sale Consent Agreement.

289.     Ithaca I and Ithaca II, as controlled and dominated by Fintiklis, failed to deliver the central material consideration they promised to Defendants under the Bulk Sale Consent

Agreement.  Specifically, in material breach of paragraph 3(D), Ithaca I and Ithaca II willfully, completely and materially interfered with and undermined Operator's and Defendants' rights under the HMA by – without limitation of the facts set forth above – fraudulently purporting to usurp control of the Claimant's board, and materially interfering with Defendants' rights as Hotel Operator.

290.     In addition, Ithaca I, Ithaca II and Fintiklis breached paragraph 3(F) through Fintiklis's actions in seeking and purportedly accepting appointment to the Foundation Council and the Board of Claimant.

291.     Moreover, Ithaca I, Ithaca II and Fintiklis continued to breach these covenants by attempting to physically remove Defendants from the Hotel, while disrupting the electric, IT, and security systems at the Property.

292.     Through these actions, Ithaca I, Ithaca II and Fintiklis have breached their covenants in paragraph 3, which were material terms of the Bulk Sale Consent Agreement.

293.     Fintiklis has dominated and controlled Ithaca I and Ithaca II at all relevant times. Ithaca I and Ithaca II are alter ego vehicles through which Fintiklis advances his personal interests. Fintiklis used Ithaca I and Ithaca II in furtherance of his fraudulent scheme to take control of Hotel TOC, Inc. and Hotel Foundation.  Accordingly, Fintiklis is jointly and severally liable with Ithaca I and Ithaca II for breach of the Bulk Sale Consent Agreement.

294.     Defendants have been damaged by the breach of the Bulk Sale Consent Agreement in an amount to be established at trial, but in no event less than $3,000,000 [Three Million U.S. Dollars], plus applicable interest.

295.     Moreover, as a direct result of Plaintiffs' manifold and material breaches of the Bulk Sale Consent Agreement, Defendants have incurred substantial legal fees relating to actions by Plaintiffs in Panama, which they are entitled to recover herein as special damages.

### SIXTH COUNTERCLAIM
### TORTIOUS INTERFERENCE WITH THE LUNDGREN SETTLEMENT AGREEMENT

296.     Defendants repeat and reallege the foregoing as if fully set forth at length herein.

297.     The Lundgren Settlement Agreement is a binding contract between the Owners Meeting, the Board of Directors of the Owners Meeting, and Trump Panama Condominium Management LLC, and Affiliate of Defendants.

298.     The Lundgren Settlement Agreement "inure[d] to the benefit of and [was] binding upon each of the Parties hereto and their respective agents, representatives, executors, administrators, trustees, personal representatives, partners, directors, officers, shareholders, agents, attorneys, insurers, employees, representatives, predecessors, successors, heirs and assigns." **Exhibit 9**, Lundgren Settlement Agreement, ¶ 11.

299.     Defendants are intended third party beneficiaries of the Lundgren Settlement Agreement, as the Hotel Operator is specifically referenced in the Lundgren Settlement Agreement in paragraph 6 thereof.

300.     Fintiklis, Ithaca I and Ithaca II are aware and have knowledge of the Lundgren Settlement Agreement, a breach of such agreement being an instrumentality of the fraudulent scheme and conspiracy enacted by Plaintiffs and their co-conspirators to improperly wrest control of the management of the Hotel.

301.     Through their wrongful conduct, Plaintiffs intentionally interfered with Defendants' rights under the Lundgren Settlement Agreement, including by causing and inducing Lundgren to violate and breach the covenant of non-interference under the Lundgren Settlement Agreement.

302.     Lundgren's actions – including the vote of his alleged Units on October 14, 2017 and his participation in the current Hotel takeover attempts – are material breaches of the Lundgren Settlement Agreement.

303.     Lundgren's breach of the Lundgren Settlement Agreement was caused by the intentional interference of Plaintiffs.

304.     Defendants are entitled to an award of damages (compensatory, consequential and punitive) as a result of the tortious interference of Plaintiffs, which precipitated a material breach of the Lundgren Settlement Agreement, in an amount to be established at trial, but in no event less than $3,000,000 [Three Million U.S. Dollars], plus applicable interest.

<u>**SEVENTH COUNTERCLAIM**</u>
**DECLARATORY JUDGMENT**

305.     Defendants repeat and reallege the foregoing as if set forth at length herein.

306.     Fintiklis, by and through Ithaca I and Ithaca II, and in concert with Lundgren, purports to act on behalf of Hotel TOC, Inc. and Hotel TOC Foundation as a result of actions taken at improperly-called meetings of Hotel TOC, Inc. and Hotel TOC Foundation on October 14, 2017.

307.     The actions taken at the improperly-called meetings by Plaintiffs violate the Bulk Sale Consent Agreement (*see* ¶¶ 285 - 294).

308.     As discussed above, the actions purportedly taken at the October 14, 2017 meetings of Hotel TOC, Inc. and Hotel TOC Foundation are *ultra vires* and contrary to law.

309.     Thus, a real and live controversy exists between Defendants and Plaintiffs that is ripe for adjudication.

310.     Specifically, the voting of Units owned by Ithaca I and Ithaca II for the actions taken at the October 14, 2017 meetings of Hotel TOC, Inc. and Hotel TOC Foundation violate the Bulk Sale Consent Agreement and are void.

311.   For the reasons set forth above, Defendants are entitled to a declaration that:

a.   the actions taken by Fintiklis, Ithaca I and Ithaca II at the October 14, 2017 meetings violate the Bulk Sale Consent Agreement;

b.   the Notice of Default issued by Fintiklis as the "authorized representative" of Claimant and Hotel Foundation is null and void, as Fintiklis is not the authorized representative of Claimant or Hotel Foundation; and

c.   there has been no termination of the HMA, as any actions purporting to terminate it have been *ultra vires* and/or unauthorized.

## EIGHTH COUNTERCLAIM
### ATTORNEYS' FEES

312.   Defendants repeat and reallege the foregoing as if set forth at length herein.

313.   The Bulk Sale Consent Agreement was executed on February 15, 2017, by Defendant Trump Panama Hotel Management LLC and the alter egos of Fintiklis – Ithaca I and Ithaca II – with Fintiklis acting as sole signatory for Ithaca I and II.

314.   Paragraph 8 of the Bulk Sale Consent Agreement provides:

If a Party commences a legal proceeding to interpret or enforce the terms of this Agreement, the prevailing Party shall be entitled to recover its costs and expenses incurred in such legal proceeding, including reasonable attorneys' fees and expenses, from the losing Party in such proceeding.

315.   On or about January 16, 2018, Plaintiffs commenced the instant action, which sought, among other things, to interpret or inforce the terms of the Bulk Sale Consent Agreement.

316.   As set forth above, however, Plaintiffs have breached not only the Bulk Sale Consent Agreement, but have tortuously interfered with Defendants' rights under the HMA.  As such, they are not the "prevailing party in such legal proceeding."

317.   Accordingly, pursuant to the terms of the Bulk Sale Consent Agreement, Defendants are entitled to their "costs and expenses incurred in such legal proceeding, including reasonable attorneys' fees and expenses" from Plaintiffs.

## JURY TRIAL DEMANDED

318.     Defendants hereby demand a jury trial on all issues so triable.

## RESERVATION OF RIGHTS

Defendants reserve their due process and lawful rights to amend this pleading to assert any additional Counterclaims and/or join additional new parties that may become apparent through discovery or otherwise.

**WHEREFORE**, Defendants seek a judgment against Plaintiffs:

(i)     on their First Counterclaim, of damages (compensatory, consequential and punitive) in an amount to be established at trial, but in no event less than $3,000,000.00 [Three Million U.S. Dollars] plus applicable interest;

(ii)    on their Second Counterclaim, of damages (compensatory, consequential and punitive) in an amount to be established at trial, but in no event less than $3,000,000.00 [Three Million U.S. Dollars] plus applicable interest;

(iii)   on their Third Counterclaim, of damages (compensatory, consequential and punitive) in an amount to be established at trial, but in no event less than $3,000,000.00 [Three Million U.S. Dollars] plus applicable interest;

(iv)    on their Fourth Counterclaim, of damages (compensatory, consequential and punitive) in an amount to be established at trial, but in no event less than $3,000,000.00 [Three Million U.S. Dollars] plus applicable interest;

(v)     on their Fifth Counterclaim, of damages in an amount to be established at trial, but in no event less than $3,000,000.00 [Three Million U.S. Dollars] plus applicable interest, along with special damages representing Defendants' legal expenses incurred in litigation in Panama;

(vi)    on their Sixth Counterclaim, of damages (compensatory, consequential and punitive) in an amount to be established at trial, but in no event less than $3,000,000.00 [Three Million U.S. Dollars] plus applicable interest;

(vii)   on their Seventh Counterclaim declaring:

a.   the actions taken by Plaintiffs at the October 14, 2017 meetings violate the Bulk Sale Consent Agreement;

b.   The Notice of Default issued by Fintiklis as the "authorized representative" of Hotel TOC, Inc. and Hotel TOC Foundation is null and void, as Fintiklis is not the authorized representative of Claimant or Hotel Foundation; and

      c.  There has been no termination of the HMA, as any actions purporting to terminate it have been ultra vires and/or unauthorized.

(viii)   On their Eighth Counterclaim, awarding Defendants their reasonable attorneys' fees and expenses in this legal proceeding; and

(ix)    such other and/or further relief as the Court deems appropriate.

Dated: New York, New York
       May 4, 2020

                     PRYOR CASHMAN LLP

                     By: **/s/ Bryan T. Mohler**
                        Todd E. Soloway
                        Bryan T. Mohler
                        Todd B. Marcus
                        Marion R. Harris
                    7 Times Square
                    New York, New York 10036
                    (212) 421-4100

                    *Attorneys for Defendants*